Leovardo Salceda J-90933
CVSP, D9-237 Low
P.O. Box 2349
Blythe, Ca. 92226

In pro se





**ORIGINAL**

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LEOVARDO SALCEDA,<br>Petitioner<br><br>v.<br><br>JOHN F. SALAZAR,<br>Respondent, Warden,<br><br>And<br><br>JERRY BROWN,<br>Attorney General of California,<br>Additional Respondent | Civil No.: **'08 CV 1037 IEG PCL**<br><br><br>**PETITION FOR WRIT OF HABEAS**<br>**CORPUS 28 U.S.C. 2254**<br>**BY A PERSON IN STATE CUSTODY** |



# TABLE OF CONTENTS

Page

A.  INTRODUCTION                                                              1

B.  FACTS AND PROCEDURE HISTORY OF INSTANT CASE SCD112436    3

    1.  Prosecution Evidence

    2.  Defense Evidence

    3.  First Direct Appeal, Re-Sentence, Second Direct Appeal

**CLAIM I.**
TRIAL COUNSEL WAS INEFFECTIVE IN PRETRIAL, TRIAL, TRIAL ON PRIORS,
AND SENTENCE STAGES.  CAL.CONST. ART. I, SEC. 15;
U.S. CONST. 5TH, 6TH, 14TH AMENDS.                                           7

A.  INTRODUCTION                                                            7

    1.  Judicial Officer's

B.  CONFLICT OF INTEREST                                                    8

    1. New Counsel

C.  INEFFECTIVE ASSISTANCE OF COUNSEL IN PRETRIAL STAGES    11

    1.  Ineffective Assistance at Trial

    2.  Discovery of Haro and Sanchez Exculpatory Statements

    3.  Charging 3-Strike Priors, Violation of Brady v Maryland 373 US 83, and
       Prosecutor Misconduct

    4.  Ineffective Assistance at Trial on Priors

    5.  Ineffective Assistance at Sentence Hearing

    6.  Mangarin's Counsel's Client File in Instant Case

    7.  Prior Robbery Case, and Slow Plea, CR105783

D.  POINTS AND AUTHORITES, STANDARD OF REVIEW                25

TABLE OF CONTENTS

Page

**CLAIM II**

PETITIONER IS ACTUALLY AND FACTUALLY INNOCENT OF RAFAEL HARO
AND RAMON CESPEDES. THE PRIOR ROBBERIES ILLEGALLY ENHANCE
PETITIONER'S CURRENT SENTENCE. CAL.CONST.ART. I, SEC. 15;
U.S. CONST. AMENDS 5TH, 6TH, & 14TH . . . . . . . . . . . . . . . . . 30

A. Claim of Innocence In Open Court

    1. The Prior Robbery Case CR105783

    2. Petitioner's Investigation In Support of His Innocence

    3. Brady v Maryland Error, False Evidence

B. Points and Authorities, Standard of Review


**CLAIM III**

PETITIONER WAS DENIED A FAIR TRIAL. CAL.CONST. ART. I, SEC. 15;
U.S. CONST. AMENDS. 5TH, 6TH, & 14TH . . . . . . . . . . . . . . . . 37

Introduction

    1. Denied Opportunity To Defend Against Charges

    2. Limited Instruction Became Meaningless

    3. Petitioner Was Entitled To CALJIC 9.58

    4. Insufficient Evidence To Support Kidnapping

    5. The O.J. Simpson of "Not Guilty" Murder Verdict Inflamed
       Passions of Jury


**CLAIM IV**

PETITIONER'S SENTENCE IS ILLEGAL AND UNCONSTITUTIONAL.
CAL. CONST. ART. I, SEC. 15; U.S. CONST. AMENDS. 5TH, 6TH, 14TH . . 43

Instruction

A. Striking Priors In The Interest of Justice

    1. Invalid Probation Report

    2. Mitigation Outweighed Aggravation

B. The 1993 Prior Assault With Deadly Weapon (W/D/W) Conviction
   Is Not A Serious Felony

    1. The Facts of the Prior Assault W/D/W

C. June 30, 1993 "Freeze Date"

Conclusion, Prayer For Relief, Verification . . . . . . . . 52

ii

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

LEOVARDO SALCEDA,
                   Petitioner,

v.

JOHN F. SALAZAR,
                   Respondent,

JERRY BROWN,
Attorney General of California,
Additional Respondent.

Civil No.: _____

PETITION FOR WRIT OF HABEAS CORPUS 28 U.S.C. 2254 BY A PERSON IN STATE CUSTODY

A.  INTRODUCTION

A jury convicted Leovardo Salceda (petitioner) of one count of kidnapping Pen. C. 207(a). Three prior strikes were found true and petitioner was sentenced to 35 years to life under the Three Strikes Law.  On appeal, the conviction was affirmed, but sentence vacated.  On remand, the trial court struck two strikes, left one strike active, and re-sentenced petitioner to 8 year upper term for kidnap, doubled to 16 years, and added two consecutive 5 year serious felony priors for a total term of 26 years 80% determinate sentence, which he currently serves.

In this Federal petition for writ of habeas corpus proceeding, petitioner seeks to overturn his state conviction and sentence on grounds of:

1.  Ineffective Assistance of Counsel;

2.  Actual Innocene of prior robberies;

3.  Denial of fair trial;

4.  Sentence errors; and

5.  Prejudicial statements by trial court made to jury before diliberations.

On 9-27-08, the California Supreme Court denied the five claims mentioned above on the MERITS, without citation to procedural default.  See Denial Order, S150480, 9-27-08. **Exh**. A16.

1

Petitioner's pleadings in pro se are held to less stringent standards than formal pleadings drafted by attorney's. *Heines v Kener* 404 US 519, 520. Petitioner presents the habeas corpus petition and application for equitable and statutory tolling in type-written form because the petition and equitable claims are lengthy and complex which does not fit on the Court's standard 2254 habeas form. All information required for this Court's review is included. If petitioner missed something and this Court requires it, petitioner promptly will supplement the information required. The habeas and equitable claims are stapled separately because they are bulky, but refer to the same exhibit's and petitioner's declaration. Cal. Rules of Court; (Federal) U.S. Dist. CT., Southern Dist. Rule HC. 2.6 (2008)

Petitioner refers to the Reporter's and Clerk's Transcript of the instant case unless otherwise noted. Should this Federal District Court require further documentation (apart from exhibits submitted herein) to verify petitioner's claims, petitioner will promptly will mail them to this Court via US Mail. The certified documents in petitioner's prison locker are:

(1) Complete set of RT and CT of instant case SCD112436; (2) Court file of instant case; (3) Defense counsel client file of instant case; (4) District attorney letters concerning discovery of instant case; (5) Court file and clerk's minutes of prior robbery case CR105783; (6) Defense counsel client file of prior robbery case; (7) District Attorney letters concerning discovery and *disclosing exculpatory evidence* of prior robbery case; (8) RT of prior assault W/D/W case CR140382; (9) Court file of prior assault W/D/W case; and (10) Defense counsel client file of prior assault W/D/W case.

Petitioner was prosecuted at the San Diego Superior Court, 220 W. Broadway, San Diego, CA 92101, (619) 531 - 4420, in the instant case SCD112436 and both prior conviction cases CR105783 and CR140382.

2

HC

B.  FACTS AND PROCEDURE HISTORY OF INSTANT CASE SCD112436

An Information was filed on 5-17-95, charging petitioner with Count 1 kidnapping to commit robbery Pen. C. 209(a); Count 2 kidnapping Pen. C. 207(a); Count 3 attempted carjacking Pen. C. 664, 215(a); and Count 4 assault W/D/W Pen. C. 245(a)(1).  It was also alleged petitioner suffered two prior felonies under Pen. C. 667(a)(1), and suffered three prior felonies under the Three Strikes Law Pen. C. 667(b)-(i), 1170.12.  Petitioner faced three strikes case.  CT 1-3.

On the day of jury trial, 9-25-95, Counts 1 and 3 of the Information were dismissed.  Counts 2 and 4 were renumbered Counts 1 and 2 for trial purposes.  (Petitioner was held to answer  kidnapping and assault W/D/W).  RT 27-28; CT 213.

*1. Prosecution Evidence.*

Petitioner's jury trial lasted three days.  On 9-25-95, jury trial began.  Russell Champion testified he was driving home and stopped to allow petitioner to walk across the street.  As petitioner reached the curb, he turned and jumped into Champion's car through the open passenger window.  Although not armed, petitioner flexed his fist in Champion's face and demanded Champion drive forward.  Champion drove four long blocks.  Halfway into the ride, Champion slowed down to make a left turn on the street he lived on.  As Champion slowed to turn, petitioner told him to go straight, but Champion instead turned.  Petitioner did not seem upset.  As Champion drove, there were two bystanders 100 yards apart.  The 1st bystander was changing his shirt next to a parked pickup truck on petitioner's side.  Petitioner told Champion to stop next to the 1st bystander.  Petitioner tried to talk with the man, but the bystander frowned and did not respond to petitioner.  Champion continued driving slowly.  As Champion neared his home, petitioner told Champion to stop next to the 2nd bystander who was raking his yard, but Champion said no and petitioner punched him two times.  Champion was near his home and zoomed into his driveway and stopped and Petitioner exited the car and went on foot back to the 2nd bystander and asked for a ride home.  Champion called 911 at 5:05

3

p.m. and within five (5) minutes the police arrived and arrested petitioner standing in front of the 2nd

bystander's home.   In total Champion drove four long blocks (1.2 miles) and petitioner was in

Champion's car five minutes.   Champion testified petitioner did not appear intoxicated nor acting

unusual. RT 59-100.


2. *Defense Evidence*

Petitioner testified he began drinking beer at his home at 10:00 a.m.  He then went to his

mother's home and continued drinking.  At 1:30 p.m. Petitioner left his mother's home staggering

drunk.  At 2 p.m., petitioner entered a bar and continued drinking and blacked out in the bar.

Carmen Lopez, petitioner's mother, testified petitioner was at her home from 11 a.m. to 1:30

p.m., drinking beer.  At 1:30 p.m., petitioner left her home and he was staggering because he was

drunk.

Gabriela Murgo, barmaid, and Jesse Guerrero, bouncer, testified petitioner entered the bar

about 2 p.m. and Murgo served petitioner beer for 3 hours.  At 5 p.m., Murgo and Guerrero saw

petitioner was too intoxicated, swaying and bothering people in the bar, so they decided to stop serving

him beer.  At that same time (5 p.m.) Guerrero kicked petitioner out of the bar.  Within five (5)

minutes of leaving the bar, Petitioner was in Champion's car. RT 236-353.


**Conviction and Sentence.**

After all the testimony had been give in the jury trial, defense counsel motioned to bifurcate the

prior convictions. Trial on the priors convictions was bifurcated.  RT 386-387; CT 213.

On 10-3-95, the jury found petitioner **guilty** of Count 1 kidnapping Pen. C. 207(a), and ***guilty***

of exhibiting a deadly weapon Pen. C. 417(a), as a lesser related offense of an assault W/D/W charged

in Count 2. RT 460-465; CT 120-123, 225.

The following day, on 10-4-95, a bifurcated trial on the priors was held. The trial court found true the two prior robberies (2 strikes); and one prior assault W/D/W (1 strike). RT 466-476; CT 226-227. **Exh**. B11.

On 12-29-95, petitioner was sentenced to 35 years to life under the Three Strikes Law as follows: 25 years to life for kidnapping with prior convictions. Pen. C. 207(a); 667(e)(2), 1170.12(c)(2), plus 10 years for two prior serious felony convictions Pen. C. 667(a)(1). RT 672-675; CT 205, 213.

### 3. *First Direct Appeal, Re-Sentence, Second Direct Appeal*

Petitioner appealed the conviction and sentence and claimed 1) instructional error, 2) illegal sentence, and 3) trial court should have exercised its power to strike prior "strikes" under 3 strikes law. On 10/25/96, the Court of Appeal filed an unpublished opinion and affirmed the kidnap conviction, but *vacated* the 35 years to life sentence and remanded petitioner's case to allow the trial court to exercise its power to strike priors in the interest of justice under the authority of *People v Superior Court (Romero)* 13 Cal.4th 497.

On 6/12/97, at re-sentence the trial court struck 2 strikes and left 1 strike active: It then selected the 8-year upper term for kidnap, doubled to 16 years because of an active strike, and added two consecutive 5-year serious priors for a total determinate sentence of 26 years 80 %. RT 17-21, 6-12-97.

Petitioner appealed the sentence and claimed 1) mitigation outweighed aggravation sentencing factors and therefore the trial court erred in selecting the 8 year upper term, and 2) Petitioner should get 531 days credit toward his 26 year sentence. On 3/25/98, the Court of Appeal filed an unpublished opinion and affirmed the sentence, and awarded petitioner 531 days credit towards his 26 year sentence. See 1st Appeal Opinion D025258, 10-25-96. **Exh**. A. See 2nd Appeal Opinion D029086, 3-25-98. **Exh**. A1

Petitioner did not file a Petition for Review in the California Supreme Court, nor Petition for Certiorari in the US Supreme Court neither after the 1st appeal, nor after the 2nd appeal.

# CLAIM

# I.

**TRIAL COUNSEL WAS INEFFECTIVE IN PRETRIAL, TRIAL, TRIAL ON PRIORS, AND SENTENCE STAGES. CAL.CONST. ART. I, SEC. 15; U.S. CONST. 5TH, 6TH, 14TH AMENDS.**

A. INTRODUCTION

Petitioner claims Daniel J. Mangarin, trial counsel, was ineffective at pretrial, trial, trial on priors, and sentencing stages. Given the particular facts, and circumstances of petitioner's 3-Strikes case, Mangarin failed to investigate the conflict of interest even though petitioner told him valid reasons to investigate. Those reasons being the public defender declared conflict of interest directly related to the prior robbery case, i.e., allegations that the former public defender was ineffective and possible grounds to strike the 2 prior robbery strikes. Apart from the conflict, Mangarin had an obligation to examine the prior cases to determine their validity. Had Mangarin done so, it is reasonable he would have discovered Boykin-Tahl error on face of prior robbery case file. *Boykin v Alabama* 395 US 238; *In re Tahl* 1 Cal.3d 122. *(Boykin-Tahl)*. Petitioner also told Mangarin that he did not rob Rafael Haro in the prior robbery case. By investigating the conflict, validity of priors, and petitioner claims to Mangarin that he did not rob Haro, it is reasonable Mangarin would have unearthed existing exculpatory statements made by Haro and Juan Sanchez, eyewitness, that existed in the client file and prosecutor's file. Petitioner even testified in the instant case on cross-examination that he did not rob Haro.

Petitioner, in pro per, exercised due diligence in gathering records and unearthed favorable and material evidence going to petitioner's guilt in the prior robbery case, and favorable and material evidence now going to petitioner's 3-strikes punishment. Had the evidence been disclose, it would have made an outcome favorable to petitioner both in the prior case, and in the instant case. Petitioner claims, inter alia, the prosecutor in the prior case, and in the district attorney in the instant case did not disclose

evidence tending to exonerate petitioner of the Haro robbery and punishment in instant case. *Brady v Maryland* 373 US 83. (Brady error). This means that *Boykin-Tahl* error, exculpatory evidence, and *Brady* error existed, but because of Mangarin's inattention he failed to discover evidence that existed in the legal files at the courthouse petitioner was prosecuted at. Because of Mangarin's ineffective assistance it resulted in prejudice because petitioner suffers an unconstitutional 13-year enhancement on top of his current sentence. Without the 13 year enhancement, petitioner would have a 13 year sentence, not 26 years.

### 1. *Judicial Officer's*

Petitioner has the instant case, and 2 prior conviction cases. For purposes of clarity, and because petitioner refers to the judicial officer's interchangeably, petitioner introduces them:

1. **Instant Kidnapping Case SCD112436 (1995)**:   Honorable E. Mac Amos, Judge;  Michael Groch, Prosecutor;  and Daniel J. Mangarin, Alternate Public Defender;

2. **Prior Robbery Case CR105783 (1989)**:   Honorable William D. Mudd, Judge;  Luis Arrogan, Prosecutor;  and William Youmans, Public Defender;

3. **Prior Assault W/D/W Case CR140382 (1993)**:   Honorable Joan P. Weber, Judge;  Albert Barrett, Prosecutor;  and Thomas Carnessale, Public Defender.

B. CONFLICT OF INTEREST

Petitioner was arrested on 4-23-95 in the instant case. Ronald K. Vanesian, Public Defender, represented petitioner. On 5-30-95, Vanesian interviewed petitioner concerning the instant case, and his exposure to several life sentences because of prior strikes under the 3-Strikes law. On 6-23-95, Vanesian filed a *Penal Code 995* motion to dismiss all counts, and a *1385* motion to strike prior "strikes." Prosecutor filed opposition to both motions. On 8-4-95, a hearing was held on the motions and they were denied. At the 8-4-95 hearing, petitioner asked Vanesian to provide him with copies of

8

1  records being used against him in the instant case SCD112436, and also of the prior conviction cases

2  CR105783 and CR140382.  Police reports, Information's, preliminary hearings, investigative reports,

3  and other documents pertaining to the instant and prior cases.  Vanesain *did not* provide any records

4  petitioner requested.

5  Next, Vanesian consulted Dr. Smith, psychiatrist, to examine petitioner.  On 8-9-95, Dr. Smith

6  concluded:

7

8  1.  In regards to instant offense, petitioner was intoxicated and suffered an alcoholic blackout at the time
   of instant offense; and

9

10  2.  In regards to "Previous Arrests" petitioner was heavily intoxicated and under peer pressure from a
   friend when the prior robberies were committed.

11  Vanesian determined that Dr. Smith's report was directly connected to the prior robbery case that

12  caused serious conflicts of his representation of petitioner, so on 8-11-95, Vanesian declared conflict of

13  interest.  Vanesian did not explain to the trial court what the conflict was.  Nor did the court investigate

14

15  on the record the basis for the declared conflict.  Vanesian and the court simply repeated to each other

16  that a conflict existed.  However, at the conflict hearing, Vanesian told petitioner the reasons that caused

17  the conflict of interest.  Specifically, that Dr. Smith's report disclosed material facts directly related to

18  the prior robbery case.  Dr. Smith's report disclosed that petitioner was intoxicated and under peer

19

20  pressure from a friend when the 2 prior robberies were committed.  Vanesain said the prior robbery case

21  indicated a court trial was held, and William Youmans, former public defender, was ineffective for

22  failure to introduce intoxication evidence in the court trial to negate the 2 prior robberies.  Vanesain

23  said he could not investigate Youmans because he was a co-worker in the same San Diego Public

24

25  Defender Office and conflicting loyalties would occur to his office, fellow public defenders, and to

26  petitioner.  Therefore, new counsel would be appointed and investigate whether Youmans was

27  ineffective and be possible grounds to strike the 2 prior robbery strikes.  This would leave petitioner

28  with only 1-strike from the prior assault case and save petitioner from several life sentences under the 3-

9

Strikes law. See Conflict Hearing RT 1-2, 8-11-95. **Exh.** __B__. Dr. Smith's Rpt., 8-9-95. **Exh.** __B1__.

Petitioner's Declaration (Pet.'s Decl.) at # __4__, __5__, _____, 3-30-08. **Exh.** __C__.

### 1. *New Counsel*

On 9-3-95, Daniel J. Mangarin, Alternate Defender, interviewed petitioner concerning the instant case and exposure to several life sentences because of prior strikes under the 3-Strikes law. At this attorney / client meeting, petitioner told Mangarin that Vanesain claimed the former public defender, Youmans, was ineffective for failure to introduce intoxication evidence in the court trial in the prior robbery case, and it could be grounds to strike the prior robbery strikes. Petitioner further told Mangarin that he did not rob Haro in the prior robbery case. Petitioner explained that Haro and Juan Sanchez were sitting in a car and Jesus Lopez walked up to the car and Lopez robbed Haro while Haro sat in the driver's seat. Sanchez was the passenger and seen Lopez rob Haro. Petitioner told Mangarin he served prison time for Haro's robbery, and after petitioner was released from prison, he learned through Sanchez that Haro had went to the courthouse during the time petitioner was being prosecuted for Haro's robbery and Haro told the court petitioner did not rob him.

Mangarin told petitioner he would not investigate the conflict of interest, nor petitioner's claim of innocence .

At the attorney/client interview (9-3-95) petitioner asked Mangarin to provide him with copies of records being used against him in the instant case and also of the prior conviction cases. Police reports, Information's, preliminary hearings, investigative reports and any other related documents pertaining to the instant and prior cases. Mangarin did not provide any records petitioner requested.

### C. INEFFECTIVE ASSISTANCE OF COUNSEL IN PRETRIAL STAGES

Valid reasons existed at pretrial stages for Mangarin to investigate the prior robbery case file. On one hand, petitioner specifically told Mangarin the conflict was because Vanesian claimed Youmans was ineffective in the prior robbery case and could be grounds to strike the 2 prior strikes. Mangarin

knew the prior robbery case constituted 2 strikes, yet Mangarin told petitioner he would not investigate the prior case. Mangarin himself acknowledged to the trial court that he "just recently" received petitioner's case based on the conflict. See RT 238-239, 9-26-95. **Exh. _F_ .**

On the other hand, Mangarin told petitioner to testify in the instant case, and Mangarin knew the prosecutor would impeach petitioner's testimony. On the day of trial, 9-25-95, the trial court, prosecutor, and Mangarin discussed that petitioner would testify, and the trial court ruled the 2 prior robberies would be used to impeach petitioner. RT 31-34, 9-25-95. **Exh. _F 1_ .**

Had Mangarin investigated the conflict, which was Dr. Smith's report and facts in the prior robbery case file, he would have learned that first of all a court trial was not held wherein Youmans could have introduced intoxication evidence to negate the 2 robberies. The reason is simple, because petitioner entered into a "slow plea" wherein the prosecutor submitted the preliminary hearing transcript in which Haro (1st victim) and Cespedes (2nd victim) testified petitioner robbed them. And Youmans, representing petitioner submitted on the basis that the transcript would be the slow plea. The record shows Youmans never *contested* the transcript, so from a legal point; this was tantamount to a guilty plea. But the face of prior robbery case file clearly shows Boykin-Tahl error.

Mangarin had an obligation to review the prior robbery court file. By acknowledging missing, and invalid constitutional waivers, he had a duty to file pretrial motion to strike prior robbery case on Boykin-Tahl grounds. At the pretrial stages, when a proper record exists, Boykin-Tahl claims can be easily determined as right of counsel claims, Gidon v Wainwright 372 US 335, because Boykin-Tahl error would appear right on face of record. The better practice is to file the motion to strike prior from the accusatory pleadings for sentencing purposes. *People v Sumstine* 36 Cal.3d 909, 915-16. (Holding pretrial motion is preferred. This is not attempt to reverse conviction, but to strike it for sentence purposes.)

From 1998 through 2001, petitioner gathered records to support Boykin-Tahl error. In particular, on 2-4-01, petitioner wrote Court Reporter Specialist requesting transcript of slow plea. On 2-14-01, E. Neal, Court Reporter, wrote a letter to petitioner and said transcript of slow plea existed from 10-3-89 to 10-3-99 (10-years). On two other occasions, petitioner made efforts to get Youmans client file of the prior robbery case. On 3-1-00, petitioner wrote Public Defender requesting the client file. On 4-28-00, Alex Loebig, Public Defender, wrote petitioner but did not send client file and further explained Youmans died. On 2-30-03, petitioner wrote the State Bar seeking assistance to get Youmans client file. On 3-30-03, State Bar wrote petitioner explaining Youmans died on 3-1-99.

This means Mangarin in instant case had opportunities in 1995 to get transcript of slow plea, and interview Youmans who still lived, respectively, to support *Boykin-Tahl* error. Petitioner is now prejudiced because records that did exist in 1995, i.e., transcript of slow plea and Youmans lived when Mangarin represented petitioner have been destroyed and foregone. Prejudice is further compounded because had the prior been stricken, the max petitioner would have faced is 13 years, not 26 years he currently serves. As follows: 8 year upper term for kidnapping, and 5 year serious felony prior for prior assault case (CR140382) total: 13 years.

The trial court at re-sentence on 6-12-97 specifically struck the prior assault case explaining the *"facts"* of that prior were not sufficient to justify a 2nd or 3rd strike. Thus, without the prior robbery case, petitioner would only received 13 years max.

### 1. *Ineffective Assistance at Trial*

On 9-25-95, trial began. On 9-26-95, Champion testified petitioner kidnapped him. On 9-27-95, petitioner testified about the kidnapping allegations. The prosecutor, on cross-examination, changed the focus of the kidnapping charges, and asked petitioner whether he suffered 2 prior robberies in 1989. Petitioner testified he did not rob Haro in the prior robbery case. The prosecutor refuted petitioner's claim of innocence by "falsely claiming" that petitioner signed a change of plea form in 1989, case # CR105783, which had on it "robbery, robbery, auto theft." Petitioner never singed a plea form.

Mangarin should have known no plea form existed, but his inattention in pretrial stages allowed prosecutor to use deceptive measure and hoodwink petitioner, jury, trial court, and Mangarin himself. More importantly, valid Boykin-Tahl waivers would appear on face of plea form. A review of prior robbery court file proves no such plea from exists. Only 2 minute orders record the slow plea, but no Boykin-Tahl waivers appear on the face. Mangarin was unfamiliar with petitioner's prior strikes that seriously compromised his representation. Petitioner's claim of innocence, and prosecutor's false claims a plea form existed:

**PROSECUTOR**: Your prior convictions were for 2 different robberies as well as car theft in 1989, wasn't it?

**PETITIONER**:   It was one case sir.

Q.    It was 2-victims, wasn't it?

A.    Yes.

Q.    it was 2-robberies, wasn't it?

A.    Yes.

Q.    And car theft?

A.    No. I didn't do the first robbery. (Sic, Haro is the first robbery)

Q.    And you served time on a robbery you didn't do?

A.    Yes.

Q.    Well, both of those robberies occurred within 15-minutes of each other didn't they?

A.    Yes.

Q.    And you're saying you did one but not the other?

A.    Yes.

Q.    Which robbery didn't you do that you pled guilty for.  Which one of the 2-robberies that occurred within 15-minutes of each other?

A.    The first one. (Sic, Haro is the first robbery).

Q.    My question to you is, do you or do you not admit that you were convicted of 2-robberies.

A.    I said yes already.

Q.    Of 2 robberies and car theft?

A.    They gave me "2-strikes" for that.

Q.    Do you or do you not admit you were convicted of 2-robberies and a car theft?

A.    I pled guilty to 2-robberies.

Q.    And a car theft.  Let's see if you recognize your signature on a *change of plea form*.  Do you see the name there where it says Leovardo Salceda?

A.    Yes.

Q.    Is that your signature?

A.    Yes.

Q.    And that's your signature on a change of plea form, court # CR105783, isn't it?

A.    Yes.

Q.    And isn't it a fact you see here, robbery, robbery, unlawful taking of a vehicle.  That's what you pled to?

A.    But I didn't take the car.


Petitioner's Testimony RT 288-290, 9-27-95. **Exh.** ___B2___.

As an offer of proof, see Minute Orders that record the slow plea.  Minutes, 10-2-89, 10-3-89, CR105783. Exhs. ___B10___.

At trial Mangarin had opportunity to object that no plea form existed, and move to strike the prior robbery case on Boykin-Tahl grounds.

Turning to petitioner's testimony claiming innocence. 2 pieces of exculpatory evidence exisited that Mangarin had access to had he asked for them.  Also had Mangarin investigated the conflict and petitioner's claim of innocence, and claims that Haro went to court after he testified at preliminary

hearing incriminating petitioner, stating he mis-identified petitioner, it is reasonable Mangarin would

have discovered: 1.) evidence in prosecutor's file that Haro mis-identified petitioner; and 2.) Sanchez,

eyewitness, tape-recorded statement that petitioner did not rob Haro, that some other person with brown

hair robbed Haro. **Exhs.   B4,   B5   .**

2. *Discovery of Haro and Sanchez Exculpatory Statements*

In the course of petitioner's collateral attack in the state court's by way of habeas and mandate

petitions, petitioner was able to unearth exculpatory evidence that was suppressed by the prosecution.

The evidence was favorable to petitioner and it hurt the prosecutions case. The evidence was material to

petitioner's guilt in the prior robbery, and it was material to 3-Strikes punishment.

On 11-25-02, petitioner filed in the court of appeal a state habeas petition alleging Boykin-Tahl

error interwoven with Haro's recant causing prejudice. This in turn illegally enhances petitioner's

current sentence with an invalid prior conviction. Petitioner also claimed he was actually innocent of

robbing Haro. In rendering its order denying relief, the court stated:

"We have taken ***judicial notice*** of prior robbery case file CR105783.

"Salceda claims the 1989 conviction is invalid because he agreed to a slow plea but was never informed of the right to remain silent and to cross-examine witnesses. The ***record is silent*** whether Salceda was advised and the court reporter's notes have been destroyed.

"Salceda claims had he known he could cross-examine witnesses he would have preceded to trial. He claims prejudice because robbery victim Rafael Haro later recanted his preliminary hearing identification of Salceda in open court. ***There is nothing in the record in to show Haro recanted.***

"Salceda's claim he is factually innocent of the robbery of Haro is unsubstantiated."

The habeas petition was denied. See Court of Appeal Opin. D041226, 2-6-03. **Exh.   A7   .**

The Court of Appeal had strong interest in Haro's exculpatory statement, but the problem for

petitioner was where to find Haro's statement. On 3-13-03, (after opin. D041226, 2-6-03), petitioner

wrote to the district attorney requesting exculpatory evidence to prove his innocence claim of Haro. The

prosecutor responded in a letter dated 5-21-03 and stated:

1   "Re: People v. Salceda, CR105783 / DA B62621

2   Dear Mr. Salceda:

3   "We are in receipt of your letter dated March 18, 2003, requesting discovery in the above case. Mr.

4   Haro provided brief information to this office on October 3, 1989, indicating that he had **mis-identified**

5   **you** as the person who had robbed him. He stated on that same date that he had no intention of coming to court at your trial and that he resided in Tijuana, Mexico. The information from Mr. Haro was not reduced to a report, but only noted in your case file.

6

7   "The information provided by Mr. Haro was immediately provided to your attorney at that time, Mr. William Youmans, at the time of your trial. If you require further information please contact the Office

8   of the Public Defender of San Diego County."

9                     Sincerely, /s/, George W. Clarke, Deputy District Attorney

10       Based on Clarke's, DDA, letter, petitioner believed more exculpatory evidence existed in

11   Youmans client file. On 6-3-03, petitioner filed in the court of appeal a *petition for writ of mandate* for

12

13   order upon public defender to give petitioner the client file. On 6-9-03, and 6-11-03, Gary R. Nicholes,

14   Public Defender, wrote a letter and executed a declaration to the court of appeal and petitioner

15   explaining he located the *"missing file,"* and thereafter he mailed petitioner a copy of <u>entire file</u>

16   maintained by his office. On 6-30-03, petitioner received the file. Because petitioner received the file,

17   the court of appeal denied the mandate petition as moot.

18       *Note*: The client file CR105783 <u>does not</u> contain information that on the day of trial, 10-3-89,

19

20   the prosecutor told Youmans that Haro went to their office and stated he misidentified petitioner.

21   Haro's statement was favorable to petitioner, material towards guilt, and would have made a different

22   outcome favorable to petitioner had it been disclosed in the prior robbery case. Also, had Haro's

23   statement been disclosed, and petitioner properly advised of his rights to confront witnesses, and against

24   self incrimination, petitioner would not have entered into the slow plea, but instead went to trial.

25   Petitioner's plea was not voluntary, intelligent, nor knowingly. The federal test for guilty pleas is did

26   petitioner have an alternative course of action open to him had he been properly advised. Petitioner

27   claims he had an alternative course of action had he been so advised of Boykin-Tahl errors. *People v*

28

*Howard* 5 Cal.4th 1132, 1175, citing *Alford v North Carolina* 400 US 25, 32.

Moreover, petitioner found in the client file Juan Carlos Sanchez tape-recorded statement that petitioner did not rob Haro, that some other person with brown hair robbed Haro. See Ct of App. Opin. D041226, 2-6-03. **Exh.** __A7__. Clark, DDA, Lett., 5-21-03. **Exh.** __B4__. Nicholes, Pub. Def., Lett. & Decl. 6-9-03, 6-11-03. **Exhs.** __E42__, __E43__. Ct. of App. (Mandate) D042258, 7-17-03. **Exh.** __A8__.

### 3. *Charging 3-Strike Priors, Violation of Brady v Maryland 373 US 83, Prosecutor Misconduct*

Michael Grouch, Deputy District Attorney, filed the instant Information charging petitioner with kidnapping, and alleged 2 prior robberies (2 strikes), and 1 prior assault (1-strike). Petitioner claims Groch reviewed the prior robbery file maintained by his office and knew key details of the prior robbery case. Groch cross-examined petitioner: In 1989 he was convicted of 2 robberies and auto theft, it was two victims, the robberies were 15 minutes apart, specific case # CR105783, and petitioner served prison time for the prior robberies. See RT 288-290, 9-27-95. **Exh.** __B2__.

Groch reviewed the prior robbery file and knew *notations* exisited tending to exonerate petitioner of the prior robbery case. Specifically, according to the letter by Clark's, DDA, he disclosed the *notations* in the prosecution's file stated Haro went to their office on the day of trial (prior to guilt phase), in the prior robbery case, stating he mis-identified petitioner as the robber. See Clarke's Lett., 5-21-03. **Exh.** __B4__. Groch knew this exculpatory existed when he questioned petitioner. **So when petitioner testified under oath he did not rob Haro**, Groch had a duty to disclose it to Mangarin (trial counsel) in the instant case under *Penal Code 1054* discovery, and *Brady v Maryland* 373 US 83 doctrine because that very prior robbery case Groch relied on to strike petitioner out under the 3-strikes law, and it is clear it went to petitioner's punishment in the instant 3-strikes case. As far back as 1972, the California Supreme Court set forth a rigorous controlling legal precedent in *In re Furguson* 5 Cal.3d 525, 532-33, that in California criminal cases, even if the defense attorney does not request discovery,

when the prosecutor knows exculpatory evidence exists and reasonably knows it tends exonerate the

defendant either in the guilt phase or punishment phase the prosecutor has an obligation to inform trial

counsel of the evidence.  The *Furguson* Court cites *US v Agurs* 427 US 97, 110-11.  Explaining in part

that in a criminal trial, the prosecutor's driving force is to present the facts and ascertain the truth, not

obtain convictions by any means irrespective of the defendant's constitutional rights.  *Furguson* 5 Cal.3d

p. 531.  "The suppression by prosecution of evidence favorable to an accused upon request violates due

process where the evidence is material either to guilt or to punishment, irrespective of the good faith or

bad faith of the prosecution."  *Brady v Maryland* 373 US 83, 87.

In *US v Agurs* 427 US 97, 110, the High Court said, "Nor do we believe the constitutional

obligation is measured by the moral culpability, or the willfulness, of the prosecutor.  If evidence highly

probative of innocence is in the prosecutor's file, he should be presumed to recognize its significance

even if he has actually overlooked it . . . .  If the suppression of the evidence results in constitutional

error, it is because of the character of the evidence, not the character of the prosecutor."  The evidence

reveals petitioner did not rob Haro, evidence was suppressed,  and petitioner never signed a change of

plea form with valid Boykin-Tahl waivers.

Groch also knew petitioner never signed a change of plea form in the prior robbery case

CR105783.  So when petitioner testified he did not rob Haro, Groch committed misconduct in deceiving

petitioner, jury, trial court, and Mangarin by falsely claiming a plea form existed.  See RT 288-290, 9-

27-95. **Exh.   B2 .**

Even though petitioner wrote to the public defender numerous times to get copy of Youmans

client file, petitioner was unable to.  Petitioner only got a copy of the client file after he filed petition for

mandate in the Court of Appeal on June 3, 2003.  However, the prosecutor had in its possession Sanchez

exculpatory statement that petitioner did not rob Haro . . . that some other person with brown hair

robbed Haro.  Given the highly exculpatory nature of Sanchez statement, Groch had a duty to also

disclose this to Mangarin in the instant case.

### 4. *Ineffective Assistance at Trial on Priors*

On 10-3-95, petitioner was convicted by the jury and they were discharged. RT 463. Immediately thereafter, the Court set a time and date for trial on the priors. In setting a date, the discussion between the Court, prosecutor, and Mangarin revealed Mangarin had not examined the certified documents that were to be used to prove the priors. The following colloque in open court:

**Court:** Again, let me thank you (the jury) for the time and effort that you put in on this case. So you are
          discharge.

**Court:** We're outside the presence of the jurors. We have the other part of the trial that we need to
          handle with respect to the priors. What's the time estimate, do you expect?

**Groch (Prosecutor):** 30 minutes.

**Court:** Have you seen all the packets and so forth, Mr. Mangarin?

**Mangarin:** (Defense Counsel): I'm not sure, you Honor, but I don't think it's going to be a problem
          seeing them, if I can get them before the hearing.

**Court:** So we'll continue the trial on the priors and we'll handle that at four O'clock tomorrow.

**Groch:** Thank you, your Honor.

**Court:** Thank you.

RT 463-465. Exh. _F 4_.

The following date, 10-4-95, Sam Bove testified for the prosecution. Essentially, Bove testified petitioner was the same person in the instant case as the person in the prior robbery case. Petitioner's photo and prints matched in both cases, i.e., court documents.

In this particular stage, the prosecutor changed tactics and no longer claimed a "change of plea form" existed bearing petitioner's signature that specifically noted: "Robbery, robbery, auto theft," case #CR105783. Instead he used selective documents:

1. Information filed 8-20-89, charging 2 robberies and auto theft, CR105783;

2. Jury waiver, 10-3-89, CR105783;

3. Sentence minutes, 11-2-89, CR105783;

4. Abstract of judgment, 11-2-89, CR105783; and

5. Cal. Penal code 969(b) "prison packet," 12-1-89, petitioner's photo & prints, CR105783.

Bove was the only prosecution witness. When he finished testifying and the prosecutor submitted the court documents mentioned above to prove the priors, the court asked Mangarin if he wanted to review the documents. Mangarin replied, "No. We submit." The court found true petitioner suffered 2 prior robberies (2 strikes), and 1 prior assault W/D/W (1 strike). The court set a sentence date. RT 466-476; CT 125-145, 226-227. Exh. B11 . (Prior convictions CR105783 and CR140382).

Mangarin did not object, contest, or otherwise challenge the prior robbery case. This may have been reasonable trial tactics had the prior conviction been sound and free of Brady and Boykin-Tahl error, and the possibility that petitioner was actually innocent of the prior robbery. However, it was not. It is unreasonble to expect that from the day of conviction of kidnapping - 10-3-95 to the following day - 10-4-95 "*1 day*" Mangarin conducted reasonable investigation whether the prior conviction was valid for sentencing purposes. The above documents used by the prosecutor to prove the prior robbery case were incapable on their face of telling whether Boykin-Tahl waivers had been elicited and personally taken from petitioner. It is unreasonable to expect Mangarin in "1 day" to have the transcript of the slow plea transcribed or interview Youmans to determine whether or not valid waivers existed. And the prosecutor suppressing Haro's exculpatory evidence further violated petitioner'r right to fair trial.

### 5. *Ineffective Assistance at Sentence Hearing*

Concluding trial on priors, the trial court set a sentence date for 12-29-95. At sentence, the prosecutor urged the trial court to sentence petitioner to 35 years to life based on instant crime, and 3

prior strikes.

In addressing the court, Mangarin outline petitioner's current conviction for kidnapping, and both prior conviction: Mangarin clearly understood the 1993 prior assault was a "*guilty plea*" and constituted 1 strike. However, turning to the 1989 prior robbery case, Mangarin believed the 1989 prior robbery case was a full-blown "court trial" wherein Judge Mudd received evidence by both prosecutor and Youmans, and found petitioner *guilty beyond a reasonable doubt* of 2 robberies, constituting "2 strikes." Mangarin stated:

> "Yes, the first case was the 1989 case. He was found guilty of two separte counts (of robbery) on that in a . . . Court Trial with Judge Mudd."

RT 666-667, 12-29-95. Exh. F2 .

The problem here is that a full-blow "court trial" was never held, the procedure was a slow plea and tantamount to a guilty plea. A case on point in describing the significant difference between a full-blown court trial and slow plea is *People v Levey* 8 Cal.3d 648, 651. The procedure of submission of preliminary hearing transcript without guilt contested, no argument by defense counsel, and no presentation of evidence is a guilty plea.

Any competent attorney after conviction of 1 count of kidnap, and 3 strike priors are alleged, would request continuance (if it is short notice) to investigate the prior convictions. However, only 1 day after guilt finding in instant case, Mangarin did not have time to investigate, nor did he intend to do so.

6. *Mangarin's Client File*

In the course of petitioner's collateral attack, on 9-25-02 petitioner wrote Mangarin requesting work product client file in instant kidnapping case. He did not respond. On 11-1-02, petitioner wrote the State Bar complaining Mangarin would not release the file. On 12-16-02, the Bar contacted Mangarin on petitioner's behalf instructing him to send petitioner the file. On 12-30-02, Mangarin

wrote the Bar and petitioner that he released the file to petitioner. See Lett's by Pet., Bar, & Mangarin,

9-25-02, 12-30-02, 12-16-02, 12-30-02. **Exhs.** $\underline{E\,34}$, $\underline{E\,35}$, $\underline{E\,36}$, _____.

Petitioner received the file. The client file has a 5-page "Activity Log" recording Mangarin's

representation of petitioner: (Note: The public defender declared conflict of interest on 8-11-95):

1) 8-15-95, Mangarin received petitioner's file from the public defender. Mangarin held a telephone
conference with petitioner. Petitioner signs Authorization Form to grant Mangarin access to
confidential records, hospitals, previous jobs, etc.

2) On 9-3-95, Mangarin interviewed petitioner for 2 ½ hours at county jail regarding petitioner's
recollecting of instant case, and his exposure to several life sentences under 3-strikes law.

3) On 9-15-95, Mangarin appears at Courtroom M-1 for Readiness Hearing without petitioner present.
Judge Amos agrees petitioner's case should go to trial.

4) On 9-16-95, Mangarin reviews client file in instant case, prepares for trial and prepares witness list.

5) Carmen Lopez, Gabriela Murgo, Jesse Guerrero.

6) On 12-29-95, Mangarin records the trial and sentence took 48-attorney-hours, and petitioner was
sentenced to 35 years to life. End of case.

The 5-page Activity Log indicates Mangarin did not review the prior robbery case file, nor

Youmans client file, nor request discovery from the prosecutor concerning the instant case nor the prior

robbery case. See 5-page Activity Instant Case SCD112436, 8-15-95 through 12-29-95. **Exhs.** $\underline{F\,3}$

- _____.

7. *Prior Robbery Case CR105783*

It is necessary to set forth the facts and prosedure of prior robbery case. After all the Court of

Appeal in its Denial Order D041226 (2-6-03) confirmed two things: (1) the record is silent on Boykin-

Tahl waivers; and (2) Haro's exculpatory statement was relevant enough for the Court of Appeal to take

judicial notice in search of it.

Petitioner briefly sets forth factual and procedural background of prior robbery case. On 7-20-

89, Rafael Haro testified at preliminary hearing that he and Juan Sanchez were setting in Haro's car. Petitioner and an unnamed person approached Haro in the driver's seat. The unnamed person pointed a gun at Haro demanding money and simultaneously petitioner snatched Haro's necklace, took his watch and $10. Petitioner then pulled Haro from the car and the unnamed person sat in the driver's seat and petitioner in the passenger seat and drove away. Haro could not identify petitioner's accomplice. Haro's car license plate was "Riquito."

Ramon Cespedes testified at the same preliminary hearing. Cespedes worked at Texaco gas station. A car bearing the license plate, "Riquito," pulled in and petitioner emerged from passenger seat pointing a gun demanding money. Petitioner took $180 from the cash register, got back into passenger seat and the car drove away. Cespedes could not identify the driver.

It is clear now, the unname person is none other than Jesus H. Lopez. See Lopez declarations. B6, B7, B8.

*Slow Plea in the Prior Robbery*

Peggie M. Sirna, recorded the slow plea in 4-pages. On 10-2-89, jury selection began. William D. Mudd, Judge, told prospective jurors petitioner was charged with robbing Haro and Cespedes. Because jury selection did not complete, prospective jurors were told to return the following day to continue jury selection.

The following day, 10-3-89, 3-steps were taken in the slow plea:

**Step 1**: At 9:40, in open court, the prosecutor, Youmans and petitioner were present. Petitioner signs a jury waiver form. The jury waiver form stated petitioner desired to have the trial court determine guilt or innocence. The prosecutor then dismiss counts 3 and 5 and prosecutor submitted the case on preliminary hearing transcript wherein Haro and Cespedes testified petitioner robbed them.

**Step 2**: At 10 a.m. trial court reviews transcript during a recess.

**Step 3**: At 10:30, court convenes with prosecutor, Youmans and petitioner were present. Prosecutor submits the case on transcript. The defense submits. Trial court finds petitioner guilty of robbing Haro and Cespedes.

The last document recording petitioner's conviction of the 2 robberies and 4-year sentence is the abstract of judgment dated 11-2-89 and signed by Peggy Sirna, Clerk. Two "X's" are marked in the box indicating court trial was held.

The minute order dated 10-3-89, however clearly shows the prosecutor submitted incriminating transcript against petitioner. Defense counsel Youmans did not contest the transcript in any manner. Clearly this was a slow plea. What is also clear is the trial court, Youmans, and prosecutor did not advise petitioner, nor did petitioner personally or by signature on a plea form waive his constitutional rights to confront witness, nor against self-incrimination. Petitioner was not aware of the 2 constitutional rights and therefore there was want for said rights because the plea was not voluntary, intelligent, and knowingly. Had petitioner known of such rights, he would not have waived them and

instead went to trial. Especially in light of the fact that Haro went to prosecutor's office that morning, on 10-3-89, the day of trial prior to the slow plea and said he misidentified petitioner. Also Sanchez statement existed as well.

Petitioner discovered Haro's exculpatory statement when the prosecutor disclosed it on 5-21-03. Mangarin had a duty to examine existing documents lodged at the courthouse used to charge petitioner with those 2-robberies to determine the validity of that prior and whether any possible grounds existed to indicate the prior was legally flawed and considering it was unconstitutional file pretrial motion to have it set aside. See slow plea records, CR105783, 10-3-89. **Exhs.** B10 . Pet's Decl., at # 18 ,

_____, _____, 3-30-08. **Exh.** C .


D. POINTS AND AUTHORITIES, STANDARD OF REVIEW

The AEDPA applies in this habeas corpus proceeding. *Lindh v Murphy* 521 US 320, 336-37. AEDPA also provides in relevant part, application for writ of habeas corpus on behalf of a person in state custody shall not be granted with respect to a claim that was adjudicated on the merits in state court proceeding unless adjudication of the claim: (1) "resulted in a decision that was contrary to, or involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the U.S." or (2) "resulted in a decision that was based on unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 USC 2254 (d); *William v Taylor* 529 US 362, 405-09.

Petitioner herein requested but was denied an evidentiary hearing in state court, therefore this Federal Court may conduct an evidentiary hearing notwithstanding 28 USC 2254 (c); *William v Taylor* p. 420, 430-32. To establish constitutionally ineffective assistance of counsel, a petitioner must prove; (1) "counsel's representation fell below an objective standard of reasonableness," and (2) there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been

different. Strickland v Washington 466 US 668, 688-694. A reasonable probability is sufficient to undermine confidence in the outcome. Strickland p. 694.

In petitioner's case, the conflict of interest declared by Vanesian resulted in Mangarin's ineffective assistance resulting in prejudice is presumed when actual or constructive denial of assistance of counsel altogether is legally presumed to result in prejudice. *Strickland*, p.692 hn. 6 citing *U.S. v Cronic* 466 US 448, 659 hn. 25.

Petitioner claims Mangarin constructive failure to review prior robbery case file, Youmans client file, or request discovery from prosecutor amounted to denial of assistance of counsel. The Information charged kidnapping and alleged prior strikes. Petitioner did not know whether the Information was good or bad to prepare a defense. A good defense existed to move to strike the 2 prior robberies. *In Johnson v Zerbst* 304 US 458, 463 hn. 1, holds petitioner needed Mangarin's professional hand for a defense and effective assistance at every step in the adverse proceedings.

*Rompilla v Beard* 545 US 374, 386-87, is a death penalty case, but is illustrative and is authority on trial counsel's duty to defend against prior convictions. Mangarin must obtain information the state has and will use against petitioner. "It is the duty of the lawyer to conduct prompt investigation of the circumstances of the case and to explore all avenues leading to facts relevant to the merits of the case...and...the penalty in the event of conviction. I ABA, Stand's for Crim. Just. 4-4.1 "Counsel must investigate prior convictions that could be used as aggravating circumstances or otherwise come into evidence. If a prior conviction is...legally flawed...Counsel should seek to have it set aside. *Rompilla v Beard* p. 587 footnote 7. Setting aside the prior conviction on Boykin-Tahl grounds is not an attempt to reverse the prior conviction, but prevent its use for sentencing purposes. *People v Sumstine* 36 Cal.3d 909, 915-16.

To show prejudice under *Strickland* for failure to file a motion to strike prior conviction on *Boykin-Tahl* grounds, petitioner must show (1) had Mangarin filed the pretrial or presentence motion to

strike it is reasonable the trial court would have granted as meritorious, and (2) had the motion been granted, it is reasonable that here would have been an outcome favorable to petitioner. *Wilson v Henry* 185 F.3d 986, 990, citing *Kimmelman v Morrison* 477 US 365, 373-74.

Two cases illustrate and are authority that particular facts and circumstances of a 3-strikes case, will necessitate reasonable investigation. In *Riggs v Fairman* 178 F. Supp.2d 1141, 1147, the court ruled counsel was ineffective for failure to examine defendants rap sheet, failed to ask defendant questions concerning his prior robbery case, and resulted in prejudice because defendant instead of taking the 5-year plea, offered by prosecutor, trial counsel advised him not to and he received 25 years to life under 3-strike law. The Federal Court in *Riggs* reversed holding trial counsel was ineffective that resulted in prejudice for failure to investigate the prior robbery case. The *Riggs* Court cited *People v Morgan* 11 Cal.Rptr.2d 502, 506, 509-510. In *Morgan* the defendant made a *Marsden* motion (*People v Marsden* 2 Cal.3d 118) complaining his attorney had not done anything at all in 77 days in the case in which he may get 25 years to life under 3-strikes law. The trial court asked counsel "Have you had the opportunity to evaluate whether or not these priors can be attacked in any fashion?" Counsel answered, "Yes." But counsel failed to investigate in the Arkansas prior kidnap convictions that constituted 2-strikes. Morgan was sentenced to 25-years to life. The Court of Appeal reversed holding Arkansas prior kidnapping convictions lacked elements to constitute California's kidnapping statute and insufficient to constitute strikes. Trial counsel was ineffective for failure to investigate the prior Arkansas convictions.

A review of the trial record is normally necessary to resolve claims of alleged Boykin-Tahl error. If a proper record exists Boykin-Tahl claims can be easily determined as simple as right to counsel claims (*Gideon v Wainwright* 372 US 335) because Boykin-Tahl errors appear plainly on face of record. Any examination will be brief with no delay. *People v Maupin* 74 Cal.Rptr.2d 309, 312-13.

Mangarin represented petitioner in 1995 and the prior robbery case file existed. Moreover, E.

1  Neal, Court Reporter, explained the transcript of slow plea existed from 1989-1999. The State Bar

2  explained Youmans worked at Public Defender until 1999. Mangarin should have examined the prior

3  court file, transcribed transcripts, and interviewed Youman to support Boykin-Tahl error. **(Exhs.**

4  **E23 , E45.1** ). The better practice is to file pretrial motion to strike the prior supported by facts,

5  documents, and declarations. This type of collateral attack is much easier than habeas corpus collateral

6

7  attack considering pretrial motion to set aside alleged priors is not attempt to over turn presumably valid

8  conviction or sentence, but simply to prevent its use at sentencing. However, petitioner now has a

9  higher burden in habeas corpus proceeding after judgment has been imposed.

10      The State Court of Appeals (D041226) confirmed the record in petitioner's prior robbery case is

11  silent as to whether or not he was advised of and waived his Boykin-Tahl rights. Petitioner claimed

12  prejudice not merely because the record was silent, but claimed the record does not affirmatively show

13

14  that petitioner's plea is voluntary and intelligent under the totality of the circumstances, *People v*

15  *Howard* 1 Cal.4[th] 1132, 1175, and cannot withstand the test set out in *North Carolina v Alford* 400 U.S.

16  25, 32, that petitioner's plea does not represent a voluntary and intelligent choice among the alternative

17  courses of action open to the petitioner.

18      Petitioner claimed he was neither advised nor personally waived his rights and there was want

19  for constitutional rights rendering his plea involuntary and had petitioner known of his rights he would

20  have went to trial. Especially in light of Haro's statement he mis-identified petitioner. Court of Appeal

21

22  Justice's Haller, Kremer and McIntyre took *judicial notice* of the prior robbery court file in search of

23  Haro's exculpatory statement to determine whether Boykin-Tahl error was interwoven with Haro's

24  statement prejudiced petitioner. In its opinion the court of Appeal explained that the record was silent as

25  to whether petitioner was advised of his constitutional rights to confront witnesses and to against self

26  incrimination and that the RT of the slow plea had been destroyed. And that nothing in the record

27  showed Haro recanted. Denial of Habeas Petition, Opin. D041226, 2-6-03. **Exh.    A7   .**

28

Finally, the 6th Amendment guarantees effective assistance of counsel that entails standards sufficient to justify the laws presumption that counsel will fulfill the roll in the adversary process that the Amendment envisions. The proper measure of attorney performance remains simply reasonableness under prevailing professional norms and entails certain basic duties, loyalty and avoidance of...conflict of interest. Strickland p. 688 hn. 6, citing *Cuyler v Sullivan* 466 US p. 346.

Vanesian determined a conflict existed and made his declaration "virtually under oath" in open court to Judge Amos. *Mickens v Taylor* 535 US 162, at p. 167-68.

Mangarin's appoint was a direct result of the conflict directly connected to the prior robbery. The reasons about the conflict were not merely passive. Vanesian complained his co-worker Youmans was ineffective and possibly could lead to striking those "2-strikes." The record now developed by petitioner indicated 3-red flags sufficient to trigger an examination of the prior robbery court file to disclose: 1) No court trial occurred but instead a slow plea and missing Boykin-Tahl waivers on its face and lead to 2) Sanchez tape recorded statement that petitioner did not rob Haro; and 3) discovery leads to Brady error because the prosecutor withheld Haro's statement. Justice O'Connor elaborated in *Rompilla v Beard*: Counsel's failure to obtain the crucial failed (*Rompilla's* prior case file) was the result of inattention, not reasoned strategic judgment. As a result strategic choices made after less than complete investigation reasonable only to the extent that reasonable professional judgments support the limitations on investigation. *Rompilla* 545 US at p. 395-96; quoting *Strickland* 466 US at 690-91.

## CLAIM II

**PETITIONER IS ACTUALLY INNOCENT OF THE PRIOR ROBBERIES OF RAFAEL HARO AND RAMON CESPEDES. THE PRIOR ROBBERIES ILLEGALLY ENHANCE PETITIONER'S CURRENT SENTENCE. CAL. CONST. ART. I, SEC 15; U.S. CONST. AMENDS. 5TH, 6TH, 14TH.**

A. Claim of Innocence In Open Court

On 4-23-95, petitioner was charged in the instant case with kidnapping, and allegations that he suffered two prior robberies, and one prior assault W/D/W. Initially, Vanesian represented petitioner, but he declared conflict and Mangarin was appointed. On 9-3-95, Mangarin interviewed petitioner. Petitioner explained Vanesian declared conflict because Dr. Smith's report (dated 8-9-95) disclosed material facts of the prior robberies, specifically, that petitioner was intoxicated and under peer pressure from a friend when the two prior robberies were committed. Vanesian alleged Youmans, co-worker in the public defender's office, was ineffective for failure to present intoxication evidence in the _**trial court**_ to negate the robberies. During this interview, petitioner also told Mangarin that he <u>did not</u> rob Haro in the prior robbery case. That Haro and Juan Sanchez were in a car and Jesus Lopez walked up and robbed Haro while he sat in the driver seat. Sanchez, the passenger, seen Lopez rob Haro. Petitioner explained he served time in prison for the Haro robbery, but heard through prison grapevine and through Sanchez that Haro went to the courthouse during the time petitioner was being prosecuted for the robberies, and that Haro told the court petitioner <u>did not</u> rob him. Mangarin said he would not investigate the conflict nor petitioner's claim of innocence.

Mangarin told petitioner to testify in the instant case concerning the kidnapping allegations. Explain the amount of alcohol he drank before entering Champion's car. Mangarin told petitioner the prosecutor would cross-examine and question him about the prior robbery case. On 9-25-95, trial began. Champion testified petitioner kidnapped him. On 9-27-95, petitioner testified on his behalf about the kidnapping allegations. Sure enough, the prosecutor changed the focus and questioned

petitioner if he suffered in 1989 two prior robberies. Petitioner said he did not rob Haro in the prior

robbery case:

PROSECUTOR:  Your prior convictions were for 2 different robberies as well as car theft in 1989,
                        wasn't it?

PETITIONER:     It was one case sir.

Q.      It was 2-victims, wasn't it?

A.      Yes.

Q.      it was 2-robberies, wasn't it?

A.      Yes.

Q.      And car theft?

A.      No. I didn't do the first robbery. (Sic, Haro is the first robbery)

Q.      And you served time on a robbery you didn't do?

A.      Yes.

Q.      Well, both of those robberies occurred within 15-minutes of each other didn't they?

A.      Yes.

Q.      And you're saying you did one but not the other?

A.      Yes.

Q.      Which robbery didn't you do that you pled guilty for.  Which one of the 2-robberies that
          occurred within 15-minutes of each other?

A.      The first one. (Sic, Haro is the first robbery).


RT 288-290, 9-27-95. **Exh**. B2

At the time of petitioner testimony described above, he did not have exculpatory evidence, nor

know for certain exculpatory evidence existed to support his claim of innocence. He did not know he

could raise an actual innocence claim or attack the prior robbery case on other grounds, i.e., Boykin-

Tahl claims in habeas petition or motion. Petitioner told Mangarin what he knew, but Mangarin did

not act nor investigate it. Petitioner did not know where Lopez, Haro, or Sanchez lived. Petitioner was

then convicted in the instant case of the kidnapping, prior convictions found true, and he was sentenced

to 35 years to life. Petitioner appealed.

On 3-7-96, Handy Horiye, appellate attorney, wrote petitioner and asked what "issues" he was wanted to raise for the appeal. Petitioner wrote Horiye and said he did not rob Haro. That Haro told the court petitioner did not rob him. On 6-1-96, and 8-23-96, Horiye wrote petitioner and said he looked in the files but did not find exculpatory evidence to support petitioner's claim of innocence. Horiye said he would not consider that issue or other issues concerning the prior robbery case. Horiye acknowledge a successful attack on the prior robbery case would mean to strike (set aside) the two prior robberies (2 strikes) and thus bring petitioner outside the Three Strikes Law for purposes of 25 years to life sentence. In other words, petitioner would still be subject to Penal Code 667 and 1170.12, but the prior assault and the instant kidnapping case would only mean two strikes at the most. See Horiye Letters, 3-7-96, 8-23-96. **Exhs**. E, E2.

On 10-25-96, the Court of Appeal filed its unpublished opinion affirming the instant conviction, but vacating the sentence and remanded the case for re-sentence. On 6-12-97, at re-sentence, the trial court allowed petitioner to address the court on his behalf. Petitioner apologized for the instant offense and . . . . again declared he did not rob Haro:

Petitioner:  "Yes, the crimes in 1989 happened. But that was not me that started everything.

That was a friend of mine. And I was found guilty."

RT 19, 6-12-97. **Exh**. B9.

The trial court then sentenced petitioner to 26 years with 80%. (Relying on the robbery of Haro to double the 8-year upper base term for kidnapping, and adding two consecutive 5-year priors). On appeal the second time, Horiye represented petitioner, and only raised the issues that the trial court erred in selecting the 8-year upper term for kidnapping without weighing mitigation against aggravation. On 3-25-98, the Court of Appeal filed an unpublished opinion affirming the sentence.

1. _The Prior Robbery Case CR105783_.

It is necessary to set forth the evidence used to convict petitioner. But other evidence when taken into consideration could help petitioner in proving his actually innocent of the robberies. The

only evidence used to convict petitioner was the preliminary hearing transcript. Haro testified he and Sanchez were sitting in Haro's car. Petitioner and another person came up to the driver seat. The person pointed a gun at Haro and demanded money. Petitioner snatched Haro's necklace, took his watch, and $10. Petitioner pulled Haro from the car. The other person sat in Haro's driver seat and petitioner went around and sat in the passenger seat. The car drove away. Haro identified petitioner, but could not identify the other person (driving the car). Haro's license plate was "Riquito."

Ramon Cespedes testified he worked at Texaco Gas Station. A car pulled and petitioner got out of the passenger seat, pointed a gun at him, and demanded money. Petitioner took $180 from the cash register and back into the passenger seat and the car drove away. Cespedes could not identify the driver. The license plate was "Riquito." Preliminary Hearing Transcript, 4-5, 21-25, CR105783. **Exh.** G.

Immediately after the robberies, Officer Eisengna #3957 received a radio call that Officers Filley #4297 and Swilley #4252 recovered Haro's car. Eisegna told the officers to impound the car for prints. Filley searched the car and found five small ziplock baggies of marijuana on the passenger floorboard. Detective Sullivan lifted prints from Haro's car and from the baggies.

Officer Aguirre #3202 interviewed Haro and Sanchez concerning the robberies and baggies of marijuana. See Police Report (Excerpts), CR105783, Prints lifted and baggies of marijuana. **Exhs.** G1.

On 10-3-89, the day scheduled for jury trial, specifically, at 9:40 a.m., in open court petitioner signed a jury waiver form and waived jury. The prosecutor dismissed two counts (receiving stolen property, and discharging a gun) and the prosecutor submitted the case to the court based on the preliminary hearing transcript. The defense submitted too. The court found petitioner guilty of robbing Haro and Cespedes. There are only four (4) court documents that record the slow plea . . . two minute orders, jury waiver, and abstract of judgment. See Slow Plea Records. **Exhs.** B10

2. *Petitioner's Investigation In Support of His Innocence*

Petitioner explains in the Application for Equitable and Statutory Tolling, at pages 7 through 14, after direct appeal, 3-25-98, he did not have any access to any records of the instant case, nor of the prior robbery case. Petitioner wrote numerous letters to gather records. The public defender would not answer petitioner's letters. And even went as far as saying that they did not represent petitioner. (See 9-19-02 Public Defender Memo **Exh. E32**). Petitioner studied and learned to raise a claim of innocence and filed a motion for discover, settled statement, and petition for mandate in efforts to gather records and exculpatory evidence. In October 2002, petitioner filed a motion in Superior Court for order upon public defender to obtain the client file. The superior court said it was the "wrong forum" in which to seek assistance to obtain the file. This is mis-leading petitioner. (See Denial of Motion 11-13-02, **Exh.** A6.).

In November 2001, petitioner was transferred from "D" yard to "B" yard because a prison riot. Petitioner met up with Sanchez, eyewitness to Haro's robbery. Petitioner received a declaration from Sanchez to support petitioner's claim of innocence. **Exh.** B3. (11-15-01).

On 7-19-02, the Superior Court denied petitioner's first habeas petition claiming innocence. On 11-25-02, petitioner filed a like habeas petition in the Court of Appeal claiming innocence supported by Sanchez' declaration. Petitioner made the bald assertion that Haro recanted his preliminary hearing identification of petitioner. The Court of Appeal denied petitioner claim of innocence because it was "unsubstantiated." However, the Court of Appeal had strong interest in Haro's alleged recanted testimony. In search of this evidence, petitioner contacted the district attorney requesting exculpatory evidence. On 5-21-03, the district attorney disclosed in a letter that Haro went to their office on the day of trial (10-3-89) before trial (slow plea) and Haro said he "mis-identified" petitioner at the preliminary hearing. In June 2003, the public defender disclosed a tape-recording by Sanchez that petitioner did not rob Haro, that some other person with brown hair robbed Haro. In May 2004, July 2006, and November 2006, Lopez submitted declarations and fingerprints that he alone

robbed Haro. The purpose of Lopez' prints is to compare with the prints lifted from Haro's car.

Detective Sullivan lifted the prints. Petitioner's prints were never found in Haro's car.

It is clear now the person that robbed Haro is Lopez. Cespedes, gas station clerk, could not

identify the driver of the car. But it was Lopez that was driving Haro's car. And Lopez ordered

petitioner to rob the gas station at gun point. See Exculpatory Evidence: **Exhibits** B2 - B9.

### 3. *Brady v Maryland Error, False Evidence*

Jury selection was scheduled for 10-3-89. At this point, the prosecutor relied on Haro's

preliminary hearing testimony that incriminated petitioner. No other evidence incriminated petitioner.

However, on 10-3-89, in the morning before court appearances, Haro went to the district attorney's

office and said he mis-identified petitioner at preliminary hearing. That very morning 10-3-89, at 9:40

a.m., the district attorney  . . . . already knew Haro mis-identified petitioner, yet did not turn this

exculpatory evidence over to petitioner, nor inform  the trial court. This in essence transformed

Haro's testimony into . . . . false evidence. This could have exonerated petitioner. *See Exhs.* B4, B10.

## B. Points and Authorities, Standard of Review

In *Schlup v Delo* 513 US 298, 315, 324, 327, describes a "gateway" claim of innocence,

alternatively called "actual innocence" exception. This allows petitioner who can demonstrate his

innocence to have his otherwise procedurally  defaulted claims heard on the merits. To be credible

such a claim require petitioner to support his allegations of constitutional error with new reliable

evidence - - whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical

physical evidence - - that was not presented at trail. Schlup does not require the evidence in fact

exonerate petitioner, rather, petitioner must demonstrate it is more probable than not that no reasonable

juror would find him guilty beyond a reasonable doubt in light of the new evidence.

A core function of the federal writ of habeas corpus is the protection of prisoner's from unjust incarceration and the correction of miscarriages of justice. Noting "concern about the injustice that results from the conviction of an innocent person has long been at the core of our criminal justice system." *Schlup* 513 US p. _____. This District Court should hold an evidentiary hearing to develop a factual record because it is faced with a colorable / credible claim of innocence. *Majoy v Roe* 296 F.3d 770, 777; citing *Schlup* 513 US at p. 332.

## CLAIM III

## PETITIONER WAS DENIED A FAIR TRIAL. CAL.CONST. ART. I, SEC. 15; U.S. CONST. AMENDS. 5TH, 6TH, 14TH

*Introduction*

Petitioner claims five cumulative errors denied him a fair trial. 1). He was denied opportunity to defend against charges; 2). Limited instruction to admit Petitioner's intoxicated state became meaningless because nearly everytime counsel questioned witnesses on "critical" intoxication evidence, the prosecutor objected and court sustained; 3). Evidence entitled Petitioner a jury instruction CALJIC 9.58; 4) insufficient evidence to support kidnapping; and 5) the passions and emotions of jurors were swayed because trial court read the "not guilty" verdict of O.J. Simpson murder trial.

### *1. Denied Opportunity To Defend Against Charges*

The information charged: Count 1 kidnapping to commit robbery; Count 2 kidnapping; Count 3 attempted carjacking; and Count 4 assault W/D/W. Vanesian's strategy to defend Petitioner was to call Dr. Smith, psychiatrist, to explain Petitioner's intoxicated state prevented him from forming "Specific intent" Dr. Smith concluded:

> "DISCUSSION: The defendant was clearly under the influence of alcohol at the time of the instant offense, with severe intoxication documented by several witnesses. With his history of recurrent alcohol blackouts it is likely that he was indeed suffering an alcoholic blackout at the time of the instant offense. He appears to be quite credible and consistent in his description of the events leading up to the offense, and in my opinion, was experiencing an alcoholic blackout and met the legal criteria for unconsciousness at the time of the instant offense."

Dr. Smith's Report, page 4, 8-9-95. Exhibit B1

However, Vanesian declared conflict and Mangarin was appointed to represent Petitioner. Mangarin did not change tactics, and relied entirely on Dr. Smith's report to defend Petitioner.

HC

Further, it is clear from Mangarin's client file (Case Activity Log) he did not investigate other avenues to defend against kidnapping. See Mangarin's client file. **Exh.** _F3_ .

At the open of trial, the court asked Mangarin to explain the defense evidence and his theory. Mangarin explained he intended to call Dr. Smith, expert witness, to explain Petitioner was in such a . drunken stupor that:

1). He could not form the specific intent to commit these crimes;

2). He could not instill fear into Champoin; and

3). Explain to the jury that Petitioner aimlessly was in Champion's car. The jury could come to a conclusion of why Petitioner was in Champion's car and not convict Petitioner of any charges.

Once the prosecutor heard petitioner's only line of defense was to call Dr. Smith's to testify, the prosecutor purposely dismissed the specific intent crimes for the sole purpose to keep Dr. Smith or his report from entering into evidence. Keeping in mind, this was the very day trial began, 9-25-95, this dismantled Petitioner's only defense. The court then ruled Dr. Smith could not be called citing voluntary intoxication is not a defense to kidnapping and assault (general intent) crimes. Mangarin countered this ruling was fundamentally unfair because the prosecutor and court were using procedural maneuvers to keep out Petitioner's "only line of defense". _RT 17-28._

So with the defense being wiped out, Mangarin making no attempt to regroup and develop a new defense even though one existed. Such defense was the fact Champion was gay and he drove Petitioner in a drunken stupor. The inference being Champion picked up Petitioner. RT17. Thus, Petitioner did not have opportunity to defend against the charges.

### 2. Limited Instruction Became Meaningless

Champion testified that the time Petitioner was in the car. Petitioner <u>did not</u> appear intoxicated. The trial court asked Mangarin how was intoxication relevant to the general intent crimes. Mangarin explained witnesses saw Petitioner staggering drunk and slurring his speech, this would impeach

Champion. The trial court said Petitioner must testify first. And it would allow intoxication evidence

for the limited purpose:

1) . To assist in evaluating the credibility of Champion;

2). To assist in evaluating the credibility of defendant; and

3). To assist in determining whether the defendant's appearance and actions instilled fear in the mind

of Champion.

RT 296, 345, 443. CT 97. (Limited Instruction). **Exh**. H.

   However, the Limited Instruction became meaningless because when counsel tried to cross

examine witness about Petitioner's drunken stupor, physical inability, and slurred speech, the

prosecutor objected and the court sustained. On six occasions when Mangarin cross-examined

Champion, specifically on Petitioner's intoxication, slurred speech, drunken stupor, the prosecutor

objected and court sustained. When Marquez testified, on six occasions when Mangarin cross-

examined specifically about Petitioner's "staggering walk," glassy eyes, slurring, the prosecutor

objected and the court sustained. RT 148 – 151; RT 166 – 177. Exh. H 4 , _____ .

   Moreover, the Limited Instruction was to allow a fair trial. Witnesses saw Petitioner staggering

drunk. This instruction was supposed to allow the jury to hear whether Petitioner had physical

limitations to negate instilling fear into Champion. Guerrero and Murgo testified Petitioner drank.

Marquez stated in the investigation that Petitioner was staggering. But jury never heard how

Petitioner's physical condition was in direct contrast to Champion's testimony. RT 263 – 250.

### 3. *Petitioner Was Entitled to CALJIC 9.58*

CALJIC 9.58 states :

"It is a defense to the charge of kidnapping that a defendant lacked general criminal intent.

There is no general criminal intent if a defendant entertained a reasonable and good faith belief

that the person alleged to have been kidnapped voluntarily consented to accompany the

defendant and to the movement involved in the purported kidnapping. If from all the evidence

4C

you have a reasonable doubt that the defendant harboured general criminal intent at or during the time of the movement, you must find him not guilty of kidnapping."

This is the jury instruction the trial court denied petitioner. RT 367. CT 80. **Exh**. H1

Another part of law that is relevant is Pen.C. 20, "in every crime there must exist a union, or joint operation of act and intent, or criminal negligence. So basic is the requirement of union of act and wrongful intent that it is an element of every crime." Petitioner entered Champion's car on 65th and Imperial and told him to drive. Champion drove two long blocks, but then he formed a plan to drive to his house. In fact at Scimitar (the street Champion lived on), Champion turned left. Petitioner just sat there in the passenger seat and did not get upset. Unknown to Petitioner, two bystanders stood on the side of the road. Petitioner called out to both bystanders to gain their attention. The 1st bystander looked at petitioner, but only frowned and did not respond. When Petitioner exited Champion's car, he went to the 2nd bystander and asked for a ride home. RT 67 – 70; 148 – 151. **Exh**. H2, H3.

Petitioner testified and the prosecutor cross-examined him. When questioned whether or not he commanded Champion to drive, Petitioner denied he commanded Champion to drive. This is a denial of a kidnapping element. RT 280 – 287. **Exh**. H5

Several factors tie in that entitled Petitioner to CALJIC 9.58, first 9.58 highlights that the jury can consider whether Petitioner *lacked general criminal intent,* if from *all* the evidence the jury has reasonable doubt, and Petitioner lacked and / or did not harbor general criminal intent *at* or *during* the time of movement, certainly, there is evidence that the union of criminal intent was broken (Pen.C. 20), when Petitioner wanted to attract attention of bystanders on two occasions.

### *4. Insufficient Evidence To Support Kidnapping*

Champion's free will was not overborn by the use of fear or threat of force. Petitioner did not kidnap Champion. Kidnapping does not speak in terms of movement of any specific or exact distance

and nothing in the statutory language limits the asporation element solely to actual distance.   In kidnapping, a primary reason forcible asporation is proscribed by kidnapping statues is the increase of risk to Champion because of the . . . diminished likelihood of discovery  The totality of circumstance should be taken into consideration.

Some of the evidence refutes the elements necessary to accomplish kidnapping.   The prosecution largely focused on three elements to convict.  1) Petitioner instilling fear into Champion; 2) Movement without consent; and 3). Movement was substantial, not trivial or slight.  Meeting these elements amount to kidnapping which is a general intent crime.  But Petitioner claims he did not have general criminal intent.   The state is required to prove "every ingredient of an offense beyond a reasonable doubt."   When taken as a whole, Petitioner not caring where Champion was driving, Petitioner calling out to people is strong facts Petitioner was not kidnapping Champion.

### 5. The O.J. Simpson "Not Guilty" Murder Verdict Inflamed Passions of Jury

It was 9:00 a.m. and the trial court told both prosecutor and defense attorney, outside the presence of jury, that the O.J. Simpson murder trial verdict was to be announced at 10:00 a.m.  The court said it had no doubt the jury in Petitioner's case had O.J.'s case in the front of their minds.  So it intended to tell the Petitioner's jury.

It was now 9:15 a.m. and the jury was present to hear closing arguments in Petitioner's case. The court told the jury it would hear closing arguments and also told them the O.J. murder case was to be announced at 10:00 a.m.  The court told the jury because it was such a big case it would monitor O.J.'s case and announce the murder verdict.

The prosecutor and defense counsel gave their closing arguments.  Immediately thereafter (but before deliberations) the trial court began again with the O.J. verdict.  The trial court began:

> "Irrespective of your feeling on that verdict, whether you think it's good or bad or
> whatnot, I want you to put that case aside...The verdict in the Simpson matter
> was "not guilty"."

The 12 jurors (nine of which were white, repectively, and 3 hispanic) in Petitioner's case stood up and erupted in hollering, unbelief, and visibly displayed their bias and inflamed passions. Ironically, the prosecutor (also white, respectively) also stood up and was hitting his hands on the table yelling, "this is injustice, O.J. was guilty."

Petitioner, Hispanic and minority, deserved impartial, fair-minded jurors. Not people who visibly displayed their anger concerning another case that no doubt angered them. Moreover, Champion himself is white, respectively. The O.J. Simpson murder case was a controversial racial case not only in San Diego, Los Angeles, but also across the U.S. The T.V., and newspapers front pages showed barricades separating people along racial lines. Petitioner claims the jurors deliberated his case with emotions and passions inflamed that tainted and swayed against Petitioner. They did not deliberate the case with a clear mind being impartial. RT 384 – 388, 429 – 430, **Exhs**. H6, H7.

CLAIM IV.

PETITIONER'S SENTENCE IS ILLEGAL AND UNCONSTITUTIONAL. CAL.CONST. ART. I, SEC. 15; U.S. CONST. AMENDS. 5TH, 6TH, 14TH

## Introduction

The trial court struck two priors in the interest of justice. Petitioner does not minimize the instant offense, and recognizes he suffered two prior robberies, and one prior assault W/D/W. However, like the State and Trial Court relied on instant and prior offenses in prosecuting and sentencing petitioner; petitioner is <u>also</u> entitled to consideration of valid factors to arrive at a constitutional sentence. Refusal to consider personal characteristics of petitioner and factual matters of law in imposing sentence raises serious constitutional questions.

Issues: 1.) the trial court struck prior strikes, but did not weigh mitigants and aggravants in selecting upper term. Six mitigants outweigh two aggravants. Moreover, it is illegal to use same facts to aggravate base term and also as enhancements. 2) The prior assault W/D/W is not a serious felony; and 3) At the time of "Freeze Date" June 30, 1993, petitioner's assault W/D/W was not listed as serious felony.

## A. Striking Priors In The Interest of Justice

Petitioner was sentenced to 35-years-to-life. The appeal's court affirmed conviction, but vacated sentence. On remand, counsel filed Romero/Mitigation Motion to strike priors. Counsel reminded the court it said if the law changed (Romero) it would take another look at the case. Counsel said two strikes arose out of the prior robbery case, and one strike from prior assault W/D/W case. During 18-months on appeal, petitioner made every effort to show he could rehabilitate by participating in self-help programs.

43

HC

Prior to incarceration in the instant case, for a period of three years, petitioner was emplyed, cared for his family (wife & children), and his elderly mother Carmen Lopez. The parole agent, family and friends wrote support letters. Petitioner moved from San Diego to Bakersfield to make a new productive life. He voluntarily took anti-abuse to curb drinking alcohol.

Trial counsel fairly summarized the facts of the instant offense, explaining petitioner was kicked out of the bar because he was too intoxicated, and within five minutes jumped into Champion's car demanding he drive forward. Essentially, Champion drove to his own house. During the four-block drive, petitioner called out to two separate by-standers to gain their attention. Petitioner told Champion to stop and back up to the 2nd by-stander. Champion refused, and petitioner puched him. Petitioner exited the car and went back to the 2nd by-stander (Jesse Marquez) and asked for a ride home. This was the basis for the instant kidnapping conviction in the technical sense. On the flip side, petitioner was in a extreme state of intoxication aimlessly in Champion's car.

Trial counsel explained Dr. Smith was scheduled to testify on petitioner's behalf, but was prevented due to technicalities. However, a new psychological report by Dr. DiFrancisca detailed petitioner's alcoholism and ability to reform.

Finally, counsel asked the trial court to strike two strikes, but he mis-quoted sentence choices. Counsel mistakenly thought five years was the low term for kidnapping. Five years doubled up, and two consecutive 5-year prior for a total of 20 years instead of 26 years. RT 1-9. The prosecutor acknowledged petitioner was employed, supported his family, and petitioner had "redeeming quailities and that he did seem to be a resourceful and good person when sober." But nevertheless urged the court not to strike priors. RT 11-16.

44.

1.  **Invalid Probation Report**

At the re-sentence in 1997, petitioner did not have the benefit of a new probation report outlining mitigants and aggravants. The trial court relied on the original 1995 Probation Report.

"SENTENCING DATA:

"The judge made a true finding on the first, second, and third strike priors pursuant to PC 667 (b) - (i). There is only one sentence choice available to the Court, that being an indeterminate term of 25-years-to life. Thus, there is no need to cite mitigants or aggravants."

Probation Report, pg. 11, CT 53. Exh. __H 8__.

Petitioner claims the sentence is illegal so he sets forth the facts considered in re-sentence:

"All right. This is a difficult case. As everyone has acknowledged in their statements, there is an overriding *severe* alcohol problem and that doesn't provide Mr. Salceda with any type of excuse.

"What I'm going to do *in this* case is that I'm going to strike two of the priors. *I'm* going to strike the 2nd and 3rd priors *for the* following reasons: *With respect to the 2nd prior, that occurred at the same time the first prior occurred. That was on the same date* is what *I'm* referring to. In view of the age *of the* defendant and the age of those priors, the court finds it more appropriate to treat that as one strike, so I'm striking the 2nd strike. With respect to the 3rd prior conviction. That's the 1993 prior -- I have looked at the sentence and it *appears the* defendant did became engaged in a confrontation with the victim and swung a brick at him. I'm going to strike

that strike. I don't feel the facts giving rise to that offense are sufficient to justify that as a 2nd or 3rd strike.

That leaves me with one strike and the next is to select the appropriate term. This is a serious charge. It's kidnap and an appropriate term is the upper or aggravated term for the following reasons:

1. The defendant was on probation when it occurred; and

2. The defendant has a serious and lengthy criminal past. For reasons, I feel that the upper term in the appropriate term. The upper term is 8-years and it must be doubled and that makes it 16-years. The two serious felony priors this court feels are appropriate and they add five years each. The final sentence is 26-years."

RT 19-20, 6-12-97. Exh. B9.

## 2. Mitigation Outweighed Aggravation

Weighing the two aggravating factors against six valid mitigating factors petitioner did not receive due process consideration:

| Mitigation | Aggravation |
|---|---|
| 4.423(a)(4) criminal conduct partially excusable for reason not amounting to defense (intoxication) | 4.421(b)(4) Petitioner was on probation when crime was committed |
| 4.423(b)(2) petitioner was suffering from mental and physical condition reducing culpability for crime (intoxicated stupor) | 4.21(b)(2) Petitioner had serious and lenghty criminal past |

46

4

<u>Valid Mitigation Factors Under</u>:

Rule 4.408(a)

The Commentary Notes in Rule 4.408(a) make reference and cites

<u>Pennsyvania v Ashe</u> 302 US 51, 55; and <u>Gregg v Georgia</u> 428 US 153,

as guidence and authority. The record in petitioner's instant case

shows (CT 22-64):

1. Petitioner was pursuing education and rehabilitation for
   alcoholism;

2. Petitioner was baptized in prison;

3. Petitioner was employed during the time of instant offense and
   supporting his family;

4. Petitioner had support letters from family and friends regarding
   drinking problem and that he was a hard worker; and

5. Petitioner was genuinely remorseful.

     All of the above factors are significant in mitigation.

Petitioner claims had the trial court weighed all the factors properly

it would have selected the middle term instead of the upper term.

/ / /

**B.  The 1993 Prior Assault With Deadly Weapon (W/D/W) Conviction**

   **Is Not A Serious Felony**

On 5-17-95, at arraignment the Information charged

kidnapping and allegation petitioner suffered two prior robberies

and one prior Assault W/D/W. Petitioner pled not guilty and denied

the allegations. After jury trial began, but before diliberations,

the trial court took from petitioner a waiver of jury trial on

the prior convictions:

Court:  Mr. Salceda, do you understand with respect to trial on

the priors, in the event you were found guilty on matter,

jury would then be reconvened and you would have a right

to have the jury determine:

1.  Whether or not the prior offenses were committed, and

2.  Whether or not you were the person committing the

offenses?

Do you understand that right?

Petitioner:  Yes.

Court:  Do you give up and waive your right to a jury trial on the

priors?

Petitioner:  Yes.

RT 386-387; CT 225.  Exh. H6 .

The jury thereafter found petitioner guilty of the kidnapping.

The following day the trial court found true two prior robberies

and one prior assault W/D/W. The record is clear, petitioner did not

admit the prior convictions.

48

### 1.  The facts of the Prior Assault W/D/W

On 7-2-93, a "Complaint" was filed charging petitioner with Assaulting Ronnie Steiner with a deadly weapon and by means of force likely to produce great bodily injury. And personal use of a deadly weapon. Pen. Code 245(a)(1); 1192.7(c)(23).

On 7-14-93, two weeks later, petitioner pled guilty and signed a change of plea form to assault W/D/W and admitted personal use of a deadly weapon. Because a preliminary hearing was not held, it appears the police report was the basis for the factual allegations. The police report:

Cesar Corrorubias argued with three men concerning a "fender bender" car accident. Corrorubias, appearently upset, crossed the street and called petitioner. Petitioner was at Eddie Gonzaba's house drinking beer. Patrick Pimental was with petitioner. Corrorubias requested petitioner to cross the street to confront the three men. Pimental told Corrorubias that petitioner was intoxicated. Corrorubias persuaded petitioner and they crossed the street and a "confrontation" ensued. Petitioner swung a brick at Steiner but did not hit him. The police arrived and arrested petitioner.

### The Three Strikes Sentencing

Defense counsel in the instant case called Corrorubias to be present at the Three Strikes Sentencing. Mangarin argued a confrontation ensued between the three men and petitioner and Corrorubias was there at the incident. Mangarin explained to the trial court that the 1993 prior assault W/D/W case was a "defenseable case." That petitioner picks up a brick and a half block away, three men with sticks, there is a stand-off, and petitioner puts the brick down and is charged with the assault W/D/W.

C. <u>June 30, 1993 "Freeze Date"</u>

Petitioner was alleged to have committed the prior assault W/D/W on June 30, 1993. Relevant here is that "June 30, 1993" is the "Freeze Date" as <u>what was</u> and <u>what was not</u> a serious felony for purposes of enhancements under the old law Pen.C. 667 and 1170.12, and the new Three Strikes Law Pen.C. 667(b)-(i).

Petitioner claims herein that the particular prior assault W/D/W he was charged with and subsequently convicted of on July 14, 1993 in prior conviction case no. CR140382 ... is not a serious felony, nor a strike because it was not listed as such before or on June 30, 1993. See People v Morgan 111 Cal. Rptr.2d 502, 508 footnotes 3 and 4, which explains the freeze date supporting petitioner's claim. See Complaint Summary CR140382, alleging the assault W/D/W was committed on June 30, 1993. Documents used to prove the prior assault W/D/W. Exhs. <u>B11</u>.

## CONCLUSION

For the foregoing reasons set forth in this petition for writ of habeas corpus, petitioner respectfully requests this Honorable Federal Court grant the claims herein.

## PRAYER FOR RELIEF

Wherefore, petitioner prays this Court:

1. Grant and issue the writ of habeas corpus;

2. Grant application for equitable and statutory tolling;

3. Order an evidentiary hearing;

4. Order to show cause;

5. Appoint counsel for petitioner; and

6. Grant any other relief this Court deems just, proper, and in the interest of justice.

## VERIFICATION

I, LEOVARDO SALCEDA, declare as follows:

I am the petitioner in the above action. I have read the foregoing application for equitable and statutory tolling, and petition for writ of habeas corpus and the facts stated therein are true to my own knowldge, except as to matters that are therein stated on my own information and belief, and as to those matters I believe them to be true.

I declare under the penalty of perjury that the foregoing is true and correct and that this declaration was executed at Chuckawalla Prison in Blythe, California, on June 6, 2008.

Respectfully submitted,

*Leovardo Salceda*

Leovardo Salceda
In pro se.

That was the basis of the assault W/D/W.  RT 666-667, 12-29-95.
Exh. _F2_ .

On 6-12-97, a year and half later, at the Romero Motion
Hearing (Re-Sentencing), the trial court struck the prior assault
W/D/W case on the following grounds:

Court:    "With respect to the 1993 prior - - I have reviewed the

facts and I have looked at the sentence and it appears

that the defendant did become engaged in a confrontation

with the victim and did swing a brick at him.  I'm going

to strike that  . . . strike.  I don't feel the . . facts

giving rise to that offense are sufficient to justify as

a 2nd or 3rd strike."

RT 19, 6-12-97.  Exh. _B9_ .

Against the factual disclosure of the 1993 prior assault
W/D/W conviction, petitioner claims as the case law holds:

"One may violate Pen. Code 245(a)(1) in two ways that

does not quailify as a "serious" felony under 1192.7(c)(23).

First, one may aid and abet the assault without personally

inflicting great bodily harm, or

One may commit the assault with force "likely" to cause

great bodily injury without actually causing great bodily

injury or using a deadly weapon."

See People v Rodriguez 17 Cal.4th 253, 261-62; People v Cortez 73
Cal.App.4th 276, 280-81.

1  STATE OF CALIFORNIA        )                    PROOF OF SERVICE BY
                              )  ss                PERSON IN STATE CUSTODY
2  COUNTY OF RIVERSIDE        )

3     I, __Leovardo Salceda__, the undersigned, certify, and

4  do declare that I am over the age of 18 years, incarcerated at Chuckawalla

5  Valley State Prison, located at __Blythe, California__ and a party/ not a party

6  to the attached foregoing cause of action. On __6-6-08__, _____,

7  I did serve a true copy of:

8     *) Petition for Writ of Habeas Corpus 28 U.S.C. 2254 By A Person In
         State Custody ; .

9     *) Application for Equitable and Statutory Tolling 28 U.S.C. 2244 To Hear
         Merits of Petition For Writ of Habeas Corpus

10    *) Exhibits A - H8        *) Motion/Declaration To Proceed In Forma Pauperis
                                                                    (incomplete)

11    *) Request To Proceed Before A Magistrate Judge, And
         Thereafter Issue A Report & Recommendation To District Judge

12  [ ] by depositing it in a prison mail box in a sealed envelope, or [✓] by

13  handing it to institutional staff in a sealed envelope, along [✓] with Inmate

14  Trust Account Withdrawal Order Form attached to it requesting that postage be

15  fully prepaid, or [ ] with postage affixed thereto for deposit in The United

16  States Mail pursuant to California Code of Regulations Sections 3142 and 3165;

17  Addressed to the following: W. Samuel Hamrick, Jr.
                               Clerk of Court, U.S. District Court
18                             Southern District of California
                               880 Front Street, Room 4290
19                             San Diego, CA 92101

20

21  Intended place of mailing: U.S. Post Office, at Blythe, California.

22  I further declare under penalty of perjury that the foregoing is true and

23  correct to the best of my knowledge, and belief. Executed on __6-6-08__,

24  _____.

25

26                                          _Leovardo Salceda_
                                            PETITIONER / DECLARANT IN PROPER
27

28  ///

JS44
(Rev. 07/89)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE SECOND PAGE OF THIS FORM.)

**I (a) PLAINTIFFS**

Leovardo Salceda

**DEFENDANTS**

Salazar, et al

FILING FEE PAID
Yes __ No __

IFP MOTION FILED
Yes __ No __

COPIES SENT TO
Court __ ProSe __

FILED
JUN 10 2008
CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

**(b) COUNTY OF RESIDENCE OF FIRST LISTED** Riverside **PLAINTIFF**
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND

**(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)**

Leovardo Salceda
PO Box 2349
Blythe, CA 92226
J-90933

**ATTORNEYS (IF KNOWN)**

'08 CV 1037 IEG PCL

**II. BASIS OF JURISDICTION (PLACE AN x IN ONE BOX ONLY)**

☐ 1 U.S. Government Plaintiff
☒ 3 Federal Question (U.S. Government Not a Party)
☐ 2 U.S. Government Defendant
☐ 4 Diversity (Indicate Citizenship of Parties in Item III

**III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN X IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT**
(For Diversity Cases Only)

| | PT | DEF | | PT | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐1 | ☐1 | Incorporated or Principal Place of Business in This State | ☐4 | ☐4 |
| Citizen of Another State | ☐2 | ☐2 | Incorporated and Principal Place of Business in Another State | ☐5 | ☐5 |
| Citizen or Subject of a Foreign Country | ☐3 | ☐3 | Foreign Nation | ☐6 | ☐6 |

**IV. CAUSE OF ACTION (CITE THE US CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY).**

## 28 U.S.C. 2254

**V. NATURE OF SUIT (PLACE AN X IN ONE BOX ONLY)**

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reappointment |
| ☐ Marine | ☐ 310 Airplane | ☐ 362 Personal Injury- Medical Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC881 | **PROPERTY RIGHTS** | ☐ 430 Banks and Banking |
| ☐ Negotiable Instrument | ☐ 320 Assault, Libel & Slander | | | ☐ 820 Copyrights | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment &Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | ☐ 830 Patent | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | | ☐ 640 RR & Truck | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | ☐ 650 Airline Regs | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 153Recovery of Overpayment of Veterans Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities Exchange |
| ☐ 160 Stockholders Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 690 Other | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC |
| ☐ Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | **LABOR** | ☐ 863 DIWC/DIWW (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability | | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 864 SSID Title XVI | ☐ 892 Economic Stabilization Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 720 Labor/Mgmt. Relations | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | **FEDERAL TAX SUITS** | ☐ 894 Energy Allocation Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | | ☐ 740 Railway Labor Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/Accommodations | ☒ 530 General | ☐ 790 Other Labor Litigation | ☐ 871 IRS - Third Party 26 USC 7609 | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 240 Tort to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | ☐ 791 Empl. Ret. Inc. | | |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | ☐ 540 Mandamus & Other | ☐ Security Act | | ☐ 950 Constitutionality of State |
| ☐ 290 All Other Real Property | | ☐ 550 Civil Rights | | | ☐ 890 Other Statutory Actions |

**VI. ORIGIN (PLACE AN X IN ONE BOX ONLY)**

☒ 1 Original Proceeding  ☐ 2 Removal from State Court  ☐ 3 Remanded from Appellate Court  ☐ 4 Reinstated or Reopened  ☐ 5 Transferred from another district (specify)  ☐ 6 Multidistrict Litigation  ☐ 7 Appeal to District Judge from Magistrate Judgment

**VII. REQUESTED IN COMPLAINT:**
☐ CHECK IF THIS IS A CLASS ACTION UNDER f.r.c.p. 23
DEMAND $
Check YES only if demanded in complaint:
JURY DEMAND: ☐ YES ☐ NO

**VIII. RELATED CASE(S) IF ANY (See Instructions):**    JUDGE _____    Docket Number _____

DATE    6/10/2008

SIGNATURE OF ATTORNEY OF RECORD

R. Miller

## Exhibits

A     Direct Appeal Opinion in Court Of Appeal, D025258, 10-25-96

A1    Direct Appeal Opinion in Court Of Appeal, D029086, 2-25-96

A2    Motion for Discovery in Superior Court, Denied, 9-14-01, Prior Robbery CR105783

A3    Motion for Settlement in Superior court, Denied, 11-30-01, Prior Robbery CR105783

A4    Reconsider Motion for Settled Statement in Superior Court, Denied, 3-27-02, Prior Robbery CR1057883

A5    Habeas Petition in Superior Court, Denied, 7-19-02, Prior Robbery CR105783

A6    Motion for Order for Public Defender to Give Petitioner Client File in Superior Court, Denied, 11-12-02, Prior Robbery CR105783

A7    Habeas Petition in Court of Appeal, Denied, 2-6-03, D041226

A8    Petition for Writ of Mandate in Court of Appeal, "Denied as Moot" 6-17-03

A9    Motion for Relief Based on Newly Discovered Evidence, Denied, 8-20-03, Prior Robbery CR105783

A10   Request for Assistance with Innocence Project, Denied, 1-1-04, Prior Robbery CR105783

A11   Habeas Petition in California Supreme Court, Denied on Procedural Grounds, S125591, 6-8-05

A12   Habeas Petition in Superior Court, Denied, HC17070(2nd), 11-2-05

A13   Habeas Petition in Court of Appeal, Denied, D048000, 4-20-06

A14   Letter for Discovery in Superior court, 10-16-06, Prior Robbery CR105783

A15   Motion for Discovery in Superior Court, Denied, 10-16-06, Prior Robbery CR105783

A16   Habeas Petition in California Supreme Court, Denied on Merits, S150480, 9-25-07

A17   Habeas Petition in Court of Appeal, Denied on Procedure Grounds, D052224, 4-9-08

A18   Coversheet of Petition for Review, S162914, Filed 8-23-08. It is Pending.

N

FILED
STEPHEN M. KELLY.

'96   OCT 25

COURT OF APPE
FOURTH DISTRI

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>LEOVARDO SALCEDA,<br><br>    Defendant and Appellant. | D025258<br><br><br>(Super. Ct. No. SCD112436) |

APPEAL from a judgment of the Superior Court of San Diego County, E. Mac Amos, Jr., Judge (Judge of the Municipal Court of the San Diego Judicial District sitting under assignment by the Chairperson of the Judicial Council). Affirmed in part and reversed in part with directions.

Leovardo Salceda was convicted by a jury of kidnapping and exhibiting a deadly weapon. The court thereafter found true one prison prior within the meaning of Penal Code[1] section 667.5, subdivision (b), two serious felony prior convictions within the meaning of section 667, subdivision (a)(1), and three

---

1    All statutory references are to the Penal Code.

*Exhibit A*

serious/violent felony prior convictions within the meaning of section 667, subdivisions (b)-(i).

Salceda was sentenced to an indeterminate term of 25 years to life for kidnapping plus 10 years for the serious felony prior convictions.

Salceda appeals, contending the court erred in refusing a requested jury instruction on good faith belief in consent, in imposing consecutive sentences for the enhancements, and that the case should be remanded to permit the court to exercise its discretion in light of *People* v. *Superior Court* *(Romero)* (1996) 13 Cal.4th 497. We will vacate the sentence and remand for resentencing, otherwise we will affirm the conviction.[2]

STATEMENT OF FACTS

We incorporate the statement of facts from the respondent's brief as an accurate summary of the evidence.

Russell Champion lived in Encanto. On April 23, 1995, at approximately 5 p.m., Champion was returning home in his 1984

---

[2]    The Attorney General concedes the sentence must be vacated and the case remanded for resentencing in light of *Romero*. We are confident on remand the trial court will follow the guidelines set forth in *Romero* and therefore find no need to discuss the issue further. (See also *People* v. *Dent* (1995) 38 Cal.App.4th 1726.)

As to the contention the trial court erred in adding consecutive terms for the serious felony prior convictions, we will leave that discussion until the trial court completes its action on the prior convictions and resentence. For the guidance of the court we refer the trial court to *People* v. *Ramirez* (1995) 33 Cal.App.4th 559, *People* v. *Anderson* (1995) 35 Cal.App.4th 587, *People* v. *Turner* (1995) 40 Cal.App.4th 733, and *People* v. *Purata* (1996) 42 Cal.App.4th 489.

*Exh. A*

Crown Victoria after picking up dinner.  Champion was alone in the car with the windows down and the doors locked.  Champion reached the intersection of 65th Street and Imperial, which had trolley tracks crossing the roadway.  Because traffic was heavy, Champion's car was barely moving.  Champion looked and saw Salceda jogging through traffic heading directly toward his car. Salceda ran in front of Champion's car.  Champion stopped his car two to four feet away from Salceda.  Salceda stopped and began gesturing to signify that Champion had almost run into him. Champion waited until Salceda walked toward the right side of the car and then proceeded driving slowly, again because of heavy traffic.  Salceda was now parallel to the car.  Salceda turned and jumped into the car through the passenger window.

Inside the car, Salceda turned toward Champion in a half kneeling position.  He had his hands in half fists and was gesturing toward Champion's face.  Salceda leaned toward Champion and put his fists two to three inches away from Champion's face. Champion asked Salceda what he was doing.  Salceda told Champion to drive forward in a demanding and threatening voice.  Champion drove to the intersection of 65th Street and Broadway.  He stopped.  Salceda told Champion to continue forward.  Salceda was still in a crouched position with his fists raised.  At the intersection where 65th Street meets Klauber and Scimitar Streets, Champion stopped.  Salceda told Champion to go forward, however, Champion turned left.  Salceda told Champion, "I told

3

*Exh. A*

you to go straight," but did not appear too demanding or upset that Champion had turned.

As they drove down Scimitar, Salceda ordered Champion to stop next to a pickup truck where a man was standing. Salceda's fists were on the dashboard. When it appeared that the man did not respond to Salceda, he ordered Champion to continue driving. Several houses down the street, Salceda ordered Champion to stop because Salceda thought he recognized a man in the front yard. Champion drove 20 yards past the man and stopped. Salceda appeared to be agitated, told Champion, "I told you to stop," and then punched him in the face, causing his glasses to crack and splashing blood on the front windows and on Champion's shirt. Jesse Marquez, who was outside in his yard sweeping leaves recognized Salceda as the passenger in the car. He saw Salceda hit Champion in the face in a very hard manner. He told his wife to call the police.

After Salceda hit Champion, the two scuffled over the car keys. Salceda lunged for the keys. Champion anticipated what Salceda was about to do and grabbed the keys. Salceda tried to get Champion's hands off the keys and punched him in the temple. Champion became more cooperative. Salceda told him to drive forward. Champion, who was already panicky, became more so because Salceda kept saying words like, "I could kill you," "I will kill you," or "I'll kill you." Salceda repeated this two or three times.

4                                    *Exh. A*

Champion continued driving slowly because, unknown to Salceda, he was nearing his house. He formed a plan. When Champion arrived at his house, he turned and zoomed up the driveway, honking his horn and yelling. Salceda attempted to grab the steering wheel. While the two were struggling, Salceda punched Champion in the head. Champion managed to park the car, causing Salceda to panic. Salceda fled the car while Champion ran to his house and called police. The entire episode happened in approximately five minutes.

James North, Champion's neighbor, heard a car driving very fast which was unusual in that neighborhood because it was rural and there are many children and animals in the area. He looked past his yard and saw Champion driving his car. He saw Salceda run from the car onto Scimitar Drive and try to hide behind some bushes. Twenty seconds later Salceda ran down the hill, towards Marquez's home. North and another neighbor stood outside trying to figure out what was happening. Champion's roommate ran past them and told them that Champion had just been attacked. North and the other neighbor joined in the chase. North hopped into his pickup truck and drove down the hill. Salceda returned to Marquez's home seven to ten minutes after Marquez saw him hit Champion. Salceda was walking at a fast pace. Marquez asked him what had happened. Salceda had an angry look on his face and did not answer him but continued walking toward him. Marquez raised a broom to his shoulder to keep Salceda at a distance. Salceda

5

*Exh. A*

stopped approximately four feet from Marquez who told him to back off. Salceda walked from side to side but did not back away from Marquez. Eventually Salceda went out toward the street. Marquez went to his car and hit the gate button, closing off the gates. Salceda came up to the gates and started conversing with Marquez. He asked for a ride which Marquez refused to give him. Marquez told Salceda to leave.

Marquez saw North drive his pickup truck near the house. North saw Salceda in the middle of the street waving his arms in an attempt to stop North who called police on his mobile telephone. Salceda began walking toward North who put his truck in reverse. Salceda picked up a large rock and stood in a position with the rock above his head as if to throw it at the truck. North got out of the truck with his rottweiler dog on a leash. He told Salceda not to throw the rock or he would let go of the dog. Salceda put the rock down. At the same time police arrived and Salceda was arrested. Champion identified Salceda as the kidnapper.

*DEFENSE*

Salceda testified that on April 25, 1995,[3] he went to his mother's house to ask his mother's friend, Nacho, for a ride to Salceda's work in order to pick up his paycheck. Salceda arrived

---

[3]    The date of April 25, 1995, is incorrect. Champion testified the date of the incident was April 23, 1995. The information also alleged that the incident occurred on April 23, 1995.

*Exh. A*

at the house at 9 a.m. and stayed for approximately a half hour before going to pick up his check. He returned to his mother's house at 10:30 a.m. He and Nacho brought a six pack of beer with them. Salceda and Nacho drank the beer and Salceda stayed at his mother's house until 2 p.m. During that time, Salceda left his mother's house twice. Each time he returned he drank beer. While Salceda was at this mother's house, his mother told him not to drink any more because he had to go to work the next day. Salceda told her he would not, and that he was waiting for his wife so they could go grocery shopping. Salceda's mother could smell beer on Salceda. At approximately 2 p.m., Salceda left his mother's house and went to the trolley on 25th and Commercial Streets. Salceda had a 16-ounce beer while waiting for the trolley. He decided to go to Encanto where he got off at 62nd Street and Imperial. When he arrived at the trolley station, he went to a store and brought another 16-ounce beer. He talked to one person he knew and then saw Jesse Guerrero in his car. Salceda asked Guerrero if it would be all right to drink the beer inside a nearby bar. Guerrero said yes. Salceda and Guerrero went inside. The last thing Salceda remembered was sitting next to Guerrero and shaking the owner's hand. He did not remember a host of events that occurred inside the bar. Salceda did not remember Champion and had no memory of any of the events about which Champion testified. The next memory Salceda had was being in the back of a police car with an officer asking him questions.

7

*Exh. A*

Salceda agreed with the prosecutor that he was an aggressive drunk. He also acknowledged that he could not dispute any of the testimony of Champion because he claimed he did not remember any of it.

Guerrero had known Salceda for years. Salceda grew up with Guerrero's sons. He remembered the events in the Rio Contijo bar. Salceda and Guerrero sat in the bar for two hours during the afternoon. Sometime between 4 and 5 p.m., Guerrero told the barmaid not to serve Salceda any more drinks because Guerrero though Salceda had had enough. Salceda's eyes were glassy and his speech was slurred. Salceda went to a nearby jukebox and slipped because of the amount of alcohol he had drunk. Because Guerrero was a friend of the bar owner, he decided to help the owner by escorting Salceda out of the bar. Guerrero and Salceda walked outside and had a conversation concerning Guerrero's children and Salceda and how they all seemed to be in trouble, and the movie "The Godfather." Salceda became angry over the movie and took off running, heading north on Imperial Avenue. Guerrero admitted Salceda became angry with Guerrero concerning "The Godfather" and that Salceda became belligerent.

DISCUSSION

I

*CALJIC No. 9.58*

Although Salceda testified he had no memory of the events of the kidnapping and that he was severely intoxicated, he contended

8

*Exh. A*

in the trial court and on appeal that he was entitled to have the
jury instructed on the defense of good faith belief that the
victim consented to allow him in the car and to drive him to
various locations.  He asked the court to instruct in the
language of jury instruction CALJIC No. 9.58, which provides:
"It is a defense to the charge of kidnapping that a defendant
lacked general criminal intent.  There is no general criminal
intent if a defendant entertained a reasonable and good faith
belief that the person alleged to have been kidnapped voluntarily
consented to accompany the defendant and to the movement involved
in the purported kidnapping.  If from all the evidence you have a
reasonable doubt that the defendant harbored general criminal
intent at or during the time of the movement, you must find him
not guilty of kidnapping."

The trial court, correctly in our view, refused to give the
instruction because there was no evidence that Salceda believed
the victim consented.

Salceda acknowledges he did not testify he believed the
victim consented and that his defense was intoxication which
produce a total absence of memory.  He speculates, however, that
since the victim followed his directions and drove to certain
locations and did not call out for help, that a jury might
believe that he believed the victim consented.

Kidnapping is committed when a person is moved or
transported some distance against the person's will accomplished

*Exh. A*

by force or threat of force. (*People* v. *Davis* (1995) 10 Cal.4th 463, 517.) It is a general intent crime to which voluntary intoxication is not a defense. (*People* v. *Walker* (1993) 14 Cal.App.4th 1615, 1620-1621.)

As set forth in the statement of facts, the only person who testified to the events of the kidnapping was the victim. Respectfully, nothing in the victim's testimony could remotely be construed to establish Salceda's *good faith belief* that the victim of this forcible kidnapping consented. There was simply no evidence in this record to support an instruction on good faith belief in consent and the court correctly refused that instruction. (*People* v. *Patrick* (1981) 126 Cal.App.3d 952, 968.)

II

*Power to Strike Priors*

After the sentencing in this case, the Supreme Court filed its opinion in *People* v. *Superior Court (Romero)*, *supra*, 13 Cal.4th 497. In that case the court made clear trial courts retain their traditional power under section 1385 to strike serious/violent felony prior convictions in the furtherance of justice.

In the present case the trial court appears to have relied on earlier appellate court decisions indicating trial courts lacked such power. The Attorney General had properly conceded the case must be resentenced. Accordingly, we will remand the case to the trial court to permit that court to exercise its

10

*Exh. A*

discretion in accordance with the guidelines set forth in *Romero*.
(See also *People* v. *Dent, supra,* 38 Cal.App.4th 1726.)

### DISPOSITION

The sentence is vacated and the case remanded to the trial court for resentencing in accordance with the views expressed in this opinion.  In all other respects the judgment is affirmed.

_____
HUFFMAN, J.

WE CONCUR:

_____
KREMER, P.J.

_____
WORK, J.

*Exh. A*

Salceda was imprisoned between his initial sentence and
resentencing.  (See *People* v. *Chew* (1985) 172 Cal.App.3d 45, 50-
51.)  The trial court shall modify the abstract of judgment to
reflect 531 days actual prison credit.

The judgment is affirmed as modified.

_____
HALLER, J.

WE CONCUR:

_____
WORK, Acting P.J.

_____
McDONALD, J.

4

*Exh. A1*

F I L E D

MAR 2 5 1998

Court, . District

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

|  |  |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>LEO SALCEDA,<br><br>    Defendant and Appellant. | D029086<br><br><br>(Super. Ct. No. SCD112436) |

APPEAL from a judgment of the Superior Court of San Diego County, E. Mac Amos, Jr., Judge.  (Judge of the Municipal Court for the San Diego Judicial District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.)  Affirmed as modified.

During the afternoon of April 23, 1995, Russell Champion was stopped in traffic at 65th Street and Imperial Avenue.  Leo Salceda, apparently inebriated, entered Champion's car and threatened to harm him if he did not drive forward.  Champion drove to his own home where he managed to run away from the car.

*Exhibit A1*

A jury convicted Salceda of kidnapping and exhibiting a deadly weapon (Pen. Code,[1] §§ 207, subd. (a), 417, subd. (a).) In a bifurcated hearing the court found he had three prior strikes (§ 667, subds. (b)-(i)), two prior serious felony convictions (§ 667, subd. (a)), and had served one prior prison term (§ 667.5, subd. (b)). The court sentenced him to 35 years to life: 25 years to life for kidnapping with 2 strikes enhanced by 5 years for each prior serious felony conviction. Salceda appealed and we remanded in light of *People* v. *Superior Court (Romero)* (1996) 13 Cal.4th 497. On remand, the trial court struck two strikes and sentenced Salceda to twenty-six years: double the eight-year upper term for kidnapping with a strike enhanced by two five-year terms for the prior serious felony convictions. Salceda contends the trial court erred in imposing the upper term.

Section 1170, subdivision (b) provides in part:

> "When a judgment of imprisonment is to be imposed and the statute specifies three possible terms, the court shall order imposition of the middle term, unless there are circumstances in aggravation or mitigation of the crime."

California Rules of Court, rule 420(b) provides in part:

> "Circumstances in aggravation and mitigation shall be established by a preponderance of the evidence. Selection of the upper term is justified only if after a consideration of all the relevant facts, circumstances in aggravation outweigh the circumstances in mitigation. . . ."

---

[1] All statutory references are to the Penal Code.

2                    *Exh. A1*

The trial court imposed the upper term because Salceda was on probation when the crime occurred and he has a serious and lengthy criminal history.  Salceda recognizes determination as to the appropriate term is within the trial court's broad discretion.  (See *People* v. *Roe* (1983) 148 Cal.App.3d 112, 119.) He recognizes the court correctly relied on both aggravating factors here, but he argues their weight is reduced by the use of two of the crimes to enhance his sentence and the court's failure to give sufficient weight to the factors in mitigation.

"Sentencing courts have wide discretion in weighing aggravating and mitigating factors [citation], and may balance them against each other in qualitative as well as quantitative terms.  [Citation.]"  (*People* v. *Roe*, *supra*, 148 Cal.App.3d at p. 119.)  The trial court here heard Salceda and his counsel argue for a lighter sentence.  It recognized Salceda has a severe alcohol problem but determined the upper term was proper. "[D]iscretion is abused whenever the court exceeds the bounds of reason, all of the circumstances being considered.  [Citations.] [I]n the absence of a clear showing that its sentencing decision was arbitrary or irrational" a discretionary determination should not be set aside on review.  (*People* v. *Giminez* (1975) 14 Cal.3d 68, 72.)  The trial court here was not arbitrary or irrational in choosing the upper term.

Salceda also argues, and the People concede, the abstract of judgment erroneously omits 531 days actual credit for the period

*Exh, A1*

F **I** **L** **E** D
STEPHEN THUNBERG
Clerk of the Superior Court

SEP 1 4 2001

By: L. Hodges, Deputy

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**COUNTY OF SAN DIEGO**

| | |
|---|---|
| IN RE THE PETITION OF: | ) SCD 105783 |
| LEOVARDO SALCEDA, | ) |
| Petitioner. | ) ORDER DENYING REQUEST |
| | ) FOR TRANSCRIPTS |
| | ) |

THIS COURT, HAVING READ AND CONSIDERED THE REQUEST FOR TRANSCRIPTS AND THE FILE IN THE ABOVE CAPTIONED MATTER, FINDS:

Petitioner seeks transcripts and other documents from the above-referenced case, but he has not provided any specific factual basis for obtaining this material, other than he wants to file a Petition for Writ of Habeas Corpus on a 12-year-old case for which he received a four-year sentence. He lists his issues but fails to state what facts he hopes to find to substantiate his issues. Petitioner has not stated anything about *what* he hopes to find in those documents. *Factual* specificity and particularity are required when seeking a reporter's transcripts or any other material from the file at the taxpayers' expense. Petitioner is not entitled to such material merely to comb the record for error. United States v. MacCollom (1976) 426 U.S. 317; Miller v. Hamm (1970) 9 Cal.App.3d 860. Further, Petitioner had the opportunity to appeal this matter, but apparently chose not to.

In People v. Bizieff (1991) 226 Cal.App.3d 1689, the Court discussed United States v.

*Exhibit A2*

ORDER - 1

MacCollom (1976) 426 US 317, where the US Supreme Court had upheld a federal statute which limited an indigent defendant's rights to transcripts: "The [MacCollom] court noted while an indigent defendant had an absolute right to transcripts on appeal, at the collateral relief stage he stood in a different position. (Citation). 'We think it enough at the collateral-relief stage that Congress has provided that the transcript be paid for by public funds if one demonstrates to a district judge that his . . . claim is not frivolous, and that the transcript is needed to decide an issue presented.' (Citation)." Id., at 1702.

With all of this being said, right of access of the Petitioner is not being denied. However, right of access is not the same as a right to have the County of San Diego pay to make copies of transcripts and/or documents from the file. Petitioner has the right, as does any member of the public, to review this file and to request that copies be made of whatever documents are contained therein. The requesting party bears the cost of making copies and there is no legal authority requiring the taxpayer to subsidize this expense. Petitioner may have a friend or relative review the file and have copies made of whatever is contained therein -- for a fee.

Further, there are no transcripts in the Court file, so Petitioner would have to contact the court reporter for each hearing to negotiate financial arrangements to pay for what he wants.

Therefore, Petitioner's request for transcripts is DENIED.

It is further ordered that a copy of this Order be served upon Petitioner.

IT IS SO ORDERED.

DATED: _Sept. 14, 2001_          _Robert F. O'neill_

ROBERT F. O'NEILL

JUDGE OF THE SUPERIOR COURT

_Exh. A2_

F I L E D

STEPHEN THUNBERG
Clerk of the Superior Court

NOV 3 0 2001

By: P. COOKE, Deputy

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**COUNTY OF SAN DIEGO**

| | |
|---|---|
| IN RE THE PETITION OF: | ) CR 105783 |
| LEOVARDO SALCEDA, | ) |
| Petitioner. | ) ORDER DENYING REQUEST |
| | ) FOR SETTLED STATEMENT |
| | ) |
| | ) |

THIS COURT, HAVING READ AND CONSIDERED THE REQUEST FOR A SETTLED STATEMENT AND THE FILE IN THE ABOVE CAPTIONED MATTER, FINDS:

On November 2, 1989, the Court sentenced Petitioner to a total term of four years for two counts of robbery (Penal Code § 211) and one count of unlawful taking of a vehicle (Vehicle Code § 10851(a)) plus the allegation on each robbery count that that he used a handgun during the commission of the offense (Penal Code § 12022.5(a)/12022(a)). There is no record that Petitioner ever filed a timely appeal in this matter or any indication that Petitioner is still serving this sentence 12 years later.

Petitioner now claims that he wants to file a Petition for Writ of Habeas Corpus and seeks copies of the record in this matter. Apparently he has purchased copies of all pertinent documents contained in the file, but was told that he could not purchase any transcripts of the proceedings because all notes had been destroyed after 10 years, as allowed by law.

In lieu of the missing transcripts, he seeks to have a settled statement approved so that he can file his Petition.

*Exhibit A3*

ORDER - 1

1    This request for a settled statement must be denied for several reasons.

2    First, there is no authority requiring or allowing a settled statement for a Petition for Writ

3    of Habeas Corpus. All of the legal authority cited by Petitioner pertains to preparation of such a

4    statement when a defendant **has filed a timely appeal**. "It is now settled law that the state must

5    allow access by an **appealing** defendant in a criminal case, to "''a record of sufficient

6    completeness" to permit proper consideration'" of his **appeal**. In Re Armstrong (1981) 126

7    Cal.App.3d 565, 570. (Emphasis added). As noted, no appeal was ever filed in this case.

8    Second, Petitioner has failed to provide the Court with any reason why he has waited

9    almost 12 years to seek to obtain these records. In other words, the problem he faces now was

10    caused by his own delay. Further, it would appear that 12 years later the four-year sentence has

11    been completely served.

12    Third, there is no showing that the settled statement would show anything contrary to

13    what the Minute Orders in the file indicate; i.e., the jury waiver.

14    Finally, there is no proof that the other party(ies) to this case have been served or even

15    been made aware that Petitioner is attempting to obtain a settled statement.

16    Therefore, for all the above-stated reasons, this request is DENIED.

17    It is further ordered that a copy of this Order be served upon Petitioner.

18    IT IS SO ORDERED.

19    DATED:    _11/30/01_

                                          STEVEN R. DENTON
                                          JUDGE OF THE SUPERIOR COURT

20

21

22

23

24

25

26

27

28

29

30

*Exh. A3*

ORDER - 2

37

F I L E D
STEPHEN THUNBERG
Clerk of the Superior Court

MAR 2 7 2002

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**COUNTY OF SAN DIEGO**

IN RE THE PETITION OF:              )    CR 105783
                                    )
LEOVARDO SALCEDA,                   )
                                    )    ORDER DENYING MOTION TO
        Petitioner.                 )    RECONSIDER ORDER DENYING
                                    )    REQUEST FOR SETTLED STATEMENT
                                    )
                                    )
_____     )

    THIS COURT, HAVING READ AND CONSIDERED THE REQUEST TO RECONSIDER AN ORDER DENYING A MOTION FOR A SETTLED STATEMENT AND THE FILE IN THE ABOVE CAPTIONED MATTER, FINDS:

    On November 30, 2001, the Court denied Petitioner's request to have a settled statement approved so that he could file a Petition for Writ of Habeas Corpus. He had requested this settled statement because he had attempted to obtain transcripts from this case but could not do so because it was more than 10 years old and notes from that long ago were destroyed, as allowed by law. Petitioner now asks the Court to reconsider its denial of that motion. For the reasons stated below, this request is DENIED.

    The underlying facts are that on November 2, 1989, the Court sentenced Petitioner to a total term of four years after it had found him guilty in a Court trial of two counts of robbery (Penal Code § 211) and one count of unlawful taking of a vehicle (Vehicle Code § 10851(a)) plus the allegation on each robbery count that that he used a handgun during the commission of

*Exhibit A4*

ORDER - 1

the offense (Penal Code § 12022.5(a)/12022(a)). Petitioner did not file a timely appeal in this matter and had he remained law-abiding, this case would have had no bearing on his current situation. However it does now have an effect because, although it was a strike that was stricken when Petitioner was sentenced in case SCD 112436 on June 12, 1997, it still was used to enhance the latest sentence because the law considers him to be a recidivist (repeat) offender, pursuant to Penal Code § 667.

Petitioner's request was denied for several reasons and this Court has fully reviewed those reasons and finds no error in that original analysis.

There is no authority requiring or allowing a settled statement for a Petition for Writ of Habeas Corpus. All of the legal authority cited by Petitioner in the original motion and again in the motion for reconsideration pertains to preparation of such a statement when a defendant *has filed a timely appeal*. "It is now settled law that the state must allow access by an *appealing* defendant in a criminal case, to 'a record of sufficient completeness' to permit proper consideration" of his *appeal*. In Re Armstrong (1981) 126 Cal.App.3d 565, 570. (Emphasis added). As noted, no appeal was ever filed in this case.

Second, Petitioner failed to provide the Court with any reason why he has waited almost 12 years to seek to obtain these records. He counters now that he requested prior attorneys to obtain information for him but that none of them ever did. However, he provides no proof of that claim and there is nothing in the current files to verify this contention.

Third, and perhaps most importantly, there is no showing that the settled statement would prove anything contrary to what the Minute Orders in the file indicate; i.e., the jury waiver. In fact, the signed jury waiver is in the Court file. However, all the waiver of the jury did was to allow the trial Judge to be the trier of fact instead of a jury. Petitioner did not have to be informed about any other waiver of other rights because none were waived when he waived jury. He still maintained the right to cross-examine witnesses, to not incriminate himself and to present evidence. Thus, no settled statement and/or transcript would demonstrate anything different than that signed jury waiver form.

Finally, while Petitioner has presented Proofs of Service to show that the People have been served with both the original motion and this motion to reconsider, they have not responded, probably because the law as noted above does not require them to reply.

*Exh, A4*

1    Therefore, because Petitioner has not provided any reason to modify the original order

2   denying his requests, this motion to reconsider is DENIED.

3       It is further ordered that a copy of this Order be served upon Petitioner.

4       IT IS SO ORDERED.

5   DATED: _____3-27-02_____        _Rafael A. Arreola_

6                                    RAFAEL A. ARREOLA

7                                    JUDGE OF THE SUPERIOR COURT

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27                 *Exh. A4*

28

29   The foregoing instrument is a full, true and correct
     copy of the original on file in this office.
30   Attest:    MAR 2 9 2002
     STEPHEN THUNBERG
     Clerk of the Superior Court of the State of California,
     in and for the County of San Diego.
     By: _J Belden_ Deputy
     J. BELDEN

                ORDER - 3

F I L E D
STEPHEN THUNBERG
Clerk of the Superior Court

JUL 1 9 2002

By: M. CHARTER, Deputy

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**
**IN AND FOR THE COUNTY OF SAN DIEGO**

| | |
|---|---|
| IN THE MATTER OF THE APPLICATION OF: ) | HC 17070 |
| ) | |
| ) | SCD 112436 |
| ) | CR 105783 |
| LEOVARDO SALCEDA, ) | CR 140382 |
| ) | |
| ) | ORDER DENYING PETITION FOR WRIT |
| Petitioner. ) | OF HABEAS CORPUS |

AFTER REVIEWING THE PETITION FOR WRIT OF HABEAS CORPUS AND THE COURT FILES IN THE ABOVE REFERENCED MATTER, THE COURT FINDS AS FOLLOWS:

A jury convicted Petitioner in 1995 of kidnapping (Penal Code[1] § 207(a)) and exhibiting a deadly weapon (§ 417(a)). In a bifurcated trial, the court found that Petitioner had three strike priors (§ 667(b)-(i)), two serious felony priors (§ 667(a)), and he had served one prior prison term (§ 667.5(b)). Petitioner was sentenced to a term of 35 years to life in state prison.

Petitioner appealed, and the Court of Appeal, Fourth Appellate District, Division One, issued an unpublished opinion remanding the case for consideration of a motion to strike Petitioner's prior strikes, pursuant to *People v. Superior Court (Romero)* (1996) 13 Cal. 4th 497. [D025258.] On remand, the trial court struck two-strikes and sentenced Petitioner to a determinate term of 26 years in prison: double the eight-year term for kidnapping and two

---

[1] All further references are to the Penal Code.

*Exhibit A5*

-1-

consecutive five-year terms for the serious felony prior convictions. Petitioner again appealed, contending the trial court erred in imposing the upper term and failing to consider the factors in mitigation. The Court of Appeal affirmed the trial court judgment on March 25, 1998, and a remittitur was issued on May 26, 1998. [D029086.]

In a petition for writ of habeas corpus filed on June 26, 2002, Petitioner asserts the following arising out of his conviction in SCD 112436: (1) that in entering a "slow plea" in CR 105783 (which formed the basis in the information of SCD 112436 for the first and second strike priors and the first serious felony prior) he was not advised nor aware of his right to confront and cross-examine the witnesses against him, the right against self-incrimination, the right to present evidence on his own behalf, and the right to a jury trial; (2) that he received ineffective assistance of counsel in CR 105783, which led to the conviction and its use as a strike prior and serious felony prior in SCD 112436; (3) that he was denied effective assistance of counsel in CR 140382 (which formed the basis in the information of SCD 112436 for the third strike prior and the second serious felony prior); (4) that the sentencing court in SCD 112436 violated Petitioner's rights to due process and equal protection by failing to consider the mitigating circumstances in sentencing Petitioner on June 12, 1997 to 26 years in state prison; (5) that Petitioner's rights to due process were violated in SCD 112436 by his counsel's failure to challenge the evidence relating to the prior convictions; and (6) that Petitioner's right to a fair trial in SCD 112436 was violated when the trial court advised the jury of the verdict in the O.J. Simpson criminal case.

The petition is denied for the following reasons.

### I. Petitioner Fails to Show a Denial of Due Process in CR 105783

Petitioner contends in CR 105783 that he was not advised nor aware of his right to a jury trial, right to confront and cross-examine witnesses, the right against self-incrimination, and the right to present evidence before he entered into the "slow plea" agreement by submitting in a court trial on the evidence in the preliminary hearing transcript. In considering this issue, the court has assumed without so finding that Petitioner is correct his conviction was the product of a "slow plea," i.e., it was tantamount to the entry of a guilty plea. In *Bunnell v. Superior Court* (1975) 13 Cal. 3d 592, the California Supreme Court held that "in all cases in which the

*Exh. A5*

defendant seeks to submit his case for decision on the transcript or to plead guilty, the record shall reflect that he has been advised of his right to a jury trial, to confront and cross-examine witnesses, and against self-incrimination." [*Id.* at 605.]   These rights have commonly been referred to as *Boykin-Tahl* rights after *Boykin v. Alabama* (1969) 395 U.S. 238 and *In re Tahl* (1969) 1 Cal. 3d 122.

First of all, Petitioner's own Exhibit G demonstrates that he was advised in writing of his right to a jury trial and that he voluntarily gave up that right in order to proceed in a court trial. Therefore, his contention that he was not aware of and was not advised of his right to a jury trial is not well taken.

Petitioner's contention that he was not advised of the right to confront and cross-examine witnesses (which, by implication includes the right to present evidence) and the right against self-incrimination is insufficient to support his collateral challenge to the validity of his prior conviction.  "In the context of a collateral attack, as opposed to a direct appeal, it has been consistently been the rule that prejudice (an uniformed, involuntary plea) must be demonstrated for any *Boykin-Tahl* error." [*People v. Cooper* (1992) 7 Cal. App. 4th 593, 597.]  After discussing considerable case precedent on the standards for challenging the constitutional validity of a guilty plea, the court in *Cooper* concluded "that a collateral attack upon a prior conviction used for sentence enhancement, whether by habeas petition or a motion to strike, must allege prejudice: an 'actual denial' of constitutional rights rendering the plea 'involuntary' because defendant was 'unaware of his [*Boykin-Tahl*] rights and would not have pleaded guilty had he known of them.'" [*Id.* at 601 (citing *People v. Tassell* (1984) 36 Cal. App. 3d 77, 92, et al.).]

Petitioner has failed to make a *prima facie* showing on two of these aspects.  First, the court notes that Petitioner makes the bald statement that he was not aware of and was not advised of his *Boykin-Tahl* rights.  He attempts to support this contention be referencing a silent record. Petitioner is correct that the minutes do not reflect whether he was advised of and waived his right to confront and cross-examine witnesses and the right against self-incrimination.  However, as was stated in *Cooper, supra,* 7 Cal. App. 4th at 597, "[w]e find that the evidence presented by the minute order of a silent record and defendant's bare declaration of nonwaiver of his right[s]

-3-

*Exh. A5*

1  ... are insufficient to support defendant's challenge of the prior conviction in this habeas corpus

2  proceeding." Furthermore, "[c]onclusory allegations made without any explanation of the basis

3  for the allegations do not warrant relief ...." [*People v. Karis* (1988) 46 Cal. 3d 612, 656.]

4  Petitioner's contentions are essentially no different from those at issue in *Cooper*, especially in

5  light of the fact that because of Petitioner's delay in presenting this issue the reporter's notes

6  have been destroyed in accordance with the law. Therefore, the court finds that Petitioner has

7  failed to make a *prima facie* showing that his plea was involuntary.

8      Petitioner has likewise failed to state in any respect that he would not have pled guilty

9  had he known of his *Boykin-Tahl* rights. Therefore, he cannot assert that he suffered any

10  prejudice as a result of his assertion that he was not advised of and was not aware of his *Boykin-*

11  *Tahl* rights. Furthermore, the court minutes reflect that the People dismissed counts 3 and 5 prior

12  to submitting on the evidence set forth in the preliminary hearing transcript. Therefore,

13  Petitioner avoided the possibility of a longer state prison term by the manner in which the

14  proceedings were handled.

15      In short, because Petitioner has not shown that he was unaware of his *Boykin-Tahl* rights

16  at the time he pled guilty, and because he has failed to show that he would not have pled guilty

17  had he known of these rights, he has not established a *prima facie* case for the collateral relief

18  requested.

19  **II. Petitioner Fails to Show That He Received Ineffective Assistance of Counsel in CR**
20  **105783**

21      Petitioner contends he received ineffective assistance from trial counsel in CR 105783

22  with respect to counsel's supposed failure in seeking to exclude evidence relating to a witness

23  who recanted his identification of Petitioner after the preliminary hearing and before trial

24  commenced (i.e., the slow plea). Petitioner also complains that counsel failed to properly

25  investigate and present evidence in support of his defense.

26      One who claims ineffective assistance of counsel is required to show: (1) "that counsel's

27  performance was deficient" [*Strickland v. Washington* (1984) 466 U.S. 668, 687]; and (2)

28  resulting prejudice from counsel's alleged deficiencies. [*Id.* at 693-94.] However, even *if* the

-4-

*Exh. A5*

evidence established "that counsel's performance was deficient," Petitioner has not established the requisite prejudice from the alleged failures of trial counsel. To prove prejudice, Petitioner must establish a "reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would be different.   A reasonable probability is a probability sufficient to undermine confidence in the outcome." [*Id.* at 694.]   This showing of prejudice must be "affirmatively proved" by Petitioner. [*People v. Ledesma* (1987) 43 Cal. 3d 171, 216.]

The prejudice Petitioner must show here relates to the use of these convictions to enhance the sentence he is presently serving in SCD 112436.   However, Petitioner is unable to demonstrate any such prejudice because the court in SCD 112436 struck one of the two strikes stemming from CR 105783, and Petitioner raises no factual challenge to the second robbery for which he stood convicted. Furthermore, the People only pled the two robbery convictions as one serious felony prior, which was used to provide one five-year sentence enhancement. Therefore, no negative consequences occurred in SCD 112436 as a result of the alleged ineffective assistance of counsel in CR105783. This ground of the petition is denied on this basis.

### III.  Petitioner Fails to Establish a Claim of Ineffective Assistance of Counsel in CR 140382

Petitioner's primary complaints in this claim are that his attorney in CR 140382 failed to properly investigate and advise Petitioner of the possible sentencing consequences he faced, and failed to advise Petitioner of his right against self-incrimination.   However, first of all, Petitioner's own Exhibit H-5 shows that he was advised of his right to remain silent, i.e., the right against self-incrimination. Secondly, there is no factual showing that properly supports the supposed failure to investigate.   Finally, Petitioner can show no prejudice by counsel's supposedly advising him the prison prior allegation added five years as opposed to one year. Petitioner was placed on probation and given one year in county jail as a condition of probation. He was not sentenced to state prison until he violated probation. Petitioner therefore cannot demonstrate that any prejudice resulted from any ineffective assistance of counsel that Petitioner might have received. This ground of the petition is therefore denied.

///

*Exh. A5*

*IV.  The Issue of the Trial Court's Consideration of the Mitigating Factors in SCD 112436 Was Considered and Rejected on Appeal*

Petitioner complains that in re-sentencing him to a determinate 26-year term in state prison, the trial court failed to consider mitigating factors because they were not addressed in the probation report prepared for the first sentencing.  However, the Court of Appeal considered and rejected this claim in the second appeal of this case, noting that the court did properly consider the mitigating factors in choosing the upper term for the crime of kidnapping.  Matters that were raised and rejected on appeal are not ordinarily cognizable on state habeas corpus in the absence of special circumstances.  [*In re Huffman* (1986) 42 Cal. 3d 552, 554-55.]  No special circumstances are shown here.  Moreover, the court notes that defense counsel filed a statement in mitigation more than one month before the re-sentencing on remand occurred in 1997.

*V.  Petitioner's Constitutional Rights Were Not Violated in the Bifurcated Court Trial on the Priors Alleged in SCD 112436*

Petitioner asserts that his due process rights were violated when neither the court nor counsel advised him and/or obtained a waiver of his constitutional rights prior to the commencement of the court trial on the prior conviction allegations.  Petitioner essentially contends that the failure of defense counsel to challenge the evidence proffered by the prosecution was tantamount to the entry of a guilty plea and thus he should have been advised of his rights.  However, first of all, Petitioner's own Exhibit O-1 shows that Petitioner waived his right to a jury trial before the bifurcated court trial on the priors commenced.  Further, Petitioner cites to no authority that requires counsel or the court to separately advise a defendant of his constitutional rights before he or she proceeds in a bifurcated trial on prior conviction allegations.  Moreover, it is not unusual for the defense not to present any affirmative evidence on the issue of whether a defendant suffered the alleged prior convictions.  In short, typically the testimony and certified records offered by the prosecution speak for themselves, and there is often nothing left to challenge.  No deprivation of Petitioner's constitutional rights occurred in the proceeding and the petition is denied in this regard.

///

*Exh. A5*

**VI.    *Petitioner Has Shown No Error Occurred When the Court in SCD 112436 Informed the Jurors about the Verdict in the O.J. Simpson Criminal Case***

Petitioner contends that his right to a fair trial was infringed upon when the court in SCD 112436 informed the jurors about the verdict in the O.J. Simpson criminal case after closing arguments were completed in the morning session of October 3, 1995. However, Petitioner has not shown that any prejudice occurred as a result of the juror's being informed at that time about O.J. Simpson verdict. The minutes reflect that the jury retired to deliberate after being instructed following a three-hour lunch break, during which they would likely have learned of the verdict in light of its prominence in the news at that time. Therefore, this ground of the petition is denied for this reason.

It is further ordered that a copy of this Order be served upon:  (1) the Office of the San Diego County District Attorney (DDA Thomas McArdle); and (2) Petitioner.

IT IS SO ORDERED.

DATED: 7/19/02

KENNETH K. SO
JUDGE OF THE SUPERIOR COURT

I hereby certify that the foregoing instrument is a
full, true & correct copy of the original on file in
this office, that said document has not been revoked,
annulled or set aside, and it is in full force and effect.

JUL 1 9 2002

Attest:
STEPHEN THUNBERG, Clerk of the Superior Court of the State
of California, in and for the County of San Diego

By _____ Deputy

*Exh. A5*

132

F I L E D
STEPHEN CHUNBERG
Clerk of the Superior Court

NOV 1 3 2002

BY: A. GARCIA, Deputy

1
2
3
4
5
6
7
8
9          **SUPERIOR COURT OF THE STATE OF CALIFORNIA**
10                     **COUNTY OF SAN DIEGO**
11
12   IN RE THE PETITION OF:          )    CR 105783
                                     )
13   LEOVARDO SALCEDA,               )    ORDER DENYING REQUEST FOR
                                     )    HEARING TO ORDER COUNSEL TO
14          Petitioner.              )    TURN OVER DOCUMENTS
                                     )
15                                   )
16                                   )
17   _____)
18          THIS COURT, HAVING READ AND CONSIDERED THE REQUEST FOR AN
19   ORDER THAT COUNSEL TURN OVER DOCUMENTS AND THE FILE IN CR 105783,
20   FINDS:
21          Petitioner asks the Court to order his trial representatives, the San Diego Office of the
22   Public Defender, to turn over the "client papers and property" from CR 105783 to Petitioner.
23   Petitioner states that his trial attorney has passed away and now wants the Court to assist him to
24   obtain his file. However, the Superior Court is not the proper forum in which to seek assistance
25   in obtaining material from a party's attorney. In Re Walker (1948) 32 Cal.2d 488; Bollotin v.
26   California State Personnel Board (1955) 131 Cal.App.2d 197. In that regard, Petitioner may have
27   civil remedies which he may pursue in civil court and/or he may contact the California State Bar.
28          Further, there are no transcripts in the Court file and the Court has already denied
29   Petitioner's request for free copies of transcripts and other documents. Petitioner would have to
30   contact the court reporter for each hearing to negotiate financial arrangements to pay for what he

*Exhibit*
*A6*

ORDER - 1

375

1   wants. Apparently he has already attempted to do so and been told that the original notes for that

2   1989 case have been destroyed.

3       Therefore, Petitioner's request for Court assistance in obtaining transcripts is DENIED.

4       It is further ordered that a copy of this Order be served upon Petitioner and the office of

5   eh san Diego Public Defender.

6       IT IS SO ORDERED.

7   DATED:  ___NOV 1 3 2002___

8                                   WILLIAM D. MUDD

9                           JUDGE OF THE SUPERIOR COURT

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

29

*Exh. A6*

376

COURT OF APPEAL - FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

FILED
Stephen M. Kelly, Clerk

FEB - 6 2003

Court of Appeal Fourth District

| | |
|---|---|
| In re LEOVARDO SALCEDA | D041226 |
| on | (San Diego County Super. Ct. No. SCD 112436) |
| Habeas Corpus. | |

THE COURT:

The petition for writ of habeas corpus has been read and considered by Presiding Justice Kremer and Associate Justices Haller and McIntyre. We have taken judicial notice of appeal files D025258 and D029086 and superior court file CR105783.

Leovardo Salceda is serving a 26-year sentence on a 1995 conviction for kidnapping with a strike enhanced by two five-year terms for prior serious felony convictions. He challenges the conviction and the use of a 1989 robbery conviction (CR105783) to enhance the sentence. " '[B]ecause petitioner seeks to overturn a final judgment in a collateral attack, he bears the burden of proof. . . . ' 'For purposes of collateral attack, all presumptions favor the truth, accuracy, and fairness of the conviction and sentence . . . [s]ociety's interest in the finality of criminal proceedings so demands . . . .' '[Citations.]' " (*In re Roberts* (2003) 29 Cal.4th 726, 740-741.)

Salceda claims the 1989 conviction was invalid because he agreed to a slow plea but was never informed of his right against self-incrimination and his right to cross-examine witnesses. The record is silent whether Salceda was advised and the court reporter's notes have been destroyed. However, Salceda's right against self-incrimination is not implicated because he does not claim he testified at the preliminary hearing and the transcript of the hearing was the only evidence the court reviewed on the slow plea. Salceda claims had he known he could cross-examine witnesses he would have proceeded to trial. He claims he was prejudiced because robbery victim Rafael Haro later recanted his preliminary hearing identification of Salceda in open court. There is nothing in the record to show Haro recanted. The absence of express admonitions and waivers is

*Exhibit A7*

not per se error. (*People v. Howard* (1992) 1 Cal.4th 1132, 1178.) Salceda has not shown his agreement to a slow plea was other than voluntary and intelligent under the totality of the circumstances. (*Ibid.*) Salceda's claim he is factually innocent of the robbery of Haro is unsubstantiated.

Salceda claims insufficient evidence supports the 1995 kidnapping conviction, the court erred in excluding an expert witness and his attorney was ineffective in investigating defenses and advising him regarding his trial testimony. All of these claims could have been raised on appeal. Salceda has not shown clear and fundamental constitutional error to warrant judicial review on postappeal habeas corpus. (*In re Harris* (1993) 5 Cal.4th 813, 834.) Salceda's claim his sentence is illegal was reviewed and rejected in D029086.

Salceda also claims the court should have granted his motion to set aside the indictment. Review of a denial of a Penal Code section 995 motion is by petition for writ of prohibition within 15 days of the denial of that motion. (Pen. Code, § 999a.) It is not reviewable on postappeal habeas corpus.

The petition is denied.

*Haller*

_____
HALLER, Acting P. J.

Copies to: All parties

*Exh. A7*

2

COURT OF APPEAL - FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

FILED
Stephen M. Kelly, Clerk
JUN 17 2003
Court of Appeal Fourth District

LEOVARDO SALCEDA,

    Petitioner,

    v.

THE SUPERIOR COURT OF SAN DIEGO COUNTY,

    Respondent;

THE PEOPLE,

    Real Party in Interest.

D042258

(San Diego County
Super. Ct. No. SCD 112436)

THE COURT:

    The petition for writ of mandate has been read and considered by Justices Nares, McDonald and O'Rourke.  The Public Defender has located and transmitted the file to petitioner Leovardo Salceda.  The petition is denied as moot.

                                        NARES, Acting P. J.

Copies to:  All parties

*Exhibit A 8*

F I L E D
Clerk of the Superior Court

AUG 2 0 2003

By: G. MEGGELIN, Deputy

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF SAN DIEGO

IN RE THE MOTION OF:                    ) SCD 112436
                                        ) CR 105783
LEOVARDO SALCEDA,                       ) CR 140382
                                        )
           Petitioner.                  )
                                        ) ORDER DENYING MOTION FOR RELIEF,
                                        ) FOR APPOINTMENT OF COUNSEL AND
                                        ) FOR AN EVIDENTIARY HEARING
                                        )
_____ )

THIS COURT, HAVING READ AND CONSIDERED THE POST-CONVICTION MOTION FOR RELIEF IN CR 105783, THE APPLICATION FOR APPOINTMENT OF COUNSEL, THE MOTION FOR AN EVIDENTIARY HEARING, AND THE FILES IN THE ABOVE CAPTIONED MATTERS, FINDS:

A jury convicted Petitioner in 1995 of kidnapping (Penal Code § 207(a)) and exhibiting a deadly weapon (Penal Code § 417(a)). In a bifurcated trial, the Court found that Petitioner had three strike priors (Penal Code § 667(b)-(i)), two serious felony priors (Penal Code § 667(a)), and that he had served one prior prison term (Penal Code § 667.5(b)). Based upon this conviction, the Court sentenced Petitioner to a total term of 35 years to life in state prison.

Petitioner timely appealed and on October 25, 1996, the Fourth District Court of Appeal issued an unpublished opinion remanding the case for consideration of a motion to strike prior strikes, pursuant to People v. Romero (1996) 13 Cal.4th 497 [Appellate case D025258]. On remand, the trial court struck two strikes and sentenced Petitioner to a determinate term of 26

*Exhibit A9*

ORDER - 1

1   years, which was double the eight-year term for kidnapping and two consecutive five-year terms

2   for the serious felony priors.

3   Petitioner timely appealed that new sentence, but this time the Fourth District Court of

4   Appeal affirmed the judgment on March 25, 1998 [Appellate case D029086].

5   Petitioner sought to obtain free documents and transcripts, but failed to present a factual

6   basis for receiving them and the motion was denied on September 14, 2001. Petitioner then

7   apparently was able to purchase copies from his files, but he could not obtain transcripts because

8   the notes were older than 10 years and had been destroyed, as allowed by law. Therefore, he

9   asked the Court to prepare a settled statement so that he could file a habeas corpus petition. This

10   request was denied on November 30, 2001.

11   Thereafter, Petitioner filed a habeas corpus petition in Superior Court, claiming he was

12   denied due process in **CR 105783**, that he had received ineffective assistance of counsel in both

13   **CR 105783** and **CR 140382**, that his constitutional rights were violated in the bifurcated court

14   trial on the priors alleged in **SCD 112436**, and that the Court committed error in **SCD 112436**

15   when it informed the jurors in his trial of the verdict in the O.J. Simpson criminal case.

16   The Court did not find merit in these arguments and denied the petition on July 19, 2002.

17   Thereafter, Petitioner filed another habeas corpus petition, this time with the Fourth

18   District Court of Appeal, challenging the conviction in **CR 105783** because he was never

19   informed of his right against self-incrimination and his right to cross-examine witnesses.

20   Petitioner claimed that had known the latter right, he would have proceeded to trial. He further

21   claimed that he was prejudiced because robbery victim Rafael Haro later recanted his

22   preliminary hearing identification of Petitioner in open court. *However,* the appellate court noted

23   "*[T]here is nothing in the record to show Haro recanted.*" (This phrase is highlighted for

24   reasons explained below.)

25   Petitioner also presented numerous other arguments in that habeas corpus petition, but the

26   Court denied that Petition [D041226] on February 6, 2003.

27   Petitioner has now filed the present motions, the basis of which all focuses around the

28   highlighted statement immediately above: "There is nothing in the record to show Haro

29   recanted."

30   Petitioner has recently received a letter from the San Diego District Attorney (DDA

*Exh. A9*

1  George Clarke), dated May 21, 2003, the pertinent part of which stated: "Mr. Haro provided

2  brief information to this office on October 3, 1989, indicating that he had mis-identified you as

3  the person who had robbed him. He stated on that same date that he had no intention of coming

4  to court at your trial and that he resided in Tijuana, Mexico. The information from Mr. Haro was

5  not reduced to a report, but only noted in your case file. ¶ The information provided by Mr. Haro

6  was immediately provided to your attorney at the time, Mr. William Youmans, at the time of

7  your trial."

8      Petitioner now believes that this letter proves that Mr. Haro recanted and had he known

9  that at the time, he would not have pled guilty and would have proceeded to trial.

10      It should be noted that all this letter actually proves is that Petitioner's attorney knew of

11  the recant at the time of the plea. But, as the record shows, Petitioner also has known about it for

12  a long time and could have raised that issue before, but did not. More importantly, the appellate

13  court vacated the original sentence and the trial court struck two strike priors on remand,

14  reducing his total sentence from indeterminate to a determinate 26 years.

15      Upon review, all the courts that have looked at this case since the original sentence have

16  not found that Petitioner was prejudiced in any way by the fact that a witness recanted and

17  Petitioner has failed to show here how proving that recantation changes anything.

18      Petitioner is now surmising that had the Judge know about the recant, he would not have

19  let Petitioner plead guilty. However, this is just a guess without substantiation. He also repeats

20  his claims about his lack of awareness of his rights to cross-examine and against self-

21  incrimination, but these issues have already been dealt with in the past against Petitioner's

22  interests and they cannot be re-visited.

23      Therefore, for the above-stated reasons, these motions are DENIED. Petitioner has had

24  his full day in court to argue all of the above issues and any further attacks on his convictions

25  and/or sentences should be filed with the Court of Appeal.

26      It is further ordered that a copy of this Order be served upon Petitioner, the San Diego

27  Public Defender, and the San Diego Office of the District Attorney (DDA Kim-Thoa Hoang).

28      IT IS SO ORDERED.

29  DATED: _____**AUG 2 0 2003**_____     _____

                                                H. RONALD DOMNITZ

                                   JUDGE OF THE SUPERIOR COURT

*Exh, A9*



# CALIFORNIA WESTERN
## S C H O O L   O F   L A W

CALIFORNIA INNOCENCE PROJECT

September 23, 2003

*Justin Brooks, Esq.*
*Bar No. 214187*

Leovardo Salceda
J90933
B3-150
P.O. Box 2349
Blythe, CA 92226

Dear Mr. Salceda:

The California Innocence Project provides *pro bono* legal assistance to inmates who maintain their innocence in the participation of the crimes for which they were convicted. In such cases, new, strong evidence of innocence must exist.

The California Innocence Project only accepts cases where the conviction occurred in Southern California. Please respond to the attached questionnaire with as many answers as you can. Submit only the documents specifically requested in section X of the questionnaire, **do not send all the documents listed in section X.** Submitting original copies is not recommended, photocopies are preferred; if you cannot produce photocopies you might forward the documents to a family member so they can make copies.

We are not agreeing to take your case at this time, but we will evaluate the case and consider representation. Once the questionnaire and supporting documents are received, your file will begin funneling through our review process. The review process includes investigating the facts of your case and can take months. Please understand that due to the overwhelming number of requests for our assistance, this letter may be the only correspondence you receive from the Project for some time; however, just because we do not contact you does not mean we are not reviewing your case. During the review process, you must proceed with your legal proceedings as if we are not involved. This may mean you need to acquire counsel to meet filing deadlines.

Thank You,
California Innocence Project

Enc: Screening Questionnaire

*Exhibit A10*



# CALIFORNIA WESTERN
## S C H O O L   O F   L A W

### CALIFORNIA INNOCENCE PROJECT

January 12, 2004

Leovardo Salceda
J90933
B3-150
P.O. Box 2349
Blythe, CA 92226

Dear Mr. Salceda:

Thank you for your questionnaire. In order to begin the review process, we need the following documents:

> ➤ Police Report(s) **SEND COPIES <u>ONLY</u> IF YOU ACCEPTED A PLEA**
> ➤ Physical Evidence, Laboratory & Medical Report(s) **SEND COPIES IF YOU HAVE THEM**
> ➤ Probation Report **SEND COPY IF YOU HAVE IT**
> ➤ Appellant's Opening Brief (AOB) **SEND COPY**
> ➤ Opinion **SEND COPY**

Once we receive the requested documents, your file will be submitted to the Project's Case Manager for preliminary review. In the event the Case Manager determines there to be compelling evidence of innocence, your case will be assigned to a student for a more in depth investigation into your case. The student will notify you of their assignment once this happens. Should your case not qualify for further investigation, your documents will be returned to you.

Please understand that due to the overwhelming number of requests for our assistance, this letter may be the only correspondence you receive from the Project for some time; however, just because we do not contact you does not mean we are not reviewing your case.

During the review process, you must proceed with your legal proceedings as if we are not involved. This may mean you need to acquire counsel to meet filing deadlines.

*Exh. A10*

Finally, please do not telephone, write, or send additional information regarding your case unless we request it. Your patience, and the patience of your loved ones, is appreciated. We will review your case and notify you of the outcome as soon as possible.

Sincerely,
California Innocence Project

*Exh. A10*



## CALIFORNIA WESTERN
### S C H O O L   O F   L A W

### CALIFORNIA INNOCENCE PROJECT

May 17, 2004

Leovardo Salceda
J90933
B3-150
P.O. Box 2349
Blythe, CA 92226

Dear Mr. Salceda:

We are returning your check you sent us for our investigation: CIP works on a strict *pro bono* basis. We are presently reviewing your file and considering investigating your claim. We will get back to you with the results as soon as we can.

Sincerely,
California Innocence Project

*Exh. A10*

S125591

# IN THE SUPREME COURT OF CALIFORNIA

**En Banc**

In re LEOVARDO SALCEDA on Habeas Corpus

Petition for writ of habeas corpus is DENIED. (See *In re Robbins* (1998) 18 Cal.4th 770, 780; *In re Swain* (1949) 34 Cal.2d 300, 304; *In re Dixon* (1953) 41 Cal.2d 756; *In re Lindley* (1947) 29 Cal.2d 709; *In re Waltreus* (1965) 62 Cal.2d 218.)

SUPREME COURT
**FILED**

JUN - 8 2005

Frederick K. Ohlrich Clerk

DEPUTY

Chief Justice

*Exhibit A11*

F 9

F I L E D

Clerk of the Superior Court

NOV 0 2 2005

By: ᵕᑐ˃ᒉ Deputy

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**
**IN AND FOR THE COUNTY OF SAN DIEGO**

| | | |
|---|---|---|
| IN THE MATTER OF THE APPLICATION OF: | ) | HC 17070 |
| | ) | |
| | ) | SCD 112436 |
| | ) | CR 105783 |
| LEOVARDO SALCEDA, | ) | CR 140382 |
| | ) | |
| | ) | 2nd Petition |
| Petitioner. | ) | |
| | ) | ORDER DENYING PETITION FOR WRIT |
| | ) | OF HABEAS CORPUS & REQUEST FOR |
| | | APPOINTMENT OF COUSEL |

AFTER REVIEWING THE PETITION FOR WRIT OF HABEAS CORPUS AND REQUEST FOR APPOINTMENT OF COUNSEL THE COURT FILES IN THE ABOVE REFERENCED MATTER, THE COURT FINDS AS FOLLOWS:

A jury convicted Petitioner in 1995 of kidnapping (Penal Code[1] § 207(a)) and exhibiting a deadly weapon (§ 417(a)). In a bifurcated trial, the court found that Petitioner had three strike priors (§ 667(b)-(i)), two serious felony priors (§ 667(a)), and he had served one prior prison term (§ 667.5(b)). Petitioner was sentenced to a term of 35 years to life in state prison.

Petitioner appealed, and the Court of Appeal, Fourth Appellate District, Division One, issued an unpublished opinion remanding the case for consideration of a motion to strike Petitioner's prior strikes, pursuant to *People v. Superior Court (Romero)* (1996) 13 Cal. 4th 497.

---

[1] All further references are to the Penal Code.

*Exhibit A12*

-1-

[D025258.]    On remand, the trial court struck two-strikes and sentenced Petitioner to a determinate term of 26 years in prison: double the eight-year term for kidnapping and two consecutive five-year terms for the serious felony prior convictions. Petitioner again appealed, contending the trial court erred in imposing the upper term and failing to consider the factors in mitigation. The Court of Appeal affirmed the trial court judgment on March 25, 1998, and a remittitur was issued on May 26, 1998. [D029086.]

Petitioner filed a Petition for Writ of Habeas Corpus on June 26, 2002, asserting: (1) that in entering a "slow plea" in CR 105783 (which formed the basis in the information of SCD 112436 for the first and second strike priors and the first serious felony prior) he was not advised nor aware of his right to confront and cross-examine the witnesses against him, the right against self-incrimination, the right to present evidence on his own behalf, and the right to a jury trial in violation of his *Boykin/Tahl* rights; (2) that he received ineffective assistance of counsel in CR 105783, which led to the conviction and its use as a strike prior and serious felony prior in SCD 112436; (3) that he was denied effective assistance of counsel in CR 140382 (which formed the basis in the information of SCD 112436 for the third strike prior and the second serious felony prior); (4) that the sentencing court in SCD 112436 violated Petitioner's rights to due process and equal protection by failing to consider the mitigating circumstances in sentencing Petitioner on June 12, 1997 to 26 years in state prison; (5) that Petitioner's rights to due process were violated in SCD 112436 by his counsel's failure to challenge the evidence relating to the prior convictions; and (6) that Petitioner's right to a fair trial in SCD 112436 was violated when the trial court advised the jury of the verdict in the O.J. Simpson criminal case. The court did not find merit in Petitioner's claims, and the Petition was denied on July 19, 2002.

Thereafter, Petitioner filed a Petition for Writ of Habeas Corpus with the Fourth District Court of Appeal challenging the conviction in CR 105783 because he was never informed of his right against self incrimination and his right to cross-examine witnesses in violation of his *Boykin/Tahl* rights. He also asserted that his attorney was ineffective in investigating and advising him regarding his trial testimony in SCD 112436. The appellate court held that Petitioner had failed to show that his agreement to a "slow plea" in CR 105783 was anything but

*Exh. A12*

1 voluntary and intelligent. The appellate court further indicated that the ineffective assistance of

2 counsel claim could have been, but was not, raised on appeal. Thus, his Petition was denied.

3 [Court of Appeal, 4th App. Dist., Div. 1, Dated February 6, 2003, D041226.]

4       Petitioner has now filed the present second Petition for Writ of Habeas Corpus.

5 Petitioner claims that he received ineffective assistance of counsel in case SCD 112436. It

6 appears that Petitioner is asserting that trial counsel failed to properly investigate the court/client

7 files in connections with Petitioner's previous conviction in case CR 105783, which would have

8 identified the *Boykin/Tahl* errors and other exculpatory evidence in connection with his

9 conviction in case CR 105783. In support of his claim, Petitioner has submitted and relies on a

10 letter from then District Attorney George Clarke, the statement and declaration of witness Carlos

11 Sanchez, and the declaration of Jesus Lopez. Petitioner claims that had his attorney, Mr.

12 Mangarin, discovered this information, he could have used it to support Petitioner's claim of

13 innocence in case CR 105783, and to attack the validity of the plea in case CR 105783 on

14 *Boykin/Tahl* errors to prevent a life sentence in case SCD 112436 under the three strikes law.

15       The Petition is denied for the reasons set forth herein.

16 **A.**     *Issues Subject to Appeal and/or Raised and Rejected on Appeal*

17       Habeas Corpus cannot serve as a second appeal, and matters that were raised and rejected

18 on appeal are not cognizable on state *habeas corpus* in the absence of special circumstances. (*In*

19 *re Huffman* (1986) 42 Cal.3d 552, 554-55; *In re Terry* (1971) 4 Cal.3d 911, 927.) Moreover,

20 habeas corpus cannot serve as a substitute for an appeal, and that matters that "could have been,

21 but were not, raised on a timely appeal from a judgment of conviction" are not cognizable on

22 habeas corpus in the absence of special circumstances warranting departure from that rule. (*In re*

23 *Clark* (1993) 5 Cal.4th 750, 765 [quoting *In re Dixon* (1953) 41 Cal.2d 756, 759; *In re Walker*

24 (1974) 10 Cal.3d 764, 773.)

25       Petitioner's ineffective assistance of counsel claim is based primarily on restatements and

26 reformulations of arguments previously made and rejected by the Court of Appeal. Further, all

27 of the issues raised by the instant Petition either were, or could have been, raised by Petitioner at

28 the appellate court. As no "special circumstances" are present in this case, and Petitioner has

*Exh. A12*

1  presented no justification warranting review on habeas corpus, his claim may also be denied on
2  this basis as well.

3  **B.    *Successive Petitions are Improper***

4          Unless a petitioner can justify the filing of numerous habeas corpus petitions, the
5  reviewing court may summarily deny the current petition in its entirety. (*In re Clark* (1993) 5
6  Cal.4th 750, 767-75 ["'In this state a defendant is not permitted to try out his contentions
7  piecemeal by successive proceedings attacking the validity of the judgment against him.'"] (*Id.*
8  [quoting *In re Connor* (1940) 16 Cal.2d 701, 705].)

9          Petitioner elected to seek habeas corpus relief in this court, the Court of Appeal, and the
10 California Supreme Court. [Court of Appeal, 4th App. Dist., Div. 1, D041226 dated February 6,
11 2003; also D041639 dated May 5, 2003; and California Supreme Court, S125591, dated June 8,
12 2005.]  None of the issues now asserted by Petitioner involve facts unknown to him at the time
13 they occurred, at the time of the filing of his appeal, or when he sought habeas corpus relief in
14 this court, the Court of Appeal, or the Supreme Court.  The instant petition could be denied on
15 that ground alone.

16 **C.    *The Petition is Untimely***

17         Additionally, the Petition may be denied as untimely.  Petitioner has the burden of
18 explaining any substantial delay in the making of his claim.  (*In re Swain* (1949) 34 Cal.2d 300,
19 304; *In re Clark* (1993) 5 Cal.4th 750, 765.)  Petitioner has the burden of establishing (1)
20 absence of substantial delay, (2) good cause for the delay, or (3) that his claims fall within an
21 exception to the timeliness bar.  (*In re Robbins* (1998) 18 Cal.4th 770, 780.)

22         Here, Petitioner was convicted in case SCD 112436 in 1995.  Any claim concerning Mr.
23 Magarin's representation of Petitioner in connection with that case arose in 1995.  Yet, Petitioner
24 waited over 10 years to raise the present ineffective assistance of counsel claim.  Petitioner does
25 not set forth any justification for considering the Petition, despite the fact that it was filed more
26 than 10 years after Petitioner was convicted.  Thus, the Petition may likewise be denied on this
27 basis.

28 / / /

*Exh. A12*

**D.    Petitioner Failed to Establish a Prima Facie Ineffective Assistance of Counsel Claim.**

Lastly, Petitioner has failed to meet his burden to establish that he received ineffective assistance of counsel.  Petitioner asserts that Mr. Mangarin failed to properly investigate Petitioner's underlying conviction in case CR 105783.  Specifically, he contends that had Mr. Mangarin thoroughly investigated the court files, client files, and prosecutor files in case CR 105783 he would have discovered: 1) the *Boykin/Tahl* errors; 2) a statement (witness interview) and declaration from witness Juan Carlos Sanchez, who stated that Petitioner was not the perpetrator in case CR 105783; 3) that the victim recanted his prior identification of Petitioner as the perpetrator in case CR 105783; and 4) prosecutorial misconduct when the prosecutor cross-examined Petitioner with what purported to be the change of plea form from case CR 105783, and no such change of plea form existed in CR 105783.

Whether Petitioner was denied effective assistance of counsel is a two prong test.  (*Strickland v. Washington* (1984) 466 U.S. 668, 687 [80 L.Ed.2d 674, 693]; *People v. Ledesma* (1987) 43 Cal.3d 171, 216.)  First, Petitioner must show that counsel's representation was deficient, in that it "fell below an objective standard of reasonableness . . . under prevailing professional norms."  (*Ledesma*, *supra*, at p. 216, citing *Strickland*, *supra*, at p. 688.)  This first prong is reviewed under a standard of deferential scrutiny.  (*Strickland*, *supra*, at p. 689; *Ledesma*, *supra*, at p. 216.)  Counsel is given the benefit of a strong presumption that his or her conduct fell within the "wide range of reasonable professional assistance."  (*Id.*)  "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time."  (*In re Marquez* (1992) 1 Cal.4th 584, 603, citing *Strickland*, *supra*, at p. 689.)  Strategic decisions made by counsel after a reasonable investigation into the alternatives should be given deference by the courts.  (*People v. Pennsinger* (1991) 52 Cal.3d 1210, 1280.)  Petitioner has shown neither deficient performance nor prejudice.

Here, Petitioner has failed to demonstrate that Mr. Mangarin's performance was deficient in any way.  Although Petitioner relies on the lack of notations in Mr. Mangarin's file pertaining

*Exh. A12*

1  to the investigation of Petitioner's prior conviction, merely citing to the absence of a notation in

2  a file does not establish that Mr. Mangarin did not adequately investigate the prior conviction.

3      Nor do the documents relied on by Petitioner from Mr. Sanchez, the District Attorney and

4  Mr. Lopez support his claims of ineffective assistance of counsel.  The interview of Mr. Sanchez

5  was conducted in 1989, by an investigator, and according to Petitioner contained within either

6  the prosecutor's file or a "client file" in case CR 105783.  However, Petitioner has not

7  established that Mr. Mangarin was aware of the existence of this document or cited to any

8  authority to support that he had a duty to discover its existence.

9      As to the remaining documents submitted by Petitioner, Mr. Sanchez's declaration

10  executed in 2001, the letter from the District Attorney dated May 21, 2003, or the declaration of

11  Jesus Lopez executed on May 20, 2004, *none* of these documents were in existence at the time

12  of Mr. Mangarin's representation of Petitioner.  Nor is there any evidence to support that Mr.

13  Mangarin should have or could have known that Mr. Sanchez or Mr. Lopez had any information

14  relevant to Petitioner's defense in case SCD 112436 in 1995.

15      Additionally, Petitioner has failed to provide any authority to support his belief that Mr.

16  Mangarin had an obligation to comb through numerous documents, court records, and prosecutor

17  files, and conduct an independent investigation as to the truth of the factual allegations

18  supporting Petitioner's prior conviction in CR 105783.   Thus, Petitioner has not presented any

19  facts, evidence, nor authority which would establish that Mr. Mangarin's performance in

20  connection with his representation of Petitioner was deficient.

21      Further, Petitioner has failed to establish any prejudice resulted from any of the alleged

22  errors.   In fact, Petitioner does not even *address* the requisite showing of prejudice by

23  establishing how the outcome of the proceedings would have been different absent any of the

24  alleged errors.  One fails to state a prima facie case when he cannot demonstrate any prejudice

25  resulting from counsel's alleged errors or omissions. (*Strickland, supra*, 466 U.S. 668, 687.)

26  Specifically, with regard to the prosecutor's alleged misconduct by reference to the change of

27  plea form (which according to Petitioner was really his jury waiver form) that did not exist in

28  case CR 105783, Petitioner has not demonstrated how this resulted in any prejudice to him.

*Exh. A12*

1    Likewise, as to the alleged *Boykin/Tahl* error, since the Court of Appeal held that

2  Petitioner's "slow plea" in CR 105783 was voluntary and intelligent, Petitioner cannot establish

3  that he suffered any prejudice by Mr. Mangarin's alleged failure to investigate Petitioner's claim

4  to the contrary.   [Court of Appeal, 4th App. Dist., Div. 1, D041226 dated February 6, 2003.]

5  Therefore, his claim of ineffective assistance of counsel may be denied on this basis as well.

6    Petitioner's request for the appointment of counsel is also denied.   The United States

7  Supreme Court has never held that prisoners have a constitutional right to counsel when

8  mounting collateral attacks upon their convictions.  (*Pennsylvania v. Finley* (1987) 481 U.S. 551,

9  555 citing *Johnson v. Avery* (1969) 393 U.S. 483, 488.)   Similarly, the California Supreme Court

10  does not require the appointment of counsel for an indigent petitioner unless he or she makes

11  "adequately detailed factual allegations stating a prima facie case for relief." (*People v. Barton*

12  (1978) 21 Cal.3d 513, 519 fn.3; *People v. Shipman* (1965) 62 Cal.2d 226, 232.)   No such

13  showing has been made in this case.

14    Therefore, this Petition is DENIED for the reasons set forth above.

15    It is further ordered that a copy of this Order be served upon Petitioner and the Appellate

16  Division of the San Diego Office of the District Attorney.

17    IT IS SO ORDERED.

18

19  DATED:  NOV   2 2005

20                                            DAVID M. GILL
                                      JUDGE   OF   THE   SUPERIOR   COURT

21  I hereby certify that the foregoing instrument is a
    full, true & correct copy of the original on file in
22  this office, that said document has not been revoked,
    annulled or set aside, and it is in full force and effect.

23  Attest:  NOV  0 2 2005
                        Clerk of the Superior Court of the State
24  of California, in and for the County of San Diego

25        By                              Deputy

26

27

28

-7-

*Exh, A12*

Salceda's motions for appointment of counsel and for further discovery are denied. The petition is denied.

McCONNELL, P. J.

Copies to:  All parties

*Exh. A13*

COURT OF APPEAL - FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

F I L E D
Stephen M. Kelly, Clerk
APR 2 0 2006
Court of Appeal Fourth District

| | |
|---|---|
| In re LEOVARDO SALCEDA<br><br>on<br><br>Habeas Corpus. | D048000<br><br>(San Diego County<br>Super. Ct. No. SCD 112436) |

THE COURT:

    The petition for a writ of habeas corpus has been read and considered by Presiding Justice McConnell and Associate Justices Benke and Nares. We have taken judicial notice of the prior petition D041226.

    Leovardo Salceda is serving a 26-year sentence on a 1995 conviction for kidnapping with a strike enhanced by two five-year terms for prior serious felony convictions. He claims a 1989 robbery conviction (CR105783) should not have been used to enhance the sentence imposed in 1995 because he agreed to a slow plea but was never informed of his right against self-incrimination and his right to cross-examine witnesses. This argument was raised and rejected in Salceda's prior petition and will not be reviewed on a subsequent petition.

    Salceda claims he has new evidence showing he did not commit the 1989 robbery. He offers the declaration of Juan Sanchez dated November 15, 2001, stating that Salceda was drunk at the time of the "incident" and tried to stop the robbery. Salceda also offers the declaration of his crime partner Jesus Lopez dated May 20, 2004, stating that Lopez alone robbed the victim and Lopez ordered Salceda to rob the gas station clerk. The declarations do not exonerate Salceda or undermine the conviction.

*Exhibit A13*



# Superior Court of California
## County of San Diego

CENTRAL COURTHOUSE
220 W. BROADWAY
PO BOX 120128
SAN DIEGO CA 92112-0128

October 16, 2006

Leovardo Salceda   J-90933
CVSP  B3 260 Low
P.O. Box 2349
Blythe, CA.  92226

RE: Request for discovery
SCD 112436 / CR 105783

Dear Mr. Salceda:

The Court is in receipt of your letters of August 16 and August 22, 2006, in which you ask the Court to provide you with certain items of "discovery" from the Court file and specifically the fingerprint records of a third party.

Both of those requests would be denied because you are not entitled to this material almost ten years after the final sentencing in this matter. Penal Code § 1054.9(a) states in full: "Upon the prosecution of a postconviction writ of habeas corpus or a motion to vacate a judgment *in a case in which a sentence of death or of life in prison without the possibility of parole has been imposed*, and on a showing that good faith efforts to obtain discovery materials from trial counsel were made and were unsuccessful, the court shall, except as provided in subdivision (c), order that the defendant be provided reasonable access to any of the materials described in subdivision (b)." (Emphasis added)

The emphasis was added above because the record shows that you did <u>not</u> receive a sentence of death or a term of life without the possibility of parole. In fact, you received a determinate term set specifically at 26 years. Therefore, this discovery statute does not pertain to you and there is no other post-conviction statute that applies to a prisoner sentenced to a determinate term.

Moreover, there are certain privacy rights that must be considered when personal records of any third party are sought, even when seeking pre-trial discovery. You may not obtain the fingerprint records of any third party simply because you believe that person may have committed the crime for which you were convicted.

The record shows that you have had two appeals plus numerous habeas corpus petitions already in this case which provided you with more than the usual amount of opportunities to attack the conviction in this case. In fact, the record shows that you have been successful in reducing an indeterminate 35 years-to-life sentence to a determinate 26 year sentence, which indicates that you have already had the chance to present your evidence. Finally, as you have already been told, unless you can justify the filing of successive habeas corpus petitions, any new petition can be summarily denied. <u>In Re Clark</u> (1993) 5 Cal.4th 750, 767.

Sincerely,
San Diego Superior Court

*Exhibit A14*



# Superior Court of California
## County of San Diego

CENTRAL COURTHOUSE
220 W. BROADWAY
PO BOX 120128
SAN DIEGO CA 92112-0128

November 15, 2006

Leovardo Salceda   J-90933
CVSP  B3 260 Low
P.O. Box 2349
Blythe, CA. 92226

RE: Renewed request for discovery
SCD 112436 / CR 105783

Dear Mr. Salceda:

The Court is going to assume that the letter it sent to you on or about October 16, 2006 (copy enclosed) crossed in the mail with the motion and attachment you sent on or about October 30, 2006.

The Court's letter fully set forth the reason why you are not now entitled to any of the "discovery" you are seeking so long after your case has closed.

If you did receive that letter and then filed this renewed request anyway, the Court is confused as to what it is that you did not understand. Certainly, the October 16, 2006, letter was not an invitation to ignore its contents and to refile the same material again as if the law set forth did not apply to you.

If you believe that for some reason you are entitled to the material you seek, it is suggested that you contact an attorney licensed by the State of California to assist you. The Court will not respond to any similar request for discovery in the future unless you can show legal authority that you are entitled to this material.

Sincerely,

San Diego Superior Court

*Exhibit A15*

F 12.

S150480

# IN THE SUPREME COURT OF CALIFORNIA

## En Banc

---

In re LEOVARDO SALCEDA on Habeas Corpus

---

The petition for writ of habeas corpus is denied.

SUPREME COURT
FILED

SEP 2 5 2007

Frederick K. Ohlrich Clerk

---

Deputy

---

GEORGE

Chief Justice

*Exhibit A16*

**S162914**

Leovardo Salceda J-90933
CVSP, D9-237 Low
P.O. Box 2349
Blythe, CA 92226

In pro per

RECEIVED

APR 2 3 2008

CLERK SUPREME COURT

**CALIFORNIA SUPREME COURT**

SUPREME COURT
**FILED**

APR 2 3 2008

Frederick K. Ohlrich Clerk

_____
Deputy

S _____

In re LEOVARDO SALCEDA,

      Petitioner,

On Habeas Corpus.

_____

**PETITON FOR REVIEW**

(Evidentiary Hearing Requested)

Fourth Appellate District, Division One, No. D052224

**PETITION FOR REVIEW**

## Exhibits

B      Conflict of Interest, SCD112436, 8-11-95

B1      Dr. Smith's Psychiatric Evaluation, SCD112436, 8-9-95

B2      Petitioner's Testimony in SCD112436, 9-27-95, Claim of Innocence of Prior Robbery CR105783

B3      First Piece of Exculpatory Evidence, Juan Carlos Sanchez's Declaration of Prior Robbery CR105783, 11-15-01

B4      Second Piece of Exculpatory Evidence, Victim Witness, Rafael Haro's Misidentification of Petitioner (George W. Clarke, Deputy District Attorney) Prior Robbery CR105783 5-21-03

B5      Third Piece of Exculpatory Evidence, Juan Carlos Sanchez's Tape Recorded Statement, 8-15-89, Prior Robbery CR105783

B6      Fourth Piece of Exculpatory Evidence, Jesus H. Lopez (Actual Robber) 5-20-04, Prior Robbery CR105783

B7      Fifth Piece of Exculpatory Evidence, Jesus H. Lopez (Actual Robber) 7-19-06, Prior Robbery CR105783

B8      Sixth Piece of Exculpatory Evidence, Supplemental Declaration of Jesus H. Lopez's "Fingerprints" 11-28-06, Prior Robbery CR105783

B9      Petitioner's Open Court Declaration, SCD112436, RT 14-21, 6-12-97, Claim of Innocence, Prior Robbery CR105783

B10      Prior Robbery CR105783: Minutes of Slow Guilty Plea, 10-2-89, 10-3-89, Boykin-Tahl Error, Prior Robbery (Submission of Preliminary Hearing, Haro's Testimony) (Cespedes Testimony); Jury Waiver for Slow Guilty Plea, 10-3-89, Boykin-Tahl Error, Prior Robbery; Abstract of Judgment, Sentence of Two Robberies, 11-2-89, Prior Robbery CR105783

B11      Certified Documents To Prove Prior Robbery Case and Prior Assault W/D/W Case at Trial on Priors, 10-4-95

B12      Criminal Minutes of Denial of Pen. C. 995 and 1385 Motions

B13      Declaration of Carmen Lopez, 11-23-05 (Robbery Case)

B14      Declaration of Angie Camarena, 11-23-05 (Robbery Case)

*conflict*

1       <u>San Diego, California, August 11, 1995, 9:06 a.m.</u>

2                            *****

3       THE CLERK:  People of the State of California

4   versus Leoardo Salceda.

5       MR. RUNNING:  Michael P. Running, Jr., on behalf

6   of the People.

7       MR. VANESIAN:  Ron Vanesian, office of the public

8   defender, criminal adult division, on behalf of

9   Mr. Salceda.

10              In this matter, criminal adult division

11  does have a conflict of interest.

12      THE COURT:  Which gentleman is Mr. Salceda?

13      MR. VANESIAN:  This is Mr. Salceda.

14      THE COURT:  Mr. Salceda, your attorney has a

15  conflict of interest and can't represent you on this

16  case.  That means I'll have to bring in another

17  attorney to represent you.  Do you understand that?

18      THE DEFENDANT:  Yes, sir.

19      THE COURT:  Okay.  That means we would put your

20  readiness conference over to September the 15th and

21  reschedule your trial for September 25th.  Do you

22  understand that?

23      THE DEFENDANT:  Yes, sir.

24      THE COURT:  Okay.  We're presently scheduled for

25  next Monday.

26      MR. VANESIAN:  That's correct, your Honor.

27      THE COURT:  Do you understand you have a right to

28  trial in 60 days from your arraignment in Superior

*Exhibit B*

1    Court?  Do you understand that?

2           THE DEFENDANT:  Yes, sir.

3           THE COURT:  Do you waive that right and agree to

4    put your trial over to September 25th?

5           THE DEFENDANT:  Yes, sir.

6           THE COURT:  So ordered.  And you will be

7    relieved -- your office will be relieved and new

8    counsel will be appointed.

9           MR. VANESIAN:  I believe it's going to be

10   alternate public defender, your Honor.

11          THE COURT:  Yes.  As far as we know, they have no

12   conflict; correct?

13          MR. VANESIAN:  That's my understanding, your

14   Honor.  I will provide the file to them today.

15          THE COURT:  I appreciate that.

16          MR. VANESIAN:  Thank you, your Honor.

17               (Whereupon, the hearing concluded.)

18

19

20

21

22

23

24

25

26

27

28

Exh. B

85  7²



## Clark E. Smith, M.D.
DIPLOMATE, AMERICAN BOARD OF PSYCHIATRY AND NEUROLOGY

591 Camino de la Reina, Suite 1020
San Diego, California 92108
(619) 226-5214

# FORENSIC PSYCHIATRIC EVALUATION

**Subject:** Leovardo Salceda  **Date of Birth:** August 20, 1969

**Attorney:** Ronald Vanesian, Deputy Public Defender

**Date of Evaluation:** August 9, 1995  **Case No.:** SCD 112436

**Reason for Evaluation:** Leovardo Salcedo was evaluated at the request of his attorney, Ron Vanesian, Deputy Public Defender, regarding his current psychiatric diagnosis, and his psychiatric condition at the time of the instant offense.

**SOURCES OF INFORMATION:** Arrest reports from officers Pechin and Collier, followup investigative reports from Detectives' Miller and Lovetere, with witness interviews of Jesse Guerrero, Gabriella Murgo, Jessie Marquez, and statements from the victim, Russell Champion, forensic psychiatric evaluation by Charles Rabiner, M.D., and previous arrest records.

**SYNOPSIS OF INSTANT OFFENSE:** Leovardo Salceda was drinking heavily on Sunday morning, April 23, 1995. He was noted by several people to be intoxicated and was thrown out of a bar when they refused to serve any more alcohol because he was too intoxicated and his conduct was disorderly. He then apparently, staggered in front of a car in traffic, appeared to be upset because the car nearly hit him, then abruptly jumped in through the open passenger window, threatened the driver with his fists, then demanded that the driver take him home. In the course of a brief ride, he struck the driver several times in the face with his fist, breaking his glasses and causing a facial laceration. The driver drove to his own home, then abandoned his car and the defendant was observed by a neighbor to be extremely intoxicated. Mr. Salceda states that he has no memory for any of these events starting shortly after he entered the bar, until he woke up handcuffed in the back of a police car, intoxicated and soaked with urine.

It is important to note that Mr. Salceda has a well documented severe alcohol abuse problem, with a history of multiple blackouts, and that his previous arrests have all been alcohol related. Because of these recurrent alcohol related felonies, he now falls

*Exhibit B1*

Salceda, L.
Page 2

under the 'three strikes' legislation.

**MENTAL STATUS EXAMINATION:** *General Appearance:* Mr. Salceda was seen in the professional interview room at the George Bailey Detention Facility on August 9, 1995. The interview was audiotaped. He was clean shaven, well groomed, and pleasant and polite on approach. He appeared to be tired and under stress, but there was no evidence of involuntary movement disorder, or marked psychomotor agitation or psychomotor retardation. He was forthright, with no evidence of evasion or manipulation noted. *Speech:* The pattern of speech was clear and well organized. There was some limitation in the range of vocabulary, however, he was able to express himself well. He would, at times, use phrases in Spanish, then translate into English. *Affect:* The subject appears to be depressed and is tearful and choking away tear at times. He seems quite disappointed and ashamed of his behavior and expresses deep regrets about his alcohol problems. *Thought Content:* The subject denies current suicidal ideation but admits to feeling preoccupied with suicide in November, 1994, with thoughts of jumping from a freeway overpass to kill himself at that time. He states that he was despondent over a recent alcohol relapse and this led to his suicidal preoccupation. He denies auditory or visual hallucinations, but admits to feeling paranoid at times when drinking, fearing that his wife was planning to leave him or having an affair with another man. He talks about being depressed and describes symptoms of insomnia, decreased appetite, decreased energy, decreased concentration, and depressed mood. He had constant tearfulness, unable to stop crying until mid-July, 1995, with some improvement since that time. He states that he felt great in July through October, 1994, because he was taking Antabuse and not drinking, however, he has had recurrent feelings of depression since that time. His insight and judgment regarding his alcohol abuse and inability to tolerate any alcohol has been chronically impaired through most of his life. He seems to have a sincere to be free of alcohol at this time, and appears to be willing to go any means necessary to stop his pattern of recurrent alcohol abuse. *Cognitive Function:* The subject is alert and oriented times three; short and long term memory appears to be intact.

**PAST PSYCHIATRIC HISTORY:** He states that he was diagnosed as having depression and antidepressant medication, Elavil, was recommended by the staff psychiatrist at the detention facility. He has been afraid to take Elavil, afraid that he would be, "drugged out", and too sedated to assist his attorney in his case, as he says he has seen in other inmates who are, "too drugged out ". He denies previous psychiatric treatment.

**PAST CHEMICAL DEPENDENCY HISTORY:** He has attended AA meetings, directed by alcholic peers while in the detention facilities, and he has tried to attend lectures after being arrested for driving under the influence in December, 1994. He states that he also voluntarily sought out Antabuse treatment from a doctor at the St. Vincent DePaul clinic. He has not had any previous exposure to a chemical

*Exh. B1*

0060     0200

Salceda, L.
Page 3

dependency rehabilitation program, was not treated in chemical dependency rehabilitation prior to release from incarceration, has not been recommended to move into a alcohol halfway house or recovery house, and was not recommended for ongoing chemical dependency counseling. No treatment for alcoholism was required as a condition of his probation, in spite of multiple incarcerations for alcohol related problems. His wife was not counseled regarding the hazards of alcohol use nor was the Al-Anon support group for wives recommended. He states that he sincerely admires the alcoholics he met at AA meetings who had stopped drinking and wanted to be like them, however, he is quite discouraged secondary to his repetitive failures, even though he has never received systematic therapy in order to develop skills to maintain an alcohol free lifestyle.

**FAMILY HISTORY:** The subject states that his mother is a severe alcoholic, with a longstanding history of recurrent alcoholic blackouts. He states that his mother suffered a stroke and was hospitalized, though she was recently released and has not resumed drinking at this time. His earliest childhood memories of his mother are of heavy alcohol related parties at their house, with lots of music and many bottles of Thunderbird wine.

**PREVIOUS ARRESTS:** The subject states that he was drinking heavily and was involved in an auto theft and robbery while under the influence and peer pressure from his friend in 1989. He was arrested again in 1992, when he apparently threw a brick at someone during a fight. He has no recollection of this because he was in an alcoholic blackout at that time. He states that he was arrested for driving under the influence in December, 1994, and apparently had a blood alcohol level of .3, severely intoxicated, more than three times the legal limit.

**PSYCHIATRIC DIAGNOSIS:**

**Axis I:**      Alcohol Dependency (with recurrent binges and history of alcoholic blackouts).

Major Affective Disorder, Depressed, recurrent.

**Axis II:**     Antisocial Personality Traits (may be secondary to chemical dependency).

**Axis III:**    History of Multiple Head Trauma

Stressors, Severe, secondary to recurrent marital, occupational, and liver problems secondary to alcohol abuse.

Global Assessment of Function (GAF) at the Time of the Instant Offense:

*Exh. B1*

0061   0201

Salceda, L.
Page 4

Estimated at 2D.

Current GAF Estimated at 60.

**DISCUSSION:**   The defendant was clearly under the influence of alcohol at the time of the instant offense, with severe intoxication documented by several witnesses. With his history of recurrent alcohol related blackouts it is likely that he was indeed suffering an alcoholic blackout at the time of the instant offense. He appears to be quite credible and consistent in his description of the events leading up to the offense, and in my opinion, was experiencing an alcoholic blackout and met the legal criteria for unconsciousness at the time of the instant offense.

| | |
|---|---|
| **Clark E. Smith, M.D., F.A.P.A.**<br>**General and Forensic Psychiatry** | **Date** |

*Exh. 81*

*false plea form*

1   Q.   So you would agree with me that's another

2   incident of you being argumentative, at least --

3   A.   No.

4   Q.   -- when you're drunk and you don't remember

5   it?

6   A.   No, sir.

7   Q.   Why wouldn't you agree with me?

8   A.   Because in jail people pick on you.

9   Q.   So you're naturally argumentative and

10  aggressive in jail?

11  A.   You have to be.

12  Q.   So you were doing what comes naturally, even

13  though you don't remember it?

14  A.   No.

15  Q.   Your prior conviction was for two different

16  robberies as well as a car theft in 1989, wasn't it?

17  A.   It was one case, sir.

18  Q.   It was two victims, wasn't it?

19  A.   Yes.

20  Q.   It was two robberies, wasn't it?

21  A.   Yes.

22  Q.   And a car theft?

23  A.   No, the robbery was the car theft, I think.

24  I think.   I'm not really sure.   I didn't do the first

25  robbery.

26  Q.   But you pled guilty to a robbery you didn't

27  do?

28  A.   Yes.

Exhibit B2

398

1    Q.   And you served time on a robbery you didn't

2 do?

3    A.   Yes, sir.

4    Q.   You never mentioned this to anybody?

5    A.   Well, they told me they would give me eight

6 years if I didn't plead, and I didn't want the eight

7 years.

8    Q.   Well, both of those robberies occurred

9 within 15 minutes of each other, didn't they?

10    A.   Yes.

11    Q.   And you're saying you did one but not the

12 other?

13    A.   Yes.

14    Q.   Which one didn't you do?

15    A.   The reason I'm not answering right away is

16 I'm trying to think.  Ask me again, the question.

17    Q.   Which robbery didn't you do that you pled

18 guilty for?  Which one of the two that occurred within

19 15 minutes of each other?

20    A.   The first one.

21    Q.   The carjacking, the one where you -- the car

22 theft --

23    A.   It was not a carjacking.

24    Q.   So you robbed a gas station, but you didn't

25 steal the guy's car, is that what you're telling me?

26    A.   I have two.  That was the first case in

27 1989.  I was 18 years old.

28    Q.   It's not my question.

Exh. B2

399

1      A.   I don't understand what you're trying --

2      Q.   My question to you is, do you or do you not

3  admit that you were convicted --

4      A.   I said yes already, sir.

5      Q.   -- of two robberies and a car theft?

6      A.   They gave me two strikes for that.

7      Q.   Do you or do you not admit you were

8  convicted of two robberies and a car theft?

9      A.   I pled guilty to two robberies.

10     Q.   And a car theft.

11        Let's see if you recognize your signature

12  on a change of plea form.  Do you see the name there

13  where it says Leovardo Salceda?

14     A.   Yes, sir.

15     Q.   Is that your signature?

16     A.   Yes, sir.

17     Q.   And that's your signature on a change of

18  plea form, court number CR105783, isn't it?

19     A.   Yes, sir.

20     Q.   And isn't it a fact that you see here,

21  robbery, robbery, unlawful taking of a vehicle.  That's

22  what you pled to?

23     A.   But I didn't take the car.

24     Q.   You didn't take the car then and you don't

25  remember what you did now; is that what you're telling

26  me?

27     A.   No.

28     Q.   And you don't remember anything except for

Exh. B2

400

**3**

November 15, 2001

Juan Sanchez #K-08877
44750 60th St. West
Lancaster, CA 93536

To whom it may conern,

I know Leovardo Salceda (Leo) since we were younger and he is my friend. On June 30, 1989 I was going to visit a friend on 61st Street. I seen Leo and we said hi and were talking. And I noticed Leo was very drunk. As we were talking an incident happened with Rafael Haro and Leo was trying to stop it.

Leo was drunk and was not driving the car.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this 15th day of November, 2001 at Lancaster, California.

Respectfully,

Juan Sanchez
Juan Sanchez

OFFICE OF
# THE DISTRICT ATTORNEY
COUNTY OF SAN DIEGO

JESUS RODRIGUEZ
ASSISTANT DISTRICT ATTORNEY

330 WEST BROADWAY, SUITE 1300
SAN DIEGO, CA 92101
(619) 531-3544

http://www.sandiegoda.com

BONNIE M. DUMANIS
DISTRICT ATTORNEY

May 21, 2003

Leovardo Salceda, J90933
B3-164
P.O. Box 2349
Blythe CA 92226

Re: *People of the State of California v. Salceda*, CR105783/DA B62621

Dear Mr. Salceda:

We are in receipt of your letter dated March 18, 2003, requesting discovery in the above case. Mr. Haro provided brief information to this office on October 3, 1989, indicating that he had mis-identified you as the person who had robbed him. He stated on that same date that he had no intention of coming to court at your trial and that he resided in Tijuana, Mexico. The information from Mr. Haro was not reduced to a report, but only noted in your case file.

The information provided by Mr. Haro was immediately provided to your attorney at that time, Mr. William Youmans, at the time of your trial. If you require further information please contact the Office of the Public Defender of San Diego County.

Thank you for your inquiry.

Yours very truly,

GEORGE W. CLARKE
Deputy District Attorney

DATE: 8-15-89
INVESTIGATOR: LES WALDEN
DEFENDANT: LEVORADO SALCIDA
WITNESS: JUAN CARLOS SANCHEZ
INTERVIEW CONDUCTED AT: JUVENILE HALL

MR SANCHEZ DO I HAVE YOUR PERMISSION TO CONDUCT THIS INTERVIEW ON TAPE?

YES

OK, IF I COULD ASK YOU TO SPEAK UP A LITTLE BIT FOR THE TAPE RECORDER

YES

COULD YOU SPELL YOUR LAST NAME

S-A-N-C-H-E-Z

AND WHAT IS YOU DATE OF BIRTH?

APRIL 16, 1974

OK, ARE YOU THE PERSON THAT WAS ROBBED WITH MR. RAFAEL HARO ON THE NIGHT OF JUNE 30TH?

YES

DID THE OFFICERS OF THE SAN DIEGO POLICE DEPARTMENT INTERVIEW YOU ABOUT THIS?

YES

OK.  DID THEY ASK IF YOU KNOW A PERSON NAMED LAVARDO SALCIDA?

YES

WHAT I'M GOING TO DO NOW, MR. SANCHEZ IS GO THROUGH YOUR STATEMENT YOU MADE TO THE POLICE.  YOU TOLD THE OFFICERS ON THIS DATE THAT YOUR NAME WAS JUAN CARLOS SANCHEZ AKA "CHINO" OF THE PARADISE HILLS LOCO GANG

YES

THAT YOU ALSO KNEW ONE OF THE SUSPECTS KNOWN LEO, DID YOU TELL THEM THAT ONE OF THE PERSONS THAT TOOK THE CAR WAS LEO?

NO BECAUSE THEY WERE ASKING ME ABOUT LEO OR SOMETHING, LIKE THEY TOLD ME IF I KNEW AND I SAID YES, BUT THEY TOLD ME IF HE WAS ONE OF THEM THAT HAD ROBBED 'EM AND I SAID "NO"  THE ONE THAT HAD ROBBED ******, THE ONE I HAD SEEN GOING DOWN THE STREET WITH THE CAR WAS, HAD BROWN HAIR AND LEO WAS BALD AT THE TIME.

10

OK.  HOW DO YOU KNOW LEO?

'CAUSE I KNOW HIM WHEN I WAS YOUNGER AND STUFF.

OK, AND YOUR STATEMENT IS THAT YOU WERE ASKED BY THE POLICE IF YOU KNEW OF A LEO?

YES

AND YOU SAID YES YOU KNEW LEO

YES

BUT YOU SAID THAT THE LEO WAS NOT THE PERSON WHO TOOK THE CAR THAT NIGHT?

YES

HOW MANY PHOTOGRAPHS DID THE OFFICER SHOW YOU THAT NIGHT?

ABOUT TWO OR THREE

TWO OR THREE?  AND WHAT TIME OF NIGHT WAS IT?

IT WAS AT NIGHT AT ABOUT NINE OR TEN WHEN THEY TOOK US HOME

OK, DID THE OFFICER POINT OUT TO ANY SPECIFIC PICTURE WHEN THEY SHOWED YOU THOSE PHOTOGRAPHS?

NO, THEY JUST SHOWED ME SOME PICTURES AND THEY SAID IF IT WAS LEO AND I SAID "YES THAT'S LEO BUT I, I, I SAID THAT WASN'T THE GUY THAT STOLE THE CAR"

OK.  IN THE REPORT THAT THE POLICE MADE IT SAYS THAT AT ABOUT MIDNIGHT ON 30TH OF JUNE THEY WENT TO YOUR HOUSE, IS THAT CORRECT?

YES

AND THEY SPOKE WITH YOU AND ONE OF THE OFFICERS SHOWED YOU A PHOTOGRAPH OF LEOVARDO SALCIDA AND HE ASKED YOU "DO YOU KNOW HIM" WHAT DID YOU SAY?

I SAID THAT'S ****** LEO

OK.  THEN IT SAYS THAT YOU STEPPED BACK AND SAID "THAT'S HIM, THAT'S HIM, THAT'S LEO"  DID YOU MAKE THOSE STATEMENTS?

YES

YOU DID SAY THAT "THAT'S HIM, THAT'S HIM, THAT'S LEO"?

NO I DIDN'T SAY "THAT'S HIM, THAT'S HIM"  I SAID THAT'S HIM, THAT'S LEO"  BUT I DIDN'T SAY, I DIDN'T SAY THAT THAT'S THE GUY

THAT STOLE THE CAR.  'CAUSE THEY WERE JUST ASKING ME QUESTIONS ABOUT LEO AND I JUST SAID "YES I KNOW LEO"  I SAID "THAT'S HIM"

OK, WHAT WERE YOU DOING THAT NIGHT, WERE YOU GETTING A RIDE FROM SOMEONE?

FROM RAFAEL

FROM RAFAEL?  WHERE WERE YOU GOING TO?

THEY WERE GOING TO TAKE ME TO MY AUNT'S HOUSE 'CAUSE MY MOM WASN'T AT HOME

OK

AND I WENT TO ******* HOUSE TO USE THE PHONE, BUT NOBODY WAS THERE WHEN I WAS COMING BACK OUT THEY WERE PULLING AROUND THE ***********

OK. AND WHERE DOES RAFAEL LIVE AT CURRENT?

T.J.

OK, DO YOU KNOW HIS ADDRESS OR PHONE NUMBER?

NO, I DON'T KNOW HIS ADDRESS BUT I KNOW WHERE HE LIVES

DOES HE HAVE A MOTHER WHO IS WORKING IN THE UNITED STATES?

NO

OK.  MR. SANCHEZ I APPRECIATE YOUR COOPERATION IN THIS MATTER, END OF MY INTERVIEW WITH MR. JUAN CARLOS SANCHEZ.

DECLARATION OF JESUS H. LOPEZ IN SUPPORT OF

LEOVARDO SALCEDA'S CLAIM OF INNOCENCE


I, Jesus H. Lopez, declare as follows:

I make the following declaration of facts based on my own knowledge and, if called, can testify competently thereto.

I know and remember the incident that happened on June 30, 1989, on 61st Street in Encanto, San Diego, California, involving myself and the two victims Rafael Haro and Juan Sanchez (first names only).

I was walking on 61st to Lizzy's house. Rafael was sitting in his parked car on 61st. Juan was there too. Leovardo Salceda was standing about thirty (30) feet away. Leovardo was an innocent by-stander. I started a conversation with Rafael and Juan. I complemented the car etc. Rafael asked me if I was interested in buying some marijuana. I said no. I asked Rafael for a free joint (one marijuana cigarette). Rafael said no. I hurried around to the driver side where Rafael was sitting and pointed my gun at him and Juan. I told Rafael to give me the weed (marijuana). I opened the driver door with my free hand and reached and snatched Rafael's necklace and took his watch and $10. Rafael was standing trying to protect himself.

Leovardo was standing 30 feet away. Leovardo was not in the conversation between Rafael and me about the marijuana. I

1

did not tell Leovardo that I was going to rob Rafael.  I robbed
Rafael on my own by myself.  After I robbed Rafael, is when
Leovardo stepped in with his hands up trying to separate me from
Rafael.  Leovardo told me to leave Rafael alone, to kick back,
and not to shoot him.  Leovardo tried to protect Rafael.
Leovardo did not take anything from Rafael.

I then got into the driver seat.  The marijuana, small
baggies of marijuana, were on the driver side floor board.  I
ordered Leovardo to get into the car.  I said get in now.
Leovardo got into the passenger seat and told me not to take the
car.  I ignored Leovardo and drove down 61st, going south, and
turned right, going west, on Atkins to Market Street.  The
streets connect.  I drove west on Market and reached Euclid.  I
made a right, going north, on Euclid and seen Texaco Gas Station
on the right side.  I pulled into the gas station and seen the
attendant at the cash register.  Leovardo was telling me to take
the car back.  I said no.  I then ordered Leovardo to take the
money from the attendant.  Leovardo pleaded he did not want to,
but I ordered him again and handed him my gun and Leovardo did
as I said and robbed the attendant.

Leovardo got back into the car and I drove out of the gas
station and continued north on Euclid.  I reached an unknown
street and turned and drove up a hill.  A car in front of me was

2

going slow so I rammed it.  Leovardo was telling me to stop.  I

stopped and left the car.  Leovardo left the car also.

I submit this declaration to the court to explain I am

responsible for the two robberies and taking the car.  Leovardo

was an innocent by-stander and not responsible for the two

robberies nor taking the car.

I declare under penalty of perjury under the laws of the

State of California that the foregoing is true and correct.

Executed on May 20, 2004, at San Diego, California.


Respectfully submitted,



Jesus H. Lopez.


3

Jesus H. Lopez V-34389
P.O. Box 409000
Ione, California 95640

### DECLARATION OF JESUS H. LOPEZ IN SUPPORT OF
### LEOVARDO SALCEDA'S CLAIM OF INNOCENCE

I, Jesus H. Lopez, declare as follows:

I make the following declaration of facts based on my own knowledge and, if called, can testify competently thereto.

I know and remember the incident that happened on June 30, 1989, on 61st Street in Encanto, San Diego, California, involving myself and the two victims Rafael Haro and Juan Sanchez (first names only).

I was walking on 61st to Lizzy's house. Rafael was sitting in his parked car on 61st. Juan was there too. Leovardo Salceda was standing about thirty (30) feet away. Leovardo was an innocent by-stander. I started a conversation with Rafael and Juan. I complemented the car etc. Rafael asked me if I was interested in buying some marijuana. I said no. I asked Rafael for a free joint (one marijuana cigarette). Rafael said no. I hurried around to the driver side where Rafael was sitting and pointed my gun at him and Juan. I told Rafael to give me the weed (marijuana). I opended the driver door with my free hand and reached and snatched Rafael's necklace and took his watch and $10. Rafael was standing trying to protect himself.

Leovardo was standing 30 feet away. Leovardo was not in the conversation between Rafael and me about the marijuana. I

1

did not tell Leovardo that I was going to rob Rafael. I robbed Rafael on my own by myself. After I robbed Rafael, is when Leovardo stepped in with his hands up trying to separate me from Rafael. Leovardo told me to leave Rafael alone, to kick back, and not to shoot him. Leovardo tried to protect Rafael. Leovardo did not take anything from Rafael.

I then got into the driver seat. The marijuan, small baggies of marijuana, were on the driver side floor board. I ordered Leovardo to get into the car. I said get in now. Leovardo got into the passenger seat and told me not to take the car. I ignored Leovardo and drove down 61st, going south, and turned right, going west, on Atkins to Market Street. The streets connect. I drove west on Market and reached Euclid. I made a right, going north, on Euclid and seen Texaco Gas Station on the right side. I pulled into the gas station and seen the attendant at the cash register. Leovardo was telling me to take the car back. I said no. I then ordered Leovardo to take the money from the attendant. Leovardo pleaded he did not want to, but I ordered him again and handed him my gun and Leovardo did as I said and robbed the attendant.

Leovardo got back into the car and I drove out of the gas station and continued north on Euclid. I reached an unknown street and turned and drove up a hill. A car in front of me was going slow so I rammed it. Leovardo was telling to stop. I stopped and left the car. Leovardo left the car also.

I submit this declaration to the court to explain I am responsible for the two robberies and taking the car. Leovardo

2

was an innocent by-stander and not responsible for the two
robberies nor taking the car.

    I declare under penalty of perjury under the laws of the
State of California that the foregoing is true and correct.

    Executed on ___*JuLY, 19TH.*___ , 2006, at Ione,
California.

                                       Respectfully submitted,

                                  Jesus H. Lopez.

3

8

8

Jesus H. Lopez V-34389
P.O. Box 409000
Ione, California 95640

SUPPLEMENTAL DECLARATION OF JESUS H. LOPEZ
IN SUPPORT OF LEOVARDO SALCEDA'S CLAIM OF INNOCENCE

I, Jesus H. Lopez, declare as follows. I make the following declaration of facts based on my own knowledge and if called can testify competently thereto. This declaration and fingerprints are mine. I submit this declaration in support of Leovardo Salceda's claim of innocence of the robbery of Rafael Haro and of the gas station clerk. Rafael was sitting in his car at about 9 p.m. on June 30, 1989, on 61st Street in San Diego when I robbed him. I took Rafael's necklace, watch, and $10. And I took Rafael's car from him. I ordered Leovardo to get into the car. Leovardo was reluctant and did not want to follow my orders, but me with a gun in my hand, again ordered Leovardo to get into the car. Leovardo got into the passenger's seat and I drove away. I then drove from 61st to the Texaco Gas Station on Euclid Avenue. I pulled into the gas station and ordered Leovardo to rob the gas station clerk. Leovardo was reluctant and did not want to follow my orders, but me with a gun in my hand pointed at Leovardo, I again ordered Leovardo to rob the clerk and Leovardo did as I ordered. Leovardo got back into the car and I drove away. We abandoned the car right after this. My recent declaration dated July 19, 2006, which Leovardo now has to support his innocence, is an accurate summary of the two robberies of Rafael and the clerk.

This supplemental declaration is to show my fingerprints for comparison to the prints that were lifted from Rafael's car. I opened the driver's side door at the time I robbed Rafael and drove the car to the gas station at the time of the robbery of the gas station. I did not have any gloves on.

| Pinky | Ring | Middle | Index | L.Thumb | R.Thumb | Index | Middle | Ring | Pinky |
|-------|------|--------|-------|---------|---------|-------|--------|------|-------|



I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed on this, _NOVEMBER 28TH_ , 2006, at Ione, California.

Respectfully Submitted,

Jesus H. Lopez, Declarant.

1   WHAT'S THE LIKELIHOOD THAT THE DEFENDANT WILL COMMIT ANOTHER

2   CRIME IF HE GETS OUT?  AND IT'S HIGH.  IT'S EXTREMELY HIGH

3   BECAUSE -- I HOPE I'M WRONG, BUT I FEEL PRETTY CONFIDENT IN

4   SAYING THAT'S A TOUGH DISEASE TO BATTLE.  AND MOST PEOPLE

5   DON'T SUCCEED.  AND HE'LL PROBABLY FALL OFF THE WAGON.  AND

6   WHEN HE DOES THERE IS GOING TO BE ANOTHER RUSSELL CHAMPION

7   AT AN INTERSECTION.  ANOTHER GUY WITH HIS FRIENDS DRIVING

8   DOWN THE STREET, HOMIES, AND MR. SALCEDA WITH A GUN.

9              THE COURT:  AFTER TEN YEARS IN STATE PRISON.

10             MR. GROCH:  WHEN IS HE GOING TO CHANGE HIS

11  CRIMES THAT STARTED BACK WHEN HE WAS A JUVENILE?  HE HAS A

12  RESIDENTIAL BURG FROM '84.  WHAT'S CHANGED BETWEEN '84 AND

13  '97?  NOTHING.  WHY SHOULD ANYTHING WITHIN THE NEXT TWENTY

14  YEARS?  THERE'S NOTHING UNUSUAL ABOUT THIS CASE.  THE PRIORS

15  ARE SERIOUS.  THEY'RE RECENT.  THE CURRENT OFFENSE IS

16  SERIOUS AND RECENT.  THE DEGREE OF DANGER IS HIGH.  I WOULD

17  JUST URGE THE COURT TO RESERVE OF THE EXERCISE OF ITS

18  DISCRETION FOR THOSE CASES THAT TRULY FIT THE DEFINITION OF

19  UNUSUAL ABERRATION.  ALL THE TIMES THAT THE COURT EXERCISES

20  ITS DISCRETION SHOULD BE FEW AND FAR BETWEEN AND RESERVED

21  FOR THAT TRULY EXCEPTIONAL CASE.

22             MR. SALCEDA IS A CLASSIC THREE-STRIKES CASE.

23             THE COURT:  ALL RIGHT.  MR. SALCEDA, DO YOU

24  WANT TO BE HEARD?

25             THE DEFENDANT:  YES.

26             THE COURT:  GO AHEAD.

27             THE DEFENDANT:  THANK YOU FOR LETTING ME

28  SPEAK.  I HEARD MR. GROCH'S ARGUMENT.  MR. MANGARIN.  I'M

1    NOT HERE SAYING FEEL SORRY FOR ME OR ANY OF THAT STUFF.    NO.

2    IT DOES BOIL DOWN TO ME AND HOW I GREW UP AND STUFF

3    HAPPENED.

4                    THE WAY I WOULD LIKE TO ADDRESS THE COURT IS

5    THAT BEING OVER HERE AND GROWING UP IN THE GANG ENVIRONMENT

6    AND GROWING UP IN A VIOLENT ATMOSPHERE PRODUCED AND LED ME

7    TO MAKE MYSELF THE WAY I BECAME.    BUT MY LAST THOUGHT FOR

8    THE LAST YEARS HAVE CHANGED UP AT LANCASTER PRISON WAS THAT

9    I WANT TO GO BACK TO MY NATIVE COUNTRY WHERE A LOT OF PEOPLE

10   DON'T DO THE THINGS THAT HAPPENS OVER HERE AND GROW UP TO BE

11   LIKE ME.    WHETHER I GOT CHILDREN OR I DON'T, WHETHER I GOT

12   MY MOTHER OR I DON'T, I THINK I NEED TO START LOOKING OUT

13   FOR ME.    I'M NOT GOING TO USE MY CHILDREN OR MY MOTHER OR

14   ANYTHING FOR EXCUSES, BUT IF YOU CAN GIVE ME A CHANCE AT MY

15   LIFE I WOULD ONLY APPRECIATE IT.    AND FROM THE HEART.    BUT

16   TO SERVE 20 YEARS OR SOMETHING IN PRISON FOR WHAT HAPPENED,

17   REALISTICALLY, I WOULD SAY THAT'S A LOT OF TIME, YOUR HONOR.

18                    I'M VERY SORRY.    AND I UNDERSTAND MR. GROCH'S

19   ARGUMENT.    BUT THERE'S BEEN NUMEROUS TIMES WHEN I HAVE A LOT

20   OF CHANCES TO COMMIT OTHER CRIMES, BUT I CHOSE ON MY OWN NOT

21   TO; NOT TO PICK UP GUNS TO DO WHATEVER AND TO STAB WHOEVER

22   OR WHATEVER.    BUT I PUT MYSELF ON THE LINE ON A LOT OF TIMES

23   THERE BECAUSE I SAID, YOU KNOW WHAT, I DON'T NEED TO BE THE

24   OLD PERSON THAT I USED TO BE.    I STILL STOOD UP TO SOME

25   PRETTY STRONG PEOPLE IN PRISON, AND I'LL CONTINUE TO DO

26   THAT.

27                    I DID A LOT OF THINGS BECAUSE MY HERITAGE

28   DOESN'T MATTER TO ME BECAUSE I KNOW WHAT I WANT TO DO.    AND

```
 1    SORT OF I GOT FED UP.  IT'S NOT THE U.S. OR CALIFORNIA.

 2    IT'S ME.  BUT I WAS SORT OF A PRODUCED PERSON SINCE I WAS A

 3    LITTLE BOY.  I'VE SEEN A LOT OF THINGS.  AND THAT'S WHY I

 4    SAY I SEE THE -- I HAVE AN ARTICLE IN SPANISH AND I THINK

 5    MAYBE IF I GO BACK TO MY NATIVE COUNTRY TO MICHEOCAN.  I'VE

 6    GOT SOME BROTHERS THERE.  AND JUST LEAVE CALIFORNIA.

 7              LIKE I SAY, IF I DO GET OUT AND I DRINK AGAIN,

 8    WHICH ISN'T GOING TO HAPPEN, BUT I'M GOING TO DO SOMETHING

 9    STUPID PROBABLY AND BE BACK IN HERE AND SAYING I'M VERY

10    SORRY.  BUT THAT'S NOT WHAT I WANT TO DO.  I WANT TO GET ON

11    WITH MY LIFE.  AND I'M JUST VERY SORRY, YOU KNOW.

12    MR. CHAMPION, I TOLD HIM I AM VERY SORRY.  AND I TRIED

13    EVERYTHING I COULD, BUT IT SORT OF SEEMS THAT MR. GROCH

14    OR -- YOU KNOW, HE KEEPS ARGUING THAT I KEEP SAYING I'M

15    SORRY.  WHEN IF I DIDN'T SAY I WAS WHAT COULD THEY SAY?  HE

16    DOESN'T EVEN SAY HE'S SORRY.

17              THERE WAS -- A LOT OF TIMES THERE WAS PRUNO

18    THERE OR WHATEVER, WEED, ON THE YARD OR WHATEVER.  I SAID,

19    YOU KNOW, THAT'S WHAT GOT ME HERE.  THAT'S WHAT GOT ME A

20    LIFE SENTENCE.

21              WHERE MY CHILDREN ARE AT, I DON'T KNOW TO THIS

22    DAY.  THEY'RE BEING RAISED BY I DON'T EVEN KNOW WHO.  MY

23    MOTHER IS IN CUSTODY.  SHE USED THE EXCUSE OF PRISON BECAUSE

24    I CAME TO PRISON AND SHE COULDN'T EVEN HANG OUT THERE AND

25    THIS AND THAT.  AND I CAN UNDERSTAND IT.  BUT SOME OTHER

26    PEOPLE DON'T EVEN UNDERSTAND IT.  BUT I'M NOT SAYING TO GIVE

27    ME A CHANCE FOR THAT.  THAT'S ALL SORT OF COLD.  I GOT

28    INSIDE THAT.  I DON'T EVEN NEED OTHER PEOPLE'S SYMPATHY.
```

1    IT'S ME. I'M RESPONSIBLE FOR BEING DRUNK THAT DAY. AND I

2    CAN'T EVEN CONTROL MY ANGER WITH MY WIFE THAT DAY AND I

3    STARTED TO DRINK. AND I -- I -- I FOULED UP, YOUR HONOR. I

4    CALL THOSE PEOPLE AND I WRITTEN THEM A LETTER AND I ASKED

5    THEM TO BE IN COURT, YOU KNOW. IT'S EMBARRASSING FOR ME TO

6    ASK PEOPLE TO COME HERE BECAUSE OF WHAT I DID. BUT I THANK

7    THEM. I THANK THE COURT. AT LEAST YOU LET ME SPEAK. I'M

8    TRYING TO SEE -- I LOOKED IN SOME PAMPHLETS TO OHIO

9    UNIVERSITY AND SOME COLLEGES. I SEE THINGS THAT I COULD

10   HAVE DONE ALL OF THESE THINGS. BUT I'M NOT GOING TO GIVE

11   UP, YOUR HONOR. I'M GOING TO CONTINUE TO TRY TO GET MY

12   EDUCATION AND SOMEDAY WEAR A TIE. WHETHER IT'S IN MEXICO

13   WHERE I WOULD LIKE TO GO BACK TO WHEN I GET OUT YOU KNOW.

14   THAT IS WHERE I CAME FROM. THAT'S IT.

15         MR. GROCH IS RIGHT; APPARENTLY I CAN'T MAKE IT

16   OVER HERE AND THAT'S, THAT'S -- I DON'T THINK ANYBODY CAN

17   ARGUE; WELL, YOU'RE JUST LYING TO GET OUT OF THIS. TO GET

18   OUT. BUT YOU KNOW, WHEN I MOVED TO BAKERSFIELD IT'S A LOT

19   OF COUNTRY OUT THERE. AND I ENJOYED IT A LOT. MY WIFE

20   WANTED TO MOVE BACK. MY MOTHER ALSO WAS HERE. BUT I USED

21   TO TELL HER LET'S MOVE TO TIJUANA OR BACK TO WHERE I LIVED.

22   SHE DID SAY "I LIKE THE FAST LIFE."

23         NOW, I SEE THAT I DID -- A LOT OF TIMES I DID

24   THINGS FOR OTHER PEOPLE. AND I SHOULDN'T HAVE. YES, THE

25   CRIMES IN '89 HAPPENED, BUT THAT WAS NOT ME THAT STARTED

26   EVERYTHING. THAT WAS A FRIEND OF MINE. BECAUSE I KEPT MY

27   MOUTH SHUT. I WAS FOUND GUILTY.

28         THEN THE INCIDENT THAT HAPPENED IN '93 I WAS

```
 1    PULLED OUT OF A HOUSE TO GO FIGHT WITH WHOEVER AND MY NEPHEW

 2    WAS THERE.  HE WAS TELLING MY FRIENDS, HEY, MAN, MY UNCLE IS

 3    DRUNK.  LEAVE HIM ALONE.  I WENT LIKE A STUPID.

 4              IN 1993, YOU KNOW, I DID WHAT I DID, YOUR

 5    HONOR.  AND, YOU KNOW, I'M CERTAINLY NOT PROUD OF IT.  I

 6    FEEL MYSELF HOT, BUT THEN I START TO COOL DOWN BECAUSE I

 7    KNOW THAT I'M TELLING THE TRUTH.  I HAVE NOTHING TO BE

 8    NERVOUS ABOUT OR SCARED ABOUT.

 9              BUT I HAVE REALLY TRIED TO CHANGE MY LIFE,

10    YOUR HONOR.  AND THERE IS A LOT OF INCIDENTS WHERE I COULD

11    HAVE COMMITTED CRIMES THAT I DIDN'T EVEN WANT TO, BECAUSE I

12    KNOW THE CONSEQUENCES OF A CRIME.

13              THE COURT:  THANK YOU, MR. SALCEDA.

14              MR. MANGARIN, ANYTHING YOU WANT TO ADD IN

15    CLOSING?

16              MR. MANGARIN:  NO, YOUR HONOR.  JUST ASK THE

17    COURT TO BE MINDFUL -- ALTHOUGH THE FIRST CASE HAS TWO

18    STRIKES COMING OUT OF THE SAME DAY WHICH WERE SERIOUS, I

19    WOULD ASK THE COURT TO BE MINDFUL OF THE FACT THAT HE WAS 18

20    YEARS OLD AT THE TIME OF THAT OFFENSE.  AND WITH THAT, I

21    WOULD SUBMIT, YOUR HONOR.

22              THE COURT:  WAIVE FORMAL ARRAIGNMENT FOR

23    JUDGEMENT AND SENTENCING?

24              MR. MANGARIN:  YES.

25              THE COURT:  ANY LEGAL REASON WHY SENTENCE

26    SHOULD NOT BE IMPOSED?

27              MR. MANGARIN:  NO, YOUR HONOR.

28              THE COURT:  ALL RIGHT.  THIS IS A DIFFICULT
```

1    CASE, AS EVERYONE HAS WRITTEN IN THEIR STATEMENTS.  THERE IS

2    A OVERRIDING SEVERE ALCOHOL PROBLEM THAT DOESN'T GIVE

3    MR. SALCEDA ANY TYPE OF EXCUSE.  WHAT I'M GOING TO DO IN

4    THIS CASE IS I'M GOING TO STRIKE TWO OF THE PRIORS.  I'M

5    GOING TO STRIKE THE SECOND AND THIRD PRIOR FOR THE FOLLOWING

6    REASONS:  WITH RESPECT TO THE SECOND PRIOR, THAT OCCURRED AT

7    THE SAME TIME THE FIRST PRIOR OCCURRED.  THAT WAS ON THE

8    SAME DATE IS WHAT I'M REFERRING TO.  AND IN VIEW OF THE AGE

9    OF THE DEFENDANT AND AGE OF THOSE PRIORS, THE COURT FINDS

10   IT'S MORE APPROPRIATE TO TREAT THAT AS ONE STRIKE.  SO I'M

11   STRIKING THE SECOND STRIKE.

12            WITH RESPECT TO THE THIRD PRIOR, THAT'S THE

13   1993 PRIOR, I HAVE REVIEWED THE FACTS.  I'VE LOOKED AT THE

14   SENTENCE AND IT APPEARS THAT THE DEFENDANT DID BECOME

15   ENGAGED IN A CONFRONTATION WITH THE VICTIM.  DID SWING A

16   BRICK AT HIM.  I'M GOING TO STRIKE THAT STRIKE.  I DON'T

17   FEEL THAT THE FACTS GIVING RISE TO THAT OFFENSE IS ENOUGH

18   THAT AS A SECOND OR THIRD STRIKE IS SUFFICIENT TO JUSTIFY A

19   SECOND OR THIRD STRIKE.  THAT LEAVES ME WITH ONE STRIKE.

20            NEXT I NEED TO SELECT THE APPROPRIATE TERM.

21   THIS IS A SERIOUS CHARGE; IT'S KIDNAP.  AN APPROPRIATE TERM

22   IS THE UPPER OR AGGREGATE TERM FOR THE FOLLOWING REASONS:

23   THE DEFENDANT WAS ON PROBATION WHEN IT OCCURRED.  THE

24   DEFENDANT HAS A SERIOUS AND LENGTHY CRIMINAL PAST.  AND FOR

25   THOSE REASONS I FEEL THAT THE UPPER TERM IS THE APPROPRIATE

26   TERM.  THE UPPER TERM IS EIGHT YEARS.  IT MUST BE DOUBLED.

27   THAT MAKES IT 16 YEARS.

28            THERE ALSO IS A SERIOUS FELONY PRIOR FOR HIS

1    PREVIOUS STRIKE -- THE COURT HAS PREVIOUSLY STRICKEN THE

2    ONE-YEAR PRISON PRIOR AND THAT WILL REMAIN STRICKEN.

3              THE TWO SERIOUS FELONY PRIORS THIS COURT FEELS

4    APPROPRIATELY THEY ADD FIVE YEARS EACH.  THAT MEANS THE

5    AGGREGATE OR FINAL SENTENCE IS 26 YEARS.  SO ACCORDINGLY,

6    THE DEFENDANT IS NOT ELIGIBLE FOR PROBATION.  PROBATION IS

7    DENIED.  THE DEFENDANT IS SENTENCED TO THE DEPARTMENT OF

8    CORRECTIONS FOR THE DETERMINATE SENTENCE OF 26 YEARS.  HE'LL

9    RECEIVE CREDIT FOR THE TIME THAT HE PUT IN.

10              I THINK I'M SUPPOSED TO -- I'M IMPOSING A

11   RESTITUTION FINE PURSUANT TO 1202.4 OF THE PENAL CODE IN THE

12   AMOUNT OF $500.  LAST TIME THAT -- THAT WILL REMAIN AS PART

13   OF THE SENTENCE TO BE PAID FORTHWITH OR AS PROVIDED IN PENAL

14   CODE SECTION 2085.5.

15              ON PART OF THE ORIGINAL SENTENCE THERE WAS A

16   SENTENCING ON A MISDEMEANOR OF 180 DAYS.  HE'S DONE THAT SO

17   THAT WILL BE SATISFIED.  THAT WAS CONCURRENT.  THERE WAS

18   ALSO A REVOCATION IN A PREVIOUS CASE TO RUN CONCURRENT.

19   THAT WILL REMAIN THE SAME.

20              SO, MR. SALCEDA --

21              THE DEFENDANT:  YES.

22              THE COURT:  -- I'VE REDUCED IT SOME.  DOESN'T

23   -- YOU'LL STILL SERVE 80 PERCENT.  BUT I HAVE REDUCED IT

24   DOWN TO 26 YEARS.  SO THAT YOU WILL SERVE 80 PERCENT OF THAT

25   INSTEAD OF 85 PERCENT OF 35 TO LIFE.

26              GOOD LUCK.  AND I HOPE YOU CONTINUE WITH THE

27   PROGRAMS THAT YOU HAVE STARTED ON WHILE YOU'RE IN STATE

28   PRISON.  THAT WILL BE THE SENTENCE OF THE COURT.

1          MR. GROCH:   THANK YOU, YOUR HONOR.

2          MR. MANGARIN:   THANK YOU, YOUR HONOR.

3

4     (WHEREUPON COURT PROCEEDINGS CONCLUDED.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO

DATE  October 2, 1989                    MINUTES DEPT.  34

PRESENT: HON.         WILLIAM D. MUDD,                         JUDGE

CLERK  K. Bircumshaw                  REPORTER   D. Moody

BAILIFF  W. Becker

| | |
|---|---|
| CR 105783   PEOPLE OF THE STATE<br>B 6262101      OF CALIFORNIA,<br><br>              v.<br><br>      LEOVARDO SALCEDA,<br>                    Defendant. | By:  DDA Luis M. Aragon,<br><br><br>By:  Bill Youmans, |

---

11:34 a.m.  This being the time set for jury trial in the above-entitled cause, comes now the prospective jury panel, both counsel and the defendant having been excused until 3:00 p.m. today.  The Court explains the delay in proceeding at this time and directs the panel to return to Department 34 of the Superior Court at 3:00 p.m. today.

11:37 a.m.  The prospective jurors are excused and the Court is in recess.

3:19 p.m.  Counsel as noted above, the defendant and the prospective jurors are present.  Out of the presence of the Court, the clerk calls the roll.

3:21 p.m.  The Court is now present and makes preliminary remarks to the jury.
3:24 p.m.  The prospective jurors are sworn as to their qualifications.  The Court reads the Information aloud and introduces both counsel and the defendant.  The Court reads the People's prospective witness list aloud.

3:34 p.m.  Fourteen prospective jurors are seated in the jury box.  The Court explains the jury question chart.

3:43 p.m.  Voir dire begins.

4:32 p.m.  The prospective jurors are admonished and excused to return at 9:30 a.m. on Tuesday, October 3, 1989, in Department 34. Out of the presence of the prospective jurors, counsel are advised to return to Department 34 at 9:00 a.m. on October 3, 1989.

4:35 p.m.  The Court is adjourned.  The defendant remains in custody with bail set at $30,000.

-krb-

S

BJO

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO

DATE     October 3, 1989                    MINUTES DEPT.     34

PRESENT: HON.        WILLIAM D. MUDD,                              JUDGE

CLERK   P. SIRNA                    REPORTER     D. MOODY

BAILIFF   W. BECKER

| | | |
|---|---|---|
| CR 105783    PEOPLE OF THE STATE OF | By:  DDA Luis M. Aragon, | |
| DA B6262101      CALIFORNIA, | | |
| v. | | |
| LEOVARDO SALCEDA, | By:  William Youmans, | |
| Defendant. | | |

---

9:40am  This being the time previously set for further jury trial in the above
entitled matter, present are parties as noted above and defendant. Outside the
presence of the jury, the defendant personally waives jury and signs waiver form.

The Attorney for the People dismiss Counts 3 and 5 and the case is submitted on
the Preliminary Hearing transcript.

9:50am  Court is in recess until 9:54am when the jury is brought into court
and the court explains that the defendant has waived jury and they are discharged
on this case to return to the jury lounge.
10:00 am court is in recess for the Judge to review Preliminary Hearing transcript.

10:30am  Court convenes with all parties and defendant present.  The People
submit on transcript.  The Defense submits.

The Court finds the defendant GUILTY of Counts 1,2, and 4 and finds PC12022(a)
allegations on Counts 1 and 2 to be true.  Court finds PC12022.5(a) allegation
on Count 4 to be true.

Defendant personally waives time for sentencing.

Case set for NOV. 2, 1989 @ 9:00am for probation hearing and sentencing.

Defendant remains in custody with bail as set at $30,000.

pms

S

*Robert D. Zumwalt, Clerk*

**OCT 03 1989**

BY: SINKA
DEPUTY

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO

THE PEOPLE OF THE STATE OF CALIFORNIA,

Plaintiff,

vs.

LEO Salceda

Defendant(s).

No. CR- CR 105783

## JURY WAIVER

Comes now   LEO Salceda

defendant in the above-entitled criminal action, and, in support of his waiver of his right to a trial by jury to be made
in open court personally and by his attorney, does declare:

1. That his attorney in the above-entitled criminal action is   Bill Youmans

2. That he (does/ does not) desire to waive and give up his right to a trial by jury and that he (does/ does not)
desire to have this court sitting without a jury determine whether he is guilty or not guilty of the offense(s) for which
he is charged in the above-entitled criminal action;

3. That he (does/ does not) understand that he is entitled to a trial by jury, that is, he (does/ does not)
understand that he is entitled to have twelve citizens of this community impaneled and sworn to try his case and to
determine by their verdict whether he is guilty or not guilty of the offense(s) or crime(s) for which he is charged in the
above-entitled action;

4. That his attorney (has/ has not) fully explained to him the term "jury trial";

5. That his attorney (has/ has not) fully explained to him the term "court trial";

6. That his attorney (has/ has not) fully explained to him the difference between a "jury trial" and a "court trial";
and

7. That he (does/ does not) personally waive his right to a "jury trial".

Executed this   3RD   day of   OctobER , 19 89 , in the County of San Diego, State of California.

_Leonardo Salceda_
(Defendant's signature)

15

# ABSTRACT OF JUDGMENT — COMMITMENT

FORM DSL 290

S_____OR COURT OF CALIFORNIA, COUNTY OF ___SANDIEGO___

BRANCH _____

COURT I.D. 3 7

FILED NOV 02 1989

CASE NUMBER(S)

**PEOPLE OF THE STATE OF CALIFORNIA** versus [X] PRESENT   CR105783 - A

**DEFENDANT:** LEOVARDO SALCEDA   [ ] NOT PRESENT   - B

**AKA:**   - C

**COMMITMENT TO STATE PRISON**   [ ] AMENDED ABSTRACT   - D

**ABSTRACT OF JUDGMENT**   - E

| DATE OF HEARING (MO)(DAY)(YR) | DEPT. NO. | JUDGE | CLERK |
|---|---|---|---|
| 11 02 89 | 34 | WILLIAM D. MUDD | P. SIRNA |

| REPORTER | COUNSEL FOR PEOPLE | COUNSEL FOR DEFENDANT | PROBATION NO. OR PROBATION OFFICER |
|---|---|---|---|
| C. FRANKLIN | L. ARAGON | B. YOUMANS | A. STALCUP |

**1. DEFENDANT WAS CONVICTED OF THE COMMISSION OF THE FOLLOWING FELONIES:**

A. [ ] ADDITIONAL COUNTS ARE LISTED ON ATTACHMENT _____

| COUNT | CODE | SECTION NUMBER | CRIME | YEAR CRIME COMMITTED | DATE OF CONVICTION MO DAY YEAR | CONVICTION BY JURY/TOTAL COURT/TRIAL PLEA | TERM (L.M.J) | CONCURRENT | CONSECUTIVE/VIOLENT | CONSECUTIVE/NON-VIOL | CONSECUTIVE/FULL TERM | SENTENCE RELATION INCOMPLETE 654 STAY | PRINCIPAL OR CONSECUTIVE TIME IMPOSED YEARS MONTHS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 4 | PC | 211** | ROBBERY | 89 | 10 02 89 | X | L | PRINCIPAL | | | | | 2 |
| 1 | PC | 211** | ROBBERY | 89 | 10 02 89 | X | M | X | | | | | (3) |
| 2 | VC | 10851(a) | UNLAW TAKING OF VEH | 89 | 10 02 89 | X | M | X | | | | | (2) |

**2. ENHANCEMENTS (CHARGED AND FOUND, STRICKEN, TIME IMPOSED):**

| COUNT | 12022(a) C/F S I | 12022(b) C/F S I | 12022.3(a) C/F S I | 12022.3(b) C/F S I | 12022.5 C/F S I | 12022.6(a) C/F S I | 12022.6(b) C/F S I | 12022.7 C/F S I | 12022.8 C/F S I | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | X | X | | | | 2 |
| | X | X | | | | | | | | (1) |
| 2 | X | X | | | | | | | | (1) |

**3. INCOMPLETED SENTENCE(S) CONSECUTIVE:**

| COUNTY | CASE NUMBER | CREDIT FOR TIME SERVED |
|---|---|---|
| | | |

**5. A. NUMBER OF PRIOR PRISON TERMS:**

| § | C/F | S | I |
|---|---|---|---|
| 667.5(a) | 0 | | |
| 667.5(b) | 0 | | |
| 667.6(b) | 0 | | |

**4. OTHER ORDERS:**
RESTITUTION FINE IN THE AMOUNT OF $300 FORTHWITH OR PER PC2085.5.

**B. NUMBER OF PRIOR FELONY CONVICTIONS:**

| § | C/F | S | I |
|---|---|---|---|
| 667.6(a) | 0 | | |

**6. TOTAL TIME IMPOSED ON ALL ATTACHMENT PAGES (FORM DSL 290-A):**

**7. TIME STAYED § 1170.1(a) [5-YEAR LIMIT] AND/OR § 1170.1(f) [DOUBLE BASE LIMIT]:** → 4

**8. TOTAL TERM IMPOSED:**

**9. EXECUTION OF SENTENCE IMPOSED:**

A. [X] AT INITIAL SENTENCING HEARING   B. [ ] AT RESENTENCING PURSUANT TO DECISION ON APPEAL   C. [ ] AFTER REVOCATION OF PROBATION   D. [ ] AT RESENTENCING PURSUANT TO RECALL OF COMMITMENT (PC§1170(d))

| 10. DATE SENTENCE PRONOUNCED: MO DAY YEAR | CREDIT FOR TIME SPENT IN CUSTODY: | TOTAL DAYS | INCLUDING: | ACTUAL LOCAL TIME | LOCAL CONDUCT CREDITS | STATE INSTITUTIONS |
|---|---|---|---|---|---|---|
| 11 02 89 | | 183 | | 122 | 61 | [ ] DMH   [ ] CDC |

**11. DEFENDANT IS REMANDED TO THE CUSTODY OF THE SHERIFF, TO BE DELIVERED:**

[X] FORTHWITH

[ ] AFTER 48 HOURS, EXCLUDING SATURDAYS, SUNDAYS AND HOLIDAYS

[ ] INTO THE CUSTODY OF THE DIRECTOR OF CORRECTIONS AT THE RECEPTION-GUIDANCE CENTER LOCATED AT:

[ ] CALIF. INSTITUTION FOR WOMEN — FRONTERA   [ ] CALIF. MEDICAL FACILITY — VACAVILLE   [ ] CALIF. INSTITUTION FOR MEN — CHINO

[X] OTHER (SPECIFY): RICHARD J. DONOVAN CORRECTIONAL FACILIT SAN DIEGO, CA

**CLERK OF SUPERIOR COURT**

I hereby certify the foregoing to be a correct abstract of the judgment made in this action.

CLERK'S SIGNATURE: PEGGY SIRNA   DATE: NOV. 2, 1989

This form is prescribed pursuant to Penal Code §1213.5 to satisfy the requirements of Penal Code §1213 (Abstract of Judgment and Commitment) for determinate sentences under Penal Code §1170. A copy of the probation report shall accompany the Department of Corrections' copy of this form pursuant to Penal Code §1203. A copy of the sentencing proceedings and any supplementary probation report shall be transmitted to the Department of Corrections pursuant to Penal Code §1203.01. Attachments may be used but must be incorporated by reference.

## ABSTRACT OF JUDGMENT — COMMITMENT

Form Adopted by the Judicial Council of California Effective July 1, 1981

FORM DSL 290

Pen.C. 1213

DISTRIBUTION:   PINK COPY — COURT FILE,   YELLOW COPY — DEPARTMENT OF CORRECTIONS,   WHITE COPY — ADMINISTRATIVE OFFICE OF THE COURT

DEPT. NO. M-1

CLERK K. Holland

**SUPERIOR COURT OF CALIFORNIA**
**COUNTY OF SAN DIEGO**
**EXHIBIT LIST**

COURT USE ONLY

F KENNETH J. MARZONE D
Clerk of the Superior Court

OCT 13 1995

By: W.E. NICKS, Deputy

CASE NO. SCD 112436

CASE NAME _PEO_ vs _Leovardo Salceda_

COUNSEL _Michael Groch - DDA_  _Dan Mangarin - A.PD_

Name(s) and address(es)

| NO. TT△ | ID Date | EVID Date | EXHIBIT DESCRIPTION | NO. TT△ | ID Date | EVID Date | EXHIBIT DESCRIPTION | |
|---|---|---|---|---|---|---|---|---|
| 1 π | 9-25-95 | 9-26-95 | Backboard w/two photos of Victim's car | 1 CT | 10-4-95 | 10-4-95 | Sheriff's Booking Record dated 4-23-95 | ✓ |
| 2 π | 9-25-95 | 9-26-95 | Back w/two photos of Victim's car | 2 CT | 10-4-95 | 10-4-95 | Sheriff's Booking Record dated 7-3-89 | ✓ |
| 3 π | 9-25-95 | 9-26-95 | Backboard w/color photo of Railroad Crossing | 3 CT | 10-4-95 | 10-4-95 | Cert. copy of case CR105783 | ✓ |
| 4 π | 9-25-95 | 9-26-95 | Backboard w/two color photos of Victim | 4 CT | 10-4-95 | 10-4-95 | Sheriff's Booking Record dated 6-30-93 | ✓ |
| 5 π | 9-25-95 | 9-26-95 | Backboard w/two photos of interior of Victim's car | 5 CT | 10-4-95 | 10-4-95 | Cert. copy of case CR140382 | ✓ |
| 6 π | 9-25-95 | 9-26-95 | Backboard w/two photos of Victim's driveway | 6 CT | 10-4-95 | 10-4-95 | Cert. copy of defendant's prison records | ✓ |
| 7 π | 9-5-95 | 9-26-95 | Map of Encanto area 63rd St. to 66th St. | | | | | |
| 8 π | 9-5-95 | 9-26-95 | Backboard w/two photos of Retaining wall along Scimitar Ave. | | | | | |
| A △ | 9-26-95 | 9-26-95 | Color photo of victim's driveway | | | | | |

DISTRIBUTION

White - Court File
Canary - Court Clerk
Pink - Exhibit Envelope

ID - Marked for Identification
EVID - Entered in Evidence
TT - Plaintiff/Petitioner Offered
△ - Defendant/Respondent Offered
○ - Not Received by Exhibit Clerk

PAGE NO. 1 of 1

Date: 10/13/95

Exhibits Custodian

715

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF SAN DIEGO

| THE PEOPLE OF THE STATE OF CALIFORNIA, | |
|---|---|
| Plaintiff, | SC No. CR105783 |
| | DA No. B    062621 |
| v. | |
| | INFORMATION |
| LEOVARDO   SALCEDA, | |
| aka LEO SALCEDA | |
| *8-3-89* | Defendant(s) |

I N F O R M A T I O N
S U M M A R Y

| Ct. No. | Charge | Sentence Range | Defendant | Special Allegation | Alleg. Effect |
|---|---|---|---|---|---|
| 1 | PC211 | 2-3-5 | SALCEDA, LEOVARDO | PC12022(a) | +1 |
| 2 | VC10851(a) | 16-2-3 | SALCEDA, LEOVARDO | PC12022(a) | +1 |
| 3 | PC496.1 | 16-2-3 | SALCEDA, LEOVARDO | PC12022(a) | +1 |
| 4 | PC211 | 2-3-5 | SALCEDA, LEOVARDO | PC12022.5( | +2 |
| 5 | PC246.3 | 16-2-3 | SALCEDA, LEOVARDO | | |

The District Attorney of the County of San Diego, State of California,
accuses the Defendant(s) of committing, in the County of San Diego, State
of California, the following crime(s):

COUNT - 1 ROBBERY

On or about June 30, 1989 LEOVARDO SALCEDA did willfully, unlawfully,
and by means of force and fear take personal property from the person,
possession, and immediate presence of RAFAEL SALDIBAR HARO, in violation
of PENAL CODE SECTION 211.

And, it is further alleged that at the time of the commission and
attempted commission of the above offense the said defendant,
LEOVARDO SALCEDA, was armed with a firearm, to wit, a handgun, within the
meaning of Penal Code section 12022(a).

Court's Ex. *3*
Case # *SC · 2436*
Rec'd *10 - 75*
Dept *M-1* CE *rgr*

Page  1  of Case No. CR105783

0126

COUNT - 2 UNLAWFUL DRIVING OR TAKING OF A VEHICLE

On or about June 30, 1989 LEOVARDO SALCEDA did willfully and unlawfully drive and take a vehicle, the personal property of another, without the consent of and with intent to deprive the owner of title to and possession of said vehicle, in violation of VEHICLE CODE SECTION 10851(a).

And, it is further alleged that at the time of the commission and attempted commission of the above offense the said defendant, LEOVARDO SALCEDA, was armed with a firearm, to wit, a handgun, within the meaning of Penal Code section 12022(a).

COUNT - 3 RECEIVING STOLEN PROPERTY

On or about June 30, 1989 LEOVARDO SALCEDA did willfully and unlawfully buy, receive, conceal, sell, withhold, and aid in concealing, selling, and withholding property which had been stolen and obtained by extortion, knowing that said property had been stolen and obtained by extortion, in violation of PENAL CODE SECTION 496.1.

And, it is further alleged that at the time of the commission and attempted commission of the above offense the said defendant, LEOVARDO SALCEDA, was armed with a firearm, to wit, a handgun, within the meaning of Penal Code section 12022(a).

COUNT - 4 ROBBERY

On or about June 30, 1989 LEOVARDO SALCEDA did willfully, unlawfully, and by means of force and fear take personal property from the person, possession, and immediate presence of RAMON CESPEDES, in violation of PENAL CODE SECTION 211.

And, it is further alleged that in the commission and attempted commission of the above offense, the said defendant(s), LEOVARDO SALCEDA, personally used a firearm(s), to wit: a handgun, within the meaning of Penal Code section 12022.5(a).

COUNT - 5 DISCHARGE FIREARM IN GROSSLY NEGLIGENT MANNER

On or about June 30, 1989 LEOVARDO SALCEDA did unlawfully discharge a firearm in a grossly negligent manner which could have resulted in injury or death to a person, in violation of PENAL CODE SECTION 246.3.

717

0127

THIS INFORMATION NUMBERED CR105783    , CONSISTS OF  5 COUNT(S).

EDWIN L. MILLER, JR.
DISTRICT ATTORNEY
County of San Diego,
State of California

Dated 07/28/1989                        By: _____

718

F I L E D
Robert O. Zumwalt, Clerk
OCT 03 1989
By PEGGY SIRNA
DEPUTY

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO

THE PEOPLE OF THE STATE OF CALIFORNIA,

Plaintiff,

vs.

LEO Salceda

Defendant(s).

No. CR- CR 105783

## JURY WAIVER

Comes now   LEO Salceda

defendant in the above-entitled criminal action, and, in support of his waiver of his right to a trial by jury to be made in open court personally and by his attorney, does declare:

1. That his attorney in the above-entitled criminal action is Bill Youmans

2. That he (does/ does not) desire to waive and give up his right to a trial by jury and that he (does/ does not) desire to have this court sitting without a jury determine whether he is guilty or not guilty of the offense(s) for which he is charged in the above-entitled criminal action;

3. That he (does/ does not) understand that he is entitled to a trial by jury, that is, he (does/ does not) understand that he is entitled to have twelve citizens of this community impaneled and sworn to try his case and to determine by their verdict whether he is guilty or not guilty of the offense(s) or crime(s) for which he is charged in the above-entitled action;

4. That his attorney (has/ has not) fully explained to him the term "jury trial";

5. That his attorney (has/ has not) fully explained to him the term "court trial";

6. That his attorney (has/ has not) fully explained to him the difference between a "jury trial" and a "court trial"; and

7. That he (does/ does not) personally waive his right to a "jury trial".

Executed this   3rd   day of   October   , 19 89   , in the County of San Diego, State of California.

_(Defendant's signature)_

7/9

SDS

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO    0129

CR **CR105783**  DA **B6262101**

DATE **11-02-89**    **09:00**  AT **89153443** M        PROB HEAR-SENTENCING

PRESENT: HON. **WILLIAM D MUDD** _____ JUDGE PRESIDING DEPARTMENT **034**

CLERK _____ REPORTER _____

THE PEOPLE OF THE STATE OF CALIFORNIA
VS
                                                         DEPUTY DISTRICT ATTORNEY
**SALCEDA    LEOVARDO**
        DEFENDANT                    ATTORNEY FOR DEFENDANT (APPT'D/RETAINED)

VIOLATION OF **✪PC211** Ct. 1  **✪VC10851(A)** Ct. 2 **✪PC211** Ct. 4

☒ DEFENDANT ☐ NOT PRESENT ☐ ARRAIGNED FOR JUDGMENT ☒ WAIVES ARRAIGNMENT
☐ DEFENDANT ADVISED OF RIGHTS AND (ADMITS/DENIES) A VIOLATION OF PROBATION. ☐ WAIVES HEARING
PROBATION IS: ☒ DENIED ☐ REVOKED ☐ REINSTATED ☐ CONTINUED ☐ MODIFIED ☐ GRANTED _____ YEARS (FORMAL/SUMMARY)

**P R O B A T I O N**
☐ IMPOSITION OF SENTENCE IS SUSPENDED. ☐ DEFENDANT SENTENCED TO STATE PRISON, EXECUTION STAYED (SEE BELOW FOR TERM).
**CONDITIONS OF PROBATION INCLUDE, BUT ARE NOT LIMITED TO:**
☐ COMMITMENT TO SHERIFF FOR ___ DAYS. ☐ ADULT INSTITUTIONS RECOMMENDED. ☐ PAROLE NOT TO BE GRANTED.
☐ FINE OF $ _____ INCLUDING PENALTY ASSESSMENT AT $ _____ PER MONTH, COMMENCING _____ THROUGH REVENUE AND RECOVERY
☐ RESTITUTION OF $ _____ TO VICTIM/RESTITUTION FUND AT $ _____ PER MONTH, COMMENCING _____ THROUGH REVENUE AND RECOVERY
☒ RESTITUTION/FINE OF $ **300—** PER GC 13967, STAYED PER PC 1202.4(b). forthwith + per pc 2085.5
☐ PARTICIPATION IN COMMUNITY SERVICES PROGRAM IN LIEU OF RESTITUTION.
☐ FOURTH AMENDMENT WAIVER OF PERSON/AUTO/RESIDENCE/PERSONAL EFFECTS.
☐ REGISTRATION PER PC 290/H&S 11590.

**S T A T E  C O M M I T**
☒ DEFENDANT IS COMMITTED TO DEPARTMENT OF CORRECTIONS FOR (LOWER) MIDDLE/UPPER TERM OF **2** YEARS.
   (SEE BELOW FOR ADDITIONAL COUNTS)   PRINCIPAL   COUNT **4**
☐ DEFENDANT IS COMMITTED TO CALIFORNIA YOUTH AUTHORITY. ☐ PER W&I 707.2 ☐ PER W&I 1737
   (SEE BELOW FOR FINDINGS)
☒ DEFENDANT IS ADVISED OF APPEAL RIGHTS   ☒ DEFENDANT IS ADVISED REGARDING PAROLE

CREDIT FOR TIME SERV
**122** DAYS LOCAL
____ DAYS STATE INST.
**61** DAYS PC 4019
**183** TOTAL DAYS CREDIT

**C U S T O D Y  S T A T U S**
DEFENDANT REMAINS AT LIBERTY:
☐ ON BOND POSTED $ _____
☐ ON OWN RECOGNIZANCE
☐ ON PROBATION

DEFENDANT REMANDED TO CUSTODY:
☒ WITHOUT BAIL
☐ WITH BAIL SET AT $ _____

☐ DEFENDANT ORDERED RELEASED FROM CUSTODY

**F U T U R E  H R N G S**
☐ DEFENDANT WAIVES STATUTORY TIME FOR PRONOUNCEMENT OF JUDGMENT
_____ CONTINUED TO/SET FOR _____ AT _____ M IN DEPT. _____ ON MOTION
COURT/DDA/DEFENDANT/PROBATION OFFICER. REASON:
☐ DEFENDANT REFERRED FOR DIAGNOSTIC EVALUATION PER PC 1203.03. FURTHER HEARING SET FOR _____ AT _____ M IN DEPT. _____

**B O N D S  W R N T S**
☐ BENCH WARRANT TO ISSUE, BAIL SET AT $ _____ . SERVICE WITHHELD TO _____ .
☐ BENCH WARRANT, ISSUED _____ IS RECALLED.
☐ BOND FORFEITED. BOND AMOUNT _____ . BOND NO. _____ . BOND COMPANY _____ . AGENT _____
☐ BOND IS EXONERATED.

**M H**
☐ PROCEEDINGS SUSPENDED PER: ☐ PC 1368, MENTAL COMPETENCY. (SEE BELOW FOR DATES OF EXAMINATION AND HEARING.).
          ☐ W&I 3051 ADDICTION OR DANGER OF ADDICTION. (SEE BELOW FOR DATE OF SERVICE OF PETITION AND ORDER

OTHER: ☐ REFERRED TO DEPT. OF REVENUE AND RECOVERY  ☒ REPORT TO REGISTRAR OF VOTERS  ☒ DMV ABSTRACT
As to pc 12022.5(a) allegation on Ct. 4 — Defendant committed for
2 years, consecutive to ct. 4. As to Ct. 1 — Defendant sentenced to
mid-term 3 years concurrent. As to Ct. 2 defendant committed to
for one year concurrent. As to Ct. 2 to pc 12022(a)
mid-term 2 year concurrent with Ct. 4. As to pc 12022(a)
allegation -committed to 1 year concurrent.
                                    TOTAL TERM 4 Ct.

CRIMINAL MINUTES — PRONOUNCEMENT OF JUDGMENT

720

## ABSTRACT OF JUDGMENT — COMMITMENT

0130 FORM DSL 2!

SUPERIOR COURT OF CALIFORNIA, COUNTY OF __SANDIEGO__

BRANCH ___

COURT I.D. 3 7

FILED

NOV 02 1989

BY PEGGY SIRNA DEPUTY

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF CALIFORNIA | versus | CASE NUMBER(S) |
| DEFENDANT: LEOVARDO SALCEDA | [X] PRESENT | CR105783 - A |
| AKA: | [ ] NOT PRESENT | - B |
| | | - C |

COMMITMENT TO STATE PRISON
ABSTRACT OF JUDGMENT   [ ] AMENDED ABSTRACT   - D / - E

| DATE OF HEARING (MO) (DAY) (YR) | DEPT. NO. | JUDGE | CLERK |
|---|---|---|---|
| 11 02 89 | 34 | WILLIAM D. MUDD | P. SIRNA |

| REPORTER | COUNSEL FOR PEOPLE | COUNSEL FOR DEFENDANT | PROBATION NO. OR PROBATION OFFICER |
|---|---|---|---|
| C. FRANKLIN | L. ARAGON | B. YOUMANS | A. STALCUP |

### 1. DEFENDANT WAS CONVICTED OF THE COMMISSION OF THE FOLLOWING FELONIES:

A. [ ] ADDITIONAL COUNTS ARE LISTED ON ATTACHMENT

SENTENCE RELATION

| COUNT | CODE | SECTION NUMBER | CRIME | YEAR CRIME COMMITTED | DATE OF CONVICTION MO DAY YEAR | CONVICTION BY JURY TRIAL / COURT TRIAL / PLEA | TERM (L,M,U) | CONSECUTIVE / CONCURRENT | PRINCIPAL OR CONSECUTIVE TIME IMPOSED YEARS MONTHS |
|---|---|---|---|---|---|---|---|---|---|
| 4 | PC | 211** | ROBBERY | 89 | 10 02 89 | X | L | PRINCIPAL | 2 |
| 1 | PC | 211** | ROBBERY | 89 | 10 02 89 | X | M X | | (3) |
| 2 | VC | 10851(a) | UNLAW TAKING OF VEH | 89 | 10 02 89 | X | M X | | (2) |

### 2. ENHANCEMENTS (CHARGED AND FOUND, STRICKEN, TIME IMPOSED):

| COUNT | 12022(a) C/F S I | 12022(b) C/F S I | 12022.3(a) C/F S I | 12022.3(b) C/F S I | 12022.5 C/F S I | 12022.6(a) C/F S I | 12022.6(b) C/F S I | 12022.7 C/F S I | 12022.8 C/F S I | YEARS MONTHS |
|---|---|---|---|---|---|---|---|---|---|---|
| 4 | | | | | X X | | | | | 2 |
| 1 | X X | | | | | | | | | (1) |
| 2 | X X | | | | | | | | | (1) |

### 3. INCOMPLETED SENTENCE(S) CONSECUTIVE:

| COUNTY | CASE NUMBER | CREDIT FOR TIME SERVED |
|---|---|---|
| | | |

### 5. A. NUMBER OF PRIOR PRISON TERMS:

| | $ | C/F | S | I |
|---|---|---|---|---|
| 667.5(a) | | 0 | | |
| 667.5(b) | | 0 | | |
| 667.6(b) | | 0 | | |

### 4. OTHER ORDERS:

RESTITUTION FINE IN THE AMOUNT OF $300 FORTHWITH OR PER PC2085.5.

### B. NUMBER OF PRIOR FELONY CONVICTIONS:

| | $ | C/F | S | I |
|---|---|---|---|---|
| 667.6(a) | | 0 | | |

6. TOTAL TIME IMPOSED ON ALL ATTACHMENT PAGES (FORM DSL 290-A): 

7. TIME STAYED § 1170.1(a) [5-YEAR LIMIT] AND/OR § 1170.1(f) [DOUBLE BASE LIMIT]:

**8. TOTAL TERM IMPOSED:**  ➤  **4**

### 9. EXECUTION OF SENTENCE IMPOSED:

A. [X] AT INITIAL SENTENCING HEARING   B. [ ] AT RESENTENCING PURSUANT TO DECISION ON APPEAL   C. [ ] AFTER REVOCATION OF PROBATION   D. [ ] AT RESENTENCING PURSUANT TO RECALL OF COMMITMENT [PC§1170(d)]

| 10. DATE SENTENCE PRONOUNCED: MO DAY YEAR | CREDIT FOR TIME SPENT IN CUSTODY: | TOTAL DAYS | INCLUDING: | ACTUAL LOCAL TIME | LOCAL CONDUCT CREDITS | STATE INSTITUTIONS |
|---|---|---|---|---|---|---|
| 11 02 89 | | 183 | | 122 | 61 | [ ] DMH   [ ] CDC |

### 11. DEFENDANT IS REMANDED TO THE CUSTODY OF THE SHERIFF, TO BE DELIVERED:

[X] FORTHWITH   
[ ] AFTER 48 HOURS, EXCLUDING SATURDAYS, SUNDAYS AND HOLIDAYS

INTO THE CUSTODY OF THE DIRECTOR OF CORRECTIONS AT THE RECEPTION-GUIDANCE CENTER LOCATED AT:

[ ] CALIF. INSTITUTION FOR WOMEN — FRONTERA   [ ] CALIF. MEDICAL FACILITY — VACAVILLE   [ ] CALIF. INSTITUTION FOR MEN — CHINO

[X] OTHER (SPECIFY): RICHARD J. DONOVAN CORRECTIONAL FACILITY SAN DIEGO, CA

CLERK OF SUPERIOR COURT

I hereby certify the foregoing to be a correct abstract of the judgment made in this action.

| DEPUTY'S SIGNATURE | | DATE |
|---|---|---|
| PEGGY SIRNA | *[signature]* | NOV. 2, 1989 |

This form is prescribed pursuant to Penal Code §1213.5 to satisfy the requirements of Penal Code §1213 (Abstract of Judgment and Commitment) for determinate sentences under Penal Code §1170. A copy of probation report shall accompany the Department of Corrections' copy of this form pursuant to Penal Code §1203. A copy of the sentencing proceedings and any supplementary probation report shall be transmitted to the Department of Corrections pursuant to Penal Code §1203.01. Attachments may be used but must be incorporated by reference.

Form Adopted by the Judicial Council of California Effective July 1, 1981

## ABSTRACT OF JUDGMENT — COMMITMENT
FORM DSL 290

721

Pen.C. 1213.5

16

F I L E D
KENNETH E. MARTONE
Clerk of the Superior Court
JUL 1 6 1993
By: _____ Deputy

CR140382

MUNICIPAL COURT OF CALIFORNIA, COUNTY OF SAN DIEGO
SAN DIEGO JUDICIAL DISTRICT

People vs. _Salceda, Leovardo_     Case No. F158003

I 5

## PLEA OF GUILTY/NO CONTEST - FELONY

The defendant in the above-entitled action, in support of his motion to change his plea(s) in open Court, personally and by his attorney, does declare that his attorney in this case is _T. W. Carnessale_ and does further declare as follows:

1. Of those charges now filed against me in this case, I wish to plead _guilty_ to the following violations: (List Crimes and Code Sections)

   _Ct. 1- P.C. 245 (a)(1)_

1a. (If Applicable) I also wish to admit the following enhancement(s)/prior conviction(s) with which I am charged: (List Court, Docket No. and Date of any Prior Conviction)

   _P.C. 1192. 7 (c) - Serious felony_

2. I have not been induced to enter the above plea by any promise or representation of any kind, except: (Briefly state any plea bargain with the District Attorney.)

   _Dismiss balance ; Low-Term Lid [ 2 yr.] ;
   C.C. w/ violations_

### RIGHT TO A LAWYER

3. I understand that I have the right to be represented by a lawyer at all stages of the proceedings, including this one. I can hire my own lawyer, or the Court will appoint a lawyer for me if I cannot afford one.

### CONSTITUTIONAL RIGHTS

I understand that I also have the following constitutional rights which I now give up to plead either Guilty or No Contest:

| | I understand this right. | I give up this right. |
|---|---|---|
| 4. The right to be tried by a jury, in a speedy, public trial. | | |
| 5. The right to confront and to cross-examine all the witnesses against me. | | |
| 6. The right to remain silent (unless I choose to testify on my own behalf). | | |
| 7. The right to present evidence and to have witnesses subpoenaed to testify in my behalf at no cost to me. | | |

### CONSEQUENCES OF PLEA OF GUILTY OR NO CONTEST

8a. I understand that I may serve this maximum sentence as a result of my plea: _4_ years in State Prison, $_10,000_ fine plus restitution and/or a restitution fine and 48 months parole, with up to one year return to prison for every parole violation. If I should receive probation (for up to five years), I understand that I may be given up to a year in local custody, plus the fine plus restitution and/or a restitution fine, and any other conditions deemed reasonable by the Court. I understand that if I violate any terms or conditions of probation I can be sent to State Prison for the maximum term as stated above.

8b. My attorney has explained to me that other possible direct consequences of this plea may be: (Circle applicable consequences.)

   (a) Ineligibility for probation.
   (b) Prison sentence presumptive.
   (c) Registration as an arsonist, sex or narcotics offender.
   (d) Loss of driving privileges.
   (e) Commitment to the Youth Authority.
   (f) Serious (5 yr.) felony prior

9. I understand that if I am not a citizen of the United States a plea of Guilty or No Contest could result in deportation, exclusion from admission to this country, or denial of naturalization.

10. I understand that my plea of Guilty or No Contest in this case could result in revocation of my probation or parole in other cases.

SDMC Form 711 (Rev. 01/89)

725

0135

11. I now plead _guilty_ _____ to the charge(s) described in #1
above and admit that on the date charged I: (Describe facts as to each charge in #1.)

_assaulted another w/ a deadly weapon_

11a. (If Applicable) I understand that as to any and all prior conviction(s)/enhancement(s) alleged against me in this case, I have all the constitutional rights listed in #3 ~ #7 above. As to any prior convictions alleged, I understand that if I request a jury trial on the current case, the jury would not learn of, or decide, the prior conviction(s) unless and until the jury found me guilty on the current charges.

11b. (If Applicable) I hereby admit the prior conviction(s)/enhancement(s) listed in this form, and give up my constitutional rights, including the right to a separate jury determination on the issue of the prior conviction(s).

12. I do understand that the matter of probation and sentence is to be determined solely by the Court.

13. (Harvey Waiver) The sentencing judge may consider the entire factual background of the case, including any dismissed or stricken charges or allegations or cases, and any charges the District Attorney agrees not to file, when granting probation, ordering restitution or imposing sentence.

14. I am entering my plea freely and voluntarily, without threat or fear to me or anyone closely related to me.

15a. I am pleading Guilty because in truth and in fact I AM GUILTY.

15b. I understand that a plea of No Contest is the same as a plea of Guilty in this criminal case and for all purposes has the same consequences as a plea of Guilty.

16. I am now sober. I have not consumed any drug, alcohol or narcotic within the past 24 hours to the extent that my judgment is impaired.

17. I declare under penalty of perjury, under the laws of the State of California, that I have read, understood, and initialed each item above, and everything on the form is true and correct.

Dated: _7-14-93_

_Leonardo Salceda_
Defendant's Signature

_____
Defendant's Address

_____
City        State        Zip

_____
Defendant's Telephone Number

## ATTORNEY'S STATEMENT

The undersigned states that (s)he is the attorney for defendant in the above-entitled action; that (s)he personally read and explained the contents of the above declaration to the defendant and each item thereof; that no meritorious defense exists to the charge(s) to which defendant is pleading Guilty/No Contest; that (s)he personally observed the defendant fill in and initial each item, or read and initial each item to acknowledge explanation of the contents of each item; that (s)he observed defendant date and sign said declaration; that (s)he concurs in defendant's above plea and in defendant's waiver of constitutional rights.

Dated: _7-14-93_

_____
Attorney for Defendant

## INTERPRETER'S STATEMENT (If Applicable)

I, the interpreter in this proceeding, having been duly sworn, truly translated this form and all the questions therein to the defendant in the _____ language. The defendant indicated that (s)he understood the contents of the form and (s)he then initialed and signed the form.

Dated: _____

_____
Court Interpreter

## PROSECUTOR'S STATEMENT

The People of the State of California, plaintiff in the above-entitled criminal action, by and through its attorney, EDWIN L. MILLER, JR., District Attorney, concurs in the defendant's plea of Guilty/No Contest as set forth above.

Dated: _7/14/93_

_____
Deputy District Attorney

## COURT'S FINDINGS AND ORDER

The Court, having questioned the defendant concerning the defendant's constitutional rights, finds that defendant has voluntarily and intelligently waived his/her constitutional rights. The Court finds that defendant's pleas and admissions are freely and voluntarily made, that defendant understands the nature of the charges and the consequences of the plea, and that there is a factual basis for the plea. The Court accepts defendant's plea, and the defendant is hereby convicted on his plea.

Dated: _7-14-93_

_Joan Weber_
Judge of the Municipal Court

726

0136

SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO
☐ CENTRAL COURTHOUSE, 220 W. BROADWAY, SAN DIEGO, CA 92101-3409
☐ NORTH COUNTY BRANCH, 325 S. MELROSE, VISTA, CA 92083-6627
☐ EAST COUNTY COURT, 250 E. MAIN, EL CAJON, CA 92020-3913
☐ SOUTH BAY COURT, 500 THIRD, CHULA VISTA, CA 91910-5694

*Court Use Only*

F [ ] I [ ] L [ ] E [ ] D [ ]
KENNETH E. MARTONE
Clerk of the Superior Court

AUG 11 1993

By: _____ Deputy

PEOPLE OF THE STATE OF CALIFORNIA    PLAINTIFF,

vs

Leonardo Saleeda    DEFENDANT

PROBATION A# 700988    CII # 08882859

CR 140382
DA P3182901
BK 93146999-A

**ORDER GRANTING PROBATION**
**(PC 1203)**

Defendant having been convicted of violating section(s) PC 245 (9)(1)    IT IS THEREFORE ORDERED that
the ☒ imposition/☐ execution of the sentence be suspended for a period of ___3___ years, and defendant be granted
probation ☒ under the supervision of the Probation Officer/☐ to the Court on the following conditions:

1. ☒ a. Be committed to the custody of the Sheriff for
___366___ day(s), with credit for ___70___ actual
day(s) and ___34___ 4019 P.C. credits, a total of
___104___ day(s) credit.

☒ b. Adult Institutions recommended.   C Barrett rec

☐ c. Probation Work Furlough recommended; report on
_____ at _____ am/pm to 551 So.
35th St., San Diego 92113.

☐ d. Women's Work Furlough/ESP recommended;
report to Las Colinas on a date set by SDSO; call
Jail Counselor at 258-3204 or 940-4846 for
screening within 72 hours.

☐ e. Custody to be served consecutively/concurrently
with _____.

2. ☐ Work in Probation Department Public Service
Program for _____ days, ☐ at the direction of the
Probation Officer, who will set the enrollment date
within 60 days of issuance of the Court order/☐ call
560-3258 within 72 hours to enroll.

3. ☐ Participate in program of volunteer work (non-profit
organization) for ____ hours, work to be completed
by _____ (date), with proof to be submitted to
the Probation Officer within 15 days of completion.

4. ☐ Pay a fine of $_____ including penalty assessments,
and restitution of $____, to be paid to the Probation
Officer through Revenue and Recovery at a
combined rate of $_____ per month; with interest of
10% per annum on principal amount of restitution
unsatisfied, commencing _____;
disbursement to victim per P.O.'s report.

5. ☒ Pay fine of $ 800, including penalty assessments,
and restitution to Restitution Fund of $ 200, to
be paid to Probation Officer through Revenue and
Recovery at a combined rate of $ 25 per month,
commencing 60 days after release

6. ☒ Pay restitution fine per 3967 Gov. Code of$ 1,000
said fine to be stayed per 1202.4(b) PC, with stay to
become permanent on successful completion of
probation.

7. ☐ Any restitution order shall become a judgment under
PC1203(j) if unpaid at the end of probation.

8. ☐ Restitution to be determined by further court order
if victim reports a loss.

9. Illegal Aliens

☐ a. Not enter or be in U.S.A. unless properly
documented evidencing your lawful presence.

☐ b. Report to P.O. within 72 hours of release from
custody if not deported.

☐ c. The formal grant of probation to become
probation to the Court on verification that
defendant has been released to INS for
processing.

10. ☒ Obey all laws, traffic infractions excepted.

11. ☒ Not depart from San Diego County without the
Probation Officer's consent, nor move to another
state without the consent in writing of the Superior
Court; ~~may travel/reside in~~ _____.

12. ☒ Report to the Probation Officer in a manner and at
such times as may be directed by that officer, and
report any change of address or employment to the
P.O. within 72 hours. Further, follow such course of
conduct as the P.O. may prescribe

13. ☒ Seek and maintain full-time employment, schooling
or a full-time combination of the two.

14. ☒ Report to the Probation Officer within 72 hours of
release from custody.

15. ☐ (Fine payable to law enforcement - on all PC 211,
459, 487, & 488): Pay a fine of $10 including penalty
assessments, per PC 1202.5 to Probation Officer
through Revenue and Recovery for disbursement to
_____ (law enforcement agency).

16. ☐ Not maintain a checking/charge account or be in
possession of checks/credit cards other than those
issued pursuant to employment.

17. ☐ Not possess any stolen property.

18. ☒ Not possess a firearm or deadly weapon.

727

Leonardo Salcedo

CASE NUMBER:
CR 14 0382 0137

## DRUG AND SEX CONDITIONS/REGISTRATION

19a ☒ Participate in counseling or therapy if/as directed by Probation Officer; continue until released by therapist and/or P.O.; authorize therapist to provide progress reports to P.O. when requested; all costs to be borne by defendant.

20a ☐ Pay a special fine of $_____, pursuant to PC 290.3 to P.O. through Revenue and Recovery at the rate of $_____ per month, commencing 30 days after release from custody/today's hearing date.

21a ☒ Not contact, annoy or molest _Victim_ _or be within 100' feet of_ _Victim's residence -_

22a ☐ Not associate with minors, nor frequent places where minors congregate, unless in the company of a responsible adult who knows the defendant is on probation for _____.

23a ☐ Obey all orders of Juvenile Court.

24a ☐ Do not use or possess any controlled substance without a valid prescription, and submit to testing for the use of controlled substances when required by the Probation Officer or any law enforcement officer.

25a ☒ Submit person, property, place of residence, vehicle, personal effects to search at any time with or without a warrant, and with or without reasonable cause, when required by the P.O. or other law enforcement officer.

26a ☐ Register per ☐ 11590 H&S; ☐ 290 PC; ☐ 457.1 PC.

27a ☒ Complete a program of residential treatment if ☒/as ☐ directed by Probation Officer.

## AIDS TESTING, EDUCATION, FINE/FEE/DNA TESTING

28a ☐ Submit to AIDS testing by SDSO/Adult Institutions, prior to release, per PC 1202.1.

29a ☐ Submit to AIDS testing by S.D. County Health facility at _____; provide proof of testing to P.O.

30a ☐ Pay special fine of $70 including penalty assessments, at $_____ per month through Revenue and Recovery, commencing _____ for crimes described in 1463.23 P.C.

31a ☐ Complete the County AIDS Education Course per 1001.10 P.C.; report to _____ (provider) at telephone _____ within 30 days/within 30 days of release from custody.

32a ☐ Pay fee not exceeding $50 to AIDS Education provider in lieu of fine, for crimes described in 1463.23 P.C.

33a ☒ DNA Testing (in custody)
Submit to testing by SDSO/Adult Institutions per 290.2 P.C. prior to release from custody.

34a ☐ DNA Testing (out of custody)
Report for testing per 290.2 P.C. within 14 days to S.D. County Health Services Facility (between 8 a.m. and 9 a.m. Monday through Friday) at 1700 Pacific Highway, San Diego; provide proof of testing to P.O.

## FURTHER CONDITIONS

35a ☐ Placed in _____ private placement facility for ____ days, with credit for ____ actual days and ____ days 4019 P.C. credits; Defendant waives future 4019 P.C. credits while in the facility; defendant to report to facility on _____

36a ☒ _Not use force or_ _violence on another_ _____ _____

37a ☐ _____ _____ _____

38a ☐ _____ _____ _____

39a ☐ _____ _____ _____

40a ☐ _____ _____ _____

41a ☐ _____ _____ _____

42a ☐ _____ _____ _____

43a ☐ _____ _____

128

NOTE: This order is incomplete unless

Leonardo Salcedo

CASE NUMBER: CR140388 0138

## OTHER SPECIFIC CONDITIONS RELATING TO ALCOHOL; AND GANG RELATED CRIMES

19b ☒ Totally abstain from the use of alcohol; submit to testing for the use of alcohol when required by the Probation Officer.

20b ☐ Register/enroll within 30 days and satisfactorily complete the First Offender Drunk Driving Program as directed by Probation Officer, all costs to be borne by defendant.

21b ☒ Attend meetings of Alcoholics Anonymous as directed by the Probation Officer.

22b ☒ Take antabuse (if physically able, as determined by a licensed physician) under the supervision of the Probation Officer or his delegate and continue in program until excused by P.O. If physically unable to take antabuse, submit a written statement from physician verifying inability to do so.

23b ☒ Not frequent places where alcohol is the main item for sale except in the course of employment.

24b ☐ If arrested for drunk driving, submit to any chemical test of blood, breath or urine, for the purpose of determining the alcohol content of the blood.

25b ☒ Not drive unless licensed and insured as required by State of California.

26b ☐ Surrender your driver's license forthwith to court for forwarding to DMV pursuant to 13350-13351 V.C.

### GANG CONDITIONS

27b ☐ Not appear in Court or at the Courthouse unless you are a party in the proceedings.

28b ☐ Have a photo ID card on your person at all times.

29b ☐ Not visit or frequent any schoolgrounds unless you are a student registered at the school.

30b ☐ Not be an occupant in any stolen vehicle or vehicle that you should have known was stolen.

31b ☐ If contacted by Law Enforcement, you are to provide your true name, address and date of birth; Further you are to report said contact or arrest in writing to your Probation Officer within 7 days and include date of contact/arrest, charges, if any, and contacting agency.

32b ☒ Not associate with any known gang member or persons who are associated with the _Barrio_ gang. _Logan Encanto_

33b ☐ Not own, transport, sell or have in possession any firearm, replica, ammunition, or other weapon, or any instrument used as a weapon; further, do not associate with any person who has firearms or weapons in their possession.

34b ☐ Not involve yourself in activities or frequent places where firearms or weapons are used either illegally or legally (hunting or target shooting).

35b ☐ Not be in possession of any beeper or paging device except in course of lawful employment.

36b ☐ Not be within two blocks of _____
_____
(an area of gang or criminal activity).

37b ☐ Not wear, display, use or possess any insignias, emblems, badges, buttons, caps, hats, jackets, shoes, flags, scarves, bandanas, shirts or other articles of clothing which are evidence of affiliation with or membership in the _____ gang.

38b ☐ Not display any gang signs or gestures.

39b ☐ _____
_____
_____

40b ☐ _____
_____
_____

41b ☐ _____
_____
_____

42b ☐ _____
_____
_____

43b ☐ _____
_____
_____

44b ☐ _____
_____
_____

n29

Leonardo Salceda

CASE NUMBER: 0139
CR 140382

## ORDER TO PAY PROBATION COSTS/REFERRAL TO DEPARTMENT OF REVENUE AND RECOVERY

You are hereby ORDERED TO REPORT to the Department of Revenue and Recovery at the address checked below and to follow each specified order as checked in addition to those indicated on previous pages.

☒ Pay probation costs: $ 888.00 for presentence investigation and $ 43.00 per month for supervision; to the Probation Office through Revenue and Recovery at a combined rate of $ 25.00 per month commencing 60 days after release

☒ REPORT to the Department of Revenue and Recovery for instructions regarding the REPAYMENT OF COURT APPOINTED ATTORNEY FEES in an amount to be determined.

Name of attorney  J. Carnasale
PD/APD/CA (circle)

☐ PAY COSTS OF TRANSCRIPTS ON ANY SUBSEQUENT APPEALS.

| | | | |
|---|---|---|---|
| ☒ Central Courthouse<br>Room M-060<br>220 W. Broadway<br>San Diego, CA | ☐ North County<br>Room C-65<br>325 S. Melrose<br>Vista, CA | ☐ East County<br>Suite 210<br>1000 Broadway<br>El Cajon, CA | ☐ South Bay<br>Third Floor<br>500 Third<br>Chula Vista, CA |

If it is determined by the Department of Revenue and Recovery that you have the present ability to repay the County for Court Appointed Attorney Fees, or the costs of transcripts on appeal, and you do not agree with such determination, you have the right to a hearing before the court to determine your present ability. Failure to report to the Department of Revenue and Recovery will be deemed a waiver of your right to a hearing on your present ability to repay the County, and a civil judgment will be entered against you for the amount of funds expended for the above services. Failure to pay a fine or restitution may result in a bench warrant being issued for your arrest. Execution may be issued on the order for costs of probation investigation/report, the costs of probation supervision, and the costs of transcripts on appeals, in the same manner as a judgment in a civil action (PC 1203.1b). Each of the above ordered amounts are to be paid to the Department of Revenue and Recovery.

FURTHER CONDITIONS:

_____
_____
_____
_____
_____

Done in open Court: 8-11-93

Joan P. Weber
JOAN P. WEBER    Judge of the Superior Court

CLERK'S CERTIFICATE
The foregoing is a full, true and correct copy of the original on file in this office.

KENNETH E. MARTONE
CLERK OF THE SUPERIOR COURT

730

ATTEST: _____    By _____
DATE                                      DEPUTY

ORDER GRANTING PROBATION PAGE ___ OF ___    NOTE: This order is incomplete unless SUPCT

STATE OF CALIFORNIA—YOUTH AND ADULT CORRECTIONS AGENCY

DEPARTMENT OF CORRECTIONS

PETE WILSON, Governor



## CALIFORNIA MEDICAL FACILITY
VACAVILLE, CA 95687-2000
(707) 448-6841

DATE: JULY 27, 1995

NAME: SALCEDO, LEOVARDO
FILE: E-35733
D/D: 10/94

OFFICE OF THE DISTRICT ATTORNEY
COUNTY OF SAN DIEGO

Dear Sir/Madam:

This is to certify that the Director of the Department of Corrections is the official legal custodian of the records of prisoners committed to the California State Prisons, and has authorized the undersigned as Correctional Case Records Supervisor of the Department of Corrections to certify in his behalf the criminal records of persons who have served sentences in the California State prisons, including the certifications required under 969b of the California Penal Code.

I further certify that the copies of the commitment, photograph, fingerprints and chronological history and/or movement history are true and correct copies of those in my custody as required by law.

Sincerely,

JANE F. VERGARA
Correctional Case Records Supervisor
Departmental Archives Unit
(707) 449-6519



Court's Ex. 6
Case # SCD112436
Rec'd 10-4-95
Dept M-1 Clk tba

731

STATE OF CALIFORNIA | CHRONOLOGICAL HISTORY | DEPARTMENT OF CORRECTIONS

0141

CDC 112 (7-83)

| Date | Chronological Listings | Initials | Dead Time | Release Date |
|---|---|---|---|---|
| NOV 0 9 1989 | Rec'd RJD/RC | | | |
| 11-16-89 | NOTICE PURSUANT TO 3058.6PC | gm | | |
| 11-16-89 | FILE AUDITED | gm | MIN DSL | 3-4-90 |
| 12-27-89 | Rec'd RJD | RC | | |
| 1-9-90 | Intake audit | VP | 156PX19 | 3-4-92 |
| 1-15-91 | 6 mos wca, due 13-21-90 3, A1 | JL | A1-CPRD | 8-27-91 |
| 6-11-91 | 60-Day Audit | Puc | COD | 8-27-91 |
| 8-5-91 | Parole Audit | | CR | 8-27-91 |
| 8-27-91 | Parole + Cypon #/sp co/req # | Jo | SK | 8-27-93 |
| 9-9-91 | FHP RE | SW | | |
| 9-25-92 | RETAIN ON PAROLE PER BPT/RULE 2535(c) (1.5) | RFM | | |
| 8-13-93 | RETAIN ON PAROLE PER BPT-RULE 2535(c) (J.25) | RS | COD | 8-27-94 |
| 4-28-94 | Rec'd RJD SV PV/PTC | M | OR | NA |
| 4-17-94 | Hold placed | gr | | |
| 5-17-94 | Rev. hearing, retain hold, PV-RTC Two mos (2), SB16 drilig | gr | | |
| 5-18-94 | FILE AUDITED | gr | RRD | 6-16-94 |
| 5-18-94 | COD audited per PM 2/89, total rev. served to date 0 days | gr | COD OR | 10-26-94 NA |
| 5-18-94 | NOTICE PURSUANT TO 3058.6PC | gr | | |
| MAY 3 1 1994 | REC'D RJDC | | | |
| 6-1-94 | Intake App Day audit | RG | | |
| 6-14-94 | Parole Contact | RG | | |
| 6-14-94 | parole SD 2/sp ca/Reg A | SG | | |
| 10-28-94 | DISCHARGE EFFECTIVE 10-26-94 PER BPT 2536A ) Expiration of sentence. | S GR | DD | 10-26-94 |

| Number | Name | Page |
|---|---|---|
| E-35733 | SALCEDA, LEOVARDO | 1 |

BEST COPY AVAILABLE

138

ABSTRACT OF JUDGMENT — COMMITMENT

8915344 3A

DSL 290

SUPERIOR COURT OF CALIFORNIA, COUNTY OF ...... SANDIEGO ..........

BRANCH

PEOPLE OF THE STATE OF CALIFORNIA    VERSUS    X PRESENT
DEFENDANT:    LEOVARDO SALCEDA              NOT PRESENT
AKA:
COMMITMENT TO STATE PRISON
ABSTRACT OF JUDGMENT            AMENDED
                                ABSTRACT

CR105783    A
            B
            C
            D
            E

DATE OF HEARING     DEPT NO.    JUDGE
11 02 89    34    WILLIAM D. MUDD    COUNSEL FOR DEFENDANT  P. SIRNA    PROBATION NO. OR PROBATION OFFICER

C. FRANKLIN    L. ARAGON    R. YOUMANS    A. STALCUP

1. DEFENDANT WAS CONVICTED OF THE COMMISSION OF THE FOLLOWING FELONIES:

| COUNT | CODE | SECTION NUMBER | CRIME | YEAR CRIME COMMITTED | DATE OF CONVICTION | | | CONVICTION BY | | | | | | PRINCIPAL OR CONSECUTIVE TIME IMPOSED |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | MO | DAY | YEAR | JURY | COURT | PLEA | | | | |
| 4 | PC | 211** | ROBBERY | 89 | 10 | 02 | 89 | X | | L | PRINCIPAL | | | 2 |
| 1 | PC | 211** | ROBBERY | 89 | 10 | 02 | 89 | X | | M | X | | | (3) |
| 2 | VC | 10851(a) | UNLAW TAKING OF VEH | 89 | 10 | 02 | 89 | X | | M | X | | | (2) |

2. ENHANCEMENTS (CHARGED AND FOUND, STRICKEN, TIME IMPOSED):

| COUNT | 12022(a) | | 12022(b) | | 12022.5(a) | | 12022.5(b) | | 12022.3 | | 12022.6(a) | | 12022.6(b) | | 12022.7 | | 12022.9 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | C/F | S | C/F | S | C/F | S | C/F | S | C/F | S | C/F | S | C/F | S | C/F | S | C/F | S |
| 4 | X | X | | | | | X | X | | | | | | | | | | 2 (1) |
| 1 | X | X | | | | | | | | | | | | | | | | (1) |

3. INCOMPLETED SENTENCE(S) CONSECUTIVE:

| COUNTY | CASE NUMBER | CREDIT FOR TIME SERVED |
|---|---|---|
| | | |

4. OTHER ORDERS:

RESTITUTION FINE IN THE AMOUNT OF
$300 FORTHWITH OR PER PC2085.5.

5. A. NUMBER OF PRIOR PRISON TERMS:

| | C/F | S |
|---|---|---|
| 667.5(a) | 0 | |
| 667.5(b) | 0 | |
| 667.6(b) | 0 | |

B. NUMBER OF PRIOR FELONY CONVICTIONS:

| | C/F | S |
|---|---|---|
| 667.6(a) | 0 | |

6. TOTAL TIME IMPOSED ON ALL ATTACHMENT PAGES (FORM DSL 290-A):

7. TIME STAYED 1.170.1(f) 5-YEAR LIMIT AND/OR 1.170.1(f) DOUBLE BASE LIMIT:

8. TOTAL TERM IMPOSED:    4

9. EXECUTION OF SENTENCE IMPOSED:

A. X AT INITIAL SENTENCING HEARING    B. AT RESENTENCING PURSUANT TO DECISION ON APPEAL    C. AFTER REVOCATION OF PROBATION    D. AT RESENTENCING PURSUANT TO RECALL OF COMMITMENT (PC1170(d))

10. DATE SENTENCE PRONOUNCED    CREDIT FOR TIME SPENT IN CUSTODY:    TOTAL DAYS    ACTUAL LOCAL    LOCAL CONDUCT CREDITS    STATE INSTITUTIONS
MO 11  DAY 02  YEAR 89    183    INCLUDING:    122    61    DMH    CDC

11. DEFENDANT IS REMANDED TO THE CUSTODY OF THE SHERIFF, TO BE DELIVERED:

X FORTHWITH    INTO THE CUSTODY OF THE DIRECTOR OF CORRECTIONS AT THE RECEPTION-GUIDANCE CENTER LOCATED AT:    CALIF. INSTITUTION FOR WOMEN — FRONTERA    CALIF. MEDICAL FACILITY — VACAVILLE    CALIF. INSTITUTION FOR MEN — CHINO
AFTER 48 HOURS, EXCLUDING SATURDAYS, SUNDAYS AND HOLIDAYS    X OTHER (SPECIFY): RICHARD J. DONOVAN CORRECTIONAL FACILITY SAN DIEGO, CA

CLERK OF SUPERIOR COURT

I hereby certify the foregoing to be a correct abstract of the judgment made in this action.

DEPUTY'S SIGNATURE    DATE
PEGGY SIRNA    NOV 0 2 1989

This form is prescribed pursuant to Penal Code 1213.5 to satisfy the requirements of Penal Code 1213.1 (Abstract of Judgment and Commitment) for determinate sentences under Penal Code 1170. A copy of probation report shall accompany the Department of Corrections' copy of this form pursuant to Penal Code 1120(c). A copy of the sentencing proceedings and any supplementary probation shall be transmitted to the Department of Corrections pursuant to Penal Code 1120.01. Attachments may be used but must be incorporated by reference.

Form Adopted by the
Judicial Council of California
Effective July 1, 1981

ABSTRACT OF JUDGMENT — COMMITMENT

DSL 290                                              Pen.C. 1213.5.

DISTRIBUTION:    PINK COPY  COURT FILE    YELLOW COPY  DEFT.    WHITE COPY  ADMINISTRATIVE OFFICE OF THE COURTS

0143

STATE OF CALIFORNIA                                                    DEPARTMENT OF CORRECT

# FINGERPRINT CARD

NO. _E-35733_

NAME _SALCEDA, LEOVARDO_            CLASS _____

ALIAS _____          REF. _____

**Right Hand**



**Left Hand**

| Hair | BLK | Eyes | BRN | Complexion | MED | Height | 5'6" |
| Weight | 140 | Age | 20 | Build | SM | Occupation | LANDSCAPE |
| Rec'd at | RJD R/C | Date | 11-9-89 | County | SD | Nativity | CALIF. |
| Offense | CT 4 ROBBERY 2nd (212.5(B)PC  see reverse | | | Term | 4 years | Race | |

CR105183

Marks, Scars, Tattoos (Location & Brief Description — Scar Right Eye, Tattoo Eagle Right Forearm. NOTE: If numerous list those most prominent).

NONE

Taken by _____                    Signature _Leovardo Salveda_

| Left Hand | Left Thumb | Right Thumb | Right Hand |





CDC. 138 (7/85)



BEST COPY AVAILABLE

734

0144

& USE(12022.5 PC)
CT 1 ROBBERY 2nd (212.5 (b)PC)
& ARMA (12022(a) PC)
CT 2 VEHICLE THEFT 910851 (A) VC
& ARMA (12022(A) PC

735

0145





SBS

CR __SCD112436__  DA __P6236901__    **SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO**

DATE __08-04-95__ AT __09:00__ M.    95127906    995PC HG    **0210**

PRESENT: HONE __MAC AMOS__    JUDGE PRESIDING DEPARTMENT __M01__

CLERK __GEO. KUETTNER__  REPORTER __TERRI SMITH__    CSR# __7949__

REPORTER'S ADDRESS: P.O. BOX 128, SAN DIEGO, CA 92112-4104

THE PEOPLE OF THE STATE OF CALIFORNIA    __EDWARD MANTYLA for MICHAEL GROSS__
VS.                                                        DEPUTY DISTRICT ATTORNEY

__SALCEDA    LEOVARDO__    B - P.DEFENDERS __RONALD VANESIAN__
DEFENDANT                              ATTORNEY FOR DEFENDANT (APPTD/RETAINED)

VIOLATION OF __PC209(B)    PC207(A)    PC664-215(A)  ✢PC245(A)(1)__

INTERPRETER _____ SWORN/CERT 5
LANGUAGE _____

DEFENDANT ☒ ☐ PRESENT.
☐ COUNSEL & DEFT. STIP TO PRELIM TRANS AS FACTUAL BASIS OF PC 995 MOTION.
☒ DEFENDANT'S MOTION TO DISMISS PURSUANT TO PC 995 IS BY THE COURT ~~GRANTED~~/(DENIED)/SUBMITTED AS TO: _____

**L**  ☐ DEFENDANT'S MOTION TO SUPRESS EVIDENCE PURSUANT TO PC 1538.5 IS BY THE COURT GRANTED/DENIED/SUBMITTED AS TO: _____
**A**

**W**  ☐ DEFENDANT'S MOTION FOR DISCOVERY IS GRANTED/DENIED/SUBMITTED AS TO: _____

**&**  ☐ PEOPLE'S MOTION FOR DISCOVERY IS GRANTED/DENIED/SUBMITTED AS TO: _____

**M**  ☐ OTHER MOTION: _____

**O**
**T**
**I**
**O**
**N**

| WITNESSES SWORN & EXAMINED: | PEO. | DEFT. | NO. | EXHIBIT DESCRIPTION | MRKD | RCVD |
|---|---|---|---|---|---|---|
| _____ | [ ] | [ ] | ____ | _____ | [ ] | [ ] |
| _____ | [ ] | [ ] | ____ | _____ | [ ] | [ ] |
| _____ | [ ] | [ ] | ____ | _____ | [ ] | [ ] |
| _____ | [ ] | [ ] | ____ | _____ | [ ] | [ ] |
| _____ | [ ] | [ ] | ____ | _____ | [ ] | [ ] |
| _____ | [ ] | [ ] | ____ | _____ | [ ] | [ ] |
| _____ | [ ] | [ ] | ____ | _____ | [ ] | [ ] |
| _____ | [ ] | [ ] | ____ | _____ | [ ] | [ ] |

**C**  ☒ DEFENDANT REMANDED TO CUSTODY OF SHERIFF ☐ WITHOUT BAIL ☒ WITH BAIL SET AT $ __150,000.00__
**S**  ☐ DEFENDANT ORDERED RELEASED FROM CUSTODY ☐ ON OWN/SUPERVISED RECOGNIZANCE ☐ CASE DISMISSED ☐ THIS CASE ONLY
**T**
**O**  ☐ DEFENDANT TO REMAIN AT LIBERTY ☐ ON BOND POSTED $_____ ☐ ON OWN/SUPERVISED RECOGNIZANCE.
**D**
**Y**  ☐ BAIL IS SET AT/REDUCED TO/INCREASED TO $_____.

**F**  __Jury Trial__ ~~CONTINUED TO~~/SET FOR __08-14-95__ AT __9:00__ M IN DEPT. __MC-1__
**H**
**U**  ON MOTION OF (COURT)/DDA/DEFENDANT/PROBATION OFFICER.  REASON: _____
**R**
**T**
**G**

**B**  ☐ BENCH WARRANT TO ISSUE, BAIL SET AT $_____. ☐ SERVICE FORTHWITH. ☐ ORDERED WITHHELD TO _____
**W**
**O**  ☐ BENCH WARRANT ISSUED/ORDERED _____ IS RECALLED/RESCINDED.
**R**
**N**  ☐ BOND IS ☐ EXONERATED ☐ FORFEITED. AMOUNT $_____. BOND NO. _____
**D**
**T**  BOND COMPANY _____ AGENT _____
**S**

OTHER: _____

_E. ___ Cross, for 800_

☐ MAC AMOS, JR JUDGE OF THE SUPERIOR COURT

SUPCT C8 30 (Rev 3-94)    CRIMINAL MINUTES

Leovardo Salceda J-90933
CVSP, B3-260 Low
P.O. Box 2349
Blythe, California 92226

In pro per

———————————————

Carmen Lopez (619) 264-5583
3893 Gamma Street
San Diego, California 92113

COURT OF APPEAL - FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re LEOVARDO SALCEDA<br><br>on<br><br>Habeas Corpus. | No. _____<br>Superior Court No. SCD112436<br>Prior Convictions CR105783,<br>CR140382 |

DECLARATION OF CARMEN LOPEZ IN SUPPORT OF PETITION FOR

WRIT OF HABEAS CORPUS FOR LEOVARDO SALCEDA

I, Carmen Lopez, declare the following, that if I am called

to testify, I could and would competently testify that;

1.) I am 70 years old and I am the natural mother of

Leovardo Salceda who is serving 26 years at Chuckawalla Prison.

Leovardo is the petitioner in this cause of action a petition for

writ of habeas corpus. That I am on a fixed income through

social security of approximately $500 a month and this said

amount is for basic necessities of life, i.e., room, board, food,

medical, clothing and traveling on city transit. That when

financially possible I go to visit Leovardo every 3 months.

Earnie Lopez gives me a ride to visit Leovardo at said prison.

Declaration of Carmen Lopez page 1 of 3          Exh. B13

That since Leovardo's incarceration on April 23, 1995, to the present day, inclusive this decaration, I have tried to help him regarding his case. I testified at Leovardo's trial and explained he was very drunk on April 23, 1995, the very day he was arressed and charged with kidnapping Russell Champion in instant case SCD-112436;

2.) That Leovardo explained to me through letters, phone calls, and visits about the alleged constitutional errors in his case and that he did not rob Rafael Haro. That Leovardo asked me to go to the San Diego Courthouse, to his attorney Mr. Mangarin SCD112436, and his previous attorney Mr. Youmans CR105733 and request to buy copies of his records to support his past conviction efforts in Leovardo 's pleadings to the Court for relief. I have traveled on the San Diego City Bus and Trolly to the places of business mentioned above to obtain records for Leovardo's case. Sometimes I was successful to buy Court records, other times I was unsuccessful. Nevertheless I tried. I was not able to obtain records from either attorney mentioned above. That Angie C Camarena whom I live with did travel with me on the city buses and trolly to the places of businesses' mentioned above to obtain records. That the records I was able to obtain for Leovardo, I mailed to him via United States mail; and

3.) That I searched for Jesus H. Lopez for years but could not find him. That in 2004 I seen Rosanna Lopez (Jesus' niece) and she told me Jesus was in the  San Diego County Jail. That Angie and I traveled on the city bus to interview Jesus regarding Leovardo's prior robbery case CR105733 and Jesus voluntarily agreed

Declaration of Carmen Lopez page 2 of 3

*Exh. B13*

to tell the truth that he in fact is the sole person who robbed
Rafael Haro.  And that Leovardo did not rob Haro.  Jesus further
told me that he is willing to testify regarding Leovardo's robbery
case CR105733.


   I declare under penalty of perjury under the laws of the
State of California that hte foregoin is ture and correct.
   Exeuted on  Wednesday, November 23, 2005, at San Diego,
California.


                    Respectfully submitted,

                    Carmen Lopez.
                    Carmen Lopez, Declarant.


          Declaration of Carmen Lopez page 3 of 3

                                        Exh. 813

Leovardo Salceda J-90933
CVSP, B3-260 Low
P.O. Box 2349
Blythe, California 92226

In pro per

———————————————

Angie Camarena (619) 264-5583
3393 Gamma Street
San Diego, California 92113

COURT OF APPEAL - FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re LEOVARDO SALCEDA | No. _____ |
| on | Superior Court No. SCD112436 |
| Habeas Corpus. | Prior Convictions CR105783, CR140332 |

DECLARATION OF ANGIE CAMARENA IN SUPPORT OF PETITION FOR
WRIT OF HABEAS CORPUS FOR LEOVARDO SALCEDA

I, Angie Camarena, declare the following, that if I am called

to testify, I could and would competently testify that;

1.) I am 50 years old and Carmen Lopez whom lives with me is

Leovardo Salceda's mother.  Leovardo is serving 26 years at

Chuckawalla Prison.  Leovardo is the petitioner in this cause of

action a petition for writ of habeas corpus.  That neither Carmen

nor myself can afford to hire an attorney to represent Leovardo.

That I was present on Leovards's behalf at his Court hearing -

sentencing and also submitted a letter to Judge Amos asking for

leniancy on behalf of Leovardo;

Declaration of Angie Camarena page 1 of 2          Exh. 814

2.) That Leovardo has explained to me through letters and phone calls the alleged constitutional errors in his case and that he did not rob Rafael Haro. That Leovardo asked me and Carmen to the San Diego Courthouse, to his attorney Mr. Mangarin SCD112436, and his previous attorney Mr. Youmans CR105783 and request to buy copies of records to support his post conviction efforts in Leovardo's pleadings to the Court for relief. I have traveled with Carmen on the San Diego City Bus and Trolly to the places of business mentioned above in attempts to obtain records. That the records we were able to buy from the Courthouse we sent to Leovardo via United States mail. Sometimes Carmen and I were unsuccessful to buy Court records. Nevertheless we tried. We were not able to obtain records from either attorney mentioned above; and

3.) That Carmen searched for Jesus H. Lopez for years but could not locate him. But finally in 2004 Carmen seen Rosanna Lopez (Jesus' niece) and Rosanna told Carmen that Jesus was in San Diego County Jail. Carmen and I traveled on the city bus to interview Jesus regarding Leovardo's prior robbery case CR105733 and Jesus voluntarily agreed to tell the truth that he in fact is the sole person who robbed Rafael Haro. That Leovardo did not rob Haro. Jesus further told Carmen and me that he is willing to testify regarding Leovardo's robbery case CR105733.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed on Wednesday, November 23, 2005, at San Diego, California.

Respectfully submitted,

*Angie Camarena*

Angie Camarena, Declarant.

Declaration of Angie Camarena page 2 of 2

*Exh. B¹⁴*

**Exhibit**

C    Declaration of Leovardo Salceda in Support of Application for Equitable
and Statutory Tolling 28 USC 2241, and Petition for Writ of Habeas
Court 28 USC 2254 in Federal Court

**DECLARATION OF LEOVARDO SALCEDA IN SUPPORT OF APPLICATION FOR**

**EQUITABLE AND STATUTORY TOLLING 28 U.S.C. 2244, AND PETITION FOR**

ORIGINAL          **WRIT OF HABEAS CORPUS 28 U.S.C. 2254**

I, Leovardo Salceda, declare as follows:

1. I make the following declaration of facts based on my own knowledge and, if called, can testify competently thereto;

2. I am the defendant in the instant kidnapping case, 1995, People v Salceda, Case # SCD11243.  I was charged as a 3 Strikes Case because in 1989 I was convicted of 2 robberies, Case # CR105783, and in 1993 I was convicted of 1 assult W/D/W, Case # CR140382,

3. Ronald K. Vanesain, Public Defender, was appointed to represent me. Vanesian filed  a Cal. Penal Code 995 motion to dismiss all counts, and a 1385 motion to dismiss strikes.  The prosecutor filed opposition to both motions. On 8-4-95 a hearing was held on the 2 motions, and the trial court denied both motions.  At this 8-4-95 hearing, I asked Vanesain to give me copies of all relevant legal papers of the instant case, and also of prior conviction cases.  I.e., Informaions, preliminary hearings, police and police reports, etc.  I never received them.

4. Vanesian told me Dr. Clark Smith, psychiatrist, would evaluate me.  On 8-9-95 Dr. Smith interviewed me and I answered all questions.  In particular, Dr. Smith asked me about the instant offense.  I explained I was very drunk.  Dr. Smith asked me about the prior robbery case and I explained I was very drunk and that another person was actually responsible for the robbery.

5. On 8-11-95 a court hearing was held and Vanesain declared conflict of interest.  The trial court did not investigate on the record the basis for the conflict, nor did Vanesain explain the

ORIGINAL

reasons for declaring the conflict. But importantly and specifically, Vanesain told me he declared conflict of interest because Dr. Smith's report disclosed materal facts directly related to the prior robbery case. That William Youmans, former Public Defender, was ineffective for failure to introduce intoxication evidence in the *court trial* to negate the prior robberies. Vanesain said he could not investigate Youmans because they worked in the the same public defender office,so new counsel would be appointed to investigate whether Youmans was ineffective, and possibly be grounds to strike the 2 prior robbery strikes.

6. On 9-3-95 Daniel J. Mangarin, Alternate Defender, interviewed me concerning the instant kidnapping case, and that I was exposed to several life sentences because of the prior robbery and assault cases. I exaplained to Mangarin the reasons Vanesain declared conflcit. I also told Mangarin that I did not rob Rafael Haro in the prior robbery case, that Jesus Lopez, robbed Haro. And Juan Sanchez said that Haro went to court and said I did not rob him. Mangarin told me that he would not investigate the conflict of interest, nor my claim of innocence. During the 9-3-95 attorney/client interveiw, I asked Mangarin for records of my instant case and also of the prior robbery and assault cases. Mangarin did not give me copies of records that I requested.

7. In 1996, Handy Horiye was my appeal attorney. he wrote to me and asked whether I wanted to raise "issues" for the appeal. I wrote and explained 1) prejudicial conflict of interest that affected Mangarin's trial performance resulting in ineffective assistance of counsel; 2) that I testified in the instant case and claimed I did not rob Haro in the prior robbery case. That Haro recanted his preliminary hearing identification of me; and 3) when I testified in the instant case, the prosecutor cross-examined me about the prior robbery case. The prosecutor falsely claimed I signed a *"change of plea form"* in prior robbery case. THE IMPORTANCE

2

THAT NO SUCH PLEA FORM EXISTS IS THAT A PLEA FORM WOULD HAVE BOYKIN-TAHL WAIVERS ON ITS FACE. HOWEVER, NO PLEA FORM EXISTS. I did not personally, voluntarily, intelligently and knowingly waive Boykin-Thal rights in the prior robbery case. Had I understood the rights, and known Haro told the prosecutor he mis-identified me at preliminary hearing, and Sanchez stated I did not rob Haro, that some other person with brown hair robbed Haro, I would not have submitted the incriminating transcript. The preliminary hearing is the only evidence that was used to convict me of the two prior robberies.

8.  I did not rob Rafael Haro in the prior robbey case. Jesus Lopez robbed Haro. Lopez ordered me at gun point to rob the gas station. Or I would not have robbed the gas station.

9.  From 8-13-97 to 3-6-03 I was at Lancaster Prison and was assigned to vocational trades and prison jobs and was forced to attend or face disciplinary punishment.

10. From 8-13-97 to 3-6-03 I was at Lancaster Prison and during these 5 1/2 years there were numerous yard stabbings and neck slashings. There were 3 racial riots on the yard I was on. Lancaster Prison declared 5 state of emergencies. This was the reason for continuous lockdowns and preventd me from going to the law library to reasearch, investigate and

11. When I filed motion for settled on 9-20-01 seeking Haro's exculpatroy statement, I served the prosecctuor a copy of the mtoion. And evey other pleaing from there forth up until comply with rules of court, rules of law, and avoid ex parte communication. The prosecutor's and attorney general knew I looked for Haro's exculpatory statement.

12. On 8-14-02 I was diagnosed with cronic Chrones disease. Since then, 6 colonoscopy's have been performed on me. I am continuously bleeding internally, often weak, and take medication daily. The medications I take often have serious side effects causing headaches

and fitigue. My sickness has seriously affected my ability to prepare my pleadings to the court's in a timely manner. Until the present day, 3-30-08, I am sick and bleeding internally. From Jaunuary 2008 to March 2008 I have been going to the doctor's complaing of my sickness because I have gotten sicker.

13. I was arrested for the instant kidnap case on 4-23-95. I was indigent and illiterate. On 9-24-98 while I was in vocational office machine repair I was tested and scored grade point level 7.6.

14. On 3-25-98, the court of appeal affiremd the 26-year sentence D029086. I did not have any records of instant case, nor of prior cases. I wrote to Superior Court, defense attorney's, prosecutor's, police department, Department of Justice, Innocence Project, and searched for witnesses.

15. In September 2003, I wrote to Innocence Project seeking help in proving my innocence of the robbery of Haro.

16. My mother Carmen Lopez, and aunt Angie Camarena went on my behalf to the San Diego Superior Court and Public Defender to help me gather records. They searched for witnesses.

17. The prison law library at Lancaster Prison and Chuckawalla Prison have been inadequate. Libraries are often closed becasue of staff shortage, and legal books are outdated. AEDPA legal materials are outdated and scarce. Up to the present day, another memo has been posted that library is limited to inmates with court deadlines and seating is limited.

18. I bought a copy of my prior robbery case file CR105783. The file was stored at the San Diego Courthouse. The slow plea record shows I did not personally, intelligently and voluntary waive my rights to confront witness against me and against self-incrimination.

4

19. When I testified in the instant kidnapping case, I denied commanding Russell Champion to drive. I was intoxicated but never had the general criminal intent to kidnap Champion.

20. The equitable and statutory claims, and the habeas claims, I have diligently tried to prepare in a timely manner. However, lockdowns, library often closed, making sufficient copies for exhibits and equitable and habeas claims has been difficult. I have diligently went around the prison yard, wrote to organizations and attorney's, and to other inmates seeking guidence and copies of case law, statutory law, and constitiutional law because I cannot rely on the library. This declaration was dated 3-30-08 (which correlates with equitiable and habeas claims) but because I was unable to complete the equitable and habeas claims until the ***present day 6-6-08*** I now sign this declaration and equitable and habeas claims this date.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on June 6, 2008, at Chuckawalla Valley State Prison, in Blythe, California.

Respectfully Submitted,

*Leovardo Salceda*

6-6-08

Petitioner / Declarant, in pro se.

Leovardo Salceda J-90933
CVSP, D9-237 Low
P.O. Box 2349
Blythe, CA 92226

5

## **Exhibits**

D       Grade Point Level 7.6, 9-24-98

D1      Petitioner's Notes in San Diego County Jail of Requests and Complaints that Trial
        Counsel did not Provide Copies of Instant Case SCD112436, and also of Prior
        Conviction Cases CR105783 and CR140382

D2      Prison Vocation Trades and Prison Jobs, 8-13-97 to present day 3-30-08

D3      Lancaster Prison Maximum Security, Consistant Lockdowns, 8-13-97 to 3-6-03

D4      Petitioner Diagnosed with Cronic Crones Disease, 8-14-02 to present day 3-30-08

D5      Inadequate Prison Law Libraries , Prison Over Crowding , 4-28-02
        to present Day 5-16-08



ATE OF CALIFORNIA                                                                    DEPARTMENT OF CORRECTIONS

## GRADE

|  | S-SATISFACTORY UN-UNSATISFACTORY | TOTAL CERTIFICATION UNITS IN COURSE: | |
|---|---|---|---|
| ATTITUDE | | | |
| ADAPTABILITY | S | VOCATION (VOC) | 35 |
| CONDUCT | S | ADULT BASIC EDUCATION (ABE) | |
| COOPERATION | S | GENERAL EDUCATION DEVELOPMENT (GED) | |
| DEPENDABILITY | S | HIGH SCHOOL (H.SCH) | TOTAL CERTIFICATION UNITS PRIOR TO THIS |
| INITIATIVE | S | ENGLISH SECOND LANGUAGE (ESL) | QUARTER: 0 |

| SPECIFIC CERTIFICATE UNITS COMPLETED |
03.02.01, 02, 03, 04

| DATE STUDENT ENROLLED | DATE STUDENT TERMINATED | REASON FOR TERMINATION |
|---|---|---|
| 10-98 | | |

COMMENTS
M. SALCEDA IS COOPERATIVE AND CONDUCTS HIMSELF IN A MATURE MANNER. HE REPORTS TO CLASS ON TIME AND DOES NOT HAVE TO BE REMINDED OF CLASSROOM RULES. HE NEEDS TO CONCENTRATE MORE ON HIS STUDIES.

| DATE 10/9/98 | COURSE OFFICE MACHINE REPAIR | GRADE C+ | INSTRUCTOR J. COLLINS |
|---|---|---|---|
| J-90933 | NAME SALCEDA, L | INST CSP/LAC | |

## EDUCATION PROGRESS REPORT

CDC 128-E (7/89)

---

NAME and NUMBER        SALCEDA        J-90933

CDC 128-B REV (4/74)

TESTS OF ADULT BASIC EDUCATION SCORES:    FORM __7__  LEVEL __M__  DATE TESTED ___9/24/98___

READING __9.6__  MATH __8.2__  LANGUAGE __4.0__  SPELLING __8.5__  AVG. TOTAL ___7.6___

DISTRIBUTION:    C-FILE
                 INSTRUCTOR __OFFICE MACH REP/D-YARD__
                 EDUCATION FILE
                 INMATE
                                        E. MENDOZA,
                                        SUPERVISOR OF ACADEMIC INSTRUCTION

DATE    October 15, 1998        TABE TEST SCORES        GENERAL CHRONO

Exh. D

F

THE DAY BEFORE MY TRIAL SEPTEMBER 24, 1995. MY ATTORNE

DANIEL MANGARIN OF THE ALTERNATE PUBLIC

DEFENDERS OFFICE HAD A PROFESSIONAL VISIT

WITH ME. I DID NOT HAVE ANY LEGAL PAPER WORK

ABOUT MY PRESENT CASE. EVEN THOUGH I REQUESTED

SEVERAL TIMES TO HAVE COPIES OF ALL LEGAL

PAPER WORK ON MY CASE, AND ALSO MY PREVIOUS

CASES, BECAUSE MY CASE IS A THREE STRIKES

CASE. I REQUESTED TO BOTH OF MY ATTORNEYS.

RONALD VANESZAN (PUBLIC DEFENDER) AND DANIEL

MANGARIN (ALTERNATE PUBLIC DEFENDER) (DECEMBER 1995.)

I, Leovardo Salceda, declare under penalty of perjury that I wrote these
NOTATIONS while I was in County jail in 1995. They are my complaints
that I was not given copies of any and all legal papers in my instant
case SCD112436 and prior convictions CR105783 and CR140382 although
I personally requested to Mr. Mangarin for copies several times.
I was a "3 strikes" case in 1995 and had a right to know
all evidence in my favor and against me to help defend myself.
I, Leovardo Salceda, declare under penalty of perjury that
the forging is true and correct (THE NOTATIONS OF 1995) that
I did request copies of my cases from Mr. Mangarin but did not
receive the copies. Leovardo Salceda   J-90933. August 29, 2005
                                                          Blythe, California
                                                          Chuckawalla Prison

1995 NOTATIONS
OF REQUESTS
TO Mr. Mangarin        Page 1 of 4 (NOTATIONS)
FOR COPIES OF MY
LEGAL PAPERS IN
SCD112436, CR105783                                                    -9-
AND CR140382.
August 28, 2005
Leovardo Salceda  J-90933
Chuckawalla Prison
Blythe, California

Exhibit D-1

FOR ME, EVIDENCE IN MY CASE, I WAS NEVER GIVEN
ANY LEGAL PAPER WORK IN MY CASE. EVERYTIME I
WENT TO COURT I WAS "WISPERED TO" FOR ONLY A FEW
MINUTES. I NEVER HAD COURT HEARING ON DISCOVERY,
PRE-TRIAL, READINESS, BASICLY I WAS IN THE
DARK THROUGH OUT MY CASE. I DECEMBER 1995.

WHAT THE LEGAL PERSIDULES ARE.

1

*Page 2 of 4 (NOTATIONS)*

*Exh. D1*

*I, Leovardo Salceda declare under penalty of perjury that I wrote these NOTATIONS while I was in County Jail in 1995. They are my complaints that I was given not given copies of any and all legal papers in my instant case SCD112436 and prior convictions CR105783 and CR140382 although I personally requested to Mr. Mangarin for these copies several times.* ←

THE DAY BEFORE MY TRIAL SEPTEMBER 24, 1995 - MY
ATTORNEY DANIEL MANGARIN HAD A PROFESSIONAL
VISIT WITH ME. WE WERE SORT OF REVIEWING " NEVER FULLY REVIED MY CASE.
MY CASE. MY ATTORNEY STATED TO ME HE WOULD OF
LIKED TO HAVE BEEN THERE FOR PREVIOS HEARINGS.
ASKED ME HOW TALL WAS RUSSELL CHAMPION, I
EXPRESSED MUCH TALLER THAN MYSELF, OF WHAT
I SEEN AS PRELIMINARY HEARING, AND MY
ATTORNEY WAS NOT CERTIN IF IT WAS A WATER
METER COVER OR ROCK AS EVIDENCE IN MY CASE.
THE MAN RUSSELL CHAMPION IS A HOMOSEXAL, AS
I WAS INFORMED, BY HIS NEIGHBORS, MY PREVIOUS
ATTORNEY RONALD K. VANESIAN (PUBLIC DEFENDER)
ALSO TOLD ME HE SUSPECTED RUSSELL CHAMPION
AS BEING HOMOSEXUAL BECAUSE HE TALKED TO
RUSSELL OFF THE RECORD IN COURT. MY PROBLEM
IS I FEEL MY PRESENT ATTORNEY DANIEL MANGARIN
(ALTERNATE PUBLIC DEFENDER) WAS NOT FULLY PREPARED
FOR MY TRIAL. AS I INSISTED RUSSELL CHAMPION
→ PICKED ME UP. I REQUESTED SEVERAL TIMES TO
BOTH OF MY ATTORNEYS FOR COPIES OF ALL MY
LEGAL PAPER WORK IN THIS PRESENT CASE, POLICE
REPORTS, PRELIMINARY HEARING, INVESTIGATIVE
REPORTS OF THE D.A. AND MY ATTORNEY, AND, I ALSO    LEGAL PRESIDURES
REQUESTED COPIES OF MOTIONS, COPIES OF MY PREVIOUS
CASES, BECAUSE THIS IS A THREE STIKE CASE, AND
I DO HAVE A RIGHT TO KNOW WHAT IS SAID AGAINST ME
                Page 3 of 4 (NOTATIONS)   DECEMBER 1995.

*I was a "3 strikes" case in 1995 and had a right to know all evidence in my favor and against me to help defend myself. I, Leovardo Salceda declare under penalty of perjury that the forgoing is true and correct. THE NOTATIONS of 1995 that I did request copies of my cases from Mr. Mangarin but did not receive the copies. Leovardo Salceda J-90733. August 28, 2005 Blythe, California, Chuckawalla Prison*

Exh. D.1 ①

The day before my trial my attorney pulled
me out to a professional visit. My attorney

The day before my trial my Attorney
DANIEL MANGARIN OF THE ALTERNAT PUBLIC
DEFENDERS OFFICE had a professional visit
with me. I did not have any paper
work on my case. Although I requested
several times to have police reports,
investagative reports, evidence, and paper
work on this my present case. I was never given
copies of documents, evidence, and investagative
reports as to what was said by witnesses.
Or any kind of paper work related to
my case. My attorney did not know the victims
size, I had to estamate from what I seen
at pre-liminary hearing. Did not if the
evidence was a water meter cover, or
rock. He is my attorney how he could not
know. In my view he was not prepared
to for trial the next day. December 1995

Page 4 of 4 (NOTATIONS)

Exh. D1

6

**STATE OF CALIFORNIA**
**CDC 101 (DBB)** — **WORK SUPERVISOR'S REPORT** — **DEPARTMENT OF CORRECTIONS**

| GRADES | GRADE | | GRADE |
|---|---|---|---|
| 1 - EXCEPTIONAL | 1 | A. DEMONSTRATED SKILL AND KNOWLEDGE | 1 F. TEAMWORK AND PARTICIPATION |
| 2 - ABOVE AVERAGE | 1 | B. ATTITUDE TOWARD FELLOW INMATES AND WORKERS | 1 G. LEARNING ABILITY |
| 3 - SATISFACTORY | 1 | C. ATTITUDE TOWARD SUPERVISORS AND STAFF | 1 H. USE OF TOOLS AND EQUIPMENT |
| 4 - BELOW AVERAGE | 1 | D. INTEREST IN ASSIGNED WORK | 1 I. QUALITY OF WORK |
| 5 - UNSATISFACTORY | 1 | E. EFFORT DISPLAYED IN ASSIGNED WORK | 1 J. QUANTITY OF WORK |

PAY STATUS: FROM $ 15 TO $ 18    FROM JOB NO. CAN-D. 201    TO JOB NO. SAME

TOTAL # Hours Assigned: 37.50    TOTAL # Hours Worked: 37.50

JOB TO WHICH ASSIGNED: D-CANTEEN    DATE ASSIGNED: 8/13/97    ACTUAL WORK CONSISTED: Scanner, Inventory, ASSY. of orders.    PERIOD COVERED BY REPORT: 8-97/11-01-97

RECOMMENDED FOR: ☐ REASSIGNMENT ☒ RETAIN ☒ PAY INCREASE ☐ PAY DECREASE    INMATE'S INITIALS: L.S.

COMMENTS: (IF MORE SPACE REQUIRED, USE REVERSE SIDE) Very motivated, conscientious, & respectful    CODE OF SAFE PRACTICES REVIEWED    SUPV. INITIALS: CLK    INMATE'S INITIALS: L.S.

SUPERVISOR: L. Knight    LENGTH OF SUPERVISION: 3 mo.    WORK DETAIL: D-Canteen    ETHNICITY: Mexican

INMATE NAME: SALCEDA, L.    CDC NUMBER: J-90933    INSTITUTION: CSP-LAC    DATE: 10/31/97

---

**Assignment Ducat/Activity Card**
CDC#: J90933 SALCEDA, LEOVARDO
EFF: 05/30/1998
BED#: FDB4 220L
LOC: DFSA
RDO: M T
JOB#: DRW-D.216 D CUL 2/W
HRS: 0400-0530 0600-1130
AUTHORIZED BY: _____

**Assignment Ducat/Activity Card**
CDC#: J90933 SALCEDA, LEOVARDO
EFF: 07/10/1998
BED#: FDB4 220L
LOC: DUMB
RDO: SU M T H
JOB#: OMR#D.205 D/V OFFICE MACHIN
HRS: 0645-1600 1215-1600
AUTHORIZED BY: _____

**Assignment Ducat/Activity Card**
CDC#: J90933 SALCEDA, LEOVARDO
EFF: 03/06/1999
BED#: FDB5 135L
LOC: D5HU
RDO: F S
JOB#: CLK-D.511 D-5 REC CLERK
HRS: 0800-1400 1430-2010
AUTHORIZED BY: _____

**Assignment Ducat/Activity Card**
CDC#: J90933 SALCEDA, LEOVARDO
EFF: 05/16/2001
BED#: FBB5 128L
LOC: BVOA
RDO: TH F S 5 H
JOB#: OSS-B.107 B/V OFFICE SERV-A
HRS: 0630-1545 0630-1015
AUTHORIZED BY: _____

**Assignment Ducat/Activity Card**
CDC#: J90933 SALCEDA, LEOVARDO
EFF: 04/24/2002
BED#: FBB5 235L
LOC: BL1B
RDO: F S H
JOB#: CLK-B.501 B-LIBRARY CLK-PTR
HRS: 0730-1130 1200-1530
AUTHORIZED BY: _____

**Assignment Ducat/Activity Card**
CDC#: J90933 SALCEDA, LEOVARDO
EFF: 03/25/2003
BED#: B3 164U
LOC: FSBP
RDO: SU H
JOB#: DRLFB-088 B-PM LINESERVER
HRS: 1200-1615 1645-2000
AUTHORIZED BY: _____

**Assignment Ducat/Activity Card**
CDC#: J90933 SALCEDA, LEOVARDO
EFF: 04/12/2003
BED#: B3 164U
LOC: PSB2
RDO: M T
JOB#: CLKAB.021 B-2W/3W PROG CLK
HRS: 0700-1100 1130-1500 1400-2200
AUTHORIZED BY: SC

**Assignment Ducat/Activity Card**
CDC#: J90933 SALCEDA, LEOVARDO
EFF: 05/07/2005
BED#: B3 Z60L
LOC: BVOB
RDO: S SU H
JOB#: OSSXB.021 B OFFICE SERV STU
HRS: 0625-1100 1130-1325
AUTHORIZED BY: _____

**Assignment Ducat/Activity Card**
CDC#: J90933 SALCEDA, LEOVARDO
EFF: 05/17/2007
BED#: C6 237L
LOC: BRGC
RDO: S SU H
JOB#: TEA-C.005 C8 BRIDGING TUTOR
HRS: 0600-1100 1130-1345
AUTHORIZED BY: na

*Exh. D 2*

Assignment Ducat/Activity Card

CDC#: J90933  SALCEDA, LEOVARDO

EFF : 04/05/2008

BED#: D9 237L

LOC : EAD1

RDO : S  SU H

JOB#: CLK*D.205  ELD/1&2 TUTOR

HRS: 0615-1100 1130-1345

AUTHORIZED BY: _____

Exh. D.2

3

# Memorandum

Date    :    February 11, 2000

To      :    ALL CONCERNED

Subject :    LOCKDOWNS/PROGRAM MODIFICATIONS/FACILITY D, CSP-LAC

The following dates reflect those times where Facility D, CSP-Lancaster has been placed on either lockdown or program modification during the period of January 1999, through February, 2000.

Such conditions have resulted not only in segments of the inmate population being placed on such status, but also those where the entire facility was locked down, with no inmate movement, to enable yard and housing unit areas to be searched.

In addition to these dates listed, there was a period between July 19, and August 2, 1999 where this and other institutions were placed on a "State of Emergency", with no inmate movement during extensive searches being conducted.

All dates given reflect only that information found within the files of the Men's Advisory Council:

1/04/99 - 1/26/99; 2/09/99 - 2/23/99; 2/19/99; 5/21/99; 5/24/99; 5/28/99; 6/03/99; 6/28/99; 7/11/99; 8/09/99; 8/25/99; 9/10/99; 10/01/99; 10/16/99; 10/18/99; 10/20/99; 11/04/99; 12/10/99; 12/29/99; 1/03/00; 1/22/00; 1/26/00.

T.M. Simmons
Chairman, MAC
Facility D, CSP-LAC

*Exh. D 3*

2.4

State of California

# Memorandum

Date : July 3, 2001

To :   ALL STAFF
       ALL INMATES

Subject:   CALIFORNIA STATE PRISON-LOS ANGELES COUNTY, "STATE OF EMERGENCY"

This is to advise you, effective July 4, 2001, per the California Code of Regulations (CCR), Title 15, Section 3383, a "State of Emergency" has been declared for the California State Prison-Los Angeles County.

The declaration of a "State of Emergency" is based on the June 22, 2001, discovery of a potentially serious breach of security. Thorough searches will be completed of all level IV facilities and operations. Due to the discovery of dangerous contraband continuing up to and including July 3, 2001, a "State of Emergency" is now warranted.

In conformance with the CCR, Title 15, Section 3383, all non-essential operations, procedures, services or functions, and normal time limits are suspended to control and contain the situation. The lockdown status will be reviewed daily. The current status of the lockdown is as follows:

1.  Feeding – Cell feeding
2.  Critical Workers – As approved by facility captain
3.  Showers – Every 72 hours
4.  Law Library – None at this time, will commence for PLU within 7 days
5.  Visiting – Visiting under escort
6.  Medical – Emergency only. Critical medication distributed in the unit
7.  Canteen – None
8.  Dayroom – None
9.  Yard – None
10. Phones – None
11. Chapel - None

Modifications to this order will be issued as needed.

If you have any questions, you may contact L. L. Schulteis, Associate Warden, at extension 6919.

E. ROE
Warden
CSP-Los Angeles County

*Exh. D3*

VALLEY PRESS
LANCASTER, CALI
CIRCA 7-6-01
PAGE A-1

# Contraband brings prison lockdown

## State starts internal investigation

PRISON:
Earliest end
to lockdown
to be July 17

**By BART WEITZEL**
Valley Press Staff Writer

LANCASTER — The Lancaster prison has been in a declared state of emergency and locked down since July 4, after guards found prisoners with cell phones, weapons, drugs and other contraband.

The discovery triggered an internal prison investigation by California Department of Corrections investigators into how the contraband got into the California State Prison Los Angeles County.

Prison spokesman Curtis Carson confirmed the findings Monday, but would not comment on the nature of the other contraband, which reportedly includes cellular phones and a list of guards' names and addresses.

"I can't comment on that because it is part of an ongoing investigation," Carson said. "But we've found inmate-manufactured weapons, drugs, drug paraphernalia, and some inmates had personal items like personal shoes that are not on the list of allowable items."

An example of shoes that are not on the allowed items list are the pump-type tennis shoes that have air bladders inside them. The bladders can be used to hide drugs and other contraband, Carson explained.

"In the past we have suspended visitors for wearing in those types of shoes and then swapping shoes with the prisoners they were visiting," he added.

Carson would not comment on the depth of the investigation or if the probe involved prison guards or employees helping get the contraband into the facility, on 60th Street West between avenues I and J.

The contraband was found June 22 in the facility's "B" yard, one of four separate maximum-security yards at the prison.

Carson said some prisoners had "modified" their cells by painting them or making other nonstandard
**See PRISON on A8**

From A1

modifications, adding that Warden Ernie Roe is cracking down on those modifications and making the prisoners return the cells to their original conditions.

The contraband found was so serious that Roe sought and was granted permission from the state correctional authority to declare a state of emergency.

A number of inmates have been placed in "administrative segregation," or what prisoners call solitary confinement.

"I knew they were investigating and they took it very seriously and that they were locking down," said Lancaster Assistant City Manager Dennis Davemport, who also sits on the prison's citizens advisory committee. "It doesn't sound very good."

Under lockdown conditions, prisoners are fed in their cells and are not allowed out into the exercise yards. They are allowed normal visits and showers, according to Carson, but most privileges have been restricted.

"They notify us because when they are on lockdown, the cleanup crew that works around the city is not allowed out," Davemport said.

The prison also is in a state of transition because its "C" yard is being transformed into housing for sensitive-needs prisoners.

An example of a sensitive-needs prisoner would be a convicted child molester who cannot be placed into the general population because other inmates might try to injure or kill him.

Carson said plans eventually are for the "C" yard to house about 800 sensitive-needs prisoners and about 160 prisoners under psychiatric care and on prescription medication.

In the meantime, guards are conducting regular intense searches looking to clean up inside the prison, Carson said. July 17 would be the earliest date lockdown conditions could be relaxed and the prison could return to normal routine, he said.



**CRACKING DOWN**
California State Prison Los Angeles County in Lancaster is conducting an internal investigation with the yards under lockdown and inmates being left inside their cells. Authorities are looking into large amounts of contraband found in the possession of prisoners.

RON SIDDLE
Valley Press

Exh. D3

Date :    December 26, 2001

To

   All Staff
   All Inmates

Subject:    **CALIFORNIA STATE PRISON-LOS ANGELES COUNTY, "STATE OF EMERGENCY"**

In conformance with the California Code of Regulations (CCR), Title 15, Section 3383, a "State of Emergency" has been declared for the California State Prison-Los Angeles County (LAC) effective December 26, 2001.

The declaration of a "State of Emergency" is based upon; staff assaults, inmate assaults, the December 20, 2001, riot on Facility 'B' involving all races, and the discovery of dangerous contraband up to and including the aforementioned riot. Thorough searches will be completed of all Level IV facilities and operations.

In conformance with the CCR, Title 15, Section 3383, all non-essential operations, procedures, services or functions and normal time limits are suspended to control and contain the situation. The current status of the lockdown is as follows:

- Feeding – Cell feeding
- Critical Workers – As approved by the Facility Captain
- Showers – Every 72 hours
- Law Library – Approved court deadlines
- Visiting – Facility B Non-Contact, Facilities A, C, D, MSF Normal.
- Medical – MTA conduct rounds in the units
- Canteen – None
- Dayroom – None
- Recreation – None
- Phones– None
- Chapel – Modified with input from the Chaplains

The review of this "State of Emergency" will be conducted daily. You will be kept advised of any further developments.

E. ROE
Warden
CSP-Los Angeles County

*Exh. D3*

# Valley Press

More Antelope Valley People Read the Valley Press Than Any Other Newspaper
Established 1915. © 2001 Antelope Valley Newspapers, Inc. All rights reserved.

Partly cloudy; chance of showers. Highs upper 40s to lower 50s. Lows in upper 20s to lower 30s.

# Largest-ever riot hits prison

## Up to 400 prisoners fight in yard

**By ALAN SCHNEPF**
Valley Press Staff Writer

LANCASTER — At least five inmates sustained serious stab wounds in the largest riot ever at the state prison in Lancaster, an eruption of violence involving up to 400 inmates brawling in a prison yard. No one was hurt, according to prison authorities.

Ron Nipper, a public information officer for California State Prison Los Angeles County, said prison staff quelled the riot within minutes, using pepper spray, tear gas and wooden bullets fired from a 37 mm gun.

Guards fired three rounds, but only as warning shots, according to Margot Bach, a spokeswoman for the California Department of Corrections.

The most serious fighting lasted about two or three minutes. After that, prison staff spent about 10 or 15 more minutes quashing "pockets of resistance," Bach said.

Nipper said four officers were guarding the inmates in the "D Yard" when the trouble broke out. The rest of the prison went on lockdown and other staff rushed over to assist with quelling the uprising, Nipper said.

There was no physical damage to the prison during the riot. Nipper

See RIOT on A4



**GENE BRECKNER/Valley Press photos**
**INMATES INJURED** — An inmate from California State Prison Los Angeles County in Lancaster is transported to a waiting helicopter following a riot in the prison yard. Above, an ambulance carrying an injured inmate leaves the prison bound for a nearby helicopter.

# Living's different as prison neighbor

**By JANNISE JOHNSON and JANA TREECE**
Valley Press Staff Writers

LANCASTER — On a quiet morning in a small single-family-home neighborhood on the far west side of Lancaster, it's not uncommon for residents to hear yelling — "down, down, down" — from the correctional officers over the loudspeakers of California State Prison Los Angeles County.

"It was a little unsettling the first time I heard it," said resident Michael Bitton, who knew the prison was there when his family moved in.

Those in the neighborhood, Bitton added, "jokingly" call their westside neighborhood "Prison View Estates."

Bitton's neighborhood is the closest housing area to the prison, across 60th Street West and between avenues I and J. Also nearby is the Westside Union High School District's Sundown Elementary School.

Thursday morning was louder and busier than usual in the neighborhood and the prison, with news helicopters and air rescue copters buzzing the desert area as more than 300 inmates rioted with the prison's walls.

Bitton, who also teaches at nearby Sundown Elementary, didn't know exactly what was going on when shortly before 11 a.m. the school called a "Code Blue," which put the school into lockdown.

Many children were on their lunch recess when the Code Blue was broadcast.

"The children did exactly what they were supposed to do," he said of them filing into the classrooms, where the doors were shut and locked. "I was very impressed. It was very organized."

See NEIGHBOR on A4



Ex. Exh. D3

A4 Friday, Dec. 21, 2001, Antelope Valley Press

# RIOT:
## Authorities
## find at least
## 26 weapons

From A1
said.

The facility remained on lockdown Thursday afternoon while officials tried to determine what sparked the unrest in the 200-by 200-foot yard. Officials said they did not know how long the lockdown would last.

Although previous riots at the prison were sparked by racial tension, a corrections official said race doesn't appear to have instigated this incident.

"It's unclear with some white inmates attacking other white inmates," said Terry Thornton, a spokeswoman for the California Department of Corrections. "Then some Hispanic inmates attacked black inmates, and the whites jumped into that and it escalated from there."

Three of the seriously injured inmates were airlifted to hospitals, while two more were transported by ambulance. All were critically injured with stab wounds, and had been stabilized by Thursday afternoon, Thornton said. At least one inmate had a collapsed lung. Bach said. Prison staff treated 12 other inmates for less serious injuries, mostly lacerations, in an on-site infirmary.

Authorities were securing the yard Thursday looking for inmate-made weapons. By 3:30 p.m., they had found at least 26 weapons. Four had been thrown down a sewer drain.

"That's a lot," Thornton said. "It's scary to think that that many may have been on the yard ... I've worked on prison grounds, and it's escalating."

The B Yard, where the riot oc-

**INJURED INMATE** — A Los Angeles County Fire Department helicopter prepares to lift off from the parking lot of California State Prison Los Angeles County in Lancaster with an injured inmate from a prison riot.

GENE BRECKNER/Valley Press

curred, has had its share of problems this year. It was placed on lockdown Dec. 11 after four inmates held were injured. The effective date for transitioning into the "modified program" — a state less serious than lockdown, but lighter than ordinary status — was Thursday, Bach said.

The unit was declared a state of emergency July 4 after guards found contraband in the B Yard on June 22. A prison guard, Anthony Lunnon, was arrested after an investigation into the contraband found in June. He is still under investigation and faces weapons charges, with bail at $50,000.

The state of emergency and lockdown lasted from July 4 to 18 and triggered an internal investigation in cooperation with the California Department of Corrections' Office of Internal Affairs.

Thornton said, another corrections spokesman, said in September that the internal affairs investigation was triggered by not only the state of emergency in July, but also by other problems at the prison in Lancaster.

"There has been an ongoing problem with the introduction of contraband into California State Prison Los Angeles County that prompted us to go in and search cell by cell," [...] "As the cell search is not

all that unusual — we do those at all our facilities from time to time — but the state of emergency was a little unusual."

The B Yard is one of the four yards allocated to Level Four inmates, the highest level of inmate classification reserved for inmates convicted of crimes such as murder, rape and robbery. Another area of the prison — separated from the Level Four yards — houses minimum security prisoners.

In February, guards in B Yard reportedly quelled the disturbances by race in the yard and ordered the prisoners to lie down. The guards then searched the inmates and returned them to their cells and combed the yard for weapons.

Since it opened in 1993, the security level of the maximum-security facility has inched upward. The prison started as a 2,200-bed medium-security facility with some maximum-security prisoners, to a 4,200-bed entirely maximum-security facility surrounded by an electric fence that emits deadly force.

The current population of more than 4,000 inmates puts the prison at 185% of its designed capacity.

Under normal lockdown conditions, inmates are fed in their cells and not allowed into the yard. They are usually denied all normal visits and showers, however.

# NEIGHBOR: Residents say
## they feel secure in area

From A1
The school lockdown lasted about 10 minutes, he said.

Neither Westside Union Superintendent Allan Sack nor the school principal could be reached for further comment Thursday about the school's emergency procedures.

Despite the largest riot in the Lancaster prison's eight-year history, Bitton said he doesn't feel unsafe living near the prison and he wouldn't move.

"I've never heard of anyone breaking out," he said. "They keep them well contained. They're in the area and there are people who aren't outside."

Several residents in the neighborhood, Bitton said, are correctional officers, who, probably like him, chose to live close to where they work.

Ray Fleck, Elana Sherve, a resident who lives in the 44000 block of 62nd Street West less than a mile away from the prison, said she feels especially safe because there are so many correctional officers who live in the area housing tract.

Sherve has lived in her home for the past 10 years and recalled at least one escape just after the prison opened. She thinks she may have laid eyes on the escapee at one point, but she's not sure.

Even then, she said, she didn't

believe her safety would be compromised. She thinks they were probably looking for a car to steal so they could get out of the immediate area.

She suspects most prisoners know that correctional officers live close by and would most likely head in another direction if they were able make it past the gates.

Richard McIntosh, who lives off Avenue J-2, said he has never felt unsafe in his home, despite its proximity to the prison.

"I feel safe," he said. "I didn't even know they had a riot over there this morning."

Jesse Alvarado, owner of J and R Market in Lancaster and works on his property at 45420½ 60th St. West, an area with much more space around it than the housing tract where McIntosh and Sherve live.

Alvarado, who has lived in the area for 16 years, is confident the area is safe.

"I feel safer. If anything goes on there's a million cops right there," Alvarado said.

While his confidence in the area's safety is fairly high today, he wasn't always so sure.

"I knew when I first moved out here, I was a little scared," Alvarado said. "But not anymore."

# Infant found in crash wreckage

SACRAMENTO (AP) — Authorities have found the remains of a 5-month-old infant who is the sixth and final fatality victim in a fatal big rig crash south of Sacramento.

The fiery crash injured two others and shut down a busy highway for most of Wednesday. Investigators searched most of the day Thursday for the infant's remains after they received late word that a

women who was killed in a passenger vehicle in the crash may have had the child with her.

The infant is believed to be the son of the driver or registered owner of the minivan destroyed in the crash and ensuing inferno.

The two other occupants of the minivan were killed, California Highway Patrol Lt. Erik Knudsen said Thursday.

**FREE**
## Mall Gift
## Certificate
With this coupon & any test drive*

*One per test drive. Must be at least 18 years old and a licensed driver.

PLUS

Including a Microsoft XPDX Vi...

GETTING IN TOUCH WITH THE

Valley Press

The Antelope Valley Press (USSN 0745-5836)
is published daily by the Antelope Valley
Newspapers, Inc. 37404 Sierra Highway,
Palmdale, California 93550. Periodicals
postage paid at Palmdale, CA and additional
mailing offices. POSTMASTER: Send address
changes to Antelope Valley Press, P.O. Box
4050, Palmdale, CA 93590-4050.

Exh. D3

Fv

January 11, 2002

Facility B Staff and Inmates

## LEVEL IV FACILITY B, POPULATION MANAGEMENT/MOVEMENT POLICY.

We have learned that inmate idleness due to UN-RESTRICTED yard and program access is the most significant cause of inmate disruptions and violence within our Level IV Facilities. The majority of violence is perpetrated on our large recreational yards where both programming and non-programming inmates participate. Subsequently, we will establish restricted yard and program access with mandatory work programs for all unassigned and assigned inmates.

Traditionally, Facility B has been plagued with inmates who have proven to be the most dangerous, hostile and poorly socialized segment of our population. There is unification among inmates along racial and gang/disruptive group lines resulting in gang rivalries drug trafficking, and victimization of the weak. Management of this facility is the most difficult problem facing CSP-LAC. The workload of our staff, in comparison to lower classification levels, is greater resulting in soaring employee turnover and staff burnout. On a daily basis, Management and Supervision of this Institution is generally conducted in a crisis mode moving from one incident, disturbance, lockdown, modified program, investigation to the next.

Program expectations such as compliance with work incentive, grooming standards, cell cleanliness, behavioral expectations, and receptiveness to counseling, have become ancient history. Level IV non-programming inmates have squeezed the lifeblood out of our staff and programming inmates. We must use existing policy to hold inmates accountable for their actions, isolate and correct non-programming inmates, allow other inmates to effectively program, and provide an incentive to program.

Staff must "raise the bar" and focus on behavior and program expectations. Inmates must program or face rapid, focused, and comprehensive enforcement of disciplinary procedures. Before the inmate ever leaves his cell, he must be held accountable for having his hair cut, his mustache trimmed, his cell cleaned and organized in an orderly fashion, or else face the consequences. When he leaves his cell, he must report to work, participate fully, be on time, be productive, or else face the consequences. All infractions regarding inmates' behavior must be corrected with constant feedback. Those who fail to make sufficient progress regarding behavioral expectations and program requirements, will be isolated and designated as non-programmers.

*Exh. D3*

# Memorandum

Date : July 31, 2002

To : ALL FACILITY B INMATES

Subject: PROGRAM MODIFICATION

This memorandum is to inform all Inmates that Facility 'B' remains on a Modified Program as a result of the Stabbing Assault that occurred on July 26, 2002 and the numerous weapons discovered within the Facility.

The current Mod Order will remain in effect, searches will be continued in all housing units. All movement will be under escort.

If you have any questions regarding this memorandum, contact the facility Sergeant.

J. MIDDLETON
FACILITY 'B' LIEUTENANT
CSP-LAC

Exh. D3

CDC 1617 (3/89)

Department of Corrections

# Memorandum

Date    :    August 28, 2002

To    :    All Staff
            All Inmates

Subject:    **CALIFORNIA STATE PRISON-LOS ANGELES COUNTY, "STATE OF EMERGENCY"**

In conformance with the California Code of Regulations (CCR), Title 15, Section 3383, a "State of Emergency" has been declared for the California State Prison-Los Angeles County (LAC) effective August 28, 2002.

The declaration of a "State of Emergency" is based upon; staff assaults, inmate assaults, and the discovery of deadly weapons. Thorough searches will be completed of all facilities and operations.

In conformance with the CCR, Title 15, Section 3383, all non-essential operations, procedures, services or functions and normal time limits are suspended to control and contain the situation. The current status of the lockdown is as reported on the current Program Status Report LAC-LAC-02-018.

The review of this "State of Emergency" will be conducted daily. You will be kept advised of any further developments.

M. YARBOROUGH
Warden
California State Prison-Los Angeles County

*Exh. D3*

**INSTITUTION** | **EFFECTIVE DATE OF PLAN** | **PROGRAM STATUS NUMBER:** LAC-LAC-02-018

| ☐ NORMAL PROGRAM | ☒ MODIFIED/ PROGRAM | ☐ LOCKDOWN | ☒ STATE OF EMERGENCY |
| --- | --- | --- | --- |
| | ☐ INITIAL | ☒ UPDATE | ☐ CLOSURE |

## RELATED INFORMATION (CHECK ALL THAT APPLY)

| AREA AFFECTED | INMATES AFFECTED | REASON |
| --- | --- | --- |
| ☐ INSTITUTION | ☒ ALL | ☒ BATTERY ON STAFF |
| ☒ FACILITY: _B_ | ☐ BLACK | ☐ DEATH |
| ☐ HOUSING UNIT: _____ | ☐ WHITE | ☐ RIOT / DISTURBANCE |
| ☐ VOCATION: _____ | ☐ HISPANIC | ☐ GROUPING |
| ☐ EDUCATION: _____ | ☐ OTHER | ☐ OTHER: |
| ☐ OTHER: | ☐ | |

| MOVEMENT | WORKERS | DAYROOM |
| --- | --- | --- |
| ☐ NORMAL | ☒ CRITICAL WORKERS * SEE BELOW * | ☐ NORMAL GYM INMATES |
| ☐ ESCORT ALL MOVEMENT | ☒ CULINARY GYM INMATES ONLY | ☒ NO DAYROOM ACTIVITIES |
| ☐ UNCLOTHED BODY SEARCH PRIOR TO ESCORT | ☒ CLERKS ONE (1) PER WATCH | ☐ MODIFIED: |
| ☒ CONTROLLED MOVEMENT | ☐ VOCATION/EDUCATION | **RECREATION** |
| ☐ OTHER: | ☐ CANTEEN | ☐ NORMAL |
| | ☒ CLOTHING ROOM GYM INMATES ONLY | ☒ NO RECREATIONAL ACTIVITIES |
| **FEEDING** | ☐ RESTRICTED WORK PROGRAM | ☐ MODIFIED: |
| ☒ NORMAL HOUSING UNIT 3, 4, AND 5 | ☐ PORTERS | |
| ☒ CELL FEEDING HOUSING UNIT 2 | ☐ NO INMATE WORKERS | **CANTEEN** |
| ☒ CONTROLLED FEEDING IN DINING ROOM | **SHOWERS** | ☐ NORMAL |
| ☒ GYM, | ☐ NORMAL | ☒ NO CANTEEN |
| ☐ DORM POD AT A TIME | ☒ CONTROLLED MOVEMENT | ☒ MODIFIED: B1 AND B2 AD-SEG |
| ☐ TIER AT A TIME | ☐ ONE INMATE PER SHOWER – OWN TIER | |
| ☐ HOUSING UNIT SECTION AT A TIME | ☒ CELL PARTNERS TOGETHER – OWN TIER | **PACKAGES** |
| ☐ SACK MEAL BREAKFAST | ☐ DORM SHOWERING BY GROUP | ☐ NORMAL |
| ☐ SACK MEAL LUNCH | ☐ CRITICAL WORKERS ONLY | ☒ NO PACKAGES |
| ☐ SACK MEAL DINNER | ☐ NO SHOWERS | ☒ MODIFIED: B1 AND B2 AD-SEG |
| **DUCATS** | **MEDICAL** | |
| ☐ ALL DUCATS HONORED | ☒ NORMAL MEDICAL PROGRAM | **PHONE CALLS** |
| ☐ MEDICAL DUCATS ONLY | ☐ PRIORITY DUCATS ONLY | ☐ NORMAL |
| ☐ CLASSIFICATION DUCATS | ☐ MTA CONDUCT ROUNDS IN UNITS | ☒ NO PHONE CALLS |
| ☐ PRIORITY DUCATS ONLY | ☐ INMATES ESCORTED TO SICK CALL | ☒ MODIFIED: GYM INMATES ONLY |
| **VISITING** | ☐ EMERGENCY MEDICAL ONLY | |
| ☐ NORMAL VISITING 2, 3, 4, 5 & Gym | ☐ OTHER: | **RELIGIOUS SERVICES** |
| ☐ NON-CONTACT ONLY | | ☐ NORMAL |
| ☐ NO VISITING | **LEGAL LIBRARY** | ☒ NO RELIGIOUS SERVICES |
| ☐ OTHER: | ☐ NORMAL | ☐ MODIFIED |
| | ☒ APPROVED COURT DEADLINES | |

REMARKS: Due to the serious incident involving Battery on a Peace Officer, Facility B will remain on Modified Program. threat assessment was conducted and was determined to be an isolated incident at this time. Sixteen (16) Facility Gym Inmates have been classified and cleared for food handling to work in culinary. Controlled movements are to escorted without handcuffs. Chairman and Vice- Chairman of the MAC shall have access to housing units 2,3,4,5, d Gym during their assigned work hours. Building MAC Representatives will be released within their own housing it after the completion of the morning meal.

_Exh. D3_

| PREPARED BY: [signature] R. Downs Facility 'B' Captain | DATE 11/13/02 | NAME / SIGNATURE (WARDEN) [signature] M. Yarborough Warden | DATE 11/13/02 |
| --- | --- | --- | --- |

## RECEIPT FOR COPIES OF HEALTH INFORMATION

INMATE NAME: _Leovardo Salceda_                CDC#: _T90933_ COPY

DATE COPIED: _6/23/06_                HOUSING: _B3-260L_

CHART REVIEWED: (YES)    NO            RECEIVED COPIES ONLY/NO REVIEW: YES    NO

I have received the following copies from my health record that I requested.

| # of pages | SECTION | DATE(S) of REPORT(S) |
|---|---|---|
| | INTAKE | |
| | Medication Administration Record | |
| | Physicians Orders | |
| 39 | Drs. Progress Notes | 8/9/02 thru 6/14/06 |
| | PPD Mantoux/TB | |
| 6 | Lab/Pathology | 8/9/02 thru 9/13/05 |
| 1 | Radiology | 9/1/04 |
| 11 | Consultations/Procedures/Treatments | 10/16/03 thru 9/30/05 |
| | Miscellaneous | |
| | Dental | |
| | Psychiatric | |
| 27 | Inpatient | 2/24/04  GI Bleed/Colonoscopy 3/2/05 |
| | Chronos | |

Total Number of Copies _84_    @ 10 cents per copy = $ _8.40/xx_

_Leovardo Salceda_                _6/23/06_
Inmate Signature                Date Rec'd

ORIGINAL

HISTORY AND PHYSICAL     HISTORY AND PHYSICAL     ORIGINAL

MR NO:          105-84-17
PATIENT NAME:   SALCEDO, LEOVARDO          DATE OF ADMISSION: 08/14/02

REASON FOR HOSPITALIZATION:  Gastrointestinal bleeding and abdominal
pain.

HISTORY OF PRESENT ILLNESS:  This is the first High Desert Hospital
admission for this 32-year-old Hispanic male who has been a resident
he state prison.  He was not feeling well for the last two to
three weeks which initially started with abdominal pains and later
had diarrhea and also had rectal bleeding for nearly six to seven
days.  The patient had been starting to feel weak and dizzy.  The
patient had dizziness by the physician in the state prison and a
rectal examination was positive for blood.  The patient was in need
of further care and treatment, and admitted as of today in the ICU
for closer observation.  The patient had given a history of taking
one time aspirin and also possibly Motrin for relief of pain, but no
history of any vomiting of blood, but has nausea.  The stool
revealed dark reddish blood with the stool.

PSYCHOSOCIAL HISTORY:  No psychiatric problem.  The patient is
married with children.  He does not smoke; does not drink alcohol;
no history of a drug abuse problem.

PAST MEDICAL HISTORY:  Small surgery for an infected finger of the
right hand and also suturing of the laceration of the left ankle in
the past.  No medical problems.

FAMILY HISTORY:  Family history is noncontributory.

REVIEW OF SYSTEMS:  GENERAL:  Denies any fever or any weight loss.
HEENT:  Some dizziness as mentioned.  CARDIOPULMONARY:  No symptoms.
GASTROINTESTINAL:  Symptoms as described.  GENITOURINARY:  No
urinary symptoms.  CENTRAL NERVOUS SYSTEM:  No symptoms.

ALLERGIES:  None.

PHYSICAL EXAMINATION:

GENERAL APPEARANCE:  On physical examination, this is an alert and
oriented, young male patient who is slightly pale.

VITAL SIGNS:  Show temperature of 98 degrees Fahrenheit, pulse of 90
per minute, respirations of 18 and a blood pressure of 107/53 mmHg.

SKIN:  Shows hydration to be adequate, but paleness of the skin is

CONTINUED...

---

SALCEDO, LEOVARDO
105-84-17
Page 2 of 3

noted.

HEAD:  Normocephalic.

EYES:  Normal shape..  Extraocular movements intact.  Pupils equal
and reacting.

EARS, NOSE AND THROAT:  The rest of the ENT examination is
essentially unremarkable.

NECK:  Supple.  No jugular venous distention.  No carotid bruits.
LYMPH NODES:  No lymphadenopathy.

CHEST:  Without any obvious deformity.

BREASTS:  Normal male breasts.

LUNGS:  Clear to auscultation and percussion.

HEART:  Rhythm is regular.  No murmur or friction rub.

ABDOMEN:  Not distended.  Some epigastric tenderness and upper
abdominal tenderness is noted, but no rebound tenderness.  No
masses.  Bowel sounds are present.

EXTERNAL GENITALIA:  Male genitalia.

EXTREMITIES:  Able to move extremities.  No calf tenderness.  No
ankle edema.  Peripheral pulses are present.

CENTRAL NERVOUS SYSTEM:  Without any focal neurological deficit.

RECTAL:  Examination not done, but this was done by the MD in the
state prison and stated to have stool positive for blood.

IMPRESSION:
1.  Abdominal pain and gastrointestinal bleeding, exact etiology
    undetermined, rule out acute erosive gastritis versus rectal
    bleeding and colonic lesion.
2.  Past history of trauma and laceration to the left ankle and
    also surgery for infected right hand finger.

PLAN:  The patient is presently admitted to the ICU with a view of
close observation with current monitoring of the hemoglobin and

---

CONFIDENTIAL
HISTORY AND PHYSICAL

COUNTY OF LOS ANGELES   HIGH DESERT HOSPITAL   DEPARTMENT OF HEALTH SERVICES
                        44900 NO. 60th STREET WEST
                        LANCASTER, CALIFORNIA 93536        ORIGINAL

HISTORY AND PHYSICAL

SALCEDO, LEOVARDO
105-84-17
Page 3

hematocrit.  If the hemoglobin and hematocrit drop, the patient will
be given blood transfusion, and the patient was told about the need
of possible blood transfusion.  In addition to this, the patient
will also be seen in GI consultation as soon as possible today for
possible endoscopic examination.  Other symptomatic therapy will be
given as indicated.  The patient will also be started on IV Zantac
therapy pending the diagnosis.

DISCHARGE PLANNING:  No discharge planning problems anticipated.
The patient will be discharged back to the state prison when
clinically stable.

CM :TL867 1058
D: 08/14/02 15:14:00      CHANDRAVADAN MISTRY, MD
T: 08/14/02 16:27:33      Internal Medicine

---

PROGRESS NOTES

| DATE/TIME | |
|---|---|
| 8/14/02 | *(handwritten progress notes — illegible)* |

Los Angeles County High Desert Hospital
44900 N. 60th Street West
Lancaster, CA 93536

Patient Name:
MRUM:
DOS:

*Exhibit H*

HISTORY AND PHYSICAL               PROGRESS NOTES

| DATE | TIME | |
|------|------|---|
| 8/9/02 | | S: 32 y/o ♂ ℅ rectal bleeding |
| | | O: 2 wks ago started c̄ abdominal pain |
| | | shortly p̄ eating. That has resolved, now |
| 120/75 – B/P | | I'm having bloody diarrhea x 2-3 |
| 80 – P | | days. Lips are dry. I'm looks slightly |
| 97⁶ – T° | | pale. Guaiac ⊕, Tilt ⊕ |
| | | A: |
| | | P: send to Infirmary |
| | | |
| | | |
| 104/72 | | ℞ 8-9-02 12-30. |
| 94 | | S: the rectal bleeding for first time today |
| | | very little blood. Had diarrhea x 6 day |
| 99/60 B/P | | nausea ⊕. No vomiting. Abd. pain ⊕ |
| 10 P | | O: afebrile not in distress. Not anemic |
| | | Heart rrr, Lungs CTAB |
| | | Abd. soft ND, NT, |
| | | Rectal no external hemorrhoids. |
| | | A: Diarrhea |
| | | Rectal bleeding |
| | | P: See orders |

| INSTITUTION | PHYSICIAN | ROOM NO. | CDC NUMBER, NAME (LAST, FIRST, MI) |
|-------------|-----------|----------|-------------------------------------|
| | | | Salcedo, L |
| | | | J 90933 |

**PHYSICIAN'S PROGRESS NOTES**

CDC 7230 (7/90)

STATE OF CALIFORNIA

DEPARTMENT OF CORRECTIONS

240

| DATE IN | TIME IN | INSTITUTION | EMERGENCY ROOM # | BROUGHT BY: | | | | |
|---|---|---|---|---|---|---|---|---|
| 8/21/02 | 1705 | CSP-LAC | | ☑ SELF | ☒ C.O. | ☐ AMBULANCE | ☐ OTHER: | |

**COPY**

PATIENT COMPLAINT / REASON FOR VISIT: Return from HDH

| DATE OF LAST TETANUS | ALLERGIES (CHECK BOX OR SPECIFY) ☑ NONE | EMERGENCY ROOM PHYSICIAN: D Cassim | TIME PHYSICIAN NOTIFIED here | TIME PHYSICIAN ARRIVED |
|---|---|---|---|---|

MED HX / TIME OF LAST DOSE

## NURSING ASSESSMENT

1705 - Returned from HDH VSS, afebrile, D. Cassim in house - I/M evaluated immediately.
1715 - Orders received & noted.
1730 - I/M RTC

NURSE'S SIGNATURE / INITIALS

## VITAL SIGNS

| TIME | BLOOD PRESSURE | PULSE | RESPIRATORY | TEMPERATURE | INITIALS |
|---|---|---|---|---|---|
| 1706 | 113/73 | 81 | 20 | 98 | W |

## MEDICATION

| MEDICATION / IV / RX | SITE | TIME | GIVEN BY |
|---|---|---|---|

## PHYSICIAN NOTES & ORDERS (History, Physical Exam, Impression, Treatment, Instructions)

See above. ↑

## DISPOSITION OF PATIENT

☑ RELEASED
☐ TRANSFERRED TO
☐ ADMITTED TO
☐ EXPIRED
MORTUARY

CONDITION OF PATIENT ON DISCHARGE
AAOX3, VSS, ambulatory
REFERRED TO ;

| PHYSICIAN SIGNATURE D Cassim, MD | DATE 8-21-02 |
|---|---|

| CHARGE INSTRUCTIONS GIVEN? ☐ YES ☐ NO | DATE OUT 8-21-02 | TIME OUT 1730 | INITIALS W |

DIST:  ORIG - PATIENT'S HEALTH RECORD
       YELLOW - EMERGENCY ROOM
       PINK - PHARMACY

## NOTIFICATION

☐ CORONER
CORONER'S #
☑ CUSTODY
☐ WATCH COMMANDER

CDC NUMBER, NAME (LAST, FIRST, MI) AND DATE OF BIRTH

Salcedo, Leonardo
J-90933

8-20-69    BS 235

**EMERGENCY ROOM ADMISSION**

CDC 7286 (9/92)
STATE OF CALIFORNIA                    DEPARTMENT OF CORRECTIONS

| DATE | TIME | PROBLEM # | |
|------|------|-----------|---|
| 1 27-03 | 0300 | I/M Awaken, To RCRMC for medical ___ ___ colonoscopy. NPO since mid-night. w/Hx(s/w) W.J. Hazzard, RN HCSD/CVSP **COPY** |
| 10-27-03 | | | Returned from RCRMC S/P Colonoscopy - ☺ TX per Dr Ang ♂ Hazzard Hazzard R |

INSTITUTION  CVSP

ROOM / WING  B3-150 L

CDC NUMBER, NAME (LAST, FIRST, MI)

SALCERA, LEOVARDO

J-90933

08/20/69

# OUTPATIENT INTERDISCIPLINARY
# PROGRESS NOTES

CDC 7254 (8/89)

STATE OF CALIFORNIA                    DEPARTMENT OF CORRECTIONS

| DATE | TIME | | |
|------|------|---|---|

**COPY**

DATE 2/24/04 T 10/63 R 3C³

TIME 0805 P 62 R 18

SA O2 98% WEIGHT 154 ALLERGY Y N    C/O Colitis

M. ROGGELIN, MTA
CVSP/HCSD

C/O Chron's Disease

M. ROGGELIN, MT
CVSP/HCSD

2/24/04 — For admission to
0837       Infirmary — SEE

1.8.P

R. Ang, M.D.
Staff Physician / CVSP

2/24/04 1030 Pt. admitted to CI-181 from B3 c̄ Dx of GI Bleeding H/O Chron's Disease, Refer to 7202 for further information Malian

M. Kalian, RN
HCSD / CVSP

| INSTITUTION | PHYSICIAN | | ROOM NO. | CDC NUMBER, NAME (LAST, FIRST, MI) |
|-------------|-----------|---|----------|-----------------------------------|
| CVSP | Ang | | 777 | B3150L |

SA. CEBA, LEOVARDO
J-90433
09/22/2007

## PHYSICIAN'S PROGRESS NOTES

CDC 7230 (7/90)

STATE OF CALIFORNIA

DEPARTMENT OF CORRECTIONS

33

DATE____ TIME____ BP 1/72 T 36⁸
____ ____ P 13 R 18
SA O2 98% WEIGHT 143 ALLERGY Y (N)    FU

**COPY**
M. ROOSE... ATA
CVSP/HCSD

4/8/04  S: Chronc dis in Feb — in
1100    Infermery 12 days
        relievance — ① symptoms — cramps, rectal
        bleeding + loose stools
        Has lost 10 #s
        O: mild tenderness abd
        A: Chronc dis
        P: Will confer c̄ Dr Arp about steroids
           + diet supplements

                                    R.J. Soholt
                                    R. Soholt, MD
                                    HCSD/CVSP

DATE____ B____ T____
TIME____ P____ R____
A O2____ WEIGHT____ ALLERGY Y N

INSTITUTION CVSP    HOUSING UNIT B3 260L

CDC NUMBER, NAME (LAST, FIRST, MI) AND DATE OF BIRTH
Salceda, Leoverto
J90933

8-20-69

## NTERDISCIPLINARY PROGRESS NOTES

CDC 7230 (Rev 04/03)
STATE OF CALIFORNIA          DEPARTMENT OF CORRECTIONS

| DATE | TIME |
|------|------|

DATE  6/4/04  BP 92/57  T 36.7

TIME  0800  P 63  R 18

SA O2  98%  WEIGHT  151#  ALLERGY Y/N

0930
6-4-04    Crohns disease
                    dictated

**COPY**

R. ROLEY MTA
HCSD/CVSP

R. ROBINSON, M.D.
HCSD / CVSP

| DATE | TIME | NAME AND CDC NUMBER |
|------|------|---------------------|
| 6/04/04 | 0838 | SALCEDA, LEOVARDO    J90933 |

S:    This patient suffers from Crohn's disease.  He had finished his medication, stopped it, did not have it renewed, and now for four days he is having diarrhea. He cannot hold it when he has to go to the bathroom, and several times he has soiled his clothes.  He states that there is just a little bit of blood in his stool, but he has had to go between six and nine times today.

O:
A:    Crohn's disease a flare up of it.
P:    The patient will have a lay-in for one week, Sulfasalazine 1000 mg twice a day orally, and Flagyl 250 mg twice a day orally for ten days.
E:    It has been explained the nature of his disease, the reason he has to take the medication not just once but continuously and he apparently understood.

Riva Robinson, M.D.

d: 6/04/04  t: 7/06/04 as

INSTITUTION  CVSP    HOUSING UNIT    B 260

**INTERDISCIPLINARY PROGRESS NOTES**

CDC NUMBER, NAME (LAST, FIRST, MI) AND DATE OF BIRTH

Salceda, Leovardo
J 09033
8/20/69

CDC 7230 (Rev 04/03)
STATE OF CALIFORNIA                    DEPARTMENT OF CORRECTIONS

| DATE | TIME | |
|------|------|--|
| 9/1/04 | 1415 | Returns from RCRMC medical __~~COPY~~__ transport |

C. WILLIAMS, RNC
HCSD/CVSP

DATE 9/24/04 BP 97 57 36.7

TIME 0558 P R 18

T. Holmes, MTA
HCSD/CVSP

SA O2 98 WEIGHT 155 ALLERGY Y (N)

0920

9-24-04   s. no abdominal cramping, no blood in
stool, no diarrhea. Toes crack,
o no tenderness in abdomen, toe nails in
great toes eaten away.
A Tinea pedis, tinea unguum
P. Miconazole cream bid X 3 weeks
Lotremin liquid daily x 30 days

R. ROBINSON, M.D.
HCSD / CVSP

E. Instructs how to treat

DATE 9/27/04 BP   T

TIME 0325 P   R   I/m on medical transport to RCRMC

S. Nunley, MTA
HCSD/CVSP

SA O2   WEIGHT   ALLERGY Y N

9/27/04 | 1530 | Returned from RCRMC For GI Bleed, medication
Sulfasalazine reccomende

A. HESTER, RN
HCSD/CVSP

| INSTITUTION | HOUSING UNIT |
|-------------|--------------|
| CVSP | B3 260L |

CDC NUMBER, NAME (LAST, FIRST, MI) AND DATE OF BIRTH

Salceda, Leonardo
J90933

8-20-69

### INTERDISCIPLINARY PROGRESS NOTES

CDC 7230 (Rev 04/03)
STATE OF CALIFORNIA                    DEPARTMENT OF CORRECTIONS

| DATE | TIME |
|------|------|

TE 12-20-04 B.___ T___    I/n on medical transport    COPY    S. Nurse, RN
HCSD/CVSP

TIME 0420 P___    R___

SA O2 ___ WEIGHT___ ALLERGY Y N

| 2-26-04 | 1500 | Returned from RCRMC F/U GI Bleed Called |

A. HESTER, RN
HCSD/CVSP

DATE 2/7/05 B. 124/80 T 36.1

TIME 13:34 P 43 R 18    F/U    S. Nurse, MTA
HCSD/CVSP

SA O2 97 WEIGHT 158 ALLERGY Y N

D/ 7/5 J    ① c/o Bleeding per rectum

1405

DICTATES

Tan

ANG

INSTITUTION CVSP    HOUSING UNIT    B3- 260L

**INTERDISCIPLINARY PROGRESS NOTES**

CDC NUMBER, NAME (LAST, FIRST, MI) AND DATE OF BIRTH

Salceda, Leovendo
J G0933
8-20-69

CDC 7230 (Rev 04/03)
STATE OF CALIFORNIA    DEPARTMENT OF CORRECTIONS

| DATE | TIME |
|------|------|

**DATE**      **TIME**      **NAME AND CDC NUMBER**      COPY

02/17/05      1359         SALCEDA, LEOVARDO

**S:**   This patient is being seen here at Central Health for bleeding per rectum. Patient is a Hispanic guy with a known diagnosis of Crohn's disease. He has been seen at RCRMC multiple times with multiple workups consisting of a colonoscopy and x-rays consisting of small bowel follow through which were all negative. He had been asymptomatic for quite sometime and his Sulfasalazine medication was discontinued in September. He had been doing fine then until about three days prior to the consultation when he started having watery stools of about three times daily, and started to notice maroon colored blood yesterday, and becoming fresh blood this morning. He still has about three bowels daily. He denies any abdominal pain, denies any dizziness, no vomiting, and no weakness.

**O:**   Vital signs are stable with a blood pressure of 122/80 and pulse rate of 63. Abdomen is soft, non-tender, negative organomegaly, normoactive bowel sound. Rectal exam done shows a small amount of fresh blood on tactating finger.

**A:**   Acute exacerbation of Crohn's disease.

**P:**   We'll start patient again on Azulfidine, Prednisone and Flagyl. We'll schedule patient for follow-up at Central Health tomorrow.

**E:**   Discussed with patient about his condition. Patient verbalized understanding. He was initially advised admission however patient declined at present time and he stated that he would come back anytime to Central Health if his condition worsens this afternoon or tonight.

d: 02/17/05  t: 02/18/05 as                    R. Ang, Jr., M.D.

| INSTITUTION | HOUSING UNIT | CDC NUMBER, NAME (LAST, FIRST, MI) AND DATE OF BIRTH |
|-------------|--------------|------------------------------------------------------|

**INTERDISCIPLINARY PROGRESS NOTES**

CDC 7230 (Rev 04/03)
STATE OF CALIFORNIA                    DEPARTMENT OF CORRECTIONS

| DATE | TIME |
|------|------|
| 3/1/05 | |

*see previous page*

**DATE**      **TIME**      **NAME AND CDC NUMBER**    [COPY]
03/02/05      1033          SALCEDA, LEONARDO          J90933

**S:**  This patient has Crohn's disease and he has an acute exacerbation of approximately six to eight stools a day and he has blood in his stools also.
**O:**
**A:**  *see infirmary entry*
**P:**  The patient is going to be admitted to the infirmary for further care.
**E:**

d: 03/02/05  t: 03/02/05 as          Riva Robinson, M.D.

---

4/8/05  1445  s: 35 yo ♂ to clinic c/o hx of Crohn's disease, c bloody diarrhea X 4 days c ↑ frequency.

P: ① refer to M.D. tomorrow am          M. LAFEVER MTA

DATE 4/9/05  B. 117/60  T 96.9

P: 855  1 60   R 16

SA O2 98%  WEIGHT 149  ALLERGY Y/N          M. ROGGELIN, MTA
                                             CVSP/HCSD

4/18/05  s: 3 bloody diarrhea x several days
o. loosing weight, no tenderness to abdn
A chronic disease  P. 1 multiple vitamin daily
c sulfasalazine 1.5 gram  b i/x 30 days
Flagil 500 mg po tid x 1 week
Prednisone 30 oo bid x 1 week po
Resource2 can daily po
Miconazol cream tix x 1 wk          R. ROBINSON, M.D.
                                     HCSD / CVSP

INSTITUTION CVSP   HOUSING UNIT  B3 200   CDC NUMBER, NAME (LAST, FIRST, MI) AND DATE OF BIRTH
                                          J 90933
                                          SALCEDA, LEONARDO
                                          D.o.B. 8/30/69

**INTERDISCIPLINARY PROGRESS NOTES**

CDC 7230 (Rev 04/03)
STATE OF CALIFORNIA                    DEPARTMENT OF CORRECTIONS

| | |
|---|---|
| **NGS:** | Clear to auscultation and percussion. |
| **ABDOMEN:** | Soft, not really tender to touch, no organomegaly and no masses are felt. Bowel sounds are slightly hyperactive. |
| **GU:** | Normal. |
| **RECTAL:** | Revealed no masses, no mucus or hemorrhoids. |
| **BACK:** | *normal* |
| **EXTREMITIES:** | No edema and no cyanosis. |
| **NEUROLOGICAL:** | Within normal limits with no deficit of any kind. |
| **DIAGNOSIS:** | Crohn's disease with some GI bleeding. |
| **PLAN:** | Admit him to the infirmary and to keep him from having any dairy products and to give him Sulfasalazine at the present time Flagyl and also Prednisone. |

COPY

END OF REPORT
Riva Robinson, M.D.
nc

| TYPE OF REPORT (*Check one*) | | SIGNATURE OF PROVIDER | | |
|---|---|---|---|---|
| | | PATIENT'S NAME (LAST, FIRST, MI) | | |
| [X] HISTORY AND PHYSICAL EXAM CDC 7206 | [ ] DISCHARGE SUMMARY CDC 7218 | SALCEDA, LEOVARDO | | |
| [X] PROGRESS NOTE CDC 7230 | [ ] DEATH REPORT CDC 7229 | CDC NUMBER **J90933** | DATE DICTATED **03/03/05** | DATE TYPED **03/03/05** |
| [ ] CONSULTATION REPORT CDC 7243 | [ ] TRANSFER SUMMARY CDC 7295 | INSTITUTION CHUCKAWALLA VALLEY STATE PRISON | | |
| [ ] OPERATION REPORT CDC 7205 | [ ] OTHER (*Specify*) | UNIT / WING / BED # | HOSPITAL / CENTER CVSP - INFIRMARY | |

## HEALTH RECORD REPORT

CDC 7292 (11/89)
STATE OF CALIFORNIA

DEPARTMENT OF CORRECTIONS

57

I/M D.O.B.:              08/20/69

DATE OF ADMISSION:   03/02/05

```
COPY
```

CHIEF COMPLAINT:     Frequent stools with small amounts of blood.

HISTORY OF PRESENT ILLNESS:     This is a 35-year-old Hispanic male who has a history of Crohn's disease. He has been in the infirmary previously with similar symptoms. He has had about eight stools on the previous to being admitted. He also complained of cramping especially of the time of his bowel movements. He was then admitted because of the past history. He takes Sulfasalazine as a general rule and whenever he has exacerbations he was given Prednisone also.

PAST HISTORY: *Only Crohn's disease*

ALLERGIES:              NKDA

FAMILY HISTORY:      Not contributory.

SOCIAL HISTORY:      The patient states that he used alcohol on the streets but denies illegal drugs or tobacco. He worked as a construction worker and he is single.

REVIEW OF SYSTEMS:   Essentially negative excepting for the cramping and the bloody stools. He does have a good appetite, and he does not have any other complaints.

PHYSICAL EXAMINATION
GENERAL:                The patient is well developed, well nourished. He appears to be somewhat uncomfortable but otherwise normal.

VITAL SIGNS:            Temperature 36.5, pulse 66, respiration 18, blood pressure 114/63.

SKIN:                     Good skin turgor, he is not dehydrated.

HEENT:                   Normocephalic. PERRLA.

NECK:                     Supple with full ROM.

HEART:                   Normal sinus rate and rhythm.

| TYPE OF REPORT (Check one) | | SIGNATURE OF PROVIDER *R. Robinson* | |
|---|---|---|---|
| [X] HISTORY AND PHYSICAL EXAM CDC 7206 | [ ] DISCHARGE SUMMARY CDC 7218 | PATIENT'S NAME (LAST, FIRST, MI) **SALCEDA, LEOVARDO** | |
| [ ] PROGRESS NOTE CDC 7230 | [ ] DEATH REPORT CDC 7229 | CDC NUMBER **J90933** | DATE DICTATED **03/03/05** / DATE TYPED **03/03/05** |
| [ ] CONSULTATION REPORT CDC 7243 | [ ] TRANSFER SUMMARY CDC 7295 | INSTITUTION CHUCKAWALLA VALLEY STATE PRISON | |
| [ ] OPERATION REPORT CDC 7205 | [ ] OTHER (Specify) | UNIT / WING / BED # | HOSPITAL / CENTER CVSP - INFIRMARY |

## HEALTH RECORD REPORT

| DATE | TIME |
|------|------|

**DATE        TIME        NAME AND CDC NUMBER**        COPY

04/19/05      0947        SALCEDA, LEOVARDO

**S:**   This patient has long history of Crohn's disease, he was in the infirmary in early
March, he did very well, since then he has had no problems, but within the last
several days he has started to have diarrhea, now developed blood in his stools,
and already today he has had three bowel movements.  He has already lost some
weight.

**O:** abdominal discomfort

**A:** crohns disease

**P:** start treatment

**E:** Discussed abt crohns disease

d: 04/19/05  t: 05/11/05 as

Riva Robinson, M.D.

DATE 4/05  BP 110/60  T 99⁴

TIME 0842  P 55  R 16

SA O2 97%  WEIGHT 198  ALLERGY YN

M. ROGGELIN, MTA
CVSP/HCSD

1/2/05  ↓ s/o ↑ Bowel mavit. → 1+1/2

10/05  crohn's disease

diabetes

R. Ang, M.D.
Staff Physician/CVSP

INSTITUTION CVSP  HOUSING UNIT        B3 2602

**INTERDISCIPLINARY PROGRESS NOTES**

| CDC NUMBER, NAME (LAST, FIRST, MI) AND DATE OF BIRTH |
|---|
| Salceda, Leonardo |
| J 90933 |
| 8-20-49 |

CDC 7230 (Rev 04/03)
STATE OF CALIFORNIA                     DEPARTMENT OF CORRECTIONS

| DATE | TIME |
|------|------|

DATE         TIME         NAME AND CDC NUMBER         **COPY**
06/02/05     1054         SALCEDA, LEONARDO                J91933

**S:**   The patient is being seen today with a chief complaint of increased bowel movement. The patient has a history of Crohn's disease. He stated he ran out of his medication and for the past few days he is having 10 to 12 times of bowel movements daily, although it consists mostly of mucoid, he has some small amounts of blood in it. The patient also complained of easy fatigability and loss of weight.

**O:**   The patient's weight today is 148 pounds. His last weight was 149 pounds on 4/19/05. HEENT his palpebral conjunctiva are pinkish. Lungs clear breath sounds. Heart regular rate and rhythm, non tachycardic. Abdomen is flat, soft, and no tenderness with slightly hyperactive bowel sounds.

**A:**   Crohn's disease with acute exacerbation.

**P:**   Refill his multivitamin and refill his Sulfasalazine, start him on Prednisone 30 mg p.o. b.i.d. times 1 week, Resource 1 can p.o. b.i.d. times 7 days, issue chrono for additional roll of toilet paper and accommodation for toilet privileges, CBC today.

**E:**   The patient's condition was discussed with him and advised the patient that he needs to be admitted to the infirmary. The patient however declined at the present time and stated that if he gets worse he'll come back and get admitted to the infirmary.


d: 06/02/05  t: 06/23/05 nc              R. Ang, Jr., M.D.

| INSTITUTION | HOUSING UNIT | CDC NUMBER, NAME (LAST, FIRST, MI) AND DATE OF BIRTH |
|-------------|--------------|------------------------------------------------------|

**INTERDISCIPLINARY PROGRESS NOTES**

CDC 7230 (Rev 04/03)
STATE OF CALIFORNIA                    DEPARTMENT OF CORRECTIONS

| DATE | TIME |
|------|------|

DATE 6/16/05  10²/5 T

TIME 0725  54   R 14

SA O2 98  WEIGHT 154  ALLERGY Y/N

COPY

J. O'FALLON M.T.A.
HCSD/CVSP

| 6/16/05 | 1006 | S – F/u Chron's and improving. Having problem c̄ straining. ⊕ mucus c̄ old blood. ∅ BRBPR. ∅ F/C. ∅ Pain, ∅ cramps. c/o HA and Fungus on feet. |
|---|---|---|
| | | O – VSS, Afebrile |
| | | Abdo – S/NT ⊕ BS |
| | | EXT – ∅ c/c/e |
| | | CVS – RR, ∅ (m) |
| | | Feet – toe nail deformed, thicken. Discolored ® Toe. |
| | | A/P ① Chron's disease – cont. to improve, cont prednisone x 7d and ↓ dosage. Add Fibers to prevent irritation. Cont. Sulfasalazine |
| | | ② Tinea / onychomycosis – Lotrimin x 30d |
| | | E– Rx ment plan c̄w pt and understood/agreed |
| | | P. Lumos |
| | | D. Lun |

INSTITUTION

HOUSING UNIT     B3 2600

CDC NUMBER, NAME (LAST, FIRST, MI) AND DATE OF BIRTH

Salceda, Leonardo

J90933

8-20-69

**INTERDISCIPLINARY PROGRESS NOTES**

CDC 7230 (Rev 04/03)
STATE OF CALIFORNIA

DEPARTMENT OF CORRECTIONS

| DATE | TIME |
|------|------|

DATE 8/17/05  B/P 169/36  *illegible* Flu Chrons disease  COPY

TIME 0713   P 64   R 18

SA O2 95%   WEIGHT 150#   ALLERGY Y (N)

R. FOLEY, M.D
HOSD/CMSD

8/17/7 S) I/V e *illegible* disease
*illegible*

R. Ang, M.D.
Staff Physician/CVSP

| **DATE** | **TIME** | **NAME AND CDC NUMBER** | |
|----------|----------|-------------------------|---|
| 08/17/05 | 0739 | SALCEDA, LEONARDO | J90933 |

**S:**    The patient is in today for follow-up of his Crohn's disease. The patient stated he is having diarrhea four to five times daily and he ran out of his medication.

**O:**    The patient's vital signs are stable. HEENT is unremarkable. Palpebral conjunctiva is pinkish. Abdomen is soft, flat, non-tender, normal active bowel sounds.

**A:**    History of Crohn's disease with flare up.

**P:**    Refill his MVI, Sulfasalazine, and we'll start patient again on Prednisone and Flagyl, schedule patient for CBC and lay-in times 3 days.

**E:**    The patient's condition was discussed with him and he verbalized understanding and agreed with the present treatment plan.

d: 08/17/05  t:  09/01/05 nc         R. Ang, Jr., M.D.

8/22/5  CBC done 08/17/05 - see
normal

R.Ang, M.D.
Staff Physician/CVSP

| INSTITUTION | HOUSING UNIT | CDC NUMBER, NAME (LAST, FIRST, MI) AND DATE OF BIRTH |
|-------------|--------------|------------------------------------------------------|
| WSP | B3 260L | Salceda, Leonardo  J90933  8/20/69 |

**INTERDISCIPLINARY PROGRESS NOTES**

CDC 7230 (Rev 04/03)
STATE OF CALIFORNIA             DEPARTMENT OF CORRECTIONS

| DATE | TIME |
|------|------|

DATE   B.   T   35.9°

TIME   03   R   12

SA O2   WEIGHT   ALLERGY Y

COPY

8-29-05   Crohn's disease dictated

R. ROBINSON, M.D.
HOSD / CVSP

**DATE          TIME          NAME AND CDC NUMBER**
08/29/05     1010        SALCEDA, LEOVARDO        J90933

**S:**   This patient has Crohn's disease and at the present time he is having a flare-up, there is not much cramping however he does have some bleeding every time he has a bowel movement.

**O:**   On examination he does not have any external hemorrhoids however having a bowel movement he does have some blood.

**A:**   Crohn's disease with a flare-up at the present time.

**P:**   The patient will be getting Metamucil one package daily for 15 days, Prednisone 20 mg daily in the morning for seven days, a follow-up in one week to see the results and if he needs more Prednisone, and a lay-in for three days. The patient has a chrono approved because he is unable to hold his stool he is incontinent for stool and this gives him the opportunity to go to the bathroom when he needs to, the chrono is issued but he does not have a copy so we are requesting that a copy be given to him.

**E:**   Discussed the disease extensively + the Rx

d: 08/29/05  t: 09/26/05 as

Riva Robinson, M.D.

---

INSTITUTION   CVSP        HOUSING UNIT   B3-260L

**INTERDISCIPLINARY PROGRESS NOTES**

CDC NUMBER, NAME (LAST, FIRST, MI) AND DATE OF BIRTH

Salceda
J90933

8-20-69

CDC 7230 (Rev 04/03)
STATE OF CALIFORNIA                    DEPARTMENT OF CORRECTIONS

| DATE | TIME |
|------|------|

**COPY**

DATE 6/14/06  29/27  36
TIME 913 P  68  8
SA O2 88%  WEIGHT 148  ALLERGY *NB*

Phe re: Crohn's Disease
and review of meds

R. Esparza, NST.A.
HCSD/CVSP

06/14/06  S: Phe Crohn's Disease — Pt feel his
0488  Crohn is worse 2° to disorder of
continue bleeding ō ī eye, & wt loss.

O: Gen — alert
Heart nml , lung — clr, bowel nml
Abd — soft

A: Hx Crohn's Disease ē GI bleeding

P: Colonoscopy
pending review of Phlysof
Phe 2 week

E fd visit understanding

D. Dunn, M.D.
HCSD/CVSP

INSTITUTION CVSP    HOUSING UNIT B3-260 C

CDC NUMBER, NAME (LAST, FIRST, MI) AND DATE OF BIRTH
Salceda, L
J90933
DOB 8/20/49

**INTERDISCIPLINARY PROGRESS NOTES**

CDC 7230 (Rev 04/03)
STATE OF CALIFORNIA                    DEPARTMENT OF CORRECTIONS

STATE OF CALIFORNIA                                    DEPARTMENT OF CORRECTIONS
**MEDICAL/DENTAL LAY-IN ORDER**

| INMATE'S NAME | CDC NUMBER | HOUSING |
|---|---|---|
| Salceda, Leo | J90933 | B3/260L |

ABOVE SUBJECT MUST BE CONFINED TO BED **EXCEPT** FOR MEALS, MEDICATION, AND SICK CALL

| LAY-IN NUMBER | NO OF DAYS LAY-IN | TIME AND DATE OF EXPIRATION OF LAY-IN |
|---|---|---|
| | Three (3) | 090105 @ 2359 Hr |

| SIGNATURE OF M.D., R.N., M.T.A., D.D.S., R.D.A. | | DATE |
|---|---|---|
| Thomas THOMAS MTA CVSP | | 082905 |

cc:  WORK ASSIGNMENT SUPERVISOR
     HOUSING UNIT

CDC 7257 (CVSP REV 01/02)

---

STATE OF CALIFORNIA                                    DEPARTMENT OF CORRECTIONS
**MEDICAL/DENTAL LAY-IN ORDER**

| INMATE'S NAME | CDC NUMBER | HOUSING |
|---|---|---|
| Salceda | J90533 | B3 260L |

ABOVE SUBJECT MUST BE CONFINED TO BED **EXCEPT** FOR MEALS, MEDICATION, AND SICK CALL

| LAY-IN NUMBER | NO OF DAYS LAY-IN | TIME AND DATE OF EXPIRATION OF LAY-IN |
|---|---|---|
| | Three Day (3) | Three 16th June @ 235 |

| SIGNATURE OF M.D., R.N., M.T.A., D.D.S., R.D.A. | | DATE |
|---|---|---|
| R. Esparza m   R. Esparza, MTA  MOD/CVSP | | 6/14/66 |

cc:  WORK ASSIGNMENT SUPERVISOR
     HOUSING UNIT

CDC 7257 (CVSP REV 01/02)

---

STATE OF CALIFORNIA                                    DEPARTMENT OF CORRECTIONS
**MEDICAL/DENTAL LAY-IN ORDER**

| INMATE'S NAME | CDC NUMBER | HOUSING |
|---|---|---|
| Salceda, Leovardo | J90933 | B3  260L |

ABOVE SUBJECT MUST BE CONFINED TO BED **EXCEPT** FOR MEALS, MEDICATION, AND SICK CALL

| LAY-IN NUMBER | NO OF DAYS LAY-IN | TIME AND DATE OF EXPIRATION OF LAY-IN |
|---|---|---|
| | (2) Two days | 01-24-07    2357 |

| SIGNATURE OF M.D., R.N., M.T.A., D.D.S., R.D.A. | DATE |
|---|---|
| M. Patino  LVN | 01-23-07 |

cc:  WORK ASSIGNMENT SUPERVISOR
     HOUSING UNIT

CDC 7257 (CVSP REV 01/02)

## DUCAT / PASS

Name: __SALCEDA__   CDC#: __J90933__   Dorm/Bed: __B3-260L__   Date: __28JUN06__
Report To: __B - MEDICAL__   Time: __0845__   Reason: __MEDICAL__
Time Arrived: _____   Time Departed: _____   Location Staff Signature: _____

This Inmate **MUST** report at the designated time and place. Failure to do so must be reported to their Sergeant's office immediately as to the cause and appropriate action as necessary.

**GREEN ID REQUIRED**
**APPROVED**

I/M ASSIGNMENT LT. / Alt. WATCH COMMANDER 3/W

---

## DUCAT / PASS

Name: __SALCEDA__   CDC#: __J90933__   Dorm/Bed: __B3-260L__   Date: __05SEP06__
Report To: __CENTRAL HEALTH__   Time: __0730__   Reason: __LAB__
Time Arrived: _____   Time Departed: _____   Location Staff Signature: _____

This Inmate **MUST** report at the designated time and place. Failure to do so must be reported to their Sergeant's office immediately as to the cause and appropriate action as necessary.

I/M ASSIGNMENT LT. / Alt. WATCH COMMANDER 3/W

---

## DUCAT / PASS

Name: __SALCEDA__   CDC#: __J90933__   Dorm/Bed: __B3-260L__   Date: __05SEP06__
Report To: __CENTRAL HEALTH__   Time: __0700__   Reason: __MEDICAL__
Time Arrived: _____   Time Departed: _____   Location Staff Signature: _____

This Inmate **MUST** report at the designated time and place. Failure to do so must be reported to their Sergeant's office immediately as to the cause and appropriate action as necessary.

I/M ASSIGNMENT LT. / Alt. WATCH COMMANDER 3/W

---

## DUCAT / PASS

Name: __SALCEDA__   CDC#: __J90933__   Dorm/Bed: __B3-260L__   Date: __16OCT06__
Report To: __CENTRAL HEALTH__   Time: __1400__   Reason: __MEDICAL__
Time Arrived: _____   Time Departed: _____   Location Staff Signature: _____

This Inmate **MUST** report at the designated time and place. Failure to do so must be reported to their Sergeant's office immediately as to the cause and appropriate action as necessary

I/M ASSIGNMENT LT. / Alt. WATCH COMMANDER 3/W

---

## DUCAT / PASS

Name: __SALCEDA__   CDC#: __J90933__   Dorm/Bed: __B3-260L__   Date: __23JAN07__
Report To: __B - MEDICAL__   Time: __0800__   Reason: __DR.'S LINE__
Time Arrived: _____   Time Departed: _____   Location Staff Signature: _____

This Inmate **MUST** report at the designated time and place. Failure to do so must be reported to their Sergeant's office immediately as to the cause and appropriate action as necessary

I/M ASSIGNMENT LT. / Alt. WATCH COMMANDER 3/W

**CHUCKAWALLA VALEY STATE PRISON**
**MEDICAL ACTIVITY PASS**

NAME _Salceda_ CDC# _J90933_

TO: _CH_ ACTIVITY _MEDS_

DAYS: M T W TH FR SA SU & HOLIDAYS

TIME _0700_ A.M. _1830_ PM

BEGINS _6-17-06_ EXPIRES _7-17-06_

SIGNATURE: _____

---

NAME: _Salceda_ CDC#: _J90933_

DATE: _7/17/06_

FROM: _B A00-400_    ISSUED: TIME _0700_

DESTINATION

RETURNED: _____

☐ PROGRAM SERVICES
☐ VISITING
☐ R & R
☐ LIBRARY
☐ WORK CHANGE
☐ OTHER _____

STAFF SIGNATURE _A Silva Torres_

PASS

---

NAME: _SALceda_ CDC# _J90933_

DATE: _11-23-06_    TIME

FROM _B3 260L_    ISSUED _1850_

RETURNED _____

DESTINATION

PASS

[ ] PROGRAM SERVICES
[ ] VISITING
[ ] R&R
[ ] LIBRARY
[ ] WORK CHANGE
[✓] OTHER _C-hea Uth_

STAFF SIGNATURE: _____

---

NAME _Salceda_ CDC# _J90933_

DATE _10/27/06_

FROM _B3 260L_    ISSUED: TIME _1000_

DESTINATION

RETURNED _____

☐ PROGRAM SERVICES
☐ VISITING
☐ R & R
☐ LIBRARY
☐ WORK CHANGE
☐ OTHER _____

STAFF SIGNATURE _____

PASS

---

NAME _Salceda, L_ CDC# _J90933_

DATE _12/1/06_

FROM _B-3 260L_    ISSUED: TIME _0700_

DESTINATION

RETURNED _____

☐ PROGRAM SERVICES
☐ VISITING
☐ R & R
☐ LIBRARY
☐ WORK CHANGE
☒ OTHER _Central Health_

STAFF SIGNATURE _____

PASS

---

CHUCKAWALLA VALLEY STATE PRISON PHARMACY
Box 2289, Blythe, CA 92226

SALCEDA,    LEONARDO    J-90933
B3-260L    DR: DAVID, A/DUNN
665118- 0  RPH: AE    MFG: 24
CHLORPHENIRAMINE 4MG    9
TAKE 1 TABLET 3 TIMES A
DAY FOR 3 DAYS

START: 01/23/07 STOP: 02/22/07

CHUCKAWALLA VALLEY STATE PRISON PHARMACY
Box 2289, Blythe, CA 92226
SALCEDA, LEONARDO          J-90933
B3-260L        DR: DUNN, DAVID,
654709- 0  RPH: CJ        MFG: GX
PREDNISONE 10MG                    70
TAKE AS DIRECTED PER
ATTACHED INSTRUCTIONS
Lot #557857A  Exp 10/07
START: 10/23/06 STOP: 11/20/06

---

NAME SALCEDA   CDC# J90933
HOUSING B3-260L   DR. DUNN
PREDNISONE      10    MG #70
TAKE 4 TABS (40)MG 1 X DAILY FOR 7 DAYS
TAKE 3 TABS (30)MG 1 X DAILY FOR 7 DAYS
TAKE 2 TABS (20)MG 1 X DAILY FOR 7 DAYS
TAKE 1 TABS (10)MG 1 X DAILY FOR 7 DAYS.

---

CHUCKAWALLA VALLEY STATE PRISON PHARMACY
Box 2289, Blythe, CA 92226
SALCEDA, LEONARDO          J-90933
B3-260L        DR: DUNN, DAVID,
654708- 0  RPH: CJ        MFG: UM
SULFASALAZINE 500MG            120
TAKE 1TAB 4X DAILY
FOR 30 DAYS.NO REFILLS
Lot 5061890A  Exp 12/10
START: 10/23/06 STOP: 11/22/06

---

CHUCKAWALLA VALLEY STATE PRISON PHARMACY
Box 2289, Blythe, CA 92226
SALCEDA, LEONARDO          J-90933
B3-260L        DR: M BROOKS/ANG
654771- 0  RPH: CJ        MFG: PO
PREDNISONE 20MG
TAKE 1TAB ONCE DAILY WITH
FOOD FOR 7 MORE DAYS
START: 09/05/06 STOP: 09/12/06

---

CHUCKAWALLA VALLEY STATE PRISON PHARMACY
Box 2289, Blythe, CA 92226
SALCEDA, LEONARDO          J-90933
B3-260L        DR: DUNN, DAVID,
654707- 0  RPH: CJ        MFG: PG
ASACOL,MESALAMINE,400MG       90
TAKE 1TAB 3X DAILY FOR
30 DAYS
Lot 4301871S1  Exp 11/07
START: 10/23/06 STOP: 11/22/06

---

CHUCKAWALLA VALLEY STATE PRISON PHARMACY
Box 2289, Blythe, CA 92226
SALCEDA, LEONARDO          J-90933
B3-260L        DR: DUNN, DAVID,
638417- 0  RPH: CJ        MFG: PG
METAMUCIL PKTS                30
MIX 1PKT WITH WATER AND
DRINK AT BEDTIME.NO RFLS
START: 05/19/06 STOP: 06/18/06

---

CHUCKAWALLA VALLEY STATE PRISON PHARMACY
Box 2289, Blythe, CA 92226
SALCEDA, LEONARDO          J-90933
B3-260L        DR: GRANT/CULTON
644491- 0  RPH: CJ        MFG: UM
SULFASALAZINE 500MG           240
TAKE 4TABS 2X DAILY FOR
30 DAYS.NO REFILLS
Lot #50669OA
Exp 12/10
START: 07/17/06 STOP: 08/16/06

---

CHUCKAWALLA VALLEY STATE PRISON PHARMACY
Box 2289, Blythe, CA 92226
SALCEDA, LEONARDO          J-90933
B3-260L        DR: ROTH,S/ANG
641131- 0  RPH: MO        MFG: GG
METRONIDAZOLE 250MG            42
TAKE 2TABS 3X DAILY FOR
1 WEEK
START: 06/14/06 STOP: 06/21/06

---

CHUCKAWALLA VALLEY STATE PRISON PHARMACY
Box 2289, Blythe, CA 92226
SALCEDA, LEONARDO          J-90933
B3-260L        DR: R.ROBINSON,MD
608807- 0  RPH: CJ        MFG: PG
METAMUCIL PKTS                15
MIX 1PKT WITH WATER AND
DRINK FOR 15 DAYS.NO RFLS
START: 08/29/05 STOP: 09/13/05

---

CHUCKAWALLA VALLEY STATE PRISON PHARMACY
Box 2289, Blythe, CA 92226
SALCEDA, LEONARDO          J-90933
B3-260L        DR: ANG,ROMEO JR.
599686- 0  RPH: CJ        MFG: GG
METRONIDAZOLE 250MG           42
TAKE 2TABS 3X DAILY FOR
7 DAYS
Ex.
NO ALCOHOL
START: 06/03/05 STOP: 06/10/05

You have the right and obligation to make decisions concerning your health care. Your physician can provide you with the necessary information and advice, but because this affects you, you must enter into the decision making process. This form has been designed to acknowledge your acceptance of treatment recommended by your physician.

I hereby authorize Dr. _Schreiber_____, associates and assistants to perform the following procedures(s):

_Colonoscopy_____

**For surgical procedure,** I recognize that, during the course of the operation, post operative care, medical treatment anesthesia, or other procedure, unforeseen conditions may necessitate my above-named physician and his or her assistants, to perform such surgical or other procedures as are necessary. I consent to the observation or photographing of the operative procedure for the purpose of advancing medical education. Any tissues or part surgically removed may be disposed of by the hospital or physician in accordance with accustomed practice. In case of Prostate and Breast cancer, information brochure is given to me.

**For use of anesthesia,** I consent to the administration of (MAC, general, spinal, regional, conscious sedation, local) anesthesia by my attending physician, by an anesthesiologist, a nurse anesthetist, or other qualified parties under the direction of a physician or operating surgeon as may be deemed necessary. I understand that my physician or anesthesia provider discussed anesthesia risk and benefits to me prior to procedure.

**For Blood Transfusion,** I have received a copy of the Department of Health Services information pamphlet, *A Patient Guide to Blood Transfusion,* concerning the advantages, disadvantages, risks and benefits of autologous blood and of directed and non-directed homologous blood from volunteers. I have been given adequate time for myself or other person to pre-donate blood for transfusion purposes unless where there is a life-threatening emergency, or medical contraindication, or if I have waived this right.

**For Radiology procedures and X-ray,** I was told about the risk of injecting the contrast material into my blood vessels. I confirm that *I am not taking Glucophage, or metformin hypochloride* for diabetes. I confirm that *I am not pregnant,* do not have asthma, or hay fever, or kidney problem. *I am not allergic to iodine,* and never had a reaction to contrast dye.

I agree that my physician has informed me of the:

1. Diagnosis or probable diagnosis    2. Nature and benefit of treatment or procedures recommended
3. Risks, complications, and problems related to recuperation involved in such treatment or procedures.
4. Anticipated results of treatment    5. Available alternative forms of treatment, including non-treatment

I acknowledge that I have read and fully understand the above consent, and I have sufficient information to give my informed consent.

X _Leonardo Salcedo_____
Signature: **Patient/ Other Legally Responsible Person**

_____
Signature: **Practitioners**

_____
Signature: **Witness (authenticating the above signature)**

7/10/06    0715
Date and Time

| | |
|---|---|
| **PALO VERDE HOSPITAL** 250 N. First Street Bythe, CA 92225 (760) 922-4115 | ADDRESSOGRAPH |
| **AUTHORIZATION FOR AND INFORMED CONSENT TO SURGERY OR SPECIAL DIAGNOSTIC OR THERAPEUTIC PROCEDURE** | *Ex:* |

0046/6411 3/06        Board Approved 2/23/2006

CHUCKAWALLA VALLEY STATE PRISON PHARMACY
Box 2289, Blythe, CA 92226
SALCEDA, LEONARDO       J-90933
B3-260L      DR: DAVID,A/DUNN
665119- 0  RPH: AE      MFG: GX
ACETAMINOPHEN 325MG        30
TAKE 1 TO 2 TABS THREE
TIMES A DAY

START: 01/23/07 STOP: 01/30/07

CHUCKAWALLA VALLEY STATE PRISON PHARMACY
Box 2289, Blythe, CA 92226
SALCEDA, LEONARDO       J-90933
B3-260L      DR: DUNN, DAVID,
658631- 0  RPH: CJ      MFG: UM
SULFASALAZINE 500MG        180
TAKE 3TABS(1500) 2X DAILY
FOR 30 DAYS

START: 11/27/06 STOP: 12/27/06

Lot # 50%302oA
EXP 3/11

Salceda J90933. 11/23/06
Sulfasalazine 500mg, take
one tab four times a day
for 30 days    #17  CH

CHUCKAWALLA VALLEY STATE PRISON PHARMACY
Box 2289, Blythe, CA 92226
SALCEDA, LEONARDO       J-90933
B3-260L      DR: DAVID,A/DUNN
662560- 0  RPH: CJ      MFG: UM
SULFASALAZINE 500MG        180
TAKE 3TABS 2X DAILY
AUTO REFILL

START: 12/29/06 STOP: 03/29/07

CHUCKAWALLA VALLEY STATE PRISON PHARMACY
Box 2289, Blythe, CA 92226
SALCEDA, LEONARDO       J-90933
B3-260L      DR: M BROOKS/AMB
649515- 0  RPH: CJ      MFG: GA
ACETAMINOPHEN 325MG        120
TAKE 2TABS EVERY 4-6HRS
AS NEEDED FOR HEADACHE.NR

START: 08/31/06 STOP: 09/15/06

CHUCKAWALLA VALLEY STATE PRISON PHARMACY
Box 2289, Blythe, CA 92226
SALCEDA, LEONARDO       J-90933
B3-260L      DR: DUNN, DAVID,
658633- 0  RPH: CJ      MFG: GX
ACETAMINOPHEN 325MG        36
TAKE 2TABS EVERY 4 HOURS
AS NEC.FOR HEADACHE.NO RF

START: 11/27/06 STOP: 11/30/06

| STATE OF CALIFORNIA | DEPARTMENT OF CORRECTIONS |
|---|---|
| **INMATE PASS** | CDC 129 (7/88) |

| INMATE'S NAME Salceda | CDC #: J 90933 | HOUSING #: B3 260L |
|---|---|---|
| ISSUED BY: | DATE: 6/28/06 | PASS FROM: Bmeis |
| PASS TO: CH | DATE: 6/28/06 | TIME: 1400 |
| REASON: MD eval | | |
| ARRIVAL TIME: | | RECORDED BY: |
| DEPART TO: | TIME: | RECORDED BY: |

| STATE OF CALIFORNIA | DEPARTMENT OF CORRECTIONS |
|---|---|
| **INMATE PASS** | CDC 129 (7/88) |

| INMATE'S NAME Salceda Leonardo | CDC #: J-90933 | HOUSING #: B3 260L |
|---|---|---|
| ISSUED BY: hralsten, RN. | DATE: 7/10/06 | PASS FROM: CH |
| PASS TO: B3 260 L | DATE: 7/10/06 | TIME: 1600 |
| REASON: Medical | | |
| ARRIVAL TIME: | | RECORDED BY: |
| DEPART TO: | TIME: | RECORDED BY: |

CHUCKAWALLA VALLEY STATE PRISON PHARMACY
Box 2289, Blythe, CA 92226
SALCEDA, LEONARDO        J-90933
C6-237L    DR: RAHIMI
701817- 0  RPH: CJ    MFG: UM
SULFASALAZINE 500MG        360
TAKE 3TABS 4X DAILY
AUTO REFILL

START: 11/08/07 STOP: 03/07/08

YOU SHOULD AVOID PROLONGED
OR EXCESSIVE EXPOSURE TO DIRECT
AND/OR ARTIFICIAL SUNLIGHT
© 1986  WHILE TAKING THIS MEDICATION.

CHUCKAWALLA VALLEY STATE PRISON PHARMACY
Box 2289, Blythe, CA 92226
SALCEDA, LEONARDO        J-90933
CI-161    DR: JAMES,P
700791- 0  RPH: CJ    MFG: UM
SULFASALAZINE 500MG        180
TAKE 3TABS 2X DAILY

START: 11/01/07 STOP: 12/01/07

CHUCKAWALLA VALLEY STATE PRISON PHARMACY
Box 2289, Blythe, CA 92226
SALCEDA, LEONARDO        J-90933
C6-237L    DR: TORRES,KIRK
684481- 0  RPH: CJ    MFG: GX
ACETAMINOPHEN 325MG        120
TAKE 1-2TABS 4X DAILY AS
NEC FOR PAIN.REFILL OKAY

START: 06/25/07 STOP: 09/23/07

CHUCKAWALLA VALLEY STATE PRISON PHARMACY
Box 2289, Blythe, CA 92226
SALCEDA, LEONARDO        J-90933
C6-237L    DR: TORRES,K
692069- 0  RPH: CJ    MFG: UM
SULFASALAZINE 500MG        180
TAKE 3TABS 2X DAILY
AUTO REFILL

START: 08/24/07 STOP: 11/22/07


May Cause
DROWSINESS

CHUCKAWALLA VALLEY STATE PRISON PHARMACY
Box 2289, Blythe, CA 92226
SALCEDA, LEONARDO        J-90933
C6-237L    DR: TORRES,K
692078- 0  RPH: CJ    MFG: Z4
CHLORPHENIRAMINE 4MG        60
TAKE 1TAB 4X DAILY AS NEC
FOR ITCHING/CONGESTION. RF

START: 08/24/07 STOP: 11/22/07

CHUCKAWALLA VALLEY STATE PRISON PHARMACY
Box 2289, Blythe, CA 92226
SALCEDA, LEONARDO        J-90933
C6-237L    DR: RAHIMI
701818- 0  RPH: CJ    MFG:
FOLIC ACID 1MG        30
TAKE 1TAB ONCE DAILY
AUTO REFILL

START: 11/08/07 STOP: 03/07/08

CHUCKAWALLA VALLEY STATE PRISON PHARMACY
Box 2289, Blythe, CA 92226
SALCEDA, LEONARDO        J-90933
C6-237L    DR: RAHIMI
701820- 0  RPH: CJ    MFG: GX
ACETAMINOPHEN 325MG        90
TAKE 2TABS 3X DAILY AS
NEEDED.01 REFILL OKAY

START: 11/08/07 STOP: 12/08/07

CHUCKAWALLA VALLEY STATE PRISON PHARMACY
Box 2289, Blythe, CA 92226
SALCEDA, LEONARDO        J-90933
C6-237L    DR: TORRES,K
701336- 0  RPH: CJ    MFG:
FOLIC ACID 1MG        6
TAKE 1TAB ONCE DAILY
NO REFILLS

START: 11/05/07 STOP: 11/11/07

CHUCKAWALLA VALLEY STATE PRISON PHARMACY
Box 2289, Blythe, CA 92226
SALCEDA, LEONARDO        J-90933
C6-237L    DR: TORRES,K
692077- 0  RPH: CJ    MFG: VZ
MULTIVITAMINS        30
TAKE 1CAP ONCE DAILY
02 REFILLS OKAY

START: 08/24/07 STOP: 11/22/07

CHUCKAWALLA VALLEY STATE PRISON PHARMACY
Box 2289, Blythe, CA 92226
SALCEDA, LEONARDO        J-90933
C6-237L    DR: TORRES,K
692079- 0  RPH: CJ    MFG: GX
ACETAMINOPHEN 325MG        120
TAKE 1-2TABS 4X DAILY AS
NEEDED FOR PAIN.REFILL OK

START: 08/24/07 STOP: 11/22/07

## MEDICAL AND SURGICAL CONSENT

The undersigned consents to the procedures which may be performed during this episode of care, which may include but are not limited to laboratory procedures, x-ray examinations, medical or surgical treatment or procedures, anesthesia services, and other clinical services rendered to the patient under the general and special instructions of the patient's physician or surgeon. The undersigned recognizes that some of the health care providers furnishing service to the patient may be independent contractors, and not employees or agents of CDC. The patient is under the care and supervision of his/her attending physician, and it is the responsibility of the institution and its nursing staff to carry out the instructions of such physician. It is the responsibility of the patient's physician or surgeon to obtain the patient's informed consent, when required, to have medical or surgical treatment, special diagnostic or therapeutic procedures.

### NURSING CARE

This institution provides only general duty nursing care unless, upon orders of the patient's physician, the patient is provided more intensive nursing care.

### RELEASE OF INFORMATION

Upon inquiry, the institution may make available to those persons with a need to know certain basic information about the patient, including name, address, age, sex, general description of the reason for treatment (whether an injury, burn, poisoning, or other condition), general nature of the injury, burn, poisoning, or other condition, and general condition. If the patient does not want such information to be released, he/she must make a written request for such information to be withheld. The institution will obtain the patient's consent and his/her written authorization to release information, other than basic information, concerning the patient, except in those circumstances when the facility is permitted or required by law to release information. Special permission is needed to release any information if the patient is treated for alcohol, drug abuse, or HIV.

| Salceda, Leovardo | X Leovardo Salceda | 11/1/07 |
|---|---|---|
| PATIENT'S NAME (PLEASE PRINT) | PATIENT'S SIGNATURE | DATE/TIME |
| C.S Willis RVC | RN | 11/1/07 |
| WITNESS' SIGNATURE | TITLE/RELATIONSHIP TO PATIENT | DATE WITNESSED |

**INTERPRETER/READER NEEDS (Complete only if needed)**
Every word of this form needs to be (Check the appropriate box):
☐ interpreted into_____,
or
☐ read to inmate.

Interpreted/Read by: _____ Date____
Signature of Interpreter/Reader

Inmate's Signature _____ Date____

**Distribution:**
Original: Unit Health Record
Copy:     Inmate-Patient

CDC NUMBER, NAME (LAST, FIRST, MI), BIRTHDATE

SALCEDA LEOVARDO

J-90933

08/20/69

## CONDITIONS OF ADMISSION/PLACEMENT
## CDC 7293 (Rev 1/00)

STATE OF CALIFORNIA          DEPARTMENT OF CORRECTIONS

STATE OF CALIFORNIA
CDC 7362 (Rev. 03/04)

DEPARTMENT OF CORRECTIONS

# HEALTH CARE SERVICES REQUEST FORM

| PART I:  TO BE COMPLETED BY THE PATIENT |
|---|
| *A fee of $5.00 may be charged to your trust account for each health care visit.* |
| **If you believe this is an urgent/emergent health care need, contact the correctional officer on duty.** |

REQUEST FOR:     MEDICAL ☑     MENTAL HEALTH ☐     DENTAL ☐     MEDICATION REFILL ☐

| NAME Salceda, Leovardo | CDC NUMBER J-90933 | HOUSING D9-237L |
|---|---|---|
| PATIENT SIGNATURE *Leovardo Salceda* | | DATE 2-23-08 |

REASON YOU ARE REQUESTING HEALTH CARE SERVICES. (Describe Your Health Problem And How Long You Have Had The Problem) _____ I have Chrones disease. A couple weeks ago I began to get sick, feeling weak, blood in stool, and unable to sleep. I tried to help myself, but it has persisted, so I ask to see the doctor. Thank you. Respectfully Submitted.

*NOTE:  IF THE PATIENT IS UNABLE TO COMPLETE THE FORM, A HEALTH CARE STAFF MEMBER SHALL COMPLETE THE FORM ON BEHALF OF THE PATIENT AND DATE AND SIGN THE FORM*

| PART III:  TO BE COMPLETED AFTER PATIENT'S APPOINTMENT |
|---|
| ☐ Visit is not exempt from $5.00 copayment.  (Send pink copy to Inmate Trust Office.) |

| PART II:  TO BE COMPLETED BY THE TRIAGE REGISTERED NURSE |
|---|

| Date / Time Received: | Received by: |
|---|---|
| Date / Time Reviewed by RN: | Reviewed by: |

S:                               Pain Scale:  1   2   3   4   5   6   7   8   9   10

O:    T:        P:        R:        BP:            WEIGHT:

A:

P:

☐ See Nursing Encounter Form

E:

| APPOINTMENT SCHEDULED AS: | EMERGENCY (IMMEDIATELY) ☐ | URGENT (WITHIN 24 HOURS) ☐ | ROUTINE (WITHIN 14 CALENDAR DAYS) ☐ |
|---|---|---|---|
| REFERRED TO PCP: | | DATE OF APPOINTMENT: | |
| COMPLETED BY | | NAME OF INSTITUTION | |
| PRINT / STAMP NAME | SIGNATURE / TITLE | | DATE/TIME COMPLETED |

CDC 7362 (Rev. 03/04)     Original - Unit Health Record     Yellow - Inmate (if copayment applicable)     Pink - Inmate Trust Office (if copayment applicable)     Gold - Inmate

STATE OF CALIFORNIA

**INMATE/PAROLEE APPEAL FORM**
CDC 602 (12/87)

DEPARTMENT OF CORRECTIONS

| Location: | Institution/Parole Region | Log No. | Category |
|---|---|---|---|
| 1. | | | |
| 2. | | | |

You v appeal any policy, action or decision which has a significant adverse affect upon you. With the exception of Serious CDC 115s, classification col. .ee actions, and classification and staff representative decisions, you must first informally seek relief through discussion with the appropriate staff member, who will sign your form and state what action was taken. If you are not then satisfied, you may send your appeal with all the supporting documents and not more than one additional page of comments to the Appeals Coordinator within 15 days of the action taken. No reprisals will be taken for using the appeals procedure responsibly.

| NAME | NUMBER | ASSIGNMENT | UNIT/ROOM NUMBER |
|---|---|---|---|
| Sanders | H-80090 | Counsel's Clerk | B5-110 |

**A. Describe Problem:** This is an Inmate Group Appeal pursuant to 15 CCR § 3084.2.(f) in regards to the lack of up-to-date legal materials in Facility B Library.

In order to be held to the federal one year statute of limitations under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), fundamentally, a pro se litigant has to be afforded access to the library, and the library must have up-to-date materials.

If you need more space, attach one additional sheet. CONTINUED TO PAGE #2

**B. Action Requested:** The PLU inmates on Facility B, respectfully, request the library be brought into compliance immediately without any further delays.

Inmate/Parolee Signature: _____  Date Submitted: 4-28-02

**C. INFORMAL LEVEL** (Date Received: _____ )

Staff Response: _____

_____

Staff Signature: _____  Date Returned to Inmate: _____

**D. FORMAL LEVEL**
If you are dissatisfied, explain below, attach supporting documents (Completed CDC 115, Investigator's Report, Classification chrono, CDC 128, etc.) and submit to the institution/Parole Region Appeals Coordinator for processing within 15 days of receipt of response.

_____

_____

_____

_____

ature: _____  Date Submitted: _____

.d: Property/Funds appeals must be accompanied by a completed  CDC Appeal Number:
Board of Control form BC-1E, Inmate Claim

Exh. D5

L10

A.  Describe Problem (continued):

Up-dating a legal library is a fluid endeavor -- it is on-going. When the law books are being up-dated on schedule, updates and supplements are added to the library on a daily, weekly, monthly, and yearly basis.

As of this writing the below listed research materials have not been updated since last year: The California Reporter, The Federal Reporters, The Federal Supplements, The Supreme Court Reporters, The California Codes Annotate, The Federal Digests, The United States Codes, The Witkens and Epstein Volumes, and Appeals and Writs in Criminal Cases (2000, usually updated yearly).

15 CCR 3122(a), states, "Each facility <u>shall</u> provide legal materials through its law library to provide inmates with meaningful access to the courts." This is a mandatory CDC regulation buttressed by both state and federal law. (Penal Code sections 5054 & 5058; <u>Gilmore v. Lynch</u> 319 F. Supp 105; <u>Toussaint v. McCarthy</u> 801 F.2d 1080 (9th Cir. 1986))

It is virtually impossible for a pro se petitioner to litigate their claims unless they are afforded access to an <u>adequate</u> library. In <u>Walen/Hunt v. Early</u> (9th Cir. 2000), the Ninth Circuit unanimously ruled en banc that an inadequate law library is an <u>impediment</u> to one's obligation under 28 USC 2244 -- the AEDPA's one year statute of limitations.

Currently, Mrs. Rowe, the Senior Librarian provided the materials in question to yards A, C, and D. She is operating under the impression that the PLU inmates on Facility B are not privy to these mandatory legal updates. She has them, will not issue them, and is trying to send them back to the publishers for a refund -- citing budgetary considerations. In an era of dead-line oriented litigation, this is simply unacceptable.

The class of inmates affected by the unconstitutional denial of meaningful access to the courts have no other alternative than to appeal this matter.

cc: Senior Librarian, S.C.E.P., Associate Warden (Fac. A&B), Warden, Litigation Coordinator, Prison Law Office, Senator Richard Polanco

*Exh. D5*

FACILITY _ PLUs:  GROUP APPELLANTS

| NAME | CDC Number | Cell Number |
|------|------------|-------------|
| 1.) Mr. Padgett | K-45050 | B-5 110 L |
| 2.) Woody | H43127 | B5 111 L |
| 3.) fennell | P29485 | B-5-201 |
| 4.) Grass | J-63078 | B-5-249 |
| 5.) Wynglarz | J-74845 | B5-119 |
| 5.) Brambila | H-48354 | B5-231U |
| 7.) Paul Han | P-50424 | B5-215 |
| 8.) Lopez | K-94513 | B5 121 |
| 9.) Tinsley | K04236 | B5-233 |
| 10.) Dey | | B5-229 |
| 11.) Salceda | J-90933 | B5-217 L |

Exh. D5

3⁵

State of California                                          Department of Corrections and Rehabilitation

# Memorandum

Date:   May 16, 2008

To:     All Concerned

Subject:   **LIBRARY OPERATIONS BEGINNING MAY 16, 2008**

Until further notice all libraries may be on restricted open days and hours depending on staff available, inmate clerks available and trained, and of course, the move from B to C Facility.

The primary library function until all issues are resolved in all libraries will be the law libraries. Seating is limited; Preferred Legal Users (PLU) will always be seated, others depending on the posted library capacity.

Recreation reading library will be closed on a yard by yard, day by day basis until there are sufficient inmate staff and operating days to handle the demand. If recreation library is able to open and then must be shut down the next operating day for reason, please deposit all due books in the outside drop box.

If you have questions, contact me at extension 5628.

M. HARTMAN
Senior Librarian

cc:  C. Ynson, SCEP
     Facility Captain's
     LTA's

State of California                                     Department of Corrections and Rehabilitation

# Memorandum

Date:      October 24, 2007

To:        ALL INMATE LAW LIBRARY USERS


Subject:   **SHEPARDIZING-EFFECTIVE OCTOBER 24, 2007**

Effective October 24, 2007, all inmate Law Library users who utilize Shepard's® for research of their respective cases, will submit the attached form "CVSP Inmate Request to Shepardize Case" (after completion) to the Library staff on duty or forward it to "Central Library-A Yard" within a U-Save-em envelope, to get the most recent information relevant to their research.

In keeping with the Department's reduction of printed material to one print library archive within the institution, all submitted Shepard's® research will be conducted at Central Library, all Shepard's® material located in the satellite libraries will no longer be updated.

All submitted "CVSP Inmate Request to Shepardize Case" forms received by Central Library will be researched, copies made of relevant material, logged, and returned to the requesting inmate via institutional mail. All requests will be researched in the Shepard's® hardbound editions, Cumulative® updates and Express® updates. All submitted forms will be afforded first priority over all other Central Library functions daily.

Up to four (4) Case Citations may be submitted per form. **In all instances the case citation must be filled in**, case name is helpful but not required (see example). The forms (and envelopes) are available at the law counter.

If you have any questions regarding this process, please contact the Library staff on duty.

M. HARTMAN
Senior Librarian


cc: K. Williams, Vice Principal, Academic Instruction
     Library Staff

State of California

Department of Corrections and Rehabilitation

# Memorandum

Date:      July 27, 2007

To:        All Concerned

Subject:   **LIBRARY SCHEDULE-JULY 30 THOUGH AUGUST 10, 2007**

The following are the library operating schedules from July 30, through August 10, 2007. All Libraries will be open between 0830 hours to yard recall (lunch) & afternoon yard release to 1515 hours unless otherwise noted:

### JULY 30 – AUGUST 3, 2007

|                    | MONDAY       | TUESDAY      | WEDNESDAY    | THURSDAY     | FRIDAY       |
|--------------------|--------------|--------------|--------------|--------------|--------------|
| CENTRAL LIBRARY    | OPEN PM only | OPEN PM only | OPEN PM only | OPEN PM only | OPEN PM only |
| A-LIBRARY          | OPEN AM only | OPEN         | CLOSED       | CLOSED       | CLOSED       |
| B-LIBRARY          | CLOSED       | OPEN AM only | OPEN         | CLOSED       | CLOSED       |
| C-LIBRARY          | OPEN         | CLOSED       | OPEN AM only | OPEN         | CLOSED       |
| D-LIBRARY          | CLOSED       | CLOSED       | CLOSED       | OPEN AM only | OPEN AM only |
| F-LIBRARY          | CLOSED       | CLOSED       | CLOSED       | CLOSED       | OPEN         |

### AUGUST 6 – AUGUST 10, 2007

|                    | MONDAY       | TUESDAY      | WEDNESDAY    | THURSDAY     | FRIDAY       |
|--------------------|--------------|--------------|--------------|--------------|--------------|
| CENTRAL LIBRARY    | OPEN PM only | OPEN PM only | OPEN PM only | OPEN PM only | OPEN PM only |
| A-LIBRARY          | OPEN         | OPEN AM only | CLOSED       | CLOSED       | CLOSED       |
| B-LIBRARY          | CLOSED       | OPEN         | OPEN AM only | CLOSED       | CLOSED       |
| C-LIBRARY          | OPEN AM only | CLOSED       | OPEN         | OPEN AM only | CLOSED       |
| D-LIBRARY          | CLOSED       | CLOSED       | CLOSED       | OPEN         | OPEN         |
| F-LIBRARY          | CLOSED       | CLOSED       | CLOSED       | CLOSED       | OPEN AM only |

The library may be closed for facility or institution lockdown, institutional emergency, state holiday, absence of staff, staff training, or any other reason approved by the Supervisor of Correctional Education Programs (SCEP) or institution administration.

M. HARTMAN
Senior Librarian

K. WILLIAMS
SAI

C. YNSON
SCEP

cc: Facility Captains
    Libraries

# Memorandum

Date.      April 2, 2007

To:        All Concerned

Subject:   **LIBRARY SCHEDULE**

The following is the library operating schedule as of April 5, 2007. All Libraries will be open between 0830 hours to yard recall (lunch) & afternoon yard release to 1530 hours (F-Library 1515 hours):

|           | MONDAY  | TUESDAY | WEDNESDAY | THURSDAY | FRIDAY   |
|-----------|---------|---------|-----------|----------|----------|
| A-LIBRARY | -OPEN-  | -OPEN-  | CLOSED    | CLOSED   | CLOSED   |
| B-LIBRARY | CLOSED  | -OPEN-  | -OPEN-    | CLOSED   | CLOSED   |
| C-LIBRARY | CLOSED  | CLOSED  | -OPEN-    | -OPEN-   | CLOSED   |
| D-LIBRARY | -OPEN-  | CLOSED  | CLOSED    | -OPEN-   | -OPEN-   |
| F-LIBRARY | CLOSED  | CLOSED  | CLOSED    | CLOSED   | -OPEN-   |

The library may be closed for facility or institution lockdown, institutional emergency, state holiday, absence of staff, staff training, or any other reason approved by the Supervisor of Correctional Education Programs (SCEP) or institution administration.

M. HARTMAN
Senior Librarian

K. WILLIAMS
SAI

C. YNSON
SCEP

cc: Facility Captains
    Libraries

State of California                                          Department of Corrections and Rehabilitation

# Memorandum

Date:      October 10, 2006

To:        All Concerned


Subject:   LIBRARY SCHEDULE

The following is the library operating schedule as of October 10, 2006. All Libraries will be open between 0830-1045 & 1200-1530 hours (OPEN* - 0830-1030 & 1330-1530 hours):

|            | MONDAY | TUESDAY | WEDNESDAY | THURSDAY | FRIDAY  |
|------------|--------|---------|-----------|----------|---------|
| A-LIBRARY  | OPEN   | OPEN*   | CLOSED    | CLOSED   | CLOSED  |
| B-LIBRARY  | CLOSED | OPEN    | CLOSED    | CLOSED   | OPEN*   |
| C-LIBRARY  | CLOSED | CLOSED  | OPEN      | OPEN*    | CLOSED  |
| D-LIBRARY  | CLOSED | CLOSED  | OPEN*     | OPEN     | CLOSED  |
| F-LIBRARY  | CLOSED | CLOSED  | CLOSED    | CLOSED   | OPEN    |

The library may be closed for facility or institution lockdown, institutional emergency, state holiday, absence of staff, staff training, or any other reason approved by the Supervisor of Correctional Education Programs (SCEP) or institution administration.


M. HARTMAN                           C. YNSON
Senior Librarian                     SCEP


cc:  Facility Captains
     Libraries


*Exh. D5*

State of California                                    Department of Corrections and Rehabilitation

# Memorandum

Date:    May 8, 2006

To:      All Concerned

Subject:    **LIBRARY SCHEDULE**

The following is the library operating schedule as of April 8, 2006. All Libraries will be open between 1200-1515 hours:

|            | MONDAY | TUESDAY | WEDNESDAY | THURSDAY | FRIDAY |
|------------|--------|---------|-----------|----------|--------|
| **A-LIBRARY** | OPEN   | CLOSED  | CLOSED    | CLOSED   | CLOSED |
| **B-LIBRARY** | CLOSED | OPEN    | CLOSED    | CLOSED   | CLOSED |
| **C-LIBRARY** | CLOSED | CLOSED  | OPEN      | CLOSED   | CLOSED |
| **D-LIBRARY** | CLOSED | CLOSED  | CLOSED    | OPEN     | CLOSED |
| **F-LIBRARY** | CLOSED | CLOSED  | CLOSED    | CLOSED   | OPEN   |

The library may be closed for facility or institution lockdown, institutional emergency, state holiday, absence of staff, staff training, or any other reason approved by the Supervisor of Correctional Education Programs (SCEP) or institution administration.

If you have questions, contact me at extension 5628.

M. HARTMAN
Senior Librarian

APPROVED/DISAPPROVED                          APPROVED/DISAPPROVED

R. DAVIS                                      C. YNSON
SVI                                           SCEP

## LAW BOOK & INFORMATION REQUEST

**Requestor's Information**

NAME: _Salcedo_

CDC Number: _J-90933_

Yard/Dorm/Bed #: _83-260Low_

Date Requested: _7-1-05_

### INFORMATION OR CASE CITATION DATA

List Complete Citation Information:

| Example: Name Of Case | Volume | Book | Topic Example: Crime, Law, Drugs | Page |
|---|---|---|---|---|
| Smith vs. Taylor | 43 | Federal Supplement 3d | Search, Trial, Etc. | 143 |

INFORMATION: List all known facts regarding Subject in spaces 1-4 below

| Name Of Case* | Volume | Book | Topic | Page |
|---|---|---|---|---|
| 1. Daniels v. U.S. | 149 | L.Ed 2d Habeas | | 590 |
| 2. Dist. Att. v. Coss | 144 | L.Ed 2d Habeas | | 608 |
| 3. | | Received Edwards Schick 7-6-05 | | |
| 4. | | | | |

**\*If you do not fill out the proper Case Name your request can not be properly filled!**

IF YOU DO NOT FILL OUT THIS PART OUT CORRECTLY, YOUR REQUEST WILL NOT BE FILLED. BE SURE TO WRITE OUT ALL THE INFORMATION REQUESTED) (Use Back Of This Form If More Space Is Needed)

### LIBRARY STAFF USE ONLY

Date Received: _7-1-05_      Dated Returned: _Complete 7-25-05_

Comments:

**LIBRARY STAFF SIGNATURES REQUIRED**

Library Technical Assistant | Senior Librarian

### FOR INMATE USE ONLY

☑ Do you wish your request to be forwarded to Mountain Valley System if not found in CVSP Library.
(If the above listed box is not checked, your request will not be forwarded)

2005

Exh. D5

---

## LAW BOOK & INFORMATION REQUEST

**Requestor's Information**

NAME: _Salcedo_

CDC Number: _J-90933_

Yard/Dorm/Bed #: _83-260L_

Date Requested: _6-29-05_

### INFORMATION OR CASE CITATION DATA

List Complete Citation Information:

| Example: Name Of Case | Volume | Book | Topic Example: Crime, Law, Drugs | Page |
|---|---|---|---|---|
| Smith vs. Taylor | 43 | Federal Supplement 3d | Search, Trial, Etc. | 143 |

INFORMATION: List all known facts regarding Subject in spaces 1-4 below

| Name Of Case* | Volume | Book | Topic | Page |
|---|---|---|---|---|
| 1. In Re Steel | 10 | Cal.Rpt 3d Habeas | | 536 |
| 2. | | | | |
| 3. | | | | |
| 4. | | | | |

**\*If you do not fill out the proper Case Name your request can not be properly filled!**

IF YOU DO NOT FILL OUT THIS PART OUT CORRECTLY, YOUR REQUEST WILL NOT BE FILLED. BE SURE TO WRITE OUT ALL THE INFORMATION REQUESTED) (Use Back Of This Form If More Space Is Needed)

### LIBRARY STAFF USE ONLY

Date Received:      Dated Returned:

Comments:

**LIBRARY STAFF SIGNATURES REQUIRED**

Library Technical Assistant | Senior Librarian

### FOR INMATE USE ONLY

☑ Do you wish your request to be forwarded to Mountain Valley System if not found in CVSP Library.
(If the above listed box is not checked, your request will not be forwarded)

2005

Exh. D5

## LAW BOOK & INFORMATION REQUEST

*Requestor's Information*

NAME: Saleem

CDC Number: J-90933

Yard/Dorm/Bed #: B3-260 Low

Date Requested: 6-14-05

### INFORMATION OR CASE CITATION DATA

List Complete Citation Information:

| Example: Name Of Case Smith vs. Taylor | Volume 43 | Book Federal Supplement 3d | Topic Example: Crime, Law, Drugs Search, Trial, Etc. | Page 143 |
|---|---|---|---|---|

INFORMATION: List all known facts regarding Subject in spaces 1-4 below

| Name Of Case* | Volume | Book | Topic | Page |
|---|---|---|---|---|
| 1. In re Dixon | 41 (Cal) | Cal. 2d | Habeas Corpus | 756 |
| 2. In re Lindley | 29 (117) | Cal. 2d | Habeas Corpus | 709 |
| 3. | | | | |
| 4. | | | Received 7-13-05 Rhonda Schacht | |

\* If you do not fill out this part out correctly, your request can not be properly filled!

IF YOU DO NOT FILL OUT THIS PART OUT CORRECTLY, YOUR REQUEST WILL NOT BE FILLED. BE SURE TO WRITE OUT ALL THE INFORMATION REQUESTED! (Use Back Of This Form If More Space Is Needed)

### LIBRARY STAFF USE ONLY

Date Received 6-20-05          Dated Returned

Comments: Sent to 6" Prout Mk V 6-22-05
           Sent to 6" Library 7-12-05 Rhonda

### LIBRARY STAFF SIGNATURES REQUIRED

_____     _____
Library Technical Assistant        Senior Librarian

### FOR INMATE USE ONLY

☒ Do you wish your request to be forwarded to Mountain Valley System if not found in CVSP Library. (If the above listed box is not checked, your request will not be forwarded)

2005

Exh. D5

---

## LAW BOOK & INFORMATION REQUEST

*Requestor's Information*

NAME: Saleem

CDC Number: J-90933

Yard/Dorm/Bed #: B Yard B3 260 Low

Date Requested: 6-20-05

### INFORMATION OR CASE CITATION DATA   J-90933

List Complete Citation Information:     Received 7-13-05 Rhonda Schacht

| Example: Name Of Case Smith vs. Taylor | Volume 43 | Book Federal Supplement 3d | Topic Example: Crime, Law, Drugs Search, Trial, Etc. | Page 143 |
|---|---|---|---|---|

INFORMATION: List all known facts regarding Subject in spaces 1-4 below

| Name Of Case* | Volume | Book | Topic | Page |
|---|---|---|---|---|
| 1. | (4) | Cal. Rptr. 3d Habeas | | 816 |
| 2. | (2) | Cal. Rptr. 3d Habeas | | 854 |
| 3. | 7 | Cal. Rptr. 3d Habeas | | 159 |
| 4. In re Horowitz | (33) | Cal. 2d | | 534 |

\* If you do not fill out this part out correctly, your request can not be properly filled!

IF YOU DO NOT FILL OUT THIS PART OUT CORRECTLY, YOUR REQUEST WILL NOT BE FILLED. BE SURE TO WRITE OUT ALL THE INFORMATION REQUESTED! (Use Back Of This Form If More Space Is Needed)

### LIBRARY STAFF USE ONLY

Date Received 6-20-05          Dated Returned

Comments: Sent to 6" Prout Mk V 6-22-05
           B3 Area all             Sent to 6" Library 7-12-05 Rhonda

### LIBRARY STAFF SIGNATURES REQUIRED

_____     _____
Library Technical Assistant        Senior Librarian

### FOR INMATE USE ONLY

☒ Do you wish your request to be forwarded to Mountain Valley System if not found in CVSP Library. (If the above listed box is not checked, your request will not be forwarded)

2005

Exh. D5

Mr. Hartman, r/m Salceda requests to return his request for library time and the attachments.

From: Bravo Library

Date: November 30, 2005

TO WHOM IT MAY CONCERN

In the months of October and November 2005 Inmate Salceda J-90933 has utilized B Library 7 times on the following dates:

10-12-05,    1½ hours   varified (as) 12-5-05.
10-14-05,    3 hours    "
10-24-05,    2 hours    "
10-31-05,    3 hours    "
11-2-05,     1 hour     "
11-16-05,    1½ hours   "
11-18-05,    1 hour.    "
11-30-05,    2 hours    "

There are 10 seats to accommodate library inmate users on B yard.

From September through November 2005 the 2 type writer have been removed from B yard library. It is unclear when or if the type-writers will be returned.

Library Staff

Exh, D5

State of California

Department of Corrections

# Memorandum

Date : January 20, 2005

To : J. M. Cortez
Chief Deputy Warden (A)

Subject: INMATE ACCESS TO THE LAW LIBRARY

In an effort to continue to provide adequate inmate access to the Law Library during the second watch programs on "C" Facility, it is necessary to make an adjustment to the existing memorandum currently in use to provide services to inmates with verified court deadlines, dated November 29, 2004, and approved by J. M. Cortez, A.W. Complex II.

The Senior Librarian or Library Technical Assistant will verify court deadlines. Once the court deadline is verified, the Senior Librarian or Library Technical Assistant will provide a ducat list to the "C" Facility Program Services office, the program office will generate a priority ducat list for the "C" Facility Library during library operating hours.

As additional library staff are in place, we plan to implement this system on all yards, until that time Mr. Cortez memorandum dated November 29, 2004 will remain in effect for all other Facility Library operations.

N. D. KRAFT
Supervisor of Correctional Education Programs (A)
Chuckawalla Valley Adult School

APPROVED/DISAPPROVED

J. M. CORTEZ
Chief Deputy Warden (A)

Attachment:  Proposed (temporary) Law Library Access

CDC 1617 (3/89)
COLibrary/HartmanLaw Access.doc

*Exh. D5*

---

## Library Schedule
### 1/31/05 to 2/11/05

| Monday's: | Tuesday's: |
|---|---|
| "A" Library – Mr. Hartman<br>Sr. Librarian | Central Library – Mr. Hartman<br>Sr. Librarian |
| Wednesday's: | Monday-Friday: |
| "D" Library – Staff | "C" Library – Ms. Chavez, LTA |
| Friday's: | Friday's: |
| "F" Library – Mr. Hartman<br>Sr. Librarian | "B" Library –Staff |

Revised: 1/25/05

N. D. Kraft

N. D. KRAFT
Supervisor of Correctional Education Programs (A)

*Exh. D5*

State of California

Department of Corrections

# Memorandum

Date : November 29, 2004

To : Facility Captains

Subject : *PROPOSED (TEMPORARY) LAW LIBRARY ACCESS*

In able to prioritize library services to inmates with court deadlines who, are programming during 2nd Watch, we will implement the following system. This system will remain in effect until further notice.

The Facility Captain or his designee will verify court deadlines. Once the court deadline has beenverified, the Program Services office will create a priority ducat list for the day the Facility Library is scheduled to be open. The ducat list is then to be signed and routed by the Facility Captain or his designee.

If you have any questions or concerns please contact D. Kraft, SCEP (A) at 5602.

N.D. KRAFT
Supervisor of Correctional Education Programs (A)

~~APPROVED~~/DISAPPROVED

J. M. CORTEZ
A. W. Complex II

CDC 1617 (3/89)

| Library Schedule<br>12/20/04 to 12/30/04 | |
|---|---|
| **Monday 12/20/04:** | **Monday 12/20/04:** |
| "A" Library – Mr. Hartman<br>Sr. Librarian | "D" Library – Ms. Davis, SVI |
| **Tuesday 12/21/04:** | **Wednesday 12/22/04:** |
| "B" Library – Ms. Williams, SAI | "C" Library – Mr. Kraft, SCEP (A) |
| **Thursday 12/23/04:** | |
| "F" Library – Ms. Williams, SAI | |
| **Monday 12/27/04:** | **Monday 12/27/04:** |
| "A" Library – Mr. Hartman<br>Sr. Librarian | "D" Library – Ms. Davis, SVI |
| **Tuesday 12/28/04:** | **Tuesday 12/28/04:** |
| "B" Library – Ms. Williams, SAI | "C" Library – Mr. Kraft, SCEP (A) |
| **Thursday 12/30/04:** | |
| "F" Library – Mr. Hartman<br>Sr. Librarian | |

Revised: 12/13/04

N. D. Kraft
SCEP (A)

Exh. D5

Exh. D5

State of California

Department of Corrections

# Memorandum

Date :    December 19, 2003

To    :    ALL LIBRARY STAFF
Chuckawalla Valley Adult School
CVSP

Subject    LAW LIBRARY OPERATIONS

Chuckawalla Valley Adult School is faced with a critical shortage of library staff. Currently, there are only two people to operate six library sites. This is a memorandum to the Librarians to begin their library operations with the primary focus of servicing those inmates with legal mandates. The recreation libraries will closed until which time more staff is available.

If you have any questions, please contact me at extension 5602.

V. Kahle
Supervisor of Correctional Education Programs
CVSP

*Exhibit D 5*

State of California

California Department of Corrections and Rehabilitation

# Memorandum

Date:    November 8, 2006

To    :    All Inmates

Subject:    **VIRAL GASTROENTERITIS**

Recently there has been an unusual increase in the number of inmates exhibiting the signs of Viral Gastroenteritis.  Viral Gastroenteritis is a temporary illness lasting approximately 24 to 48 hours.

The symptoms of Viral Gastroenteritis are nausea, vomiting, diarrhea and/or abdominal cramps.

Individuals experiencing the symptoms of Viral Gastroenteritis must increase fluids to remain hydrated, and treat the symptoms with over the counter medications.

Thorough and continuous hand washing, along with good hygiene are key elements in the prevention of spreading the virus.

If symptoms persist beyond 48 hours it is recommended medical intervention be obtained.

J. F. SALAZAR
Warden (A)
Chuckwalla Valley State Prison

_Ex._

* CDC 1617 (3/89)

# PROGRAM STATUS REPORT
## PART B – PLAN OF OPERATION / STAFF & INMATE NOTIFICATION

| INSTITUTION | EFFECTIVE DATE OF PLAN | PROGRAM STATUS NUMBER: |
|---|---|---|
| CVSP | 11/21/06  22, 23 | CVP-COC-06-0020 |

| ☐ NORMAL PROGRAM | ☒ MODIFIED PROGRAM | ☐ LOCKDOWN | ☐ STATE OF EMERGENCY |
|---|---|---|---|
| | ☐ INITIAL | ☒ UPDATE | ☐ CLOSURE |

### RELATED INFORMATION (CHECK ALL THAT APPLY)

| AREA AFFECTED | INMATES AFFECTED | REASON |
|---|---|---|
| ☒ INSTITUTION | ☒ ALL | ☐ BATTERY |
| ☐ FACILITY: _____ | ☐ BLACK | ☐ DEATH |
| ☐ HOUSING UNIT: _____ | ☐ WHITE | ☐ RIOT / DISTURBANCE |
| ☐ VOCATION: _____ | ☐ HISPANIC | ☐ GROUPING |
| ☐ EDUCATION: _____ | ☐ OTHER | ☒ OTHER: VIRAL_GASTROENTERITIS |
| ☐ OTHER: _____ | ☐ _____ | |

| MOVEMENT | WORKERS | DAYROOM |
|---|---|---|
| ☐ NORMAL | ☒ CRITICAL WORKERS ONLY | ☒ NORMAL |
| ☐ ESCORT ALL MOVEMENT | ☒ CULINARY | ☐ NO DAYROOM ACTIVITIES |
| ☐ UNCLOTHED BODY SEARCH PRIOR TO ESCORT | ☒ CLERKS | ☐ MODIFIED: |
| ☒ CONTROLLED MOVEMENT – one building at a time | ☐ VOCATION/EDUCATION – Identified inmates on the Critical Worker's List | RECREATION |
| ☐ OTHER: _____ | ☒ CANTEEN | ☐ NORMAL |
| | ☒ CLOTHING ROOM – Identified workers on the Critical Worker's List | ☐ NO RECREATIONAL ACTIVITIES |
| _____ | ☐ RESTRICTED WORK PROGRAM | ☒ MODIFIED: One Housing Unit at a time. One hour at a time. |
| FEEDING | ☒ PORTERS | |
| ☐ NORMAL | ☐ NO INMATE WORKERS | CANTEEN |
| ☐ CELL FEEDING | SHOWERS | ☐ NORMAL |
| ☒ CONTROLLED FEEDING IN DINING ROOM | ☒ NORMAL | ☐ NO CANTEEN |
| ☒ HOUSING UNIT/DORM AT A TIME (Dining Hall to be cleaned between each dorm). | ☐ ESCORTED | ☒ MODIFIED: _One Housing Unit at a time. |
| ☐ DORM POD AT A TIME | ☐ ONE INMATE PER SHOWER – OWN TIER | |
| ☐ TIER AT A TIME | ☐ CELL PARTNERS TOGETHER – OWN TIER | PACKAGES |
| ☐ HOUSING UNIT SECTION AT A TIME | ☐ DORM SHOWERING BY GROUP | ☐ NORMAL |
| ☐ SACK MEAL BREAKFAST | ☐ CRITICAL WORKERS ONLY | ☐ NO PACKAGES |
| ☐ SACK MEAL LUNCH | ☐ NO SHOWERS | ☒ MODIFIED: Second and Third Watch. One Housing Unit at a time. Facility A will be processed on the yard. |
| ☐ SACK MEAL DINNER | | |
| DUCATS | MEDICAL | PHONE CALLS |
| ☐ ALL DUCATS HONORED | ☐ NORMAL MEDICAL PROGRAM | ☒ NORMAL |
| ☒ MEDICAL DUCATS ONLY | ☒ PRIORITY DUCATS ONLY | ☐ NO PHONE CALLS  Ex. |
| ☐ CLASSIFICATION DUCATS | ☐ MTA CONDUCT ROUNDS IN UNITS | ☐ MODIFIED: |
| ☐ PRIORITY DUCATS ONLY | ☐ INMATES ESCORTED TO SICK CALL | |
| VISITING | ☐ EMERGENCY MEDICAL ONLY | RELIGIOUS SERVICES |
| ☐ NORMAL VISITING | ☐ OTHER: _____ | ☐ NORMAL |
| ☐ NON-CONTACT ONLY | | ☒ NO RELIGIOUS SERVICES |
| ☒ NO VISITING – No Family Visiting | LEGAL LIBRARY | ☐ MODIFIED: |
| ☐ OTHER: | ☐ NORMAL | |
| _____ | ☒ APPROVED COURT DEADLINES | |

### REMARKS:
The Program Modification initiated on Thursday, November 9, 2006, was reviewed by CVSP Administrative and Medical Staff on Monday, November 20, 2006. All Facilities will remain on a Modified Program. The feeding and yard program will continue to be one Housing Unit at a time. The dining hall will be cleaned between each Housing Unit. R&R will continue delivery of packages to inmates. Yard Canteen and Laundry will provide services for the Housing Unit on the yard at the time. Work Crew #24 will be released to clean the out grounds. Administrative Staff will evaluate the status of the institution on Wednesday, November 22, 2006.

PREPARED BY:

*Bldg. D-10*

State of California                                California Department of Corrections and Rehabilitation

# Memorandum

Date:    March 3, 2008

To    :    All Inmates

Subject:    **FLU**

Recently there has been an unusual increase in the number of inmates exhibiting the signs of the flu.    The flu is a temporary illness lasting approximately 24 to 48 hours.

The symptoms of the flu are nausea, vomiting, fever, coughing and/or headaches.

Individuals experiencing the symptoms of the flu must increase fluids to remain hydrated, and treat the symptoms with over the counter medications.

Thorough and continuous hand washing, along with good hygiene are key elements in the prevention of spreading the flu.

If symptoms persist beyond 48 hours, medical intervention is recommended.

J. F. SALAZAR
Warden
Chuckwalla Valley State Prison

# Memorandum

Date    :    March 10, 2008

To    :    ALL CVSP INMATES

Subject:    INFLUENZA VACCINE

The medical staff at Chuckawalla Valley State Prison will be conducting a Flu Vaccine (FLU SHOT) Clinic tomorrow March 11, 2008 after breakfast.  We will be offering the FLU Vaccine to all inmates.

Attached you will find:

> Influenza Vaccine Fact Sheet
> Influenza Vaccine Consent Form

**Please read the attached literature and sign the consent indicating whether you are interested in receiving or declining the vaccine.**

The medical staff will be available to answer any questions you should have during the Flu Clinic.

R. ANG MD
Chief Physician and Surgeon
Chuckawalla Valley State Prison

## **Exhibits**

E – E56        These Correspondence Letters are between Petitioner and the Courts, Defense Attorneys, District Attorneys, State Bar, Police Department, California Innocence Project, Department of Justice, and Locating Witnesses

These Correspondence Letters are from 3-17-96 to present day, 3-30-08

**Note:** Petitioner has over one hundred (100) letters pertaining to the instant kidnap case and also of prior conviction cases. Petitioner herein submits 56 letters, half (½) size due to bulkiness.

E

**Handy Horiye**
Attorney At Law

2420 University Avenue
San Diego, California 92104
(619) 584-1523

March 7, 1996

Mr. Leo Salceda
J-90933
480 Alta Road
San Diego, CA 92179

Dear Mr. Salceda,

I have just been appointed to represent you in your criminal appeal. I do not have the transcripts yet so I do not know what issues can be raised in the appeal, although I believe there are some Three Strikes issues. After I have read the transcripts, I plan to talk to your trial attorney.

The appeal is slow and make take over a year. There are only a few steps in the appeal. For these reasons, I will not write to you often. Please write whenever you have any questions or comments. Please remember that any issue raised in the appeal must be based on the record. That is, it must be something that occurred in court or was brought to the attention of the judge and was reported. If you write about issues, please write soon so I will be able to consider them for the opening brief.

Please do not discuss the offenses involved in the case with anyone, especially other inmates. Anything you say can be used against you if there is a retrial. Thank you.

Sincerely,

Handy Horiye

gather

**Handy Horiye**
Attorney At Law

2420 University Avenue
San Diego, California 92104
(619) 584-1523

*[Handwritten notations, top right:]*

```
7:30 A.M. (3)   36 oz.
12:00 P.M. (1)  16 oz.
12:30 P.M (1)   40 oz.
1:30 P.M ()     16 oz.
2:00 P.M. (1)   16 oz.
2:30 P.M (1)    16 oz.
4:30 P.M (3)    36 oz.
                _____
                176.07

ARPS. 5:10    14.8. Hours
              hw 1000.
```

August 26, 1997

Mr. Leo Salceda
J90933
44750 60th Street West
Lancaster, CA 93535

Dear Mr. Salceda,

I have again been appointed to handle your criminal appeal. I was sorry to hear you did not get any benefit from your resentencing. I do not have the record yet so I do not know what issues we can raise in the appeal. On resentencing, the number of issues are very limited. After I read the record, I plan to talk to trial counsel.

As you know the appeal is slow and may take a year. I will not write you often. Please write whenever you have any questions or comments. If you write about issues, please write soon so I can consider the issues for the appeal. Remember that the issues must be based on the record.

Although this appeal is involved only with sentencing, please do not talk to anyone about the offenses in this case, especially to other inmates. Anything you say can be used against you. Thank you.

Sincerely,

Handy Horiye

**Handy Horiye**
Attorney At Law

2420 University Avenue
San Diego, California 92104
(619) 584-1523

March 26, 1998

Mr. Leovardo Salceda
J-90933   D4-202
44750 60th Street West
Lancaster, CA 935367

Dear Mr. Salceda,

By now you should have received the opinion of the Court
of Appeal directly from the court.  The Court rejected our
issues except for prison credits.  There is nothing else I
can do for you and I do not intend to pursue your case any
further.  I am sending you an information sheet in case you
want to file a petition for review.  I do not believe a
petition would be granted.  Otherwise, I would file one for
you.

I still have your transcripts.  I will send them to you
when the appeal is over in about 2 months.  You do not need
the transcripts to file a petition for review.  You can use
the facts and issue raised in the briefs I sent you.  Good
luck.

Sincerely,

Handy Horiye

encl. 1

B 6

Handy Horiye
Attorney At Law
2420 University Avenue
San Diego, California 92104
(619) 584-1523

March 26, 1998

Mr. Leovardo Salceda
J-90933  D4-202
44750 60th Street West
Lancaster, CA 935367

Dear Mr. Salceda,

By now you should have received the opinion of the Court of Appeal directly from the court. The court rejected our issues except for prison credits. There is nothing else I can do for you and I do not intend to pursue your case any further. I am sending you an information sheet in case you want to file a petition for review. I do not believe a petition would be granted. Otherwise, I would file one for you.

I still have your transcripts. I will send them to you when the appeal is over in about 2 months. You do not need the transcripts to file a petition for review. You can use the facts and issue raised in the briefs I sent you. Good luck.

Sincerely,
Handy Horiye

encl. 1

---

Leovard Salceda, # J - 90933
California State Prison, Lancaster
44750 "60th" Street West
Lancaster, California 93536

In Pro Per

CALIFORNIA SUPREME COURT

THE PEOPLE OF THE STATE
OF CALIFORNIA,

    Plaintiff,

v.

LEOVARDO SALCEDA,

    Defendant.

No. D 025258

REQUEST FOR ORDER
EXTENDING TIME
TO FILE PETITION FOR
REVIEW

To the Chief Justice, I, LEOVARDO SALCEDA, request an extention of 30 days to and including January 3, 1997 to file my petition for review.

This motion is based on appellant not having enough time to prepare for formulation of my petition for review in the CALIFORNIA SUPREME COURT.

My appeal attorney dropped my case, and I am a layman of the law.

I was not aware of the California Rules of Court. Petitioner respectfully asks that the court grant an extention of 30 days to allow preperation of the petition.

Respectfully submitted,

Leovardo Salceda,
Petitioner in Pro Per.

Leonardo Salceda J-90933
D5/217 60th Street West
44750 60th Street West
Lancaster, Ca. 93536

December 20, 1999

Mr. Daniel Mangarin
110 West C Street, Ste. 1100
San Diego, Ca. 92101

Re: Case No. SCD 112436

Dear Mr. Mangarin,

I would like to ask if you can please send me any
and all my legal papers. The trial transcripts so
that I can help myself in my Habeas corpus.
I would appreciate it very much. Thank you sir.

Respectfully,
Leonardo Salceda

Ex.

---

LEONARDO SALCEDA #J-90933
D5-215 Low
44750 "60TH" STREET WEST
LANCASTER, CA. 93536

OCTOBER 5, 1998

SUPERIOR COURT OF CALIFORNIA
220 W. BROADWAY
SAN DIEGO, CA. 92101

DEAR CLERK OF THE COURT,

I AM TRYING TO GET ALL OF MY READS FOR MY CASE
IN 1989. CASE #CRN5783. POLICE REPORTS, PRELIMINARY
HEARING TRANSCRIPTS, REPORTERS TRANSCRIPTS, AND ANY
AND ALL OTHER LEGAL PAPERS IN MY CASE. FROM
BEGINNING OF MY CASE TO SENTENCING. I AM TRY
TO HELP MYSELF FILE A HABERS CORPUS AND NEED ALL
COURT RECORDS AND DOCUMENTS TO PROVE MY CLAIMS.

ENCLOSED IS A SELF ADDRESSED STAMPED ENVELOPE
IF YOU CAN PLEASE RESPOND. THANK YOU VERY MUCH
FOR YOUR TIME AND CONCERN IN THIS MATTER.

RESPECTFULLY
Leonardo Salceda

Ex.

RECEIVED

MAY 5 1 2000

Leobardo Salcedo J-90933
D5/217
44750 60th Street West
Lancaster, Ca. 93536

May 24, 2000

Mr. Kenneth E. Martone
Clerk of the Superior Court
220 W. Broadway
San Diego, Ca. 92101

ATTN: RECORDS SPECIALIST

Re: Case No. CR105783

In 1989 I had a trial court in the above mentioned case. What I would like to request is any and all paper work leading up to my court trial. The court reporter's transcripts, clerk's transcripts, the indictment, information, or accusation with any amendments, and demurrer, any motion by the defense attorney and the district attorney with supporting and opposing memoranda and affidavits, all minutes of the court relating to the action, the verdict, the judgment, abstract of judgment-commitment, all written communications, formal or informal between the defense attorney and the district attorney, police reports, arraignement in the municipal court, superior court, preliminary examination, probation officers report, any oral proceedings taken on the trial of the cause, and proceedings at the time of sentencing.

I do not have reliable family or friends who will assist me in trying to help me get my record in the above mentioned case. Currently I am incarcerated at Lancaster Prison. In doing some research I learned in California Rules of Court (State) I could write a written request to the Records Specialist where my case was heard. I am indigent, however I do have a self supporting job in the prison, where I get paid about $16.00 (sixteen dollars) a month, and I can help myself pay for my legal papers if I need to. I have enclosed a stamped self addressed envelope for you convenience if you could please respond to this letter.

Thank you very much for your time and concern in this matter it is greatly appreciated.

Sincerely,

*[signature]* July 24, 2000

cc: L.S.

*41 pages to Superior Case fees*

*Ex*

---

March 17, 2000

Mr. Leobardo Salcedo
J-90933 D5/217
44750 60th Street West
Lancaster, CA 93536

Dear Mr. Salcedo,

I received your letter dated March 14, 2000. I do not have any legal documents that would be helpful to you. You had two appeals. One appeal was from the conviction. On appeal, the court remanded for a new sentencing hearing. You appealed from the resentencing. This was the second appeal.

After the first appeal and you were going to be resentenced, I sent all the material to your trial attorney. I sent them to Daniel Mangarin, Alternate Deputy Public Defender, 110 West C Street, Ste. 1100. After the second appeal, I sent you the transcripts in that appeal. They were two short transcripts.

I do not have any documents that you mentioned. I gathered by the envelope you enclosed, you did not expect much material. Good luck.

Sincerely,

Handy Horiye

*Ex*

Leovardo Salceda J-90933
D5/217
44750 60th Street West
Lanaster, Ca. 93536

May 31, 2000

Mr. Daniel Mangarin
Alternate Public Defenders Office
110 West "C" Street Suite 1100
San Diego, Ca. 92101

Re: Case No. SCD 112436

Dear Mr. Mangarin,

I have written you respectfully requesting if you could please send me any and all my transcripts in my trial motions, arrest reports, everything that is my files in your office, if you can not send me the original's can you please send me copies.

The next step is a writ of mandate, letters to the bar association, to the trial court. Would you please send me my transcripts and everything else in my case mentioned above.

I will wait another two weeks for at least a response. Thank you very much for you time and concern in this matter.

Leovardo Salceda.    May 31, 2000

cc. L.S.

*Ex.*

---

Leovardo Salceda J-90933
D5/217 60th ST WEST
Lancaster, Ca. 93536

May 15, 2000

Mr. Daniel J. Mangarin
110 West C Street, Suite 1100
San Diego, Ca. 92101

Re: Case No. SCD 112436 (1995)
and Court of Appeal #4th App. Dist, Div. 1
Case No. SO050258 and SO29086
and Case No. CR105783 (1989)
Case No. CR104332 (1993)

Dear Mr. Mangarin,

Several months ago I sent you a letter requesting all my transcripts, police reports, arrest reports, motions filed in my case Case No. SCD 112436, and all work pertinent in my case.

And if you could please help me get all my transcripts, police reports, arrest trial transcripts on case no. CR 105783 (1989) sentencing transcripts, commitment orders etc. I also have Case No. CR 104380 that I would like to ask you if you could also help me get all work pertinent, arrest reports, commitment orders, abstracts of judgment etc.

Thank you very much for your time and concern in these matters.

Respectfully,
Leovardo Salceda

*Ex.*

Leovardo Salceda J-90933
05/217
44750 60th Street West
Lancaster, Ca. 93536

May 25, 2000

A. Gerba
Clerk of the Court
220 W. Broadway
San Diego, Ca. 92101

Re: Case No. SCD 112436

Dear A. Gerba,

In 1995, I had a jury trial in the court room of the Honorable Judge Amos. I would like to respectfully request the trial transcripts in the above mentioned case. I do not have any of my trial transcripts in this case. And then when I was sentenced in this case, I was sent to prison. On appeal I was sent back before the Honorable Judge Amos for consideration in a sentence reduction. I also would like to respectfully request the transcripts in these court proceedings. The same case.

If it is possible could you please send me all of the court reporters transcripts, clerk's transcripts, the indictment, information, or accusation with any amendments, and demurrer, and motion by the defense attorney's and the district attorney's with supporting and opposing memoranda and affidavits, all minutes of the court relating to the action, the verdict, the judgment, abstract of judgment-commitment, all written communications, formal or informal between the defense attorney and the district attorney, police reports, arrianment in the minicipal court, superior court, preliminary hearing, any oral proceeding taken on the trial of the cause, proceedings at the time of sentencing, all written instructions given or refused indicating on each instruction the party requesting it, motions by the defendant, all written or oral communication, formal or informal, between the court and the jury or any individual jurors, and proceedings on voir dire examinations, and any other legal papers pertaining to my case.

I have made verious attempts with my trial attorney, Mr. Daniel Magarin, and my appellate attorney, Mr. Handy Hority, respectfully asking them to please send my legal paper work "any and all" pertaining to my case. I have not received my paper work.

I have a self supporting job in the prison. I get paid about $16.00 (sixteen dolars) a month, so if I need to buy my legal paper work in my

( A )

case I will. Aside from this I am indigent. I have enclosed a stamped self addressed envelope if you could please respond to this letter.

Thank you very much for your time and any consideration you render on this matter its greatly appreciated.

Leovardo Salceda May 25, 2000

Leovardo Salceda.

cc: L.S.

Ex.

Ex.

*THE SUPERIOR COURT*
San Diego Judicial District
County Courthouse
330 West Broadway
San Diego, California 92101-3877
(619) 685-6145

Judge
E. Mac Amos

Clerk
Andrea Gerba

June 7, 2000

TO:     Leovardo Salceda J-90933
        D5/217
        44750 60th St. W.
        Lancaster, Ca. 93536

FROM:   Andrea Gerba, Deputy Clerk
        Dept. 70

RE:     Peo. v. Leovardo Salceda

        The Court is in receipt of your letter dated May 25, 2000 requesting
documents in regards to your case. However, the Court requires that the counsel
who has been representing you in this case must make the request.

        You may wish to make another attempt to contact your trial attorney
Daniel Mangarin or the appellate attorney, Handy Horiye. The Court will forward a
copy of this letter and your letter dated May 25, 2000 to both counsel on your
behalf.

Sincerely,

Andrea Gerba
Deputy Clerk
San Diego Superior Court

Cc:  Handy Horiye
     Appellate Defenders
     Daniel Mangarin

---

Ex.

County of San Diego

TIMOTHY A. CHANDLER
ALTERNATE PUBLIC DEFENDER

DANIEL J MANGARIN
CHIEF DEPUTY

SANDRA K. HUFF
CHIEF INVESTIGATOR

DEPARTMENT OF THE ALTERNATE PUBLIC DEFENDER
110 West "C" Street, Suite 1100, San Diego, CA 92101-3907
(619) 236-2523 FAX (619) 237-9247

July 28, 2000

Leovardo Salceda
D5/217
44750 60th St. W.
Lancaster, California 93536

Re:  People v. Leovardo Salceda

Dear Leo,

I am sending the final transcripts which I received from your Appellate Attorney,
Handy Horiye.

Hope things are going well for you. Take care.

Sincerely,

Daniel J. Mangarin
Chief Trial Deputy

Enclosure
DJM/ssb

Ex.

Leovardo Salceda # J-90933
D5/217
44750 60th Street West

March 14, 2000

Mr. William Youmans
Public Defender
233 "A" Street
San Diego, Ca. 92101

Dear Mr. Youmans,

Re: Case No. CR105783 (Superior Court 1989, Court Trial)
DA 86262101
F 122969

I respectfully would like to ask if you could please send me copies of
"any and all" legal documents pertaining to my previous case mentioned
above. You were my lawyer.

Case No. CR105783 (Court Trial)
    date of arrest, July 3, 1989
    date of conviction, October 2, 1989
    date of sentencing, November 2, 1989
    Honorable Judge Mudd, department 034
    District Attorney, L. Aragon
    Defense Attorney, Mr. Youmans

The Reporters and Clerk's transcripts of all proceedings for the date of
arrest until sentencing and everything inbetween. Typewritten
transcripts of all court appearences leading up to trial, typewritten
transcripts of trial, typewritten transcripts to consist of minute
orders, abstract of judgement, commitment order, etc., points and
authorities and declarations, motions by the district attorney, motions
by you, and motions by the court.

Unfortunately Mr. Youmans I am indigent and unable to buy my court
records. I have enclosed a stamped self addressed envelope for your
convenience. Thank you very much for your time and concern in this
matter, it is greatly appreciated.

Leovardo Salceda.

---

County of San Diego
DEPARTMENT OF THE PUBLIC DEFENDER
STEVEN J. CARROLL
PUBLIC DEFENDER

CENTRAL OFFICE
233 "A" Street, Suite 400
San Diego, CA 92101-4009
(619)338-4700
FAX (619)338-4811

NORTH COUNTY BRANCH
400 S. Melrose Drive, Suite 200
Vista, CA 92083-6627
(760) 643-0200
FAX (760) 726-1308

SOUTHEAST BRANCH
785 Third Avenue, Suite 100
Chula Vista, CA 91910-5642
(619) 498-2001
FAX (619) 498-2036

EAST COUNTY BRANCH
250 E. Main Street, Suite 88
El Cajon, CA 92020-3993
(619) 441-4490
FAX (619) 441-2744

JUVENILE DELINQUENCY
8425 Chas Drive, Suite 100
San Diego, CA 92123-2790
(858) 974-4888
FAX (858) 974-4888

JUVENILE DEPENDENCY
8425 Chas Drive, Suite 200
San Diego, CA 92123-4705
(858) 974-4700
FAX (858) 974-4711

April 28, 2000

Leovardo Salceda, #J-90933
D5/217
44750 60th Street West
Lancaster, CA 93536

Reference: People v Leovardo Salceda
           Superior Court Case #CR105783

Dear Mr. Salceda:

The Public Defender's Office received your letter addressed to Mr. William Youmans who is now deceased.

I have reviewed your file and am sending you a copy of the "preliminary hearing transcript" and the probation report. There are no transcripts of court proceedings since there was no trial.

I assume you re-offended after this case and after the 3 strikes law was enacted. It appears your original sentence of 4 years in prison was a very good deal at the time based on the expectation you would not re-offend. Unfortunately, the law of 3 strikes severely punishes repeat offenders beyond anyone's original expectations.

Sincerely,

Alex M. Loebig
Supervising Attorney

AML.cc

Enclosures

Ex.

*Ex.*

Leovardo Salceda J 90933
T9 85 128
4750 60th Street West
Lancaster, CA 93536

June 12, 2001

Mr. Thomas Carnessale, Esq.
Public Defenders Office
233 "A" Street
San Diego, CA 92101

Re: Case no. CR140382

Dear Mr. Carnessale,

Respectfully, I would like to ask you if you could please send me copies of "any and all" legal documents pertaining to my case mentioned above. You were my lawyer.

Date of arrest:  June 30, 1993, San Diego Police Department,

Date of arraignment:  July 2, 1993, case F158003, DA P31829, before Hon. Judge Jay M. Bloom, clerk BC, reporter, E. Henderson.

Date of conviction:  July 14, 1993, mun't readiness conf., Dept. FD2, before Hon. Joan P. Weber, clerk T. Dusl, reporter L. Daniels,

Date of sentence:  August 11, 1993, probation and sentence, before Hon. Joan P. Weber, clerk T. Dusl, reporter D. Gebhart

Could you please provide a copy of the court transcripts, both the minute orders and the actual transcripts for arraignment, the guilty plea in open court, and sentencing in open court. If I need to pay for these legal papers, please notify me and I will sign a trust withdraw to pay for these legal papers.

I have enclosed a stamped self addressed envelope if you could please respond at your earliest convenience. Thank you very much for your time and concern.

Sincerely,

Leovardo Salceda
Leovardo Salceda

---

*Ex.*

Leovardo Salceda # J-90933
05/217
44750 60th Street West
Lancaster, Ca. 93536

March 14, 2000

Mr. Thomas Carnessale
Public Defenders Office
233 "A" Street
San Diego, Ca. 92101

Re: Case No. CR140382 (Guilty plea)
    DA  P3182901
    F  158003

Dear Mr. Carnessale,

I respectfully would like to ask if you could please send me copies of "any and all" legal documents pertaining to my previous case mentioned above. You were my lawyer.

    Case No. CR104382 (Guilty plea)
    date of arrest, June 30, 1993
    date of conviction, July 14, 1993
    date of sentence, August 11, 1993
    Honorable Judge Weber, department M15
    District Attorney, K. Eppel
    Public Defender, Mr. Carnessale

The Reporter's and Clerk's transcripts of all proceedings for the date of arrest until sentencing and everything inbetween. Typewriten transcripts of all court appearences leading up to the guilty plea and sentencing, and typewriten transcripts to consist of minute order, abstract of judgement, commitment order, etc., points and authorities and declarations, motions by the district attorney, motions by you, and motions by the court.

Unfortunately Mr. Carnessale I am indigent and unable to buy my court records. I have enclosed a stamped self addressed envelope for your convenience. Thank you for your time and concern in this matter, it is greatly appreciated.

Leovardo Salceda 3/14/00
Leovardo Salceda.

Leovardo Salceda J-90933
D5/217
44750 60th Street West
Lancaster, CA 93536

In Propria Persona

RECEIVED

AUG 24 2000

August 24, 2000

Attn: L. Brown, Clerk Of The Superior Court,
Central Desk, Central Records,
Central Court
P.O. Box 120128
220 W. Broadway
San Diego, CA 92112-0128

Re: Case no. CR105783. (year 1989)

RECEIVED

JAN 16 2001

Dear Clerk Of The Superior Court,

On number "2" of the Jury Waiver enclosed it reads:

"That he does desire to waive and give up his right to trial by jury
and that he does desire to have this court sitting without a jury
determine whether he is guilty or not of the offence(s) for which he
charged in the above-entitled criminal action"

Respectfully I would like to request to buy those "court trial"
transcripts in case no. CR105783. Could you please give me an
estimate of the cost to buy the entire record in the above-mentioned
case. Enclosed are a copy of the jury waiver, judgment-commitment,
and probation-hear sentencing, indicating I did have a court trial.

On December 29, 1995, I filed a motion to strike prior conviction in
case no. CR105783. However, back then I did not have the entire
record in case CR105783, the arraignment hearing, the readiness
hearing, motion's hearing's, court trial transcripts, exhibits,
guilty finding and/or verdict forms, and sentencing hearing
transcripts. I filed the motion with only my memory of the case,
however, now I would like to buy the entire case record for my
appeal. I am in Propria Persona, a layman of the law, but I would
appreciate if you could provide me with the estimate of how much it
will cost for the above-mentioned "entire case" from arrest-report,
everything in between up until the court trial and sentencing.

I am preparing a habeas corpus and need the entire record to do so.
I am not trying to be complicated, but this is very important to me
and my case. Thank you very much for your time, assistance, and
concern in this matter. It is greatly appreciated.

I declare under penalty under the laws of the State of California
that the foregoing is true and correct to the best of my knowledge.

Executed this ___21st___ day of August, 2000, at Lancaster,
California.

Respectfully,

_Leovardo Salceda August 21, 2000_
Leovardo Salceda,
In Propria Persona.

Ex.

Leovardo Salceda J-90933
D5/221 44750 60th Street West
Lancaster, CA 93536

CENTRAL RECORDS RM 042
SAN DIEGO SUPERIOR COURT
P.O. Box 120128
San Diego, CA 92112-4104

February 4, 2001

RECEIVED

FEB 09 2001

Superior Court of California,
County of San Diego, Central Records,
Clerks - Court Reporters - Transcripts
220 W. Broadway
San Diego, CA 92101

Re: Case No. CR105783

Dear Clerk of the Court,

I would like to buy any and all transcripts that I had court proceedings for in the above mentioned case. These are the Dates, Departments, Honorable Judges, Clerks, and Court Reporters - Stenographers that these court proceedings happened in.

Would you please give me an estimate of how much it will cost for the following requested transcripts. Through the trust office here I could sign a trust withdraw and have the money sent to pay for the costs of the transcripts. In any order or order of send $50.00, the cost for the transcripts I requested would be deducted, or I would notified the cost is more than $50.00.

*) On July 06, 1989, in Dept. FA, before Honorable Judge John M. Thompson,
Clerk - C. Veling, Reporter/Stenographer - K. Crowder, in People v. Leovardo Salceda,
Case No. CR105783, (case F122969, DA B6262101),

*) On July 11, 1989, in Dept. FA, before Honorable Judge John M. Thompson,
Clerk - R. Salas, Reporter/Stenographer - Lynn Peters, in People v. Leovardo Salceda,
Case No. CR105783, (case F122969, DA B6262101),

*) On July 20, 1989, in Dept. 9, before Honorable Judge Nicholas Kasimatis,
Clerk - Vivian Hall, Reporter/Stenographer - Peggy Harper, in People v. Leovardo Salceda,
Case No. CR105783, (case F122969, DA B6262101),

*) On August 03, 1989, in Dept. 009, before Honorable Judge Herbert J. Exarhos,
Clerk - Edith Bixel, Reporter/Stenographer - Bill Nelson, in People v. Leovardo Salceda,
Case No. CR105783, (DA B6262101),

*) On September 13, 1989, in Dept. 008, before Honorable Judge Andrew G. Wager,
Clerk - T. Wallace, Reporter/Stenographer - Caryl Sadler, in People v. Leovardo Salceda,
Case No. CR 105783, (DA B6262101),

Page 1 of 2

*) On September 20, 1989, in Dept. 009, before Honorable Judge Herbert J. Exarhos,
Clerk - Edith Bixel, Reporter/Stenographer - Jill Mikrut, in People v. Leovardo Salceda,
Case No. CR105783, (DA B6262101),

*) On September 28, 1989, in Dept. 009, before Honorable Judge Herbert J. Exarhos,
Clerk - Carol Bonavolant, Reporter/Stenographer - Jill Mikrut, in People v. Leovardo Salceda, Case No. CR 105783, (DA B6262101),

*) On October 02, 1989, in Dept. 009, before Honorable Judge Herbert J. Exarhos,
Clerk - Chris Del Toro, Reporter/Stenographer - Jill Mikrut, in People v. Leovardo Salceda, Case No. CR105783, (DA B6262101),

*) On October 02, 1989, in Dept. 34, before Honorable Judge William D. Mudd,
Clerk - K. Bircumshaw, Reporter/Stenographer - D. Moody, in People v. Leovardo Salceda, Case No. CR 105783, (DA B6262101),

*) On October 03, 1989, in Dept. 34, before Honorable Judge William D. Mudd,
Clerk - Peggy Sirna, Reporter/Stenographer - D. Moody, in People v. Leovardo Salceda, Case No. CR 105783, (DA B6262101),

*) On November 02, 1989, in Dept. 034, before Honorable Judge William D. Mudd,
Clerk - Peggy Sirna, Reporter/Stenographer - C. Franklin, in People v. Leovardo Salceda, Case No. CR 105783, (DA B6262101),

Your time and concern in this matter is greatly appreciated. I have enclosed a stamped self addressed envelope for your convenience. Thank you very much.

Respectfully,

Leovardo Salceda
Leovardo Salceda

Page 2 of 2

Cath, Willis Bell, Official Court Reporter.
Office of Court Reporting Services
220 West Broadway
San Diego, CA 92101

August 16, 2001

Leovardo Salceda J-90933
FB - B5 - 128
44750 60th Street West
Lancaster, CA 93536

RE: Case no. CR140382

Dear Mr. Salceda,

Enclosed is the copy of the transcript you requested and that I prepared for Donna Gebhart for the sentencing proceedings held on August 11, 1993. The original of said transcript has been filed in the court file. There was an overpayment of $2.60, which I am enclosing, in cash, as your refund.

As reflected in your original request, the other two proceedings were reported by different court reporters, Evie Henderson and Leonard Daniels. They have been notified of your request and should have contacted you already. I do not have the authority or capacity to transcribe their notes for you. I have notified the Office of Court Reporting Services that you have not received the transcripts from them, and they said they would check with the reporters in question. They said if you have any further questions or concerns, Ms. Henderson and Mr. Daniels can be reached through the Office of Court Reporting Services at 619-531-3964 or contacted by mail by addressing your request to:

Office of Court Reporting Services
San Diego Superior Court
220 W. Broadway
San Diego, CA 92101

Sincerely,

Cathy Willis Bell
Official Court Reporter

*Ex.*

---

Superior Court of California
County of San Diego

CENTRAL COURTHOUSE
220 W. BROADWAY
P.O. BOX 128
SAN DIEGO, CA
92112-4104

February 14, 2001

Re: Case #CR105783
(year 1989)

Leovardo Salceda J-90933
D57221
44750 60th Street West
Lancaster, CA 93536

Dear Mr. Salceda,

This letter is with regard to your request for several transcripts from 1989. Unfortunately, criminal steno notes are destroyed after ten years in storage. Therefore, the reporters noted in your letter will not be able to produce any new transcripts from the dates indicated.

Thank you,

E. Neal
Court Reporting Services

*Ex.*

## Superior Court of California
### County of San Diego

☐ CENTRAL COURT
PO BOX 120128
220 W. BROADWAY
SAN DIEGO, CA
92112-0128
Records Division
(619) 531-3151
Central Records
(619) 531-3244
Probate Services
(619) 685-6877
Criminal Records
(619) 685-6725

☐ FAMILY COURT
PO BOX 120128
1501 6TH AVE
SAN DIEGO, CA
92112-0128
Records Division
(619) 236-0189

☐ NORTH COUNTY
325 S. MELROSE DR.
SUITE 100
VISTA, CA
92083-6643
Records Division
(760) 940-4442

☐ EAST COUNTY
250 E. MAIN ST.
EL CAJON, CA
92020-3913
Records Division
(619) 441-4622

☐ SOUTH BAY
500 3RD AVE.
CHULA VISTA, CA
91910-5894
Records Division
(619) 691-4780

CASE NUMBER: CR105783

THE ATTACHED DOCUMENTS ARE BEING RETURNED BECAUSE:

___ Insufficient/no fee submitted. If you believe you are eligible for a fee waiver, you may submit an Application for Waiver of Court Fees and Costs and return it with your correspondence.

___ Check is not signed.

___ County ordinance forbids acceptance of personal checks not drawn on a California bank. You may submit a cashier's check, money order or company check.

___ Check must have a preprinted name and full address, not a P.O. box. You may submit a cashier's check or money order.

___ Information given is not sufficient. Please provide: a. Full names of parties involved: b. Approximate year action was filed or years to search: c. Case number, if available. d. Name(s) of index(es) to search: Plaintiff/Defendant/Both: Criminal, Domestic, Probate, Mental Health, Habeas Corpus, All. For criminal cases AKA's and parties' dates of birth are needed.

___ As of this date there is no record of the final judgment.

___ Please clarify documents needed. Information given is insufficient to make determination.

_X_ Other: 1) You as well as Word 2.50 to formalize the one attached, 2) You need to certify the Court reporter's bill @ (619)531-3968 to get transcripts.

FEES ESTABLISHED BY GOVERNMENT CODE SECTIONS INDICATED, ARE AS FOLLOWS:

COPIES (26831) .50 per page
CERTIFICATION (26833.1) 6.00 per document
COMPARING TO ORIGINAL (26837.1) 1.00 per page
EXEMPLIFICATION (26839) 20.00 each form
CERTIFIED COPIES OF DISSOLUTION JUDGMENT (26832.1(a)) 10.00 document
SEARCHING FOR A NAME/CASE NUMBER, ETC. (26854) 5.00 per file
PROCESSING BAIL BOND EXONERATION SLIPS (26836.1) 6.00 per request

_X_ Please submit check/money order/cashier's check in the amount of $222.50 for 450pp.

CLERK OF THE SUPERIOR COURT
By: S. Grice, H. Grice, Deputy

Date: NOV 0 1 2000

PLEASE SUBMIT SELF-ADDRESSED STAMPED ENVELOPE FOR RETURN OF COPIES.
PLEASE RETURN THIS FORM WITH YOUR CORRESPONDENCE

Ex.

---

## Superior Court of California
### County of San Diego

☐ HALL OF JUSTICE
PO BOX 120128
330 W. BROADWAY
SAN DIEGO, CA
92112-0128
Records Division
(619) 531-3151

☐ COURTHOUSE
PO BOX 120128
220 W. BROADWAY
SAN DIEGO, CA
92112-0128
Central Records
(619) 531-3244
Criminal Records
(619) 685-6220

☐ MADGE BRADLEY
1409 4TH AVE
SAN DIEGO, CA
92101-3105
Probate Division
(619) 338-3291

☐ FAMILY COURT
PO BOX 120128
1501 6TH AVE
SAN DIEGO, CA
92112-0128
Records Division
(619) 236-0189

☐ NORTH COUNTY
325 S. MELROSE DR.
SUITE 1000
VISTA, CA
92083-6643
Records Division
(760) 726-9555

☐ EAST COUNTY
250 E. MAIN ST.
EL CAJON, CA
92020-3941
Records Division
(619) 441-4464

☐ SOUTH COUNTY
500 3RD AVE.
CHULA VISTA, CA
91910-5649
Records Division
(619) 691-4700

CASE NUMBER: CR105783

THE ATTACHED DOCUMENTS ARE BEING RETURNED BECAUSE:

___ Insufficient/no fee submitted. If you believe you are eligible for a fee waiver, you may submit an Application for Waiver of Court Fees and Costs and return it with your correspondence.

___ Check is not signed.

___ County ordinance forbids acceptance of personal checks not drawn on a California bank. You may submit a cashier's check, money order or company check.

___ Check must have a preprinted name and full address, not a P.O. box. You may submit a cashier's check or money order.

___ Information given is not sufficient. Please provide: a. Full names of parties involved: b. Approximate year action was filed or years to search: c. Case number, if available. d. Name(s) of index(es) to search: Plaintiff/Defendant/Both: Criminal, Domestic, Probate, Mental Health, Habeas Corpus, All. For criminal cases AKA's and parties' dates of birth are needed.

___ As of this date there is no record of the final judgment.

___ Please clarify documents needed. Information given is insufficient to make determination.

_X_ Other: As was stated in the previous letter to obtain the transcripts contact the Court Reporters at 619-531-3968. Enclosed is a copy of your file as requested. 685-6220

FEES ESTABLISHED BY GOVERNMENT CODE SECTIONS INDICATED, ARE AS FOLLOWS:

COPIES (26831) .50 per page
CERTIFICATION (26833.1) 6.00 per document
COMPARING TO ORIGINAL (26837.1) 1.00 per page
EXEMPLIFICATION (26839) 20.00 each form
CERTIFIED COPIES OF DISSOLUTION JUDGMENT (26832.1(a)) 10.00 document
SEARCHING FOR A NAME/CASE NUMBER, ETC. (26854) 5.00 per file
PROCESSING BAIL BOND EXONERATION SLIPS (26836.1) 6.00 per request

___ Please submit check/money order/cashier's check in the amount of $

STEPHEN THUNBERG
CLERK OF THE SUPERIOR COURT

by: R. Wilkinson, Deputy

Date: JAN 2 2 2001

PLEASE SUBMIT SELF-ADDRESSED STAMPED ENVELOPE FOR RETURN OF COPIES.
PLEASE RETURN THIS FORM WITH YOUR CORRESPONDENCE

Ex.

**Superior Court of California**
County of San Diego

☐ HALL OF JUSTICE   ☒ COURTHOUSE   ☐ MADGE BRADLEY   ☐ FAMILY COURT   ☐ NORTH COUNTY   ☐ EAST COUNTY   ☐ SOUTH COUNTY
PO BOX 120128       220 W BROADWAY    1409 4TH AVE       PO BOX 120125    325 S MELROSE DR  250 E MAIN ST    500 3RD AVE
220 W BROADWAY      SAN DIEGO CA      SAN DIEGO CA       150 I 8TH AVE     SUITE 1000        EL CAJON CA      CHULA VISTA CA
SAN DIEGO CA        92112-3915        Probate Services   SAN DIEGO CA     VISTA CA          92020-3941       91910-5649
92112-0128          Central Records   (619) 234-3781     92112-0128       92083-6643        Records Division  Records Division
Records Division    (619) 531-3311                       Records Division  (760) 236-1089    (619) 441-4461   (619) 691-4780
(619) 531-3311      Criminal Records                                       (760) 236-1089
                    (619) 685-6220

CASE NUMBER  CR105783

THE ATTACHED DOCUMENTS ARE BEING RETURNED BECAUSE:

X  Insufficient/no fee submitted. If you believe you are eligible for a fee waiver, you may submit an Application for Waiver of Court Fees and Costs and return it with your correspondence.  *See waiver enclosed*

___ Check is not signed.

___ County ordinance forbids acceptance of personal checks not drawn on a California bank. You may submit a cashier's check, money order or company check.

___ Check must have a preprinted name and full address, not a P.O. box. You may submit a cashier's check or money order.

___ Information given is not sufficient. Please provide: a. Full name of parties involved. b. Approximate year action was filed or years to search. c. Case number. If available. d. Name(s) of Index(es) to search: Plaintiff/Defendant/Both: Criminal, Domestic, Probate, Mental Health, Habeas Corpus. All. For criminal cases AKA's and parties' dates of birth are needed.

___ As of this date there is no record of the final judgment.

___ Please clarify documents needed. Information given is insufficient to make determination.

X  Other:  Enclosed is are copies from the case file - CR105783- for copies of Other the transcript you would have to contact the Court Reporters at 619/531-3961 to follow up—I have forwarded your request to them.

FEES, ESTABLISHED BY GOVERNMENT CODE SECTIONS INDICATED, ARE AS FOLLOWS:

| | | |
|---|---|---|
| 30 | COPIES (26831) | .50 per page |
| | CERTIFICATION (26833.1) | 6.00 per document |
| | COMPARING TO ORIGINAL (26837.1) | 1.00 per page |
| | EXEMPLIFICATION (26839) | 20.00 each form |
| | CERTIFIED COPIES OF DISSOLUTION JUDGMENT (26832.1(a)) | 10.00 document |
| | SEARCHING FOR A NAME/CASE NUMBER, ETC. (26854) | 5.00 per file |
| | PROCESSING BAIL BOND EXONERATION SLIPS (26836.1) | 6.00 per request |

X  Please submit check/money order/cashier's check in the amount of $  15.00

Date  FEB 13 2001

STEPHEN THUNBERG
CLERK OF THE SUPERIOR COURT

by  R. Williamson  ___ Deputy

Ex.

PLEASE SUBMIT SELF-ADDRESSED STAMPED ENVELOPE FOR RETURN OF COPIES
PLEASE RETURN THIS FORM WITH YOUR CORRESPONDENCE



---

**Superior Court of California**
County of San Diego

☐ HALL OF JUSTICE   ☒ COURTHOUSE   ☐ MADGE BRADLEY   ☐ FAMILY COURT   ☐ NORTH COUNTY   ☐ EAST COUNTY   ☐ SOUTH COUNTY

CASE NUMBER  CR105783

THE ATTACHED DOCUMENTS ARE BEING RETURNED BECAUSE:

X  Insufficient/no fee submitted. If you believe you are eligible for a fee waiver, you may submit an Application for Waiver of Court Fees and Costs and return it with your correspondence.  *See waiver enclosed*

___ Check is not signed.

___ County ordinance forbids acceptance of personal checks not drawn on a California bank. You may submit a cashier's check, money order or company check.

___ Check must have a preprinted name and full address, not a P.O. box. You may submit a cashier's check or money order.

___ Information given is not sufficient. Please provide: a. Full name of parties involved. b. Approximate year action was filed or years to search. c. Case number. If available. d. Name(s) of Index(es) to search: Plaintiff/Defendant/Both: Criminal, Domestic, Probate, Mental Health, Habeas Corpus. All. For criminal cases AKA's and parties' dates of birth are needed.

___ As of this date there is no record of the final judgment.

___ Please clarify documents needed. Information given is insufficient to make determination.

___ Other:

FEES, ESTABLISHED BY GOVERNMENT CODE SECTIONS INDICATED, ARE AS FOLLOWS:

| | | |
|---|---|---|
| 20 | COPIES (26831) | .50 per page |
| | CERTIFICATION (26833.1) | 6.00 per document |
| | COMPARING TO ORIGINAL (26837.1) | 1.00 per page |
| | EXEMPLIFICATION (26839) | 20.00 each form |
| | CERTIFIED COPIES OF DISSOLUTION JUDGMENT (26832.1(a)) | 10.00 document |
| | SEARCHING FOR A NAME/CASE NUMBER, ETC. (26854) | 5.00 per file |
| | PROCESSING BAIL BOND EXONERATION SLIPS (26836.1) | 6.00 per request |

X  Please submit check/money order/cashier's check in the amount of $  10.00

Date  11/11/02

STEPHEN THUNBERG
CLERK OF THE SUPERIOR COURT

by  ___ Deputy

Ex.

PLEASE SUBMIT SELF-ADDRESSED STAMPED ENVELOPE FOR RETURN OF COPIES
PLEASE RETURN THIS FORM WITH YOUR CORRESPONDENCE



Leovardo Salceda J-90933
FB - B5 L 128, 44750 60th St. West
Lancaster, CA 93536

Ily 26, 2001

Mrs. Evangelina Camarena
3893 Gamma Street
San Diego, CA 92113

Re: Case #CR105783 (year 1989) Settled Statement and/or transcripts. And if you could please go to Public Defenders Office.

Dear Tia Angie,

Hi, when you have time, would you go to him directly with respect to the court-house at 220 West Broadway and please ask a Clerk if Honorable Judge William Mudd is still a Judge?

And if he is, would I write to him directly with respect to a "Settled Statement" for case #CR105783 (year 1989). Because it appears those transcripts have been destroyed. Please see letter dated February 14, 2001 from E. Neal of Court Reporting Services attached to my letter dated February 4, 2001 enclosed. Please ask the Court Reporter to read what I wrote in red.

Also enclosed is a copy of a motion for discovery and for transcripts and court records I mailed to the Superior Court on June 21, 2001. Can you ask the Clerk of the Court if it has been filed. Please send me back this copy of motion back, its my only copy. I send it you so you can show the Clerk. Enclosed is a stamped self addressed envelope with my name if you could send the copy of motion back to me.

Tia if you and my mom have time on the day you go to the court-house, would you please stop by the Public Defenders Office, and ask how can I get "Settled Statement" of my case #CR105783 (year 1989). Because it appears the transcripts have been destroyed according to the letter of E. Neal. The address is:

Public Defenders Office (Downtown)
233 "A" Street, Suite 400
San Diego, CA 92101

And lastly, please ask the Clerk if my mom can make a notarized statement with a notary public at the court-house? The "notarized statement" will be later on, not now. Thank you very much Tia.

Sincerely,

Leovardo Salceda,

P.S. Tia if you would like please show the Clerk everything in this envelope. I hope it is not to confusing. :-)

Ex.

---

# THE CITY OF SAN DIEGO

IN REPLYING
PLEASE GIVE
OUR REF. NO.

July 17, 2001

Leovardo Salceda J-90933
FB B5 128
44750 60th Street West
Lancaster, CA 93536

Subject: REQUEST FOR DOCUMENTS

Dear Leovardo Salceda J-90933:

By letter dated July 5, 2001 you requested business documents for an incident that occurred on April 23, 1995. We will not be providing these records to you for two reasons. We do not have records this old. Audio records are retained for a period of one (1) year before they are erased and reused. The exception to this would be if the Master Audio Recording is placed on hold prior to the one year anniversary date. No such hold was placed on the Master Recording for April 23, 1995. Computer generated incident histories are retained only for a period of four (4) years.

Secondly, as this is a criminal case, pursuant to Penal Code Section 1054 you are to submit a discovery request through the prosecuting agency for any records you would like to use in preparation of your case. You might also like to contact your original attorney to see if the already has any of the records that you are requesting.

If you have any questions regarding this matter you should contact your attorney or legal representative.

Sincerely,

KATHLEEN HEALEY, A/CAPTAIN
San Diego Police Department
Communications Division

Office of the Chief of Police
1401 Broadway • San Diego, CA 92101-5729
Tel (619) 531-2000

Ex.

Leovardo Salceda J90933
FB B5 235
44750 60th Street West
Lancaster, CA 93536

COPY

September 1, 2002

Public Defenders Office
233 "A" Street, Suite 400
San Diego, CA 92101

Re: Case CR105783

Dear Public Defenders Office,

I would like to respectfully request from your office "Client papers and property" from my trial attorney's file. My trial attorney was Mr. William Youmans. This office notified me that Mr. Youmans passed away. I am very sorry.

Rules of Professional Conduct, Rule 3 700(D)(1) Papers, Property, and Fees. A member whose employment has terminated shall:
(1) Subject to any protective order or non disclosure agreement, promptly release to the client, at the request of the client, all the client papers and property. "Client papers and property includes correspondence, pleadings, deposition transcripts, exhibits, physical evidence, expert's reports, and other items reasonably necessary to the client's representation, whether the client has paid for them or not.

Please note the Court in this case CR105783 appointed the Public Defenders Office because I was unable to afford an attorney. I am still unable to afford an attorney and indigent. If you cannot send me the original client papers and property, please send me a copy of client papers and property. I understand this my take several weeks or the time necessary for my request. I will be patient.

Thank you very much.

Sincerely,

Leovardo Salceda.

---

Message

Corless, Candi

From: Emison, Cliff
Sent: Thursday, September 19, 2002 1:04 PM
To:   Corless, Candi

Hi Candi: ( e.g Bob Thursby for this week only)

Could you please pull the case file for Leovardo Salceda, case number CR105783.

Please copy the initial docket (or any docket for that matter) which shows who (or) which office was appointed to represent Mr. Salceda.

Defendant says we were were appointed to represent him. I do not think so because the case is an old one and our records do not have us listed as representing him for this case.

If you have any questions please contact me at 619-338-4704.

Thanks

Cliffy

Page 1 of 1

9/19/2002

Leovardo Salceda J90933
FB-B5-235
44750 60th Street West
Lancaster, CA 93536

September 1, 2002

Mr. Thomas Carnessale, Esq.
Attorney at Law
Public Defenders Office
233 "A" Street, Suite 400
San Diego, CA 92101

Re: Case CR140382

Dear Mr. Carnessale,

I would like to respectfully request from your office "Client papers and property" from the file case CR140382. I was your client in 1993.

Rules of Professional Conduct, Rule 3-700(D)(1) Papers, Property, and Fees. A member whose employment has terminated shall:

(1) Subject to any protective order or non disclosure agreement, promptly release to the client, at the request of the client, all the client papers and property. "Client papers and property" includes correspondence, pleadings, deposition transcripts, exhibits, physical evidence, expert's reports, and other items reasonably necessary to the client's representation, whether the client has paid for them or not.

Please note the Court in this case CR140382 appointed the Public Defenders Office because I was unable to afford an attorney. I am still unable to afford an attorney and indigent. If you cannot send me the original client papers and property, please send me a copy of client papers and property. I understand this may take several weeks or the time necessary for my request. I will be patient.

Thank you very much.

Sincerely,

Leovardo Salceda.

*Ex.*

---

Leovardo Salceda J90933
FB B5-235
44750 60th Street West
Lancaster, CA 93536

September 25, 2002

Mr. Daniel J. Mangarin, Esq.
Attorney at Law, Chief Deputy
Department of the Alternate Public Defender
110 West "C" Street, Suite 1100
San Diego, CA 92101

Re: Case SCD112436    Request for "Client papers and property"

Dear Mr. Mangarin,

I would like to respectfully request from you "Client papers and property" from your file case SCD112436. I was your client in 1995 and 1996.

Rules of Professional Conduct, Rule 3 700(D)(1) Papers, Property, and Fees. A member whose employment has terminated shall:

(1) Subject to any protective order or non disclosure agreement, promptly release to the client, at the request of the client, all the client papers and property includes correspondence, pleadings, deposition transcripts, exhibits, physical evidence, expert's reports, and other items reasonably necessary to the client's representation, whether the client has paid for them or not.

In August 2000 I received from you a copy of reporter's and clerk's transcripts in SCD112436. (See your letter attached.) But "aside" from the reporter's and clerk's transcripts, I am now asking you for either the original or a copy of "Client papers and property." I am preparing my habeas corpus and need "Client papers and property" to substantiate my claims. Also there were some pro per motions I wanted to file back in 1995, but you ended up getting the pro per motions I wanted to file, and you kept them and they were not filed.

Enclosed is a large stamped (with $5.18 in postage) self addressed envelope in hopes that it is enough to pay for postage so you can send me the "Client papers and property."

Thank you very much.

Sincerely,

Leovardo Salceda.

*Ex.*

---

**THE STATE BAR OF CALIFORNIA**

1149 SOUTH HILL STREET, LOS ANGELES, CALIFORNIA 90015-2299

OFFICE OF THE CHIEF TRIAL COUNSEL
INTAKE

TELEPHONE: (213) 765-1000
TDD: (213) 765-1566
FAX: (213) 765-1168
http://www.calbar.ca.gov

December 16, 2002

Leovardo Salceda
J90933 FB B5 221
44750 60th St. West
Lancaster, CA 93536

RE:    Inquiry Number:    02-22031
       Respondent:       Daniel J. Mangarin

Dear Mr. Salceda:

You have complained that Daniel J. Mangarin has been discharged and not returned your documents to you. Your complaint concerns us. However, it is hoped that bringing your complaint to the attorney's attention will resolve this matter.

We have advised the attorney to contact you within ten (10) working days from the date of this letter, regarding the availability of your client file. Under the Rules of Professional Conduct, the attorney is not required to mail or deliver the file to you. Whether you, or a designee, pick up the file from the attorney's office or the attorney mails the file to you, is a decision to be made between you and the attorney.

Should the attorney fail to contact you within the specified time, please recontact the State Bar. At that time, we will determine if further action is needed.

At this time, your complaint file is being closed, without prejudice.

Very truly yours,
007
INTAKE DEPARTMENT

*Ex.*

---

**County of San Diego**

DEPARTMENT OF THE ALTERNATE PUBLIC DEFENDER

110 West "C" Street, Suite 1100, San Diego, CA 92101-3905
(619) 446-2900 FAX (619) 446-2955

TIMOTHY A. CHANDLER
ALTERNATE PUBLIC DEFENDER

DANIEL J. MANGARIN
CHIEF DEPUTY

SANDRA K. HUFF
CHIEF INVESTIGATOR

8525 GIBBS DRIVE #201
SAN DIEGO, CA 92123-1765
(858) 974-5816
FAX (858) 974-5808

410 S. MELROSE AVE. #200
VISTA, CA 92083-6562
(760) 940-4450
FAX (760) 940-9442

250 E. MAIN STREET, 8th Fl.,
EL CAJON, CA 92020-3941
(619) 441-4890
FAX (619) 441-4845

765 3rd AVE. #305
CHULA VISTA, CA 91910-5843
(619) 498-2055
FAX (619) 498-2064

December 30, 2002

Leovardo Salceda
CDC #J-90933 B-5-123 UP
California State Prison, LAC
44750 60th Street West
Lancaster, CA 93536-7620

Dear Mr. Salceda:

Enclosed please find a copy of the contents of your client/department file. I have previously sent to you a copy of the trial transcripts and preliminary hearing. I no longer have any additional transcripts.

Good luck, Leo!

Sincerely,

Daniel J. Mangarin
Chief Trial Deputy
Department of the Alternate Public Defender

DJM:vl
Enclosure

cc:    Desiree Washington
       State Bar of California
       1149 South Hill Street
       Los Angeles, CA 90015

Re: Inquiry # 02-22031

*Case SCD/124-36*

*Ex.*

*Ex.*

HANDY HORIYE
Attorney at Law
3520 Cooper Street
San Diego, California 92104-5214
(619) 584-1523

December 27, 2002

Mr. Leovardo Salceda
J-90933 FB-B5-213
44750 60th Street West
Lancaster, CA 93536

Dear Mr. Salceda,

I received your letter dated December 23, 2002. As I stated in my letter to you dated March 17, 2000 (enclosed), I do not have any legal documents that might be helpful to you. I sent the "motions" that you mentioned to Mr. Mangarin with the trial transcripts. Since you received your sentencing transcripts from me and your trial transcripts from Mr. Mangerin, you should have received the "motions" with the trial transcripts since I included them with the trial transcripts.

I have the other letters you sent me and the letters I sent you but you should have copies of them. The letters are not helpful in any writs you might want to file. I am including a copy of the letter I sent you (which you should have) in which I discussed the issues in your "motions" in case you do not receive the "motions". It might help to remind you of the issues raised.

Good luck.

Sincerely,

Handy Horiye

encl. 2

---

Leovardo Salceda J90933
FB B5 235
44750 60th Street West
Lancaster, CA 93536

September 26, 2002

RECEIVED
OCT -1 2002
CLERK SUPREME COURT

California Supreme Court
Attn: Clerk of the Court
350 McAllister Street
San Francisco, CA 94102

Re:  Filing new habeas corpus petition or petition for review
     after Superior Court denial of habeas corpus petition
     #HC17070

Dear Clerk of the Court.

On July 19, 2002, the Superior Court denied my habeas corpus petition. I am in early stages of either filing a new habeas corpus petition or petition for review. I am in pro per. The facility I am incarcerated at has been on lock downs after lock downs. Currently we are lock down (since mid August 2002) and does make it difficult for access to law library.

I would like to ask for a couple of things so I my file the correct judicial form for habeas corpus petitioner or petition for review in pro per, comply with California Supreme Court rules, and properly present my claims. Can you please send me:

*) Correct judicial council form for petition for writ of habeas corpus or petition for review in pro per.

*) a pamphlet to comply with rules of California Supreme Court and;

    *) I understand each case has its own facts. Is there a

    general sample habeas corpus petition or petition for review with respect to challenges on prior conviction based on inadequate advisement of the right to jury, to cross examine, and against self incrimination before entery of guilty plea.

When I have a chance to read more law, I can figure what to file either a new habeas corpus petition or petition for review.

Enclosed is stamped self addressed envelope if you could please respond. Thank you very much.

Sincerely,

Leovardo Salceda

(attached is my declaration
that I am indigent and
in pro per)

*Ex.*

OFFICE OF THE CHIEF TRIAL COUNSEL
INTAKE

(213) 765-1000 FAX (213) 765-1168
TDD # (213) 765-1566

# THE STATE BAR OF CALIFORNIA

1149 SOUTH HILL STREET LOS ANGELES, CALIFORNIA 90015-2299



March 17, 2003

Leovardo Salceda .J90933
FB-B5-213
44750 60th Street West
Lancaster, CA 93536

Re:   Inquiry No.:      03-J3639
      Respondent:     Ronald Karnig Vanesian

Dear Mr. Salceda:

We have received your complaint dated February 24, 2003, against Mr. Vanesian. Your allegations may be grounds for a criminal appeal or a civil claim for damages, but they do not form the basis for discipline. You may wish to consult with an attorney with regard to the criminal appeal or any civil remedies.

Our decision to close your complaint is not a determination that the attorney(s) acted properly, it is only a determination that there is insufficient evidence that the attorney(s)wilfully violated the applicable ethical rules.  In the event that the court makes a finding that the attorney(s) committed misconduct, please provide that information along with copies of any relevant court papers and we will re-evaluate your complaint at that time.

OFFICE OF THE CHIEF TRIAL COUNSEL/INTAKE
Y50



State of California
DEPARTMENT OF JUSTICE

BILL LOCKYER
Attorney General

P. O. Box 903105
SACRAMENTO, CA 94203-3870
Public: (916) 227-2222
Facsimile: (916) 227-4815
(916) 227-3460

April 25, 2003

Leovardo Salceda, 190933
FB-B3-164
P.O. Box 2349
Blythe, California 92226

RE: Record Request

Dear Mr. Salceda:

The California Department of Justice (DOJ) is in receipt of your letter dated March 11, 2003, and received by this Department on April 7, 2003, seeking possible criminal history records on three prosecution witnesses who testified at your 1995 trial in San Diego Superior court, case # SCD112436, as outlined in your letter (attached).

The DOJ cannot honor your request and produce the requested records as they are protected by Penal Code Sections 11105, 11075, et seq., Civil Code Section 1798, et seq, and evidence Code Section 1040.

Sincerely,

DENNIS N. CROSS
Keeper of Records
Communications Administration Program
Bureau of Criminal Information & Analysis

For    BILL LOCKYER,
Attorney General

DNC:dc

*Ex.*

---

Superior Court of California
County of San Diego

☒ CENTRAL COURT
220 W. BROADWAY
P.O. BOX 120
SAN DIEGO, CA
92112-4104
Criminal Records
(619) 685-6200

☐ NORTH COUNTY
325 S. MELROSE DR.
SUITE 100
VISTA, CA
92083-6627
Records Division
(760) 940-4442

☐ EAST COUNTY
250 E. MAIN ST.
EL CAJON, CA
92020-3913
Records Division
(619) 441-4822

☐ SOUTH BAY
500 THIRD AVE.
CHULA VISTA, CA
91910-5694
Records Division
(619) 691-4780

CASE NUMBER N/A

THE ATTACHED DOCUMENTS ARE BEING RETURNED BECAUSE:

☒ Insufficient/no fee submitted.  If you believe you are eligible for a fee waiver, you may submit an Application for Waiver of Court Fees and Costs and return it with your correspondence.

☐ Check is not signed.

☐ County ordinance forbids acceptance of personal checks not drawn on a California bank.  You may submit a cashier's check, money order or company check.

☐ Check must have a preprinted name and full address, not a P.O. box.  You may submit a cashiers check or money order.

☒ Information given is not sufficient.  Please provide: a. Full names of parties involved;  b. Approximate year action was filed or years to search;  c. Case number, if available.  d. Name(s) of Index(es) to search: Plaintiff/Defendant/Both; Criminal; Domestic; Probate, Mental Health, Habeas Corpus, All. For criminal cases AKA's and parties dates of birth are needed.

☐ As of this date there is no record of the final judgment.

☐ Please clarify documents needed.  Information given is insufficient to make determination.

☒ Other: A date of birth is needed for any criminal records search. There is a $5.00 fee per name. Thank you.

FEES, ESTABLISHED BY GOVERNMENT CODE SECTIONS INDICATED, ARE AS FOLLOWS:

| COPIES (26831) | .50 | per page |
| CERTIFICATION (26833.1) | 6.60 | per document |
| COMPARING TO ORIGINAL (26837.1) | 1.00 | per page |
| EXEMPLIFICATION (26839) | 20.00 | each form |
| CERTIFIED COPIES OF DISSOLUTION JUDGMENT (26832.1(a)) | 10.00 | document |
| SEARCHING FOR A NAME, CASE NUMBER, ETC (26885) 1st Hour per 5 parties | | per request |
| PROCESSING BAIL BOND EXONERATION SLIPS (26836.1) | 6.00 | per request |

☐ Please submit check/money order/cashier's check in the amount of $_____

CLERK OF THE SUPERIOR COURT

By    D. BUDD _____ Deputy

a: March 19, 2003

PLEASE SUBMIT SELF-ADDRESSED STAMPED ENVELOPE FOR RETURN OF COPIES.
PLEASE RETURN THIS FORM WITH YOUR CORRESPONDENCE.

SUPCT ADM-90(Rev. 1-95)

*Ex.*

*Ex.*

*Ex.*

---

**County of San Diego**

**DEPARTMENT OF THE PUBLIC DEFENDER**

STEVEN J. CARROLL
PUBLIC DEFENDER

CENTRAL OFFICE
233 "A" Street, Suite 500
San Diego, CA 92101-4009
(619) 338-4700
FAX (619) 338-4811

NORTH COUNTY BRANCH
400 S. Melrose Drive, Suite 200
Vista, CA 92083-6627
(760) 945-4900
FAX (760) 726-1308

SOUTH BAY BRANCH
765 Third Avenue, Suite 100
Chula Vista, CA 91910-5842
(619) 498-2001
FAX (619) 498-2039

EAST COUNTY BRANCH
250 E. Main Street, Sixth Fl.
El Cajon, CA 92020
(619) 579-3316
FAX (720) 441-4744

JUVENILE DELINQUENCY
8325 Gibbs Drive, Suite 105
San Diego, CA 92123-2709
(858) 974-5700
FAX (858) 974-5558

JUVENILE DEPENDENCY
8325 Gibbs Drive, Suite 300
San Diego, CA 92123-2709
(858) 974-5757
FAX (858) 974-5711

Writer's Direct Telephone: (619) 338-4768
E-mail: gary.nichols@sdcounty.ca.gov
FAX: (619) 338-4811

June 11, 2003

Leovardo Salceda
J90933, B-150
P.O. Box 2349
Blythe, CA 92226

Re:   D042258; Leovardo Salceda v. Superior Court (Public Defender, RPI)

Dear Mr. Salceda:

Enclosed is a copy of the entire contents of your client file in case number CR105783 as requested in the petition for writ of mandate together with the declaration and letter filed with the Court of Appeal attesting to compliance with your request. The addresses and telephone numbers of witnesses have been redacted as required by Penal Code section 1054.2.

Sincerely,

GARY R. NICHOLS
Supervising Deputy Public Defender
Writ & Appeals Section

---

**County of San Diego**

**DEPARTMENT OF THE PUBLIC DEFENDER**

STEVEN J. CARROLL
PUBLIC DEFENDER

CENTRAL OFFICE
233 "A" Street, Suite 500
San Diego, CA 92101-4009
(619) 338-4700
FAX (619) 338-4811

NORTH COUNTY BRANCH
400 S. Melrose Drive, Suite 200
Vista, CA 92083-6627
(760) 945-4900
FAX (760) 726-1308

SOUTH BAY BRANCH
765 Third Avenue, Suite 100
Chula Vista, CA 91910-5842
(619) 498-2001
FAX (619) 498-2039

EAST COUNTY BRANCH
250 E. Main Street, Sixth Fl.
El Cajon, CA 92020
(619) 579-3316
FAX (720) 441-4744

JUVENILE DELINQUENCY
8325 Gibbs Drive, Suite 105
San Diego, CA 92123-2709
(858) 974-5700
FAX (858) 974-5558

JUVENILE DEPENDENCY
8325 Gibbs Drive, Suite 300
San Diego, CA 92123-2709
(858) 974-5757
FAX (858) 974-5711

Writer's Direct Telephone: (619) 338-4768
E-mail: gary.nichols@sdcounty.ca.gov
FAX: (619) 338-4811

June 9, 2003

Mr. Stephan M. Kelly, Clerk of the Court
Court of Appeal, 4th Dist., Div. 1
750 B Street, Suite 300
San Diego, CA 92101

Re:   D042258; Leovardo Salceda v. Superior Court (Public Defender, RPI)

Dear Mr. Kelly:

The petition for writ of mandate filed by Mr. Salceda, seeks a copy of his client file prepared in 1989 and maintained by the Public Defender in the course of our representation of Mr. Salceda in San Diego Superior Court case number CR105783.

It is the policy of the Public Defender to provide clients with copies of their files upon request. Apparently clerical staff was unable to locate Mr. Salceda's file when he requested it in 2002. The Public Defender represented Mr. Salceda during the first year of the existence of the office and before closed file tracking procedures were fully developed.

Mr. Salceda's file has now been located. It is being copied and reviewed for compliance with Penal Code section 1054.2 and will be mailed to Mr. Salceda immediately thereafter. It is anticipated those tasks will be completed within a matter of a few days. Proof of mailing will be provided to the Court immediately upon its occurrence.

The Public Defender apologizes to Mr. Salceda and the Court for the inconvenience occasioned by the original failure to locate the file.

Sincerely,

GARY R. NICHOLS
Supervising Deputy Public Defender
Writ & Appeals Section

**County of San Diego**

DEPARTMENT OF THE PUBLIC DEFENDER

STEVEN J. CARROLL
PUBLIC DEFENDER

CENTRAL OFFICE
233 "A" Street, Suite 500
San Diego, CA 92101-4009
(619) 338-4700
FAX (619) 338-4701

NORTH COUNTY BRANCH
400 S. Melrose Drive, Suite 200
Vista, CA 92081-6627
(760) 941-4000
FAX (760) 726-1108

SOUTH BAY BRANCH
765 Third Avenue, Suite 100
Chula Vista, CA 91910-5842
(619) 498-2039
FAX (619) 498-2039

EAST COUNTY BRANCH
250 E. Main Street, Sixth Fl.
El Cajon, CA 92020
(619) 579-3316
FAX (760) 441-4744

JUVENILE DELINQUENCY
8325 Gibbs Drive, Suite 105
San Diego, CA 92123-2709
(858) 974-2700
FAX (858) 974-5858

JUVENILE DEPENDENCY
8325 Gibbs Drive, Suite 300
San Diego, CA 92123-2709
(858) 974-5751
FAX (858) 974-5711

Writer's Direct Telephone: (619) 338-4768
E-mail: gary.nichols@sdcounty.ca.gov
FAX: (619) 338-4811

June 11, 2003

Mr. Stephan M. Kelly, Clerk of the Court
Court of Appeal, 4th Dist., Div. 1
750 B Street, Suite 300
San Diego, CA 92101

Re:    D04258; Leovardo Salceda v. Superior Court (Public Defender, RPI)

Dear Mr. Kelly:

Enclosed is my declaration attesting to the mailing to Mr. Salceda of a copy of the entire contents of his client file as requested in the petition for writ of mandate. This should render the petition moot.

Sincerely,

GARY R. NICHOLS
Supervising Deputy Public Defender
Writ & Appeals Section

---

STEVEN J. CARROLL
Public Defender, County of San Diego
GARY R. NICHOLS, St. Bar No. 86853
Deputy Public Defender
233 "A" Street, Suite 500
San Diego, California 92101
Telephone: (619) 338-4768

COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT, DIVISION ONE

| | |
|---|---|
| LEOVARDO SALCEDA, | No. D04258 |
| Petitioner, | (Super. Ct. No. SCD112436) |
| v. | DECLARATION OF TRANSMITTAL OF CLIENT FILE |
| SAN DIEGO SUPERIOR COURT, | |
| Respondent. | |
| SAN DIEGO PUBLIC DEFENDER, | |
| Real Party in Interest. | |

I, GARY R. NICHOLS, declare that I am an attorney duly licensed to practice law before all courts of the State of California. I am employed by the San Diego County Public Defender.

On the date of execution of this declaration I caused to be mailed a true copy of the entire contents of the client file created and maintained by the public defender in the course of representing Leovardo Salceda in San Diego Superior Court Case number CR105793. The only modification to the file was the redaction of the material described in Penal Code section 1054.2, subdivision (a).

The copy of the file was mailed to:

Leovardo Salceda
J90933; B3 – 150
P.O. Box 2349
Blythe, CA 92226

I declare under penalty of perjury the foregoing is true and correct.

Executed on June 11, 2003, at San Diego, California.

GARY R. NICHOLS

Ex.

Ex.

## THE STATE BAR OF CALIFORNIA

1149 SOUTH HILL STREET, LOS ANGELES, CALIFORNIA 90015-2299

OFFICE OF THE CHIEF TRIAL COUNSEL
INTAKE

TELEPHONE: (213) 765-1000
TDD: (213) 765-1566
FAX: (213) 765-1168
http://www.calbar.ca.gov

June 26, 2003

Leovardo Salceda J90933
B3-164
P.O. Box 2349
Blythe, CA 92226

RE:    Inquiry Number:    03-03639
       Respondent:       Laurens William Youmans, III

Dear Mr. Salceda:

This will acknowledge receipt of your complaint against Laurens William Youmans, III, complaining that the attorney has failed to release your client file from his representation of you in 1989.

As you know, the attorney about whom you complained died in or about February 1999. We have contacted the Public Defenders Office, however, and learned that the office had been created in 1988 and did not develop a file retention policy for several years. I am forwarding a copy of your letter dated September 1, 2002, for response to the following address:

> Office of the Public Defender
> Attn: Robert J. Stall, Jr.
> 233 A St., #400
> San Diego, California 92101

I note that your address has changed, and I hope this letter reaches you. Thank you for bringing this matter to our attention.

Very truly yours,

Dane C. Dauphine
Supervising Trial Counsel

DCD

cc: Robert J. Stall, Jr.

Enclosure

---

## PROOF OF SERVICE BY MAIL
(Code of Civ. Proc., § 1013a(1))

CASE NAME:  Leovardo Salceda v. Superior Court (San Diego Public Defender)

No.: D042258 (Super.Ct. Nos.SCD112436, CR105783)

I am a resident of the County of San Diego, State of California. I am over the age of 18 years and not a party to the within action. My office address is 233 "A" Street, Suite 1010, San Diego, California 92101. I am employed by the San Diego County Public Defender.

On the date of execution of this document, I served a true and correct copy of the foregoing DECLARATION OF TRANSMITTAL OF CLIENT FILE and COVER LETTER on each of the following by depositing true copies thereof in the United States Mail at San Diego, California, each in a separate sealed envelop with postage thereon fully prepaid, addressed as follows:

Leovardo Salceda
J90933; B3 - 150
P.O. Box 2349
Blythe, CA 92226

Clerk of the Superior Court
for delivery to Hon. William D. Mudd
220 West Broadway
San Diego, CA 92101

I declare under penalty of perjury that the foregoing is true and correct.

Executed this ___11th___ day of ___June___, 2003, at San Diego, California.

_____
Signature of Server

Ex.

JESUS RODRIGUEZ
ASSISTANT DISTRICT ATTORNEY

OFFICE OF
THE DISTRICT ATTORNEY
COUNTY OF SAN DIEGO

BONNIE M. DUMANIS
DISTRICT ATTORNEY

San Diego
330 West Broadway
San Diego, CA 92101
(619) 531-4040
http://www.sandiegoda.com

July 29, 2003

Leovardo Salceda
CDC No. J-90933, Cell B3-164
Chuckawalla Valley State Prison
P.O.Box 2349
Blythe, CA 92226

Re:   DA Case No. P062369
      SDSC Case No. SCD112436

Dear Mr. Salceda:

I am in receipt of your April 3, 2003 letter regarding prosecution witnesses in your September 25, 1995 trial. After a thorough records search, it has been determined that none of the witnesses referenced in your letter had impeachable prior convictions at the time of your trial.

Your appellate attorney should contact the Public Defender's office regarding their decision to conflict out of this case.

Sincerely,

MICHAEL GROCH
Deputy District Attorney

MG/jfj

cc:   Office of the Public Defender
      Office of the Alternate Public Defender

*Ex.*

---

Leovardo Salceda J-90933
B3-150
P.O. Box 2349
Blythe, CA 92226

October 30, 2003

Office of the Clerk
For Delivery To The Honorable William Mudd, Judge
San Diego County Superior Court
P.O. Box 120128
San Diego, CA 92112-0128

Re:   Did Your Honor know that Mr. Rafael Haro (the victim/witness) recanted his identification of me prior to accepting my plea of guilty? *Case CK105783.*

Dear Honorable Judge Mudd:

On August 20, 2003, Honorable H. Ronald Domnitz, Judge, denied my post-conviction motion for relief in light of confirmation by the prosecution that Mr. Haro recanted his identification of me prior to my plea. I alleged it was prejudicial error because Mr. Haro recanted before my guilty plea, because of the following:

(1) Your Honor was not made aware of Mr. Haro's recant before my plea;

(2) During plea negotiations on October 3, 1989, in holding cell and shortly thereafter in Court, my attorney discussed with me waiving jury and signing jury waiver, but my attorney did not inform me Mr. Haro had told the prosecutor prior to me waiving jury that he mis-identified me as the person who robbed him and had no intention to appear at trial (see letter attached);

(3) The prosecutor or my attorney did not inform Your Honor Mr. Haro recanted his identification of me prior to the Court accepting my plea; and

(4) When the transcript was submitted to the Court, two of my rights - the right to confront and against self incrimination - were forfeited that I was unaware of and not advised of by the Court or my attorney. As a layman I did not have full knowledge or made aware orally or on Court documents that I had the right to confront Mr. Haro regarding his recant and against self incrimination before my plea. The plea was not voluntary and intelligent.

In Judge Domnitz denial order he noted that I "surmise" that had Your Honor known about Mr. Haro's recant, you would not have accepted the guilty plea (slow plea). Also that I just "guess" without substantiation that you were unaware of Mr. Haro's recant.

Before I continue to allege that Your Honor was unaware of Mr. Haro's recant, the best alternative I have is to respectfully ask Your Honor did you know Mr. Haro recanted before I accepted my guilty plea.

Sincerely,

Leovardo Salceda

*Ex.*



# L O Y O L A

LAW SCHOOL ❖ LOS ANGELES

July 28, 2004

Leovardo Salceda J-90933
B3-260
P.O. Box 2349
Blythe, CA 92226

Dear Mr. Salceda,

Thank you for your letter. *Blakely v Washington* may have an impact on your sentence. For information, please contact Alex Riccarduli. He is a Public Defender for Los Angeles County. You can write to him at:

Los Angeles Public Defender
590 Hall of Records
320 West Temple Street
Los Angeles, CA 90012

Sincerely,

Laurie L. Levenson
Professor of Law & William M. Rains Fellow
Director, Center for Ethical Advocacy
Loyola Law School

919 South Albany Street • Los Angeles, California 90015-1211 • Telephone: 213.736.1000 • Fax: 213.380.3769 • www.lls.edu
Loyola Law School • Loyola Marymount University

---

MARY JAMESON
AUTOMATIC APPEALS SUPERVISOR
JORGE NAVARRETE
SUPERVISING DEPUTY CLERK
SAN FRANCISCO

NATALIE ROBINSON
SUPERVISING DEPUTY CLERK
LOS ANGELES

# Supreme Court of California

FREDERICK K. OHLRICH
COURT ADMINISTRATOR AND
CLERK OF THE SUPREME COURT

July 11, 2005

Mr. Leovardo Salceda #J-90933
B3-260L
P.O. Box 2349
Blythe, CA 92226

Re:  S125591 – In re Leovardo Salceda on Habeas Corpus

Dear Mr. Salceda:

Your letter to the court, dated July 5, 2005, has been referred to this office for a reply.

Neither the Chief Justice, nor any associate justice, nor the full court may give legal advice or assistance. As you may appreciate, the law limits the courts to hearing and deciding cases. The courts may not otherwise participate in any matter that may be related to a current or future legal proceeding.

I regret that we cannot be of further help to you. You may wish to consult an attorney instead.

Very truly yours,

FREDERICK K. OHLRICH
Court Administrator and
Clerk of the Supreme Court

By A. Allen, Deputy Clerk

AA/ah

☐ SAN FRANCISCO 94102
EARL WARREN BUILDING
350 McALLISTER STREET
(415) 865-7000

☐ LOS ANGELES 90013
RONALD REAGAN BUILDING
300 SOUTH SPRING STREET
(213) 830-7570

*Ex.*

*Ex.*

**APPELLATE DEFENDERS, INC.**
555 WEST BEECH ST.
SUITE 300
SAN DIEGO, CA 92101-2939

(619) 696-0282
Automated Attendant (619) 696-0284
Fax (619) 696-1828
www.adi-sandiego.com

April 14, 2006

Mr. Leovardo Salceda, J-90933
P.O. Box 2349
Blythe, CA 92226

RE:  *People v. Leovardo Salceda*
     Court of Appeal #D025258
     *In re Leovardo Salceda*; Court of Appeal #D048000

Dear Mr. Salceda:

I have received your letter dated March 27, 2006, including various enclosures. Your letter asks whether there is any case law that would allow you to file a motion in the Court of Appeal for further discovery. I suggest you take a look at the case of *Board of Prison Terms v. Superior Court* (2005) 130 Cal.App.4th 1212 to determine the right of discovery in habeas proceedings. There are two other cases I suggest you look at: *People v. Kasim* (1997) 56 Cal.App.4th 1360, 1383-1384 and *People v. Garcia* (1993) 17 Cal.App.4th 1169.

In your letter, you also ask if I or another attorney could request appointment in your case. It is the Court of Appeal which orders appointment of counsel upon a defendant's request (not an attorney's request). You need to ask the Court of Appeal to appoint counsel. I see you have already done so, but you could file another request. I do not think it would prejudice your case.

Sincerely,

Cindi B. Mishkiy
Staff Attorney
APPELLATE DEFENDERS, INC.

Ex.

---

Leovardo Salceda  J-90933
CVSP, 33-260 Low
P.O. Box 2349
Blythe, CA 92226

In pro per, November 17, 2005

Ms. Gina Villegas, CSR No.11273
Official Court Reporter
220 West Broadway
San Diego, CA 92101

Re:  People v. Leovardo Salceda, Case No. 112456, specifically
     Reporter's Transcript of Sentencing Remand, June 12, 1997
     Pages 1 through 24

Dear Ms. Villegas,

You sent me a "Reporter's Estimate of Cost Declaration" explaining the above referenced Reporter's Transcript (RT) would cost me $112. On August 4, 2005 I sent you $44.30, fee waiver, and declaration regarding necessity of said RT. My problem was I did not have the required $112.

Today I wrote to my mother, Carmen Lopez, and cousin, Ernie Lopez, asking them to please pitch-in the remaining $68 I need to complete the $112 for the RT. Carmen and Ernie hopefully should be contacting you to pay the remaining $68.

I am hopeful after full payment for RT, that you can please send me the RT so that I may include (submit) to the Court Of Appeal as exhibits in support of my claim of innocence. I intend to file my habeas petition in late late November or early early December 2005.

Enclosed is a stamped self addressed envelope for the above purpose.

Carmen Lopez          Ernie Lopez
3393 Gamma St.        507 East Park Ave.
San Diego, CA 92113   El Cajon, CA 92020
(619) 264-5543        (619) 328-5619

Thank you very much.

Sincerely,

Leovardo Salceda.

Ex.

Leonardo Salceda J-90933
CVSP, 83-260 Low
P.O. Box 2349
Blythe, CA 92226

June 21, 2006

Clerk's Office
San Diego Superior Court
220 West Broadway
San Diego, CA 92101

Re: People v Leonardo Salceda, SCD112436, (1995)

Dear Clerk of the Court,

The purpose of this letter is to respectfully request a cost estimate to buy an entire copy of Court File SCD112436.

In 1995 a jury convicted me of one count of kidnap PC §207[a]. I had 2 prior convictions CR105783, CR140382, and sentenced to 35 years to life under the Three Strikes Law. On appeal, DO25258, my case was remanded pursuant to People v Romero (1996) 13 Cal.4th 497, and Judge Amos struck 2 strikes and re-sentenced me to a determinate 26 years 8O%.

On second appeal, DO29086, sentence affirmed.

I am gathering evidence to support my habeas corpus petition to the California Supreme Court. I am raising several constitutional violations. One of which is that trial counsel in instant case SCD112436 did not thoroughly investigate my prior conviction CR105783.

1. Ronald K. Vanesian, Public Defender, declared conflict of interest on August 11, 1995 because he believed that my previous attorney William Youmans (also a Public Defender) was ineffective for failure to introduce intoxication evidence at my COURT TRIAL.

Question: Did Mr. Vanesian file any motions or otherwise collaterally attack CR105783? See RT 1-2, Conflict (Exhibit A).

2. Daniel J. Mangarin, Alternate Public Defender, was appointed. I explained to Mr. Mangarin the reason for the conflict as explained to me by Mr. Vanesian.

Question: Did Mr. Mangarin thoroughly investigate the conflict? If so, what exactly did he do? What motions, if any, or other collateral attacks concerning CR105783 did Mr. Mangarin file?

3. The Court File CR105783 is clear, there never was a COURT TRIAL wherein evidence is disputed. It was a negotiated plea bargain. The prosecutor submitted the preliminary hearing transcript in exchange for my guilty plea. Except 2 constitutional defects are apparent, which I claim that both Messrs. Vanesian and Mangarin should have discovered.

(a) Before or at the time of my plea in 1989, CR105783, I was neither advised nor waived my rights to confront witnesses or against self incrimination. These are incomplete waivers in exchange for my plea, commonly called Boykin-Tahl error.

(b) Incomplete waivers are critical to my defense because the victim Rafael Haro told the prosecutor that he mis-identified me as the person that robbed him. Cross examining Mr. Haro would have key to my defense in my prior conviction case. See letter (Ex. B).

(c) At trial during my instant case SCD112436, I unequivocally testified that I did not commit the first robbery in CR105783, i.e., the robbery of Mr. Haro. In rebuttal to my claim of innocence, the prosecutor claimed I singed a "change of plea form" in CR105783. However, the Court File CR105783 is devoid of any such "plea form." Moreover, the Boykin-Tahl rights are not mentioned anywhere in CR105783.

Were there any pretrial investigations and/or pretrial motions filed attacking CR105783 to prevent it from being used against me or striking it from the accusatory pleadings in SCD112436? Which would ahve prevented CR105783 from enhancing my current sentence as it now does.

A complete copy of Court File SCD112436 is necessary to assist my investigation to gather evidence to determine whether or not Messrs. Vanesain and/or Mangarin ever thoroughly investigate CR105783, which would support my grounds I am raising. See RT 288-290 (Ex. C).

Finally, I am indigent, but a cost estimate can tell me how much money I need to come up with. If it's $30 to $50, I can ask family/friends to help me buy the Court File, if the price is higher, I probably need to file a motion which demonstrates:

"The MacCollom Court noted while an indigent defendant had an absolute right to transcript on appeal, at the collateral stage he stood in a different position. 'We think enough at the collateral relief stage that Congress has provided that the transcript be paid for by public funds if the defendant demonstrates to a district judge that his claim is not frivolous, and the transcript is needed to decide an issue presented." People v Bizieff (1991) 226 Cal.App.3d 1689, 1702, citing "U.S. v MacCollom (1976) 426 U.S. 317. See Trust Account printout (Ex. D).

Respectfully so, serving a full additional thirteen (13) years based on an invalid prior conviction which trial counsel should have investigated and attacked is hardly frivolous.

An addressed envelope is enclosed for your reply. Thank you.

Sincerely,

Leonardo Salceda   6-21-06

Leonardo Salceda

2.

Ex.

Leovardo Salceda J-90933
CWSP, B3-260 Low
P.O. Box 2349
Blythe, California 92226

July 29, 2006

Bonnie M. Dumanis, Esq.
San Diego, District Attorney
330 West Broadway, Suite 1300
San Diego, California 92101

Re: Discovery of Evidence
    People v Salceda, CRI05783 / DA B6262101

Dear District Attorney,

In May 1995 an Information was filed in San Diego Superior Court, SCD112436, charging me with kidnap P.C. 207(a). The Information further alleged I suffered prior convictions; CRI05783 two robberies, and CRLA0382 one assault W/D/W.

On September 25, 1995, jury trial commenced and I testified. On cross examination I was questioned about the prior robbery case CRI05783. I testified I did not commit the "first robbery" which is the robbery of Rafael Haro. The district attorney (DA) rebutted that I signed a change of plea form in 1989 case CRI05783 which listed, "robbery, robbery, auto theft." See RT 283-290, SCD112436, 9-27-95. Exhibit A.

On October 3, 1995, a jury convicted me of one count of kidnap. It was found true I suffered prior convictions CRI05783 and CRLA0382. On June 12, 1997, I was sentenced as a two strike case: Upper 8 year term for kidnap, doubled to 16 years because of a strike from CRI05783, and added two 5-year terms for serious felony priors. Total 26 years at 80%. The court of appeal affirmed my sentence in March 1998, and I have been in pro per since March 1998 to the present day.

REQUEST FOR DISCOVERY OF EVIDENCE UNDER PENAL CODE
1054 et seq. DUE PROCESS CLAUSE U.S. CONST. 14TH AMENDMENT
    I am requesting additional information in your possession that is (a) material to my claim of innocence of the robbery of Rafael Haro. The evidence I request is material to the

preparation of my petition for writ of habeas corpus; (b) exculpatory or impeachment information under Brady v Maryland (1963) 373 U.S. 83; (c) any real evidence "discovery materials" means materials in the possession of prosecutor and law enforcement authorities to which I (the defendant) would have been entitled at time of trial; and (d) the change of plea form in CRI05783, listing, "robbery, robbery, auto theft," documentation, notations, or otherwise of waiver of my constitutional rights to jury trial, to cross examine witnesses, and against self incrimination before or at the time of my plea of guilty.

The prosecutor has a duty to disclose favorable evidence that is both favorable to defendant and material to either guilt or punishment. Evidence is favorable if it helps the defendant or hurts the prosecutions case as by impeaching one of its witnesses. People v Kasim (1997) 56 CA4th 1360, 1378-1381; U.S. v Bagley (1985) 473 U.S. 667, 682.

In my particular case prior conviction CRI05783 enhances my sentence in SCD112436 a full thirteen (13) years. So, if you possess evidence which is favorable to me and material to guilt in CRI05783, please disclose it to me, Due Process Clause. Also if you possess evidence which is favorable to me and material to punishment, the existence or non-existence of change of plea form, and adequate or in-adequate Boykin-Tahl waivers in CRI05783, please disclose it to me under Due Process

THE ROBBERIES AND AUTO THEFT CONVICTION
    Rafael Haro and Ramon Cespedes testified at preliminary hearing. Haro testified he was seated in his parked car on June 30, 1989, at 9 p.m. Haro was waiting for Juan Sanchez. Sanchez returned with me and another person. The "other person" pointed a gun at Haro and demanded money. That I took Haro's watch, necklace, and some money. The "other person" got into the drivers seat and I got into the passenger seat and we left in Haro's car.

2.

Ex.

Ex.

COPY

licence plate Riquito. Haro did not identify the "other person that drove his car.

Cespedes testified he was employed at Texaco Gas Station on June 30, 1989, at 9:15 p.m. A car pulled up and I got out, pointed a gun at Cespedes, and demanded money. I took $180 and left in the car as the passenger. Cespedes did not identify the driver. Cespedes identified the licence plate Riquito. PHT 4-9, 20-25, CRI05783, 7-20-89.

Immediately after the robberies, Officer H. Eisenga #3957, received a call that Haro's car had been recovered. Officer Eisenga advised Officers' Filley #4294 and Swilley #4252 to hold Haro's car for prints. See 89-073762, Exhibit B. Officer Filley searched Haro's car and found five (5) small baggy's of marijuana on the passenger floor board. The baggy's were taken into evidence at Eastern case # _____ . The car was impounded at Central. See 89-073729, Exhibit C. Officer Swilley filed a report that Haro's car was held for prints. Exhibit D.

Officer G. Padillo #1716 stated that Detective Sullivan lifted several prints from the inside / outside of Haro's car. See 89-073756, follow-up report, Exhibit B. P. Aguirre #3202 interviewed Sanchez and Haro two hours after the robberies. Did Haro and Sanchez make statements concerning the baggy's of marijuana?

On October 2, 1989, jury selection began. On October 3, 1989, the prosecutor submitted the preliminary hearing transcript, counts 3 and 5 were dismissed, and defense submitted too.

I request the following documents, notations, real evidence, and any other material evidence under 2.C. 1054 et seq, Due Process Clause U.S. Const. 14th Amendment.

1) Finger print results that Detective Sullivan lifted from Haro's car;

2) Finger print results lifted from the baggy's of marijuana;

3.

Ex.

3) Statements by Rafael Haro, Juan Sanchez, Ramon Cespedes, and any other witness which are exculpatory in nature tending to prove my innocence. Any inconsistent statements by any material witness;

4) Subpoena's of Rafael Haro, Juan Sanchez, Ramon Cespedes, and any other material witnesses;

5) Any criminal record of Rafael Haro, Juan Sanchez, Ramon Cespedes prior to June 30, 1989;

6) Copies of notations, documents, inter-department memo's of time, date, and district attorney representative that was informed by Rafael Haro stating the mis-identified me as the person that robbed him and he had no intention of coming to my trial?

7) Was Haro's mis-identification statement provided to my defense attorney?

8) If so, how was Haro's mis-identification statement provided to my defense attorney? Orally? Written? By Telephone? In Court?

9) If Haro's mis-identification statement was provided to my defense attorney, exactly who was the district attorney representative that informed my defense attorney?

10) According to the prosecutor that cross examined me in 1995, SCDL12436, Exhibit A, there exists a charge of pistol form case CRI05783 listing robbery, robbery, auto theft. Does there exist documents, notations, or otherwise of waiver of rights, jury trial, to cross examine witnesses, and against self incrimination? If so, please provide me with a copy?

11) Copies of documents, notations, or otherwise, that although the two robberies were separate, the case CRI05783 was treated as one prior felony for "all purposes." That means one serious felony. And now under the three strikes law CRI05783 is one (1) strike, not two strikes arising out of the same case; and

12) Any other material evidence to guilt or punishment?

Enclosed is a stamped self addressed envelope with $ 5 (five dollars) of postage for your response to send me the discovery materials I request. Thank you very much.

Sincerely,

Leonardo Salceda   7-29-06

Leonardo Salceda.

4.

Ex.

1  STATE OF CALIFORNIA )
2  COUNTY OF RIVERSIDE ) : ss

   PROOF OF SERVICE BY
   PERSON IN STATE CUSTODY

3      I, _Leovardo Salcedo_ the undersigned, certify, and do

4  declare that I am over the age of 18 years, incarcerated at Chuckawalla Valley

5  State Prison, located at __Blythe, CA__ and a party / not a party to the

6  attached foregoing cause of action. On _July 29, 2006_, I did serve

7  a true copy of:

8  _Letter Requesting Discovery of Evidence_

9  _Penal Code 1054 et seq; Due Process_

10  _Clause U.S. Const. 14th Amendment_

11  _DA No. B622101, CR105783_

12

13  [ ] by depositing it in a prison mail box in a sealed envelope, or [√] by

14  handing it to institutional staff in a sealed envelope, along [√] with inmate

15  Trust Account Withdrawal Order Form attached to it requesting that postage be

16  fully prepaid, or [ ] with postage affixed thereto for deposit in the United

17  States Mail pursuant to California Code of Regulations Sections 3142 and 3165;

18  addressed to the following:  _Clerks Office, Crim.No._
                                _San Diego Superior Court_
19  _Bonnie M. Dumanis_          _CR105783_
    _San Diego District Attorney_  _P.O. Box 122704_
20  _330 West Broadway #1300_     _San Diego, CA 92112-_
21  _San Diego, CA 92101_           _2704_

22

23  Intended place of mailing: U.S. Post Office, at _Blythe_, California.

24  I further declare under penalty of perjury that the foregoing is true and

25  correct to the best of my knowledge, and belief. Executed on _July 29_,

26  _2006._

27                                    _Leovardo Salcedo_
                                      PETITIONER/DECLARANT IN PRO PER
28

_Ex._

JESUS RODRIGUEZ
ASSISTANT DISTRICT ATTORNEY

OFFICE OF
THE DISTRICT ATTORNEY
COUNTY OF SAN DIEGO
BONNIE M. DUMANIS
DISTRICT ATTORNEY

San Diego
330 West Broadway
San Diego, CA 92101
(619) 531-4040
http://www.sandiegoda.com

August 3, 2006

Leovardo Salcedo J90933
CVSP, B3-260 Low
P.O. Box 2349
Blythe, CA 92226

RE: CR105783 (B62621-01)

Dear Mr. Salcedo:

Our office has received your letter dated July 29, 2006. We decline to provide the "discovery" you request for several reasons, including:

(1) Having served your sentence in CR105783 you are no longer "in custody" in that matter. Thus, there is no jurisdiction for any court to consider or grant a petition for writ of habeas corpus in that case.

(2) The only question in your current custody case, SCD112435, was whether you suffered a "strike" conviction in CR105783. Whether or not you were guilty was not before the court and is not relevant at this stage.

(3) Further any challenge to CR105783 as a valid "strike" should have been litigated in a timely fashion as part of an appeal. Indeed your claims appear to be repetitious of habeas claims previously denied by the Court of Appeal (e.g. D041206).

(4) You do not qualify for post-conviction discovery under Penal Code section 1054.9. We will not provide any material without a valid court order. We note apparently you have a pending discovery motion in another habeas matter pending in the Court of Appeal (D048000).

Any request you have for official records, such as change of plea forms, should be directed to the Clerk of the San Diego Superior Court, Criminal Records Division, 220 West Broadway, San Diego, CA 92101.

Finally, we are returning your pre-stamped envelope.

Sincerely,

Craig E. Fisher
Deputy District Attorney

---

Copy

Leovardo Salceda J-90933
CVSP, B3-260 Low
P.O. Box 2349
Blythe, CA 92225

August 16, 2006

Mr. Craig E. Fisher, Esq.
Deputy District Attorney
330 West Broadway
San Diego, CA 92101

Re: Discovery of Evidence, People v Salceda, SCD112436, DA No. P 062369

Dear Mr. Fisher,

On July 29, 2006, I wrote a letter to your office requesting discovery of evidence specifically concerning my prior conviction CR105783. Penal Code §1054 et seq. I received a letter dated August 3, 2006, written by you denying my request for discovery in CR105783.

I am serving a 26 year determinate sentence in my current custody case SCD112436. I am requesting discovery of evidence that is in your possession regarding my current custody case SCD112436:

(1) Material evidence to my guilt or punishment in SCD112436. The evidence I request is material to prepare my petition for writ of habeas corpus;

(2) Exculpatory or impeachment information under Brady v Maryland (1963) 373 U.S. 83;

(3) Any real evidence "discovery materials" in the possession of prosecutor and law enforcement authorities to which I (defendant) would have been entitled at time of trial;

(4) Any evidence whether I suffered a "strike" conviction in CR105783.

The prosecutor has a duty to disclose favorable evidence that is both favorable to defendant and material to either guilt or punishment. Evidence is favorable if it helps the defendant or hurts the prosecutions case as by impeaching one of its witnesses, People v Kasim (1997) 56 Cal4th 1360, 1378-1381; U.S. v Bagley (1985) 473 U.S. 667, 682.

I request the following discovery in SCD112436:

Statements against me (defendant) made by witnesses to the crimes charged;

All statements or utterances made by me (defendant);

Disclosure of any promise of leniency to any witness that was called by the prosecution;

Ex.

Ex.

Leovardo Salceda J-90933
CVSP BJ3-260 Low
P.O. Box 2349
Blythe, California 92226

August 22, 2006

Central Records Room 42
San Diego Superior Court
P.O. Box 120128
San Diego, California 92112-4104

Re: Jesus H. Lopez finger prints to corroborate my claim of innocence in Case Number CR105783

Dear Clerk of the Court,

I am conducting an investigation and gathering evidence to prove my innocence of a robbery. The purpose of this letter is to get Jesus H. Lopez finger prints from the Superior Court File. Lopez prints can exonerate me of the robbery of Rafael Haro. Lopez robbed Haro. I did not rob Haro. I will explain my investigation and the need for Lopez prints to present as an exhibit in support of my petition for writ of habeas corpus to the California Supreme Court.

Jesus H. Lopez, D.OBB., December 25, 1967, 1968, or 1969, prints are on file in the San Diego Superior Court. In January through August 2004, Lopez was sentenced in San Diego Superior Court to 23 years. Lopez ODCR # V-34389, is currently housed at Mule Creek State Prison, P.O. Box 409000, Ione, CA. 95640.

According to Judicial Council Form CR-100, every defendant that is sentenced shall permanently maintain his prints in the Court file, Penal Code 992. See Exhibit A.

On July 20, 1989, Rafael Haro and Ramon Cespedes testified at preliminary hearing, that "another person" robbed them on October 14, 1989, I was convicted of both robberies. I received four years and paroled in 1991. Case Number CR105783.

In 1995 I had a jury trial for one count of kidnap Penal Code 207(a). Case Number SCD112436. I testified and on cross examination I was questioned about the 1989 prior robbery case CR105783. I testified that I did not rob Rafael Haro, Haro was the first robbery victim. In 1995 during my trial I did not have evidence to support my claim of innocence. See Exhibit B, Rt 288-290, SCD112436, 9-27-95.

Prior conviction CR105783 enhances my current custody case SCD112436 a full thirteen (13) years.

I have been in pro per since 1998. On my own, I have gathered the following evidence:

*) District Attorney letter date May 21, 2003, which states Rafael Haro mis-identified me as the person that robbed him. Haro made this statement after preliminary hearing.

*) Eyewitness Juan Carlos Sanchez stated that I was not the person that robbed Rafael Haro.

*) Declaration by James H. Lopez dated July 19, 2006, stating that he alone robbed Rafael Haro. That I did not rob Rafael Haro.

See Exhibits C, D, E.

Detective G. Padillo # 1716 stated that Detective Sullivan lifted several prints from inside / outside of Haro's car. See Exhibit F.

Lopez declaration clearly states that he was in Haro's car and that Lopez alone robbed Haro.

The connection is that the prints lifted by Detective Sullivan are Lopez prints. The Superior Court has Lopez prints on file, which match the prints lifted by Detective Sullivan. And Lopez declaration places him in Haro's car.

Enclosed is a stamped self addressed envelope for a response by the Records Clerk. Thank you very much.

Sincerely,

Leovardo Salceda
Leovardo Salceda, in pro per,
August 22, 2006.

2.

DECLARATION OF LEOVARDO SALCEDA IN SUPPORT OF LETTER REQUESTING JESUS H. LOPEZ FINGER PRINTS TO PROVE MY INNOCENCE

I, Leovardo Salceda, declare as follows:

1.) I make the following declaration of facts based on my own knowledge and, if called, can testify competently thereto.

2.) I am the defendant in People v Salceda, Case No. CR-105783. I am indigent and cannot afford to hire an investigator nor an attorney to help me prove my innocence.

3.) I am in pro per and forced to conduct my own investigation and gathering evidence to prove my innocence of the robbery of Rafael Haro in CR105783.

I did not rob Rafael Haro. I am specifically raising a claim of innocence. I am stating that Jesus H. Lopez alone on his own volition robbed Rafael Haro.

4.) I am specifically raising a claim of innocence. I am stating that Jesus H. Lopez alone on his own volition robbed Rafael Haro.

5.) The evidence I am gathering in good faith is independent corroborating evidence. The evidence is exculpatory in nature and I will present it in a petition for writ of habeas corpus to make a prima facie case for relief. I will file said petition in the California Supreme Court.

6.) In 1995 I testified in my current custody case SOD-112436 and testified that I did not rob Rafael Haro. Haro was the firstirobbery victim in CR105783. At that time in 1995 I did not have the exculpatory evidence I now have. Had I had the evidence I now have, i.e., district attorney letter, Sanchez statement, and Lopez declaration, I would have presented it to Judge Amos whom presided overmy trial or given it to defense counsel, or present

7.) I need Jesus H. Lopez prints which are in the San Diego Superior Court files because specifically I will presented Lopez prints as an exhibit to the Supreme Court. I will also present the prints lifted by Detective Sullivan which match Lopez prints.

8.) The declaration of Lopez clearly states that he is alone robbed Haro. Establishing that Lopez was in Haro's car. The prints Detective Sullivan lifted from Haro's car match Lopez prints on file in the Superior Court. Three (3) pieces of corroborating evidence combined support my claim of innocence that I did not rob Rafael Haro.

I declare under penalty of perjury that the foregoing is true and correct, State of California that the foregoing is true and correct. This declaration was executed on August 22, 2006, at Blythe, California.

Respectfully submitted,
*Leovardo Salceda,*
Leovardo Salceda,

3.

---

STATE OF CALIFORNIA ) : ss
COUNTY OF RIVERSIDE )

PROOF OF SERVICE BY
PERSON IN STATE CUSTODY

I, Leovardo Salceda, the undersigned, certify, and do declare that I am over the age of 18 years, incarcerated at Chuckawalla Valley State Prison, located at Blythe CA and a party / not a party to the attached foregoing cause of action. On August 22, 2006, I did serve a true copy of:

Letter and declaration specifically explaining to the Clerk of the Court / Records Clerk why I need Jesus H. Lopez finger prints which are on file in the San Diego Superior Court.

[ ] by depositing it in a prison mail box in a sealed envelope, or [ X ] by handing it to institutional staff in a sealed envelope, along [ X with inmate Trust Account Withdrawal Order form attached to it requesting that postage be fully prepaid, or [ ] with postage affixed thereto for deposit in the United States Mail pursuant to California Code of Regulations Sections 3142 and 3165;

addressed to the following:
Central Records Room 42
San Diego Superior Court
P.O. Box 120128
San Diego, California 92112-4104

Intended place of mailing: U.S. Post Office, at Blythe, California.

I further declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, and belief Executed on August 22, 2006.

*Leovardo Salceda*
PETITIONER/DECLARANT IN PRO PER

EX.

## Exhibits

F      RT 238-239, Mangarin Acknowledges He Just Received Petitioner's Case on
Conflict of Interest, SCD112436

F1     RT 31-35, Trial Court, Prosecutor, Mangarin discuss Using Prior Robbery Case
CR105783 To Impeach Petitioner's Testimony In The Instant Case SCD112436

F2     RT 666-667, Mangarin Tells The Trial Court He Believes The Prior Robbery Case
CR105783 Is A "***Court Trial***" (Mangarin Was Wrong.  It Was A Slow Plea)

F3     Mangarin's Client File In Instant Case SCD112436, Case Activity Log,
8-15-95 Through 12-29-95.  And Then 6-12-97 For Re-Sentencing

F4     RT 463-465, Mangarin Admits To Trial Court He Did Not Review Prior Conviction
Documents Used For Trial on Prior Convictions

1   Mr. Salceda was falling all over himself, staggering,

2   what have you, I think as to whether that would in the

3   minds of the jury create a reasonable or unreasonable

4   apprehension of fear, I think that is a matter for a

·5   jury to decide the degree of it.  I don't know whether

6   any of the witnesses can come in and say based on what

7   I observed, Mr. Champion himself would have had the

8   apprehension of fear.  They can testify as to

9   Mr. Salceda's mannerisms and what he was doing right

10  before the incident.

11      THE COURT:  I have outlined the three areas that

12  I think it might be relevant in.  I am going to give

13  Mr. Mangarin a chance to talk to his witnesses and make

14  us an offer of proof, but those are the areas that I

15  see possible relevancy and those are the areas that I

16  may permit this testimony to come in.

17      MR. GROCH:  I would ask the Court then to order

18  that the investigator who took these statements be

19  produced so I can impeach these witnesses if they

20  change their story, as well as the three witnesses who

21  made the statements that I have, be ordered to come in

22  under the defendant's subpoena, so that way if they --

23  in other words, these witnesses are going to testify

24  contrary to the potential offer of proof, and so I

25  would like them made available, as well as the

26  investigator who took the statements, to impeach, if

27  necessary.

28      MR. MANGARIN:  Your Honor, that's not a correct

343

1  statement.  I don't see anything contrary.  He has one

2  paragraph statements from these individuals.  For you

3  to order him to be produced, your Honor, I don't have

4  any control over that, because that investigator is not

5  working in my office.  He is with the public defender's

6  office.

7          We got this case just recently on a

8  conflict.  Rocco Pelletier is the name of the

9  investigator.  I have had no contact with

10  Mr. Pelletier.  I guess he's subject to subpoena by

11  Mr. Groch.

12          MR. GROCH:  Well, then, the people that he does

13  have control over his subpoenas, and that I have

14  statements from, are Gabriela Murgo, Jesse Guerrero,

15  and Alma Ramos, all of whom indicate the defendant is a

16  rowdy, belligerent drunk.

17          MR. MANGARIN:  Alma Ramos is not one of the

18  persons I would intend to call.  I would love to be

19  able to call her, but she did not see Mr. Salceda on

20  the day of the incident.  Mr. Guerrero and Miss Murgo

21  are two of the witnesses I will be talking to tonight.

22          THE COURT:  Okay.  So potential witnesses will

23  include Mr. Guerrero; correct?

24          MR. MANGARIN:  Yes.

25          THE COURT:  Miss Murgo?

26          MR. MANGARIN:  Yes.

27          THE COURT:  Who are the other ones?

28          MR. MANGARIN:  Carmen Lopez and Manuel Espinosa.

1  handled in the past, simply tell them up front we're

2  going to tell you this is a three strike case.  Does

3  anyone on the panel have any feelings so strong either

4  for or against the three strike law so as to cause them

5  not to be able to serve as a fair and impartial juror.

6      THE COURT:  You realize that what we're doing is

7  we're telling the jury that your client has two prior

8  felonies?

9      MR. MANGARIN:  That's correct, your Honor.  I

10  understand that fully.  And at this point on the

11  record, I will state that it is my full intent at this

12  point to have Mr. Salceda testify and take the stand.

13  He will then be subject to advising the jury in that

14  regard anyway that he has a prior felony record.

15      THE COURT:  I haven't ruled on whether or not

16  these priors would be used for impeachment.  It would

17  appear, of course, that they involve moral turpitude.

18  They're certainly not old, '89 and '93.

19          It's true it's the People's position they

20  want to use these for impeachment; correct?

21      MR. GROCH:  That's correct, your Honor.  And the

22  only additional prior is a 10851, also from the same

23  year as the robbery, same case.

24      THE COURT:  Mr. Mangarin, do you wish to say

25  anything about whether or not these could be used for

26  impeachment purposes?

27      MR. MANGARIN:  Your Honor, Mr. Groch and I

28  discussed addressing that issue at a later point.  At

131

1  this point --

2      THE COURT:  I think it's important to address it

3  now.

4      MR. MANGARIN:  We'll state our objection.

5      THE COURT:  The reason I want to, it's important

6  to address it now, because for some reason they were

7  not used for impeachment, then the only way they would

8  come before this jury is me telling them right up front

9  your client's got two prior felonies.  So I think it's

10  important to make that ruling now.

11          So do you want to be heard on whether or

12  not these could be used for purposes of impeachment?

13      MR. MANGARIN:  We have two robberies, your Honor,

14  we have a theft of an automobile, we have assault with

15  a deadly weapon.

16          We would ask that the assault with the

17  deadly weapon not be used for impeachment purposes,

18  that being arguably not a crime of moral turpitude.

19  That be deleted.

20          With respect to the two robberies, the

21  robbery, two of them, the two counts come from the same

22  offense, we would ask the Court to present it, if the

23  Court is inclined to present it, weren't you convicted

24  of a robbery back in 1991, whatever the year was.  If

25  the Court should feel --

26      THE COURT:  Your argument is I shouldn't allow

27  the assault because it's too similar to the charges

28  herein, but the robbery and the 10851 would be

/ 32

1  permissible?

2       MR. MANGARIN:  Yes.

3       THE COURT:  That's what I'll do.  You can use the

4  robbery and the 10851 to impeach him.  You have got

5  sufficient to impeach him on the basis of prior

6  felonies.  I will utilize my discretion weighing the

7  prejudicial value against the probative effect to keep

8  out the 1993 for purposes of impeachment.

9       MR. GROCH:  Well, your Honor, I would ask that I

10  not be precluded from that.  I mean, the facts are the

11  facts, and the reason we get into the Castro priors is

12  because it does talk about the defendant's credibility,

13  and I don't think it should be completely expunged.

14            If the Court is uncomfortable with the

15  nature of the charges, then I think we could call it a

16  serious felony or --

17       THE COURT:  I think two prior felonies would be

18  sufficient for you to attack him on the grounds of lack

19  of credibility.  I think the addition of this one

20  further felony does little, if anything, to assist you

21  in your attack.  I think the prejudicial value there is

22  it outweighs any additional probative ruling.  '93 will

23  not be utilized.

24            Now, the only way, then, is that if your

25  client takes the stand, that's the only way they would

26  come before this jury.  But you still want me to

27  inquire up front about their feelings on a three strike

28  case, Mr. Mangarin; is that correct?

1    MR. MANGARIN:  Yes, your Honor.  We have made a

2    tactical decision in our case, and that is what we

3    want.

4    MR. GROCH:  Your Honor, if that's the case, I

5    think the prejudice is lessened, and I would further

6    argue to the Court that the recency in time of the 245

7    shows a pattern of moral turpitude conduct, and he is

8    to be untrusted as a witness.

9    And further, I anticipate getting into both

10    the 245 as well as the 211s in an 1101(b) nature,

11    because in both of those cases he stated I was drunk

12    and I don't remember what I did, which is what I

13    anticipate he's going to state on the stand, and yet

14    later, at least in the robbery, he said yeah, I did do

15    that.  And in the 245 did admit guilt.  And so I plan

16    on getting into that as 1101(b) anyway.

17    So in light of the fact that they know it's

18    a two strike -- three strikes case, and I do anticipate

19    getting into the 245 and 1101(b) nature, I would be

20    asked to impeach on it as well.

21    THE COURT:  Well, at this point you will not be

22    allowed to impeach on it.  If he testifies and you

23    think it comes under 1101(b), I will take a look at

24    it.

25    Mr. Salceda.

26    THE DEFENDANT:  Yes, sir.

27    THE COURT:  Have you discussed this with your

28    attorney?

*134*

1      THE DEFENDANT:  Yes, sir.

2      THE COURT:  You understand what your attorney

3  wants me to do is to ask this prospective panel about

4  their feelings on three strike cases.  That means that

5  I will be telling them in essence that you have two

6  strikes against you before we start the case.

7          Do you understand that?

8      THE DEFENDANT:  Yes, sir.

9      THE COURT:  And you're in agreement?

10     THE DEFENDANT:  Yes, I am.

11     THE COURT:  Okay.  I will ask the questions.  All

12  right.

13     MR. GROCH:  And, your Honor, in the course of the

14  questions about three strikes, will the Court also

15  remind the jury that they're not to consider that in

16  penalty or punishment in the issue of guilt, and that's

17  why you're letting them know up front that it's a three

18  strikes case, to make sure they can put that out of

19  their heads?

20     THE COURT:  Yes.

21     MR. GROCH:  Thank you.

22     THE COURT:  All right.  I'll step down, bring

23  them in.

24          (Whereupon, at 11:14 a.m. jury voir dire

25  commences.)

26          (Whereupon, at 3:37 p.m. jurors were duly

27  sworn.)

28          (People's Exhibits 1 through 8,

135

2

1  as well.

2         The second case, your Honor, 1982, was

3  the assault with a deadly weapon, and he pled to

4  the 1192, use of a deadly weapon.  Mr. --

5  Mr. Courubias is in the audience today, and he was

6  there at that incident.  I have interviewed

7  Mr. Courubias, and Mr. Salceda got the benefit in

8  that case in that he got 270 days in return for his

9  plea, but I would say that that case was

10  defensible, and that's the same as in this case in

11  which the jury did not come in with a guilty

12  verdict, and the assault, picks up a brick in this

13  situation, and a half a block away, three or four

14  individuals had sticks, and there is a standoff at

15  that point, and he puts the brick down and he is

16  charged.  He is taken off detox, and Mr. Courubias

17  thinks he is being taken down there only for detox

18  and finds out later that he has pled and got the

19  270 days, but that was a second strike or a second

20  incident.

21         He doesn't have a real egregious

22  criminal history as a juvenile or adult, and

23  certainly he has his third strike, technically, but

24  the situation given, what we have of the current

25  offense, and given particularly the second offense

26  that he pled to the second strike, and the second

27  incident.

28         He is a person that could turn his life

*Exhibit J-5*

1    around, and he was doing that before this incident

2    happened.

3              As I have indicated before, he has two

4    children, a family. He was not in the

5    neighborhood. He was receiving treatment for his

6    alcohol problem at Saint Vincent De Paul at one

7    point, and in the course of his emotional times

8    with his estranged wife, he fell off the wagon, and

9    started drinking back some time in April of this

10   year and now started finding himself in the

11   situation that he is in today.

12         THE COURT: Well, actually, there are three

13   strike priors; isn't that true?

14         MR. MANGARIN: Yes, the first was the '89

15   case. He was found guilty of two separate counts

16   on that in a court trial with Judge Mudd

17   represented by Mr. Youmans, public defender's

18   office. And then the 1992 case, I believe it was

19   an assault with a deadly weapon involving the

20   individual by his house.

21         THE COURT: So you have indicated, I would

22   have to be able to strike not one, but two of

23   these, to do anything but impose the 25 to life.

24   Isn't that correct?

25         MR. MANGARIN: Well, your Honor, I think you

26   do have the authority under the Salazar case. I

27   can give you the cites to impose sentence, the

28   great extent of that, and that is as far as I see,

People v. Salceda          SCD 112436      12/29/95

*Exhibit J-5*  667

889

*Client file*

## DEPARTMENT OF THE ALTERNATE PUBLIC DEFENDER
### Central Case Activity Log

### CLIENT INFORMATION

**Client Name:** LEOVARDO  SALCEDA          **Attorney Name:** MANGARIN

**Client Date Of Birth:** 8/20/69 **APD Case #:** A6CF0160     **Class/Location:** C58

**DA Case #:** P06236901          **MC#:** CD112436          **SC#:**

| Date | Time | Atty | DA | Judge | Event | Result | Date |
|------|------|------|----|----|----|----|----|
| | | (TF) (CL) | | | 231-3510 Gabriela Salceda | | |
| 8/15 | 1.5 | 237-5531 Mother - | (RW) File + discovery / | | | | |
| | | Telephone conf w/ client. | | | | | |
| | | Letter from client | | | | | |
| | | | | | | | |
| 9/3 | 2.5 | Conf w Client at Bailey re strikness /recollectin /exposure - | | | | | |
| 9/12 | 1.0 | Letter from client / Meeting at office w/h ( ) | | | | | |
| | | Mom & witness "Nacho" - answered all questions | | | | | |
| 9/15 | 1.0 | Appear M-1 Readiness DDA Berry / Judge Mills - | | | | | |

### CLOSE OUT SUMMARY

**Plea/Offense:** ___ PC 209 ___          **Date Closed:** 1-7-00

**Disposition:**

1368 ___   Acquittal (Major Count) ___   Conflict ___   Counsel Witness ___
Dismissed ___   Diversion ___   Failure To Appear ___   Jury Trial (Guilty) X
Jury Trial (Mistrial/Dismissed) ___   Relieved ___   Retained Private Attorney ___

**Sentence:**

Calif Youth Auth ___   Diversion ___   Fine ___   Honor Camp ___   Restitution ___
State Prison X ___   Ward Own Home ___   Probation (County Jail) ___
Probation (Credit For Time) ___          Probation (No Jail) ___
**Attorney Hours:** 90.2 **Investigator Hours:** ___   **Investigator Mileage:** ___
**Motions filed:** N/A ___   **Judge:** ___   **Result:** ___
**Expert Services Index** Expert Services for future Reference? ___
**Name:** ___   **Fee:** ___   **Topic:** ___
**Name:** ___   **Fee:** ___   **Topic:** ___

### UNUSUAL POLICE ACTIVITY

Name of Officer: ___          ID#: ___
Agency: ___
Unusual Activity Number: ___

### UNUSUAL ACTIVITY

1. Questionable Arrest/Detention     3. Use of Excessive Force
2. Other Credibility Problems     4. Cultural/Racial Bias

*Defense Attorney*
*Daniel J. Mangarin*
*Case SCD112436*

Pu Dispo ~~Codes~~ 6
Snt 33
*Exhibit*

Department Of The Alternate Public Defender
Case Activity Log

| Date | Time | Atty | DA | Judge | Event | Result | Next Date/Time |
|------|------|------|----|----|----|----|----|
| | | | | | | | |

Trial conference 9/25/95. DDA states no offer in light of Δ's prior record. / Judge Amos appeared to agree this is case probably for Jury Trial. Noted most defenses - intoxicated mental defense re "black out" may not address all charges - (Eg. Agreed see cts 2 & 4) general intent / that w.R. Mother.

| 9/16 | 1.0 | | | | | | |

Review all contents. Prepare for trial - Prepare w.nro lot.

Daniel J. Mangarin
Case SCD112436                    Exhibit

## SAN DIEGO COUNTY
## DEPARTMENT OF THE ALTERNATE PUBLIC DEFENDER

### Case Activity Log

| Date | Time | Atty | DA | Judge | Event | Result | Next Date/Time |
|------|------|------|----|----|----|----|----|
| | | | | Jury trial / companion matter | | | |
| | | | | For time and discovery and other | | | |
| | 90.2 | docs | | see case A6CF0160 | | | |

Daniel J. Mangarin, Esq.
Case SCD112436                         Exhibit

Depa    ent Of The Alternate Public    fender
Case Activity Log

| Date | Time | Atty | DA | Judge | Event | Result | Next Date/Time |
|------|------|------|----|----|------|------|------|
| | .30 | Prepare fort Trial | | | | | |
| | 48hrs | TRIAL — i prepart | | | | | |
| | 1.0 | PHS | | | | | |
| | 5.2 | Motion for new trial / strike strike | | | | | |
| | 90.2 | Ct struck 2 strikes – D sent 12yrs | | | | | |

Daniel Mangarin, Esq.
Case SCD112436                    Exhibit ''

1    anybody, and no one can force you to discuss this

2    case.

3              If you choose to discuss the case, you can

4    do so at a place and time of your own choosing.  In the

5    event someone continues to pester you or disturb you

6    about discussing the case, you do not want to discuss

7    the case, feel free to contact the Court and we will

8    take steps to remedy that situation.

9              Each of you has a right to have your own

10   personal information sealed, and there is a form which

11   will be available on the way out.  If you fill that

12   form out, I will sign the appropriate order having your

13   personal information related to this case and the other

14   case that you sit on sealed.

15             Again, let me thank you for the time and

16   effort that you put in on this case.

17             Are they finished with their tour?  You are

18   finished with your tour of service, so you are

19   discharged.  Thank you once again.

20        MR. GROCH:  If anyone would like to discuss the

21   case or answer any questions, we'll be out in about two

22   minutes.

23        THE COURT:  I'll have the attorneys here for a

24   few moments and they'll be outside.

25             (The following proceedings were had in open

26   court, outside the presence of the jury:)

27        THE COURT:  We're outside the presence of the

28   jurors.

1          We have the other part of the trial that we

2     need to handle with respect to the priors.  There has

3     been a jury waiver.  Yes.

4          All right.  We need to set a time for the

5     remaining portion.  What's the time estimate, do you

6     expect?

7          MR. GROCH:  30 minutes.

8          THE COURT:  Have you seen all the packets and so

9     forth, Mr. Mangarin?

10         MR. MANGARIN:  You provided --

11         MR. GROCH:  I believe I have.

12         THE COURT:  All right.

13         MR. MANGARIN:  I am not sure, your Honor, but I

14    don't think it's going to be a problem seeing them, if

15    I can get them before the hearing.

16         THE COURT:  I am trying to think when a good time

17    to schedule it will be.

18         MR. MANGARIN:  We discussed this.  I start a

19    trial on Thursday.  Tomorrow we're available all day,

20    and I understand you're selecting a jury, but any time

21    tomorrow, but if not tomorrow, then at your convenience

22    any date, your Honor.

23         THE COURT:  When do you start your next case

24    Thursday?

25         MR. MANGARIN:  Thursday.

26         THE COURT:  What time do you report?  Nine

27    o'clock?

28         MR. MANGARIN:  8:45.

573

1          THE COURT:  Why don't we try and do it four

2     o'clock tomorrow.  I will just let this jury go early

3     that I have and we'll do it at four o'clock tomorrow.

4     How is that?

5          MR. GROCH:  That's fine.

6          THE COURT:  So we'll continue the trial on the

7     priors and we'll handle that at four o'clock tomorrow.

8     Okay.

9          MR. GROCH:  Thank you, your Honor.

10          THE COURT:  Thank you.

11               (Whereupon, at 5:07 p.m. the hearing

12     adjourned.)

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*574*

## **Exhibits**

G     Prior Robbery Case, Preliminary Hearing Transcript (Excerpts) Pages 4-9, 21-25,
      CR105783, 7-14-89

G1    Prior Robbery Case (Excerpts), Fingerprints Lifted From Rafael Haro' Car.
      Marijuana Baggies Found In Haro's Car (also held for prints), CR105783, 6-30-89

G

1              THE COURT:  HAVE A SEAT UP HERE, PLEASE.

2                   JUST PULL THAT MICROPHONE TOWARDS YOU, IF YOU

3    WOULD, MR. HARO.

4

5                        DIRECT EXAMINATION

6    BY MS. GAYLE:

7         Q    MR. HARO, WOULD YOU STATE YOUR FULL NAME, PLEASE,

8    AND SPELL YOUR LAST NAME?

9         A    RAFAEL S. HARO, H-A-R-O.

10        Q    DO YOU OWN AN AUTOMOBILE, MR. HARO?

11        A    DO I KNOW WHAT?     .

12        Q    DO YOU OWN A CAR?

13        A    YES, MA'AM.

14        Q    DID YOU OWN A CAR ON JUNE 30TH, 1989?

15        A    YES, MA'AM.

16        Q    WHAT TYPE OF CAR DID YOU OWN?

17        A    CAPRICE CLASSIC '77.

18        Q    ALL RIGHT.  AND WHAT COLOR IS THAT CAR?

19        A    BEIGE.

20        Q    AND DO YOU HAVE LICENSE PLATES ON IT?

21        A    YES.

22        Q    CAN YOU TELL ME WHAT THE LICENSE PLATE READS?

23        A    RUQUITO.

24        Q    SPELL THAT PLEASE?

25        A    R-U-Q-U-I-T-O.

26        Q    ARE THOSE CALIFORNIA LICENSE PLATES?

27        A    YES, MA'AM.

28        Q    DO YOU RECALL WHETHER OR NOT YOU WERE IN YOUR CAR

8    1    AT APPROXIMATELY 9:00 P.M. ON JUNE 30TH, 1989?

2    A    YES, MA'AM.

3    Q    DO YOU RECALL WHERE YOU WERE LOCATED IN YOUR CAR?

4    A    YEAH, I WAS SITTING.

5    Q    OKAY.  DIRECTING YOUR ATTENTION TO JUNE 30TH, 1989,

6    AT ABOUT 9:00 CLOCK AT NIGHT, WHERE WAS YOUR CAR?

7    A    ON 61ST STREET.

8    Q    IS THAT 61ST STREET, IS THAT IN SAN DIEGO COUNTY?

9    A    YES, MA'AM.

10    Q    OKAY.  WAS ANYONE ELSE IN YOUR CAR?

11    A    NO.

12    Q    DID ANYTHING UNUSUAL HAPPEN AT THAT TIME AND PLACE?

13    A    YEAH, I GOT ROBBED.

14    Q    WERE YOU ROBBED BY ONE PERSON OR MORE THAN ONE

15    PERSON?

16    A    TWO.

17    Q    OKAY.  ARE EITHER OF THE TWO PEOPLE THAT ROBBED YOU

18    PRESENT IN THE COURTROOM?

19    A    YES.

20    Q    COULD YOU POINT TO --

21    A    RIGHT THERE.

22    Q    ALL RIGHT.  IS THAT THE ONLY PERSON?

23    A    IT WAS ANOTHER ONE WITH HIM.

24    Q    IS THAT OTHER PERSON IN THE COURTROOM?

25    A    NO.

26    Q    OKAY.

27    THE COURT:  RECORD CAN REFLECT THE WITNESS HAS POINTED TO

28    THE DEFENDANT LEOVARDO SALCEDA.

BY MS. GAYLE:

Q    WHERE EXACTLY WERE YOU, AND BY THAT I MEAN IN YOUR CAR OR OUT OF THE CAR, WHEN YOU FIRST SAW THE DEFENDANT ON THAT NIGHT?

A    I WAS SITTING -- I WAS LISTENING TO THE RADIO.  I WAS SITTING IN MY CAR.

Q    WHERE WAS THE DEFENDANT WHEN YOU FIRST SAW HIM?

A    HE WENT AROUND IN FRONT OF ME, HE CAME THIS WAY, OPEN THE DOOR AND STARTED PULLING ME OUT.

Q    WHEN YOU SAY HE CAME AROUND, DO YOU MEAN THAT HE WALKED IN FRONT OF YOUR CAR?

A    UH-HUH.

Q    IN FRONT AROUND HERE?

A    AND THEN HE OPENED THE DOOR.

Q    AND THEN HE CAME OVER TO THE PASSENGER SIDE?

A    UH-HUH.

Q    PLEASE, I'M GOING TO TRY NOT TO TALK WHILE YOU'RE TALKING AND THAT MAKES IT EASIER FOR THE COURT REPORTER.

DID HE SAY ANYTHING TO YOU?

A    "GIVE ME THE MONEY."

Q    WAS HE HOLDING ANYTHING WHEN HE SAID THAT TO YOU?

A    NO.

Q    WHAT DID YOU DO WHEN HE MADE THAT STATEMENT?

A    I TRIED TO FIGHT BACK.

Q    HOW DID YOU TRY AND FIGHT BACK?

A    BECAUSE I WAS SITTING ON THE STEERING WHEEL AND I TRIED TO FIGHT BACK AND THE OTHER GUY THAT WAS WITH HIM, BEHIND HIM, HE PUT THE GUN ON MY HEAD, AND SAY, "DON'T DO IT, I'LL BLOW

1    YOUR HEAD OFF, JUST GIVE ME THE MONEY, GIVE ME THE MONEY."

2          Q     OKAY.  NOW, YOU'RE INDICATING THAT THE OTHER PERSON

3    THAT ROBBED YOU, THAT THE ONE THAT'S NOT HERE TODAY?

4          A     UH-HUH.

5          Q     HE ALSO CAME OVER TO YOUR CAR?

6          A     UH-HUH.

7          THE COURT:  MR. -- SAY YES OR NO RATHER THAN UH-HUH SO

8    THE LADY CAN WRITE IT DOWN.  THANK YOU.

9          THE WITNESS:  OKAY.

10   BY MS. GAYLE:

11         Q     NOW, THE OTHER PERSON, YOU SAID HE HAD A GUN?

12         A     YES.

13         Q     DID YOU SEE THE GUN?

14         A     YES.

15         Q     WAS IT A HANDGUN?

16         A     YES.

17         Q     WHAT DID HE DO WITH THE GUN?

18         A     HE JUST PUT IT ON ME.

19         Q     HE HELD IT TO YOUR HEAD?

20         A     (NODS HEAD.).

21         Q     WHAT DID HE SAY WHEN HE HELD THE GUN TO YOUR HEAD?

22         A     I WAS TRYING TO FIGHT BACK.  HE SAYS, "DON'T DO IT

23   OR I BLOW YOUR HEAD OFF, JUST GIVE HERE YOUR MONEY, GIVE ME YOUR

24   WALLET."

25         Q     OKAY.  WHAT HAPPENED AFTER THAT?

26         A     HE TOOK MY WATCH, MY CHAINS AND THE MONEY I HAD ON

27   MY RIGHT POCKET.

28         Q     WHEN YOU SAY HE, WHO ARE YOU REFERRING TO?

56

| | | |
|---|---|---|
| 1 | A | HIM. |
| 2 | Q | THE DEFENDANT? |
| 3 | A | YEAH. |
| 4 | Q | HE TOOK YOUR WALLET? |
| 5 | A | NO, HE DIDN'T.  I FIGHT WITH HIM. |
| 6 | Q | YOU HAD A FIGHT WITH HIM.  DID HE TAKE ANYTHING |
| 7 | | FROM YOU? |
| 8 | A | MY WALLET AND MY CHAINS AND MONEY I GOT RIGHT HERE |
| 9 | | IN THIS POCKET. |
| 10 | Q | WHAT DID HE DO AFTER HE TOOK THAT FROM YOU? |
| 11 | A | I -- I GOT OUT OF THE CAR AND RUN AND HE WAS BEHIND |
| 12 | | ME, AND WE WERE FINALLY ACROSS THE STREET.  HE TRIED TO GET MY |
| 13 | | WALLET, BUT I DIDN'T LET HIM, BECAUSE I HAD MY PAPERS IN IT. |
| 14 | Q | OKAY.  AFTER HE FOLLOWED YOU ACROSS THE STREET -- |
| 15 | A | UH-HUH. |
| 16 | Q | -- THERE WAS A STRUGGLE?  YES? |
| 17 | A | YES. |
| 18 | Q | AND HE WAS ATTEMPTING TO GET YOUR WALLET? |
| 19 | A | YES. |
| 20 | Q | WAS HE ABLE TO TAKE YOUR WALLET FROM YOU? |
| 21 | A | NO, I DIDN'T LET HIM. |
| 22 | Q | WHAT HAPPENED AFTER THAT? |
| 23 | A | THE OTHER GUY STARTED TO COME, HE RUN WITH HIM AND |
| 24 | | THEN THEY RUN OFF. |
| 25 | Q | HOW DID -- DID YOU SEE THEM LEAVE? |
| 26 | A | YEAH. |
| 27 | Q | HOW DID THEY LEAVE? |
| 28 | A | THEY JUST RUN TOWARDS IMPERIAL. |

1   Q  OKAY.  AND WHAT HAPPENED TO YOUR CAR?

2   A  WE WENT -- ME AND THE OTHER GUY, THE ONE THAT WAS

3 WITH ME, SANCHEZ, WE WENT TO 62ND STREET.  THERE I PHONE 911 TO

4 MAKE A REPORT, AND ABOUT 15 MINUTES LATER, THEY CALL ME BACK,

5 AND THEY SAY THEY GOT MY CAR AND AND IT WAS INVOLVED IN A GAS

6 STATION ROBBERY.

7   Q  LET'S BACK UP.  OKAY.  AFTER THE DEFENDANT FOLLOWED

8 YOU ACROSS THE STREET AND TRIED TO TAKE YOUR WALLET AND YOU

9 WOULDN'T LET HIM, THEY WENT AWAY, CORRECT?

10   A  YES.

11   Q  DID THEY LEAVE ON FOOT?

12   A  NO, ON MY CAR.

13   Q  THEY TOOK YOUR CAR?

14   A  YES.

15   Q  DID YOU SEE THEM DRIVING OFF IN YOUR CAR?

16   A  YES.

17   Q  WAS THE DEFENDANT IN YOUR CAR WHEN HE DROVE OFF?

18   A  YES.

19   MS. GAYLE:  OKAY.  I HAVE NO FURTHER QUESTIONS OF THIS

20 WITNESS, YOUR HONOR.

21   THE COURT:  CROSS-EXAMINE.

22   MR. YOUMANS:  THANK YOU, YOUR HONOR.

23

24         CROSS-EXAMINATION

25 BY MR. YOUMANS:

26   Q  THIS INDIVIDUAL THAT YOU HAVE DESCRIBED AS THE

27 DEFENDANT, WHAT WAS HE WEARING THAT NIGHT?

28   A  HE WAS WEARING A HAT.

1       MR. YOUMANS:  NO, YOUR HONOR.

2       THE COURT:  ALL RIGHT.  THANK YOU, MR. HARO, YOU MAY STEP

3    DOWN.  YOU ARE EXCUSED, YOU ARE FREE TO LEAVE OR YOU CAN REMAIN

4    AND LISTEN IF YOU'D LIKE.

5       THE WITNESS:  THANK YOU.

6       MS. GAYLE:  THE PEOPLE CALL RAMON CESBETS.

7

8                    RAMON CESBETS,

9       CALLED AS A WITNESS BY AND ON BEHALF OF THE PEOPLE,

10      HAVING BEEN FIRST DULY SWORN, TESTIFIED AS FOLLOWS:

11

12      THE COURT:  JUST HAVE A SEAT RIGHT UP HERE MR. CESBETS.

13

14                   DIRECT EXAMINATION

15   BY MS. GAYLE:

16       Q    MR. CESBETS, CAN YOU STATE YOUR FULL NAME, PLEASE,

17   AND SPELL YOUR LAST NAME?

18       A    RAMON CESBETS, THAT'S R-A-M-O-N, CAP C-E-S-B-E-T-S.

19       Q    ARE YOU EMPLOYED, MR. CESBETS?

20       A    YES.

21       Q    BY WHOM ARE YOU EMPLOYED?

22       A    TEXACO.

23       Q    WAS TEXACO YOUR EMPLOYER ON JUNE 30TH, 1989?

24       A    YEAH.

25       Q    WERE YOU WORKING ON THAT DAY AT ABOUT 10:00 THAT

26   NIGHT?

27       A    YEAH.

28       Q    AT WHAT LOCATION WERE YOU WORKING?

1          A       WELL, I WORK AT THE GAS STATION, 1025 LINCOLN

2   AVENUE.

3          Q       YOU WERE WORKING AT THAT LOCATION ON THE NIGHT OF

4   THE 30TH?

5          A       YEAH, UH-HUH.

6          Q       IS THAT LOCATED IN SAN DIEGO COUNTY?

7          A       YEAH.

8          Q       DID ANYTHING UNUSUAL HAPPEN ABOUT 10:00 ON THAT

9   NIGHT?

10          A       I SAW SOMEBODY TRY TO GO THERE AND TRY TO ROB ME

11   UP.

12          Q       SOMEBODY TRIED TO ROB YOU?

13          A       YEAH.

14          Q       WAS THIS SOMEONE ONE PERSON OR MORE THAN ONE

15   PERSON?

16          A       IT WAS TWO IN THE CAR, YOU KNOW, I RECOGNIZE ONLY

17   ONE.

18          Q       IS EITHER OF THE PEOPLE THAT ATTEMPTED TO ROB YOU

19   ON THAT NIGHT PRESENT IN THE COURTROOM?

20          A       YEAH.

21          Q       OKAY.  COULD YOU POINT TO THAT INDIVIDUAL AND

22   DESCRIBE WHAT HE'S WEARING?

23          A       OVER THERE IN THE BLUE CLOTHES ON.

24          THE COURT:   RECORD CAN SHOW THE WITNESS HAS POINTED AT

25   THE DEFENDANT LEOVARDO SALCEDA.

26   BY MS. GAYLE:

27          Q       OKAY.  WHAT WERE YOU DOING WHEN YOU FIRST SAW THE

28   DEFENDANT?

1        A     WELL, HE ASKED ME THREE TIMES, I MEAN, HE ASK ME TO

2   OPEN THE CASHIERS, AND THEN I LOOK TO HIM, I LOOKED -- TO HIS

3   GUN TO SEE IF HE IS PULLING ME, AND HE ASK ME THREE TIME TO OPEN

4   THE BOX.  I OPEN FOR HIM.

5        Q     LET ME GO BACK A MINUTE.  WHEN YOU FIRST SAW THE

6   DEFENDANT, WERE YOU NEAR A CASH REGISTER?

7        A     UH-HUH.

8        THE COURT:  ANSWER YES OR NO, PLEASE.

9        THE WITNESS:  YES.

10  BY MS. GAYLE:

11       Q     SO WERE YOU WORKING IN A LITTLE BUILDING?

12       A     YEAH.

13       Q     OKAY.  AND THE DEFENDANT APPROACHED YOU?

14       A     UH-HUH, YEAH.

15       Q     DID HE SAY ANYTHING TO YOU?

16       A     YEAH, TO OPEN THE CASHIER.

17       Q     WHAT DID YOU DO WHEN HE SAID THAT TO YOU?

18       A     JUST LOOK TO HIM.

19       Q     OKAY.  AND WHAT DID HE SAY AFTER THAT?

20       A     "OPEN THE CASHIER."

21       Q     AND WHAT THEN WHAT DID YOU DO?

22       A     THE THIRD TIME I OPEN, YEAH.

23       Q     OKAY.  WAS THE DEFENDANT HOLDING ANYTHING IN HIS

24  HAND WHEN HE MADE THE STATEMENTS TO YOU?

25       A     A GUN.

26       Q     I'M GOING TO ASK YOU TO LET ME FINISH MY QUESTION

27  BEFORE YOU ANSWER.

28       A     OKAY.

72

| | | |
|---|---|---|
| 1 | Q | HE WAS HOLDING A GUN? |
| 2 | A | UH-HUH. |
| 3 | Q | WAS IT A HANDGUN? |
| 4 | A | YEAH. |
| 5 | Q | WHERE WAS HE HOLDING IT? |
| 6 | A | IN HIS RIGHT HAND. |
| 7 | Q | WAS HE POINTING IT AT ANYTHING? |
| 8 | A | YEAH, HE POINT ON ME. |
| 9 | Q | OKAY.  SO YOU OPENED THE DRAWER? |
| 10 | A | UH-HUH. |
| 11 | Q | WHAT HAPPENED NEXT? |
| 12 | A | THEN I OPEN, HE PUT HIS HANDS, TAKE THE MONEY. |
| 13 | Q | AND WHAT DID HE DO AFTER HE TOOK THE MONEY? |
| 14 | A | I JUMPED ON HIM. |
| 15 | Q | YOU JUMPED ON HIM? |
| 16 | A | YEAH. |
| 17 | Q | WAS THERE A STRUGGLE? |
| 18 | A | YEAH. |
| 19 | Q | WHAT HAPPENED AFTER THE STRUGGLE? |
| 20 | A | SHOOTING, HE SHOOT ONE TIME. |
| 21 | Q | HE SHOT AT YOU? |
| 22 | A | YEAH. |
| 23 | Q | WAS THE GUN POINTED AT YOU WHEN HE SHOT? |
| 24 | A | IT WAS POINTED ON ME BUT I WAS MOVING, BY THE TIME |
| 25 | | HE SHOT. |
| 26 | Q | WHAT DID HE DO AFTER HE SHOT THE GUN? |
| 27 | A | I JUMP ON HIM, YOU KNOW, TRY TO GET THE MONEY BACK. |
| 28 | Q | WHAT HAPPENED THEN? |

| | | |
|---|---|---|
| 1 | A | THEN WE WRESTLED TOGETHER, RIGHT, AND HE TAKE OFF. |
| 2 | Q | OKAY.  DID HE DRIVE OFF OR DID HE LEAVE ON FOOT? |
| 3 | A | NO, HE GET IN THE CAR, INSIDE OF THE CAR. |
| 4 | Q | DID YOU GET A LOOK AT CAR? |
| 5 | A | YEAH. |
| 6 | Q | WHAT COLOR WAS THE CAR? |
| 7 | A | BROWN CAR. |
| 8 | Q | DO YOU KNOW WHAT KIND IT WAS? |
| 9 | A | LIKE A CAPRICE, YOU KNOW. |
| 10 | Q | A CAPRICE? |
| 11 | A | YEAH. |
| 12 | Q | OKAY.  DID YOU HAPPEN TO GET A LOOK AT THE LICENSE |
| 13 | PLATE? | |
| 14 | A | YES. |
| 15 | Q | DO YOU RECALL WHAT THE LICENSE PLATE READ? |
| 16 | A | RUQUIDO. |
| 17 | Q | COULD YOU SPELL THAT? |
| 18 | A | R-U-Q-U-I-D-O. |
| 19 | Q | AND WHAT DID YOU DO AFTER THEY DROVE ON? |
| 20 | A | CALLED THE POLICE, PUSHED THE BUTTON. |
| 21 | | MS. GAYLE:  NO FURTHER QUESTIONS, YOUR HONOR. |
| 22 | | THE COURT:  CROSS-EXAMINE. |
| 23 | | |
| 24 | | CROSS-EXAMINATION |
| 25 | BY MR. YOUMANS: | |
| 26 | Q | MR. CESBETS, WHAT WAS THE LIGHTING LIKE IN YOUR GAS |
| 27 | STATION THAT NIGHT? | |
| 28 | A | THE LIGHT?  A LOT OF LIGHT IN THERE. |

Investigator's Follow-up Report
SDPD Crime Case #89-073756
Page 4

On June 5, 1989 at 0930 hours, Rafael HARO was shown a photographic lineup, consisting of five colored polaroid photographs. Prior to viewing any photographs, HARO was admonished per S.D.P.D. Photo Lineup Form and told that he could lay out the photographs in front of him. On viewing the photos, he immediately pointed to photograph #4 (Leo SALCEDA) and stated, "That's the fucker, Leo. That's the mother fucker right there." He signed the bottom of the form.

On July 5, 1989, Detective SULLIVAN, S.D.P.D. Robbery Division, examined the stolen vehicle belonging to HARO, which had been impounded at San Diego Police Department Central Division. Several fingerprints were lifted from inside the vehicle. They will be impounded for later comparison.

I request that Leovardo SALCEDA be charged with two counts of Armed Robbery (Case numbers #89-073756 and #89-073762), further that he be charged with two counts of attempted murder, in that he fired two rounds from a weapon at victim CESPEDES, further that he be charged with one count of 10851 V.C. (Auto Theft) in that he took the vehicle belonging to HARO by force, further that he be charged with one count of 20002 V.C. in that, while fleeing from a felony, he became involved in a traffic accident and fled the scene.

APPROVED BY:  _C. T. Martin_

59

POSSIBLY WEARING A BASEBALL CAP. HE TOLD ME HE MIGHT BE ABLE TO IDENTIFY THE PASSENGER IF HE SAW HIM AGAIN.

OFFICER'S STATEMENT: I TOOK TWO PHOTOS OF THE GAS STATION, WITH BLANCHARD'S TRUCK IN THE SAME POSITION IT WAS IN WHEN HE WITNESSED THE ROBBERY. I ALSO TOOK TWO PHOTOS OF CESPEDES' INJURIES ON HIS LEFT ARM AND LEFT CHEEK. I CHECKED THE AREA FOR ADDITIONAL EVIDENCE BUT FOUND NONE.

DURING THE INVESTIGATION I RECEIVED A RADIO CALL THAT THE SUSPECT'S CAR HAD BEEN INVOLVED IN AN ACCIDENT ON AUBURN ST., AND TWO HISPANIC MALES HAD FLED THE SCENE. OFFICERS' FILLEY (4294) AND SWILLEY (4252) FROM EASTERN DIVISION RESPONDED AND RECOVERED THE CAR. (SEE THEIR REP. I ADVISED THEM TO HOLD THE CAR FOR PRINTS.

THE CAR HAD BEEN STOLEN DURING A ROBBERY AT 2045 AT 710 61ST ST. (SEE CASE # 89-073756).

**PDRB**

☒ IMPOUNDED ☐ RECOVERED ☐ STORED ☐ RELEASED – **VEHICLE REPORT** *Use reverse for reporting Embezzled/Stolen Vehicles/Plates.*

| REPORTING DEPARTMENT | BEAT NUMBER | CASE NUMBER |
|---|---|---|
| SAN DIEGO POLICE DEPARTMENT | 317 | 89-073756. |

| LOCATION/IMPOUNDED/RECOVERED FROM | | | WAS NEIGHBORHOOD OR AREA CHECKED FOR WITNESSES, LEADS, CLUES? IF "YES" EXPLAIN IN REMARKS OR ON SEPARATE SHEET | | |
|---|---|---|---|---|---|
| 4700 AUBURN DR. | | | ☒ YES ☐ NO | | 89-073729 |
| TOWING/STORAGE CONCERN NAME AND ADDRESS | TELEPHONE NUMBER | | DATE/TIME OF RECOVERY/IMPOUND | | RECOVERED/CALL IN TIME (0800) |
| 7 TO Z TOWING | 234-3275 | | 6-30-89 2200 | | |
| REPORTED BY | HOME ADDRESS | 1401 BROADWAY | | | TELEPHONE NUMBER 531-2000 |
| SDPD. | BUSINESS ADDRESS | | | | TELEPHONE NUMBER |

## DESCRIPTION AND OWNERSHIP

| YEAR | MAKE | MODEL | BODY TYPE | COLOR (COMBINATION) | LICENSE NUMBER(s) | | ONE ☐ TWO ☒ | MONTH/YEAR | STATE |
|---|---|---|---|---|---|---|---|---|---|
| 7 | CHEV. | CAPRICE | 4 DR | TAN | RUQUITO | | | 5- 90 | CA. |

| VEHICLE IDENTIFICATION NUMBER (VIN) | ENGINE NUMBER (EN) | VIN COMPARE WITH REG. CARD | VIN APPEAR ALTERED/REMOV'D | VIN CLEAR IN SVS | LIC. NUMBER(s) CLEAR IN SVS |
|---|---|---|---|---|---|
| N691 7C16B 22C | | ☒ YES ☐ NO | ☐ YES ☒ NO | ☒ YES ☐ NO | ☒ YES ☐ NO |

| STOLEN, NAME, DATE AND CASE NUMBER OF REPORTING AGENCY | HOLDS PLACED FOR | HAS VEH. RETURNED TO OWNER | STORAGE AUTHORITY |
|---|---|---|---|
| IMPOUNDED 6-30-89-89-073756. | ROBBERY BY FILLEY (UNIT) | ☐ YES ☐ NO | ☒ 22655(A) VC |

| REGISTERED OWNER | ADDRESS | TELEPHONE(S) (HOME AND BUSINESS) |
|---|---|---|
| NARO RAFUEL | | UNKNOWN. |
| LEGAL OWNER | | UNKNOWN. |
| | | TELEPHONE(S) (HOME AND BUSINESS) |

## CONDITION AND INVENTORY *(Use Remarks space or attach separate descriptions as needed.)*

| METER READING | DRIVEABLE | HAVE YOU ENTERED MISSING, IDENTIFIABLE PARTS IN SVS |
|---|---|---|
| ,879.8 | ☐ YES ☐ NO ☐ UNKNOWN | ☐ YES ☒ NO |

* describe fully

| CONDITION | YES | NO | ITEMS PRESENT | YES | NO | ITEMS PRESENT | YES | NO | ITEMS PRESENT | YES | NO | ITEMS | CONDITION |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CHECKED | X | | SEAT (FRONT) | X | | REGISTRATION | | X | HUB CAPS (# 3 ) | | X | TIRES/WHEELS | FAIR. |
| REPAINTED | | X | SEAT (REAR) | X | | ALT/GENERATOR | X | | SPECIAL WHEELS | | X | LEFT FRONT | |
| DAMAGED | | X | RADIO | X | | BATTERY | X | | DRIVING LIGHTS | | X | RIGHT FRONT | |
| EXTRA/STRIP | | X | TAPE DECK | X | | DIFFERENTIAL | | | CAMPER * | | X | LEFT REAR | ✓ |
| . PARTS STRIP | | X | TAPES (# 4 ) | X | | TRANSMISSION | | | CARGO * | | X | RIGHT REAR | |
| Y METAL STRIP | | X | OTHER RADIO | | X | AUTOMATIC ( ) | X | | VESSEL AS LOAD * | | X | SPARE(s) | |
| SWITCH | | | IGNITION KEY | X | | MANUAL ( ) | | X | FIREARM(s) * | | | | UNKNOWN. |

## LOST PROPERTY, TOOLS, VEHICLE DAMAGE, ARRESTS (FULL NAMES, CHARGES, AGE, WHERE DETAINED)

THIS VEHICLE WAS ENVOLVED IN A ROBBERY AT 1000 EUCLID . IT THEN WAS

ENVOLVED IN A TRAFFIC ACCIDENT AT 4700 AUBURN DR. THE TWO SUSPECTS

FLED THE SCENE EASTBOUND AUBURN DR. I RECOVERED FIVE SMALL BAGGIES

OF MARIJUANA ON THE PASSENGER FLOOR BOARD. THE MARIJUANA AT EASTERN

DIV # . THE CAR WAS IMPOUNDED AT CENTRAL PER ROBBERY-

| PEACE OFFICER ORDERING VEHICLE STORED/REPORTING OFFICER | I.D. # | DIVISION | |
|---|---|---|---|
| G. FILLEY | 4294 | E-2 | ☐ CONTINUED ON SEPARATE SHEET |
| APPROVED BY D. RWALKER | I.D. # 3095 | GARAGE PRINCIPAL OR AGENT STORING VEH. (SIGNATURE) Danny C. Shaw | DATE AND TIME 6/30/89 2250 |

## VALUATION, RELEASE, DISPOSITION

| RECOVERY TELETYPE (DATE & NUMBER) | REQUIRED NOTICES SENT TO REGISTERED & LEGAL OWNERS (SEC. 22851 VC) | IF NO IS CHECKED, INDICATE REASON | ☐ AVA PROGRAM | |
|---|---|---|---|---|
| | ☐ YES ☒ NO | HOLD FOR ROBBERY | | |
| APPRAISED VALUE 1000 | DATE AND TIME OF APPRAISAL 6-30-89 2315 | APPRAISING OFFICER'S SIGNATURE Y G. Filly | | I.D. NUMBER 4294. |
| STORAGE AUTHORITY/CONCERN | | | | DATE |

| RELEASE VEHICLE TO | ADDRESS |
|---|---|
| | |

| SIGNATURE OF PERSON AUTHORIZING RELEASE | CERTIFICATION: I, the undersigned, do hereby certify that I am legally authorized and entitled to take possession of above described vehicle. |
|---|---|
| | SIGNATURE OF PERSON TAKING POSSESSION |

PD-143 (Rev. 3-89)

V.I.N. N691 7C16B 22C6

87

## Exhibits

H    Limited Instruction Regarding Petitioner's Intoxicated State, CT 80

H1    Jury Instruction CALJIC 9.58

H2    RT 60-70, Champion Drives to His House. Disobeys Petitioner. Petitioner Calls Out to Bystanders

H3    RT 148-151, Champion Forms Plan To Drive Home. Prosecutor Objects To Petitioner's Intoxication and Trial Court Sustains

H4    RT 166-177, Marquez Testifies. Prosecutor Objects To Petitioner's Intoxication and Trial Court Sustains

H5    RT 279-287, Petitioner Denies First Element of Kidnapping

H6    RT 384-388, Petitioner Waives Jury Trial on Prior Convictions. (Remarks by Trial Court Regarding O.J. Simpson Murder Trial)

H7    RT 429-430, Trial Court Reads O.J. Simpson Murder Verdict of "Not Guilty" Is Read To Petitioner's Jury

H8    CT 53, Instant Case SCD112436, Probation Report (Excerpt) "Sentencing Data' Stating No Need To Cite Mitigants or Aggravants. Note: This Probation Report Was Used At Three Strikes Sentence 12-29-95, And Also At Re-Sentence 6-12-97.

H

0097

## LIMITING INSTRUCTION

The Court has admitted evidence of the defendant's state of intoxication for the following limited purposes:

1. To assist you in evaluating the credibility of Russell Champion;

2. To assist you in evaluating the credibility of the defendant; and

3. To assist you in determining whether the defendant's appearance and actions instilled fear in the mind of Russell Champion.

By admitting evidence of the defendant's intoxication the Court is not expressing an opinion as to how much weight, if any, you should give to this evidence.

Do not consider such evidence for any purpose except the limited purposes for which it was admitted.

*Exhibit C-1*

*688*

CALJIC 9.58

0080

KIDNAPING--BELIEF AS TO CONSENT

It is a defense to the charge of kidnapping that a defendant lacked general criminal intent. There is no general criminal intent if a defendant entertained a reasonable and good faith belief that the person alleged to have been kidnapped voluntarily consented to accompany the defendant and to the movement involved in the purported kidnapping. If from all the evidence you have a reasonable doubt that the defendant harbored general criminal intent at or during the time of the movement, you must find him not guilty of kidnapping.

*Defense Request*

*Exhibit K*

671

1    A.    I stopped and he again told me to go
2    forward.

3    Q.    How was he sitting in the car still at this
4    point?

5    A.    Still crouching down on the seat, yes.

6    Q.    And were fists still raised?

7    A.    Right.

8    Q.    Did you do as you were told that time, to
9    drive forward?

10    A.    Yes.

11    Q.    Where was the next point that you changed
12    direction?

13    A.    At -- where Scimitar hits -- well, I thought
14    it was 65th, but it's Klauber, where 65th goes on up.

15    Q.    Go ahead and step down and point it out is
16    fine.

17    A.    Okay.  65th goes up there and where Scimitar
18    hits Klauber.

19    Q.    And you're indicating the point on the map
20    here where Klauber and Scimitar meet?

21    A.    Yes, sir.

22    Q.    Is that right?

23        What happened at that point?

24    A.    He told me again to go straight, but I
25    turned left instead.

26    Q.    What happened when you turned left instead
27    of following his command to go straight?

28    A.    He said, "I told you to go straight," but he

*Ex*

*172*

1  wasn't -- he wasn't too demanding about it or too upset

2  that I had turned.

3       Q.   So now you're driving down Scimitar; is that

4  right?

5       A.   Yes, sir.

6       Q.   Did you see any pedestrian or people on

7  Scimitar?

8       A.   Yes.  We came to a pickup truck parked on

9  the passenger side with a man changing his shirt,

10  standing there, and he asked me to stop.

11       Q.   Do you remember what the words that he said

12  to you?

13       A.   Just something about, "Stop, stop right

14  here."

15       Q.   Was it a question like, will you stop, or

16  was it a command?

17       A.   No, it was a command.

18       Q.   So he told you to stop next to the person

19  changing the shirt?

20       A.   Yes.

21       Q.   And again, how was the defendant in your car

22  at this point?  Is he still in the same position or is

23  he changed?

24       A.   No, he's turned and looking out the

25  passenger side.

26       Q.   What's he doing with his fist?

27       A.   Seems like they're on the front of the dash.

28       Q.   And when did he change his position from

*Ex.*

173

1   sort of facing you sideways now to facing front?

2       A.  Right as we approached this person on the

3   street.

4       Q.  But the entire time prior to approaching

5   this person, he maintained the position that you

6   described of him with his fists up close to you?

7       A.  Yes, uh-huh.

8       Q.  Is that a yes?

9       A.  Yes, I'm sorry.

10      Q.  That's okay.

11          What happened when you were next to this

12  person who was changing his shirt?

13      A.  Apparently he didn't recognize the guy like

14  he thought he was going to or the guy didn't respond to

15  whatever he had said to him, so we proceeded forward

16  again at his command.

17      Q.  How long did you stop before you were

18  commanded to drive forward again?

19      A.  We may not have actually ever come to a

20  stop.  If so, it was only like a second.

21      Q.  What was this person doing while you were

22  slowing down by him, the person outside the car?

23      A.  I guess he was continually changing his

24  shirt, because I couldn't really see him through the --

25  and I wasn't really worried about what he was doing

26  either.

27      Q.  And what was the defendant doing inside the

28  car when you were near this person outside the truck --

*Ex.*

*179*

1    outside the car?

2         A.    Like I said, he was looking at him to see if
3    he recognized him or something.

4         Q.    And then after a short while the defendant
5    commanded you to drive forward again?

6         A.    Right.

7         Q.    Did you do so?

8         A.    Yeah.

9         Q.    How far did you get down Scimitar now before
10   you noticed anyone else or were given another command?

11        A.    We went four or five, six, seven houses
12   further down Scimitar, where there was a man in his
13   yard, and again he thought he recognized him and he
14   told me to stop in front of that house.

15        Q.    Did you do as you were commanded to stop in
16   front of this second person?

17        A.    No, I didn't stop until 20 feet further
18   past.

19        Q.    What happened when you disobeyed the command
20   to stop by that second pedestrian?

21        A.    He punched me in the face.

22        Q.    Did he say anything to you before or after
23   he punched you in the face?

24        A.    "I told you to stop," something like that.

25        Q.    What was his tone of voice like?

26        A.    It's getting higher and more agitated.

27        Q.    What was his physical demeanor like?  What
28   was he doing with his body when you disobeyed his

Ex. K

(75

3

1    A.    No.

2    Q.    That wasn't possible?

3    A.    No.

4    Q.    Was there another option in your mind that

5    you could have stopped the car and said get out of my

6    car?

7    A.    No.

8    Q.    Okay.  So the only two options that were

9    posed in your mind were to follow his instructions or

10   not to follow his instructions?

11   A.    Uh-huh, yes.

12   Q.    And you chose on many occasions not to

13   follow his instructions?

14   A.    On a few, yes.

15   Q.    Okay.  But you had this master plan in your

16   mind to outsmart Mr. Salceda; is that a fair statement?

17   A.    No.

18   Q.    You turned onto Scimitar to go in the

19   direction of your house.  Had you not anything in your

20   mind that what you were about to do and how you were

21   going to get this person out of your car?

22   A.    Yeah, I had option A or B, but I didn't have

23   a master plan on what was going to happen.

24   Q.    Okay.  I don't mean, for instance, a master

25   plan, but you had a plan?

26   A.    I chose to turn left, yeah.

27   Q.    Okay.  Because you had an advantage over

28   Mr. Salceda on the 23rd, didn't you?

*Ex.*

253

1          MR. GROCH:  Objection; vague as to advantage.

2          THE COURT:  Sustained.

3    BY MR. MANGARIN:

4          Q.    Did you feel you had some type of

5    advantage?  Do you know what I mean by advantage?

6          A.    Not particularly.

7          Q.    You were in a better condition than he was,

8    weren't you?

9          MR. GROCH:  Objection; vague.

10          THE COURT:  Sustained.

11    BY MR. MANGARIN:

12          Q.    When Mr. Salceda was facing toward the front

13    of the seat, he was leaning forward with his head on

14    the dashboard in that direction at one point, was he

15    not?

16          A.    Head on the dashboard, no.

17          Q.    You testified at the preliminary hearing

18    that at some point prior --

19          A.    His hands on the dashboard.

20          Q.    And he was looking forward?

21          A.    Yeah.

22          Q.    And he was murmuring something to you?

23          A.    No.

24          Q.    He wasn't saying anything?

25          A.    He wasn't murmuring, no.

26          Q.    Let's try and backtrack a little bit.

27                When he -- when you saw him outside the

28    car, before he got into the car, wasn't he saying

*Ex*

*254*

1  things that were unintelligible to you?

2          MR. GROCH:  We're way outside the scope.

3          THE COURT:  Sustained, outside the scope.

4  BY MR. MANGARIN:

5          Q.   In part, when you described Mr. Salceda as

6  being out of control, in addition to him losing his

7  emotions and becoming irate, did it not appear to you

8  that he was out of control because of a physical

9  condition?

10          MR. GROCH:  Objection; lack of foundation.

11          THE WITNESS:  No.

12          THE COURT:  The answer is no?  Is that your

13  answer?

14          THE WITNESS:  Yeah.

15          THE COURT:  The answer will stand.

16  BY MR. MANGARIN:

17          Q.   And it did not appear to you -- well, you've

18  testified as to what your observations were with

19  respect to intoxication and what have you.

20          MR. GROCH:  Objection; relevance, outside the

21  scope.

22          THE COURT:  Outside the scope.

23  BY MR. MANGARIN:

24          Q.   Have you had experience before with people

25  that you've described as out of control?

26          A.   I've been a bartender for ten years.  Yeah,

27  I have seen people out of control.

28          Q.   So you have the ability to make a

*Ex,*

*255*

1  determination when you feel someone is out of control

2  because of past experience and your own personal

3  experience in life, you can draw on your personal

4  experience and say someone is out of control?

5          A.    Not in this situation, no.

6          Q.    You can't do it in this situation, but you

7  can do it in others, sir?

8          A.    Right.

9          Q.    So your testimony, then, is you're not able

10  to say whether Mr. Salceda was out of control?

11          A.    I can say I thought he was out of control,

12  yes.

13          Q.    Okay.  You thought he was out of control,

14  but you're not basing it on any personal past

15  experience in your life to base that on?

16          A.    No.

17          Q.    All right.  And in your experience as a

18  bartender, is this what you mean by seeing people out

19  of control?

20          A.    I have seen people drunk before, yes.

21          Q.    So you feel you have the ability to make

22  that determination?

23          A.    No.

24          MR. GROCH:  Objection; vague.

25          THE COURT:  Sustained.

26          MR. MANGARIN:  I have no further questions, your

27  Honor.

28          THE COURT:  Any further questions?

*Ex.*

756

1    about 18 feet.

2         MR. GROCH:   Thank you.

3    BY MR. GROCH:

4         Q.    And you indicated that there is bushes

5    blocking your view of the street as well; is that

6    right?

7         A.    Yes.

8    MR. GROCH:   No further questions.   Thank you.

9    THE COURT:   Cross-examination, Mr. Mangarin?

10                   CROSS-EXAMINATION

11   BY MR. MANGARIN:

12        Q.    Good morning, Mr. Marquez.

13             Mr. Marquez, you referred to my client as

14   Leo.  You knew my client before this incident, didn't

15   you?

16        A.    Yeah.  He went to school with my kids.

17        Q.    You've known him for about nine years?

18        A.    Not very well, though.

19        Q.    Okay.  You knew him because he knew your

20   kids?

21        A.    Yeah.

22        Q.    You knew of him.  That's Dedire and Dominic?

23        A.    Yes.

24        Q.    Did they go to school together?

25        A.    If they went to school together, that might

26   have been in elementary school.  High school my kids

27   went out to Point Loma.  And they went to another

28   school off of 70th and El Cajon Boulevard, I can't

Ex.

271

1  remember the name of it, but -- but they grew up in the

2  neighborhood, so they knew each other like that, you

3  know.

4      Q.   Grew up in the same neighborhood?

5      A.   Uh-huh.

6      Q.   Or the kids grew up in the same

7  neighborhood.

8           You have had some face-to-face contact with

9  him -- had some face-to-face contact with him, some

10 conversations with him, however brief, before the 23rd

11 of April this year?

12     A.   Conversations with him, no.

13     Q.   You knew his name was Leo?

14     A.   Yeah.

15     Q.   Okay.  And he knew your name as Mr. Marquez?

16 MR. GROCH:  Objection; calls for speculation.

17 THE WITNESS:  Yes.

18 MR. GROCH:  Your Honor, move to strike.

19 THE COURT:  Rephrase the question.

20 BY MR. MANGARIN:

21     Q.   He had referred to you by your name prior to

22 the 23rd, either Jesse or Mr. Marquez, if you recall?

23     A.   Yeah.  I seen him at a party in a park one

24 time that my daughter was having at Mt. Vernon Park,

25 and we shook hands then.  It was just very brief.  He

26 came up, hi, hi, you know.

27     Q.   Prior to the 23rd had he always been cordial

28 and civil to you?

*Ex.*

272

1          A.    I have never made any contact with him,

2    never, you know, we never had anything to talk -- you

3    know, I would see him and that would be about it.

4          Q.    Okay.  The one incident you talked about, he

5    came up to you, shook your hand, greeted you?

6          A.    Yeah.

7          Q.    He didn't get tough with you or challenge

8    you on that occasion?

9          A.    No.

10         Q.    In fact, prior to the 23rd you never had

11   choice words or bad words with each other, never had an

12   argument with him?

13         A.    I don't believe so, no.

14         Q.    Nothing in your mind -- nothing comes to

15   your mind, anything that happened between you and Leo

16   prior to the 23rd which would have caused him to be

17   angry with you that day?

18         A.    No.

19         Q.    Okay.  And yet on this day in question, you

20   sensed danger; is that right?

21         A.    Yes, I did.

22         Q.    Okay.  Because you saw Leo and you felt he

23   looked a little bizarre; is that a fair statement?

24         A.    He didn't look -- he had, you know, kind of

25   glassy eyes.  He looked -- he didn't look normal.

26         Q.    And what he was saying to you, did it appear

27   strange?  Content of what he was saying to you, did

28   that appear strange to you?

*Ex.*

273

1      A.    It was mainly, you know, the talk that they

2  use at that age, like what's up, you know, what's up

3  with you, you know, stuff like that.

4      Q.    Young people use?

5      A.    Yeah.

6      Q.    Did he ask you for a ride you say?

7      A.    This was after I got in my yard.

8      Q.    Okay.  Well, did that strike you as somewhat

9  strange when he asked you for a ride?

10      A.    Well, after what took place, I wasn't going

11  to give him a ride.

12      Q.    So at some point you raised your broom, you

13  get behind the gate; is that right?

14      A.    Yes.

15      Q.    You have words with him; is that right?

16      A.    Yes.

17      Q.    You tell him to get out of here, don't you?

18      A.    Uh-huh.  "Just forget it, get out of here,"

19  something like that.

20      Q.    And then after all this he asked you for a

21  ride?

22      A.    Yeah.

23      Q.    Okay.  Did you form in your mind at that

24  point that Mr. Salceda was under the influence of

25  something?

26      MR. GROCH:  Objection; relevance, lack of

27  foundation.

28      THE COURT:  Overruled.

274

1              Did you form an opinion that he was under

2    the influence of anything?

3         THE WITNESS:  Yes, I did.

4    BY MR. MANGARIN:

5         Q.   In fact, you had a chance to observe the way

6    he was walking, didn't you?  Is that right?

7         A.   Yes.

8         Q.   He was staggering, wasn't he?

9         MR. GROCH:  Objection; relevance, your Honor.

10   May we approach?

11        THE COURT:  Yes, you can approach side-bar.

12             (The following proceedings were had at

13   side-bar, outside the presence of the jury:)

14        MR. GROCH:  There is absolutely no relevance to

15   this testimony.  He's backdooring in his voluntary

16   intoxication defense, which as a matter of law is

17   inapplicable to these charges.

18        THE COURT:  You asked the question what the

19   defendant looked like in your direct examination, and

20   you brought out the fact that he had a distant look,

21   also an angered look.  So you opened the door

22   somewhat.

23             Now, Mr. Mangarin, where do you intend to

24   go?

25        MR. MANGARIN:  Your Honor, I also add the fact

26   that the first witness, Mr. Champion, testified as to

27   his walk, his gait, his appearance, his eyes, his

28   smell, and certainly this would go -- have some

Ex.

275

1    probative value as to impeachment as to Mr. North and

2    his credibility what he observed on the day in

3    question.

4             He also indicated he had special experience

5    and the ability to make that determination, and he's

6    denied any indication of any of these factors. And I

7    think Mr. Marquez, as an offer of proof, he spoke with

8    the investigator and he described the demeanor, which

9    is very much in contrast with the demeanor that

10   Mr. Champion indicated just minutes preceding his

11   contact with Mr. Marquez.

12        THE COURT: The question is whether you are going

13   to impeach him on such a collateral matter. So where

14   do you intend to go? What are you going to ask him?

15        MR. MANGARIN: I'm sorry. About the way he was

16   walking, did he not describe the look in his eyes or

17   what he described, elaborate on that, and if he goes

18   sideways on me, I'm going to ask him about the

19   statement that he gave my investigator, which I

20   provided a copy to Mr. Groch weeks ago.

21        THE COURT: So you are going to ask him --

22        MR. MANGARIN: About his appearance.

23        THE COURT: You opened the door about his

24   appearance.

25        MR. MANGARIN: And his walk, your Honor.

26        MR. GROCH: I asked demeanor in the sense of

27   aggressive stance and that's the answer I got. I

28   didn't get into glassy eyes, odor of alcohol, unsteady

276

1    gait, content of conversation.  All of that, the door

2    is not opened by how did he appear as far as his

3    demeanor.

4          THE COURT:  You can go into the look and his

5    appearance.

6          MR. MANGARIN:  Your Honor, may I go into the

7    reasons why he sensed danger, because that certainly

8    had been opened?

9          THE COURT:  That's been opened.  Okay.  You can

10   go into those areas.

11              (The following proceedings were had in open

12   court in the presence of the jury:)

13          THE COURT:  Go ahead, Mr. Mangarin.

14   BY MR. MANGARIN:

15       Q.    Mr. Marquez, you had seen Mr. Salceda, Leo,

16   in the past, and talked about expression on his face.

17   You sensed a certain expression on his face.  You

18   described that on questions by counsel.  Do you

19   remember that?

20       A.    He looked angered.

21       Q.    Other than angry, is your -- can you further

22   elaborate on that?  What do you mean by angry?

23       A.    Well, it made me uncomfortable.  I didn't

24   know, you know, if he was going to take a swing at me

25   or not.

26       Q.    Did this -- did you observe this and did

27   this come to your state of mind upon his initial

28   contact of you?

Ex.                              27?

```
 1        A.    Yes.

 2        Q.    Do you understand that?

 3        A.    Yeah.   When he first showed up on me?

 4        Q.    Yes.

 5        A.    Yes.

 6        Q.    He didn't have a conversation with you, a

 7  friendly conversation and then it became angry?

 8        A.    No.

 9        Q.    He appeared to have this expression on his

10  face when he first came down?

11        A.    He had this distant look and it wasn't a

12  comfortable look.  It made me, you know, take a

13  defensive stand.

14        Q.    He didn't ask you about your kids or

15  anything of that nature?

16        A.    No.

17        Q.    You had the opportunity to watch him walk?

18        A.    Yes.

19        Q.    How was he walking?

20  MR. GROCH:  Objection; relevance.

21  THE COURT:  Overruled.  You can describe his

22  walk.

23        THE WITNESS:  He had coordination.

24  BY MR. MANGARIN:

25        Q.    When you say he had coordination, do you

26  know what the term staggering means?

27        A.    Yes.

28        Q.    Would you say that's at the opposite end?
```

278

1  When you say coordination, what do you mean by that in

2  relation to the term staggering?

3     A.   Well, he wasn't -- he wasn't staggering, you

4  know, falling down or anything.  He was pretty -- you

5  know, he was sure footed.

6     Q.   Sir, do you remember speaking with an

7  investigator back in June of this year from the defense

8  attorney's office?

9     A.   I think I've talked to about two or three.

10  I don't remember who they are, though.

11     MR. MANGARIN:  Your Honor, may I approach?

12     THE COURT:  Yes.

13  BY MR. MANGARIN:

14     Q.   Mr. Marquez, I am going to show you a

15  document, and I'll state for the record you've seen

16  this document prior to coming to court today, have you

17  not?

18     A.   Yeah.

19     Q.   Okay.  I showed this to you just a few

20  minutes ago?

21     A.   Uh-huh.

22     Q.   And I pointed to the very last paragraph.

23     THE COURT:  What about it?  Do you want him to

24  read it to himself?

25     MR. MANGARIN:  Just read it to yourself.

26     THE COURT:  Read it to yourself, don't say

27  anything.

28     THE WITNESS:  Yeah.

279

1  BY MR. MANGARIN:

2      Q.  Have you read it to yourself?

3          I am going to ask you to read the line

4  right above the last paragraph as well to yourself.

5      A.  Yeah, right.  This right here?

6      Q.  Yes.  Having read that, first, do you recall

7  speaking to an investigator as to Mr. -- as to Leo's

8  walk, whether he was staggering or not?  Do you

9  remember that area of conversation coming up?

10     A.  No.  It's been a while.

11     Q.  Okay.  Well, is it fair to say that when you

12  say it's been a while, we're coming into October now,

13  were your recollection of the events and what you saw a

14  little clearer as we get closer to April 23rd?  Do you

15  think -- are you generally a person that can recall

16  things that happened closer to the event as opposed to

17  a passage of time?

18     A.  Yeah.  At the time it was, you know, when

19  the investigators came over, most of this was pretty

20  fresh on my mind and I was able to give them, you know,

21  most of the answers that they wanted at that time

22  pretty clearly.

23     Q.  Okay.  And you had no reason at that point

24  in time, or at any point in time, to give any

25  information to an investigator which would not be true?

26     A.  Of course not.

27     Q.  Okay.  Is it a fair statement, then, that

28  the statements that you gave the investigator in June

280

1  as to particularly staggering and gait and walk, was an

2  accurate recollection of the events of the 23rd just

3  two months earlier?

4       A.   Yeah, what was -- what I told them was the

5  truth.  I have no reason to --

6       Q.   Having looked at this document, is your

7  memory refreshed now as to whether Leo was staggering

8  or not that day?

9       A.   No, I can't remember that.  You know, that

10 right back even though I read that and everything, I

11 can't remember how he was walking at that particular

12 time.

13      Q.   Sir, is it true that you told the

14 investigator that he was staggering?

15      MR. GROCH:   Objection; hearsay, move to strike.

16      THE COURT:   Sustained.  Granted.  Question is

17 stricken.

18 BY MR. MANGARIN:

19      Q.   Did you have a discussion with the

20 investigator with respect to, or did you use a term --

21 do you recall using a term to the investigator as to

22 the demeanor of Mr. Salceda?

23      A.   I don't understand.

24      MR. GROCH:   Your Honor, I am going to object

25 under 352.  The probative value is clearly outweighed.

26      THE COURT:   We're getting far afield at this

27 point.  He said he didn't recall the conversation with

28 the investigator.

281

1      MR. MANGARIN:  With respect to his walk, your

2  Honor.

3  BY MR. MANGARIN:

4      Q.   With respect to -- well, with respect to his

5  condition, did you or did you not say that Mr. Salceda

6  was, quote, fucking out of it?

7      MR. GROCH:  Objection.

8      THE COURT:  Sustained.

9      THE WITNESS:  If I --

10     MR. GROCH:  There is no question.

11     THE COURT:  There is no question pending.

12  BY MR. MANGARIN:

13     Q.   How long did the contact with Leo take

14  place, your best recollection, the point that he came

15  up to you and the point that he walked off?

16     A.   I can't remember.  It seemed forever.  I

17  just wanted him out of there.  I didn't feel safe.  I'd

18  say ten minutes, and I don't know if that's the correct

19  time, but give or take five.

20     Q.   Okay.  You weren't watching the clock at

21  that time, obviously?

22     A.   No.

23     Q.   But you had the ability to have this

24  conversation that you described with him in that time

25  frame?

26     A.   Yeah.

27     Q.   And in fact, your wife also came out at one

28  point?

282

1  because it unduly highlights certain areas of

2  testimony. I think it's going to confuse the jury,

3  that it can't be permitted for any, so it should be

4  given with the rest of the instructions.

5       THE COURT: All right. Your position is noted.

6  I am prepared to give it now if you're requesting it.

7       MR. GROCH: I'm requesting it.

8       MR. MANGARIN: Right now, your Honor? Right now,

9  before we finish with the witness?

10       THE COURT: Well, I want to finish with this

11  witness.

12       MR. MANGARIN: Okay.

13       THE COURT: Get me the other instruction.

14       MR. MANGARIN: Your Honor, so I can be clear, I

15  will be permitted to call Miss Murgo? She is

16  apparently here.

17       THE COURT: Yes.

18            (The following proceedings were had in open

19  court in the presence of the jury:)

20                 CROSS-EXAMINATION

21  BY MR. GROCH:

22       Q.  Mr. Salceda, you are a rather mean drunk,

23  aren't you?

24       A.  No.

25       Q.  Isn't it true that when you get drunk, you

26  get aggressive?

27       A.  I don't notice it.

28       Q.  You don't know?

1        A.    I said I don't notice it, sir.

2        Q.    Well, have you been told about situations

3   where you've been drunk and then find out that you did

4   some pretty aggressive things?

5        A.    Yes.

6        Q.    So you would agree with me that you're an

7   aggressive drunk?

8        A.    Yes.

9        Q.    And you can't deny that you punched Russell

10  Champion in the face, can you?

11       A.    No, I can't, sir.

12       Q.    And you can't deny that you commanded that

13  he drive you 1.2 miles and follow your directions, can

14  you?

15       A.    Yes, I can, because I don't know if I did

16  that.

17       Q.    You can't deny that you did that?  You can't

18  sit on that stand and say I didn't do that,

19  Mr. Prosecutor?

20       A.    I also can't sit here and say I did say it.

21       Q.    My question to you is can you deny the fact

22  that you drove 1.2 miles with a person with your fist

23  pointed at his face and struck him three times?

24       A.    Can I deny that?

25       Q.    Yes.

26       A.    Yes, I can.

27       Q.    How can you deny that?

28       A.    Because I don't remember doing something

1   like that.

2        Q.    You would agree with me that there is a

3   difference between not remembering whether you did

4   something and denying whether you did something,

5   wouldn't you?

6        A.    No.   When you have a blackout --

7        Q.    When you have a blackout, you were doing

8   what you were doing, you just may not remember it

9   later; is that what you're saying?

10        MR. MANGARIN:   Objection; this is argumentative.

11        THE COURT:   Sustained.   It's argumentative.

12   BY MR. GROCH:

13        Q.    Well, isn't it true when you have a

14   blackout, if in fact you're having one, you simply

15   don't remember later what you did; at the time you know

16   exactly what's going on?

17        A.    I drank 14 beers is what I can remember.

18        Q.    And then you all of a sudden don't remember

19   anything after shaking this bartender's hand?

20        A.    No, it wasn't all of a sudden just like

21   that.   It was bits and pieces.

22        Q.    Well, your memory seemed pretty good for

23   awhile there.   You said you shook the owner's hand, he

24   says I've known the defendant since he was a kid, you

25   remember that; right?

26        A.    Yes, sir, I do.

27        Q.    And you remember the fuzzy hair of the

28   bartender; right?

1      A.    Yes, sir.

2      Q.    And you remember where the door was in the

3  bar and that there was a man next to that; right?

4      A.    I remember the bar because I have been in

5  there several times.

6      Q.    And you remember the name of the bartender

7  and she would touch people's hands and say okay, I'll

8  give you another.   You remember all that; right?

9      A.    Because I was in there two hours.

10     Q.    And then all of a sudden, it ends?

11     A.    No, it wasn't all of a sudden.   It was just

12  bits and pieces that led up to it where I can't

13  remember.   I blacked out.

14     Q.    And none of those bits and pieces that you

15  remember took place while you were forcing an innocent

16  person to drive him where you told him to go?   You

17  don't remember any of those bits and pieces, do you?

18     A.    No, I don't, sir.

19     Q.    Not a single one?

20     A.    No, I don't, sir.

21     Q.    Yet you were sober enough that you could

22  jump into that victim's car, weren't you?

23     A.    I don't know if I did that, sir.

24     Q.    Well, did you wake up the next day with any

25  cuts and scrapes from falling on the ground?

26     A.    No, sir.

27     Q.    Okay.   Did you have any bruises?

28     A.    Wait a minute, I did, I had some scratches

1  on my knees.

2      Q.   Okay.  Did you have any bruises, broken

3  bones, bleeding?

4      A.   No.

5      Q.   Nothing like that?

6      A.   Nothing like that at all, sir.

7      Q.   You said your first memory is being in jail

8  with a lady asking you questions and punching a piece

9  of paper; right?

10     A.   No, I didn't.  I said I was slouched in the

11  back of the police car like this.

12     Q.   Okay.  So let's be clear.  Your first memory

13  is you in a police car; right?

14     A.   Yes.

15     Q.   How many police officers were in that car?

16     A.   I am not even sure that there was any in

17  there.

18     Q.   Do you remember the officer sitting next to

19  me, Officer Pechin?

20     A.   No, sir.  I asked my lawyer yesterday, who

21  was he, a D.A.

22     Q.   Do you remember what happened after you woke

23  up in the back of this police car?

24     A.   No, I don't, I just remember being urinated.

25     Q.   And it's your testimony that you urinated on

26  yourself prior to going into the jail; right?

27     A.   Either I had urinated on myself -- whether I

28  was asleep or whether I was not conscious, but I don't

1  remember urinating on myself prior to going into the
2  jail.
3         Q.   Well, let's see if we get this right.  You
4  said you're in the car and you noticed the urine on
5  your pants?
6         A.   Yes, sir.
7         Q.   And then after you're in the car you're put
8  in jail; right?
9         A.   No.
10        Q.   Well, what did you do after you're in the
11 police car?
12        A.   Sat in the police car for I think -- I think
13 to my guess, several hours.
14        Q.   Okay.  So you're sitting in this police car
15 for several hours.  Then what?
16        A.   Well, I can't really place.  I remember bits
17 and pieces.  It's 14th and Broadway they have a police
18 station, and they go down in the bottom like that, and
19 that's when I came around.  I looked around, and where
20 am I at.
21        Q.   And you recognized the police station?
22        A.   Because of the police cars there.
23        Q.   You've been there before?
24        A.   One time in 1989.
25        Q.   Only once?
26        A.   No.
27        Q.   You remember recognizing the police station;
28 right?

1      A.    Yes.

2      Q.    Okay.   So you come to, you realize I'm in a

3  police car in police headquarters; right?

4      A.    No.

5      Q.    Well, you looked around, you saw all the

6  police cars, you had been to the police station

7  before.   Did you or did you not recognize I'm in a

8  police car at police headquarters?

9      A.    Instantly, no.

10     Q.    Within a few minutes?  You said you had a

11  couple hours to think about it.   Did you eventually

12  realize where you were?

13     A.    Yes, sir.

14     Q.    How long did that take?

15     A.    I can't be accurate.

16     Q.    Give me a guess.

17     A.    Maybe four or five minutes.

18     Q.    Okay.   So four or five minutes after you

19  come to you realize, one, you have urinated on

20  yourself; and two, you are in a police car at

21  headquarters; correct?

22     A.    Yes.

23     Q.    What happens after that?

24     A.    I can't really remember.

25     Q.    Then we get into another blackout?

26     A.    No, sir, it's just bits and pieces that I

27  remember up until 12 o'clock -- 12:10 rather.

28     Q.    But you do have a clear memory of having

1    urinated on yourself prior to being in jail; right?

2        A.    Yes, sir.

3        Q.    So by the time you're in jail, you already

4    would have peed on yourself; right?

5        A.    Where I peed on myself, I know that it was

6    when I was handcuffed in the back of the cop car -- in

7    the police car.  I was urinated -- I was peed on

8    myself.

9            I don't know what I am -- what you're

10   trying to tell me about the jail.

11       Q.    I am trying to establish you had peed on

12   yourself in the police car prior to getting put in

13   jail.  Would you agree with me on that point?

14       A.    Yes.  I would also say it's several hours --

15   at least several hours.

16       Q.    Fine.  But you don't remember getting taken

17   from the police car and put into jail; right?

18       A.    No, sir, I don't.

19       Q.    But you do remember this woman punching

20   12:10, good memory, on your sheet; right?

21       A.    It's on the paper.  It says 12:10.

22       Q.    You said, "I remember 12:10."

23       A.    It's on the paper, that's why I remember.

24       Q.    You remember the punching but not

25   necessarily the time?

26       A.    Yes.

27       Q.    And what do you remember after that?

28       A.    Matter of fact, the next day I had either

287

1  went to sleep, but the next day inmates in there told

2  me that I was trying to fight with people, and they

3  said, "Hey, you all right now?"  And I didn't remember

4  what they were telling me.

5        Q.    So more proof that you're an aggressive,

6  fighting drunk?

7        MR. MANGARIN:  Objection; argumentative.

8        THE WITNESS:  Sir, you're in jail.

9        THE COURT:  No question pending.  Objection

10 sustained.

11 BY MR. GROCH:

12       Q.    You do things when you're drunk that you

13 don't remember later that are pretty aggressive,

14 wouldn't you agree with me?

15       A.    No, sir.

16       Q.    You just told me now that you got into a

17 fight that you don't even remember.

18       A.    I don't remember getting into a fight.

19 People said I was arguing, but in jail it's like that.

20 Move out of the way, and if you don't move, it's either

21 fight or -- it's like that in jail.

22       Q.    So people told you you were being

23 argumentative, then, the next day?

24       A.    Yes, sir.

25       Q.    And you don't remember that?

26       A.    That I was being argumentative?

27       Q.    Right.

28       A.    No.

1  to the Court before instructions.

2       THE COURT:  Have 5.30 available for me this

3  afternoon when I instruct.

4            Other issues that we have left is whether

5  or not anyone wanted 2.21.2.  Does anyone want that

6  instruction?

7       MR. GROCH:  No, your Honor.

8       MR. MANGARIN:  No, your Honor.

9       THE COURT:  I will not give that instruction.

10  And I think that really covers the issues that we had

11  left to be resolved.

12            Does anyone else recall any other issues

13  related to the instructions?

14       MR. MANGARIN:  No, your Honor.

15       THE COURT:  All right.  This morning the verdict

16  in the O. J. Simpson case is scheduled to come out at

17  ten o'clock.  There is no doubt in my mind that these

18  jurors have that in the back of their mind, if not the

19  front of their mind.  So it would be my intent to tell

20  them when we hear something, we will let them know, so

21  that they will realize it's being monitored.  That's

22  not scheduled until ten o'clock.

23            It would be my intent to finish our

24  arguments this morning, give counsel a chance just to

25  clean up the instructions in their written form.  I

26  would instruct this afternoon.

27            Is that agreeable?  Anyone have a problem

28  with that?

1    MR. MANGARIN:  Couple things, your Honor.  I

2    would only request that the telling of the jury about

3    the O. J. result would come at an appropriate time

4    during the break.

5        THE COURT:  I will not interrupt anyone right in

6    the middle of their arguments to announce, but when we

7    take a recess or at the appropriate time, I will tell

8    them.

9        MR. MANGARIN:  Thank you.

10            I would like to make a record, your Honor,

11   with respect to the LIOs, and just so that the record

12   is clear, we had, and we would stand by our previous

13   objection, as to whether the instructions with respect

14   to false imprisonment by violence and false

15   imprisonment, simple false imprisonment can be given as

16   LIO instructions over defense objection.  We'd stand by

17   that objection for the record, your Honor.

18            With respect to the temporary use or taking

19   of a vehicle for temporary use, we think that given the

20   facts of this case, there is sufficient facts to

21   warrant an instruction with respect to Mr. Champion's

22   vehicle.  I would like to make the record that we are

23   asking for that as an LIO, given the facts of this

24   case.

25            The issue here, I think, is, as to that

26   instruction, what was Mr. Salceda doing in that car and

27   why was he asking for a ride up the hill.  And I think

28   that in and of itself is -- would warrant and justify a

*Ex.*

49U

1  jury finding him guilty of temporary as opposed to

2  permanent depriving of Mr. Champion's vehicle.  We

3  would ask for that instruction as well.

4        There is a last paragraph in 9.00 that

5  references self-defense, and His Honor has indicated

6  you would give that as part of a 9.00.

7        THE COURT:  Yes.

8        MR. MANGARIN:  Thank you.

9        THE COURT:  I have one question for you,

10  Mr. Mangarin.  I still have the priors.  What's going

11  to happen on the priors?

12        MR. MANGARIN:  I have spoken with Mr. Salceda

13  about that.  My understanding is we will, at the

14  Court's convenience, and if necessary, we'll proceed

15  forward with that without a jury.

16        THE COURT:  All right.  Well, I will take a

17  waiver at a later -- let's do it now.

18        MR. MANGARIN:  Your Honor, may I have one

19  second?

20        THE COURT:  All right.

21            (Counsel and defendant confer.)

22        MR. MANGARIN:  Okay, your Honor.

23        THE COURT:  Have you had a chance to discuss the

24  jury waiver with your client, Mr. Mangarin?

25        MR. MANGARIN:  I have.

26        THE COURT:  Mr. Salceda, do you understand with

27  respect to the trial on the priors, in the event you

28  were found guilty on this matter, the jury would then

*Ex.*

*495*

1  be reconvened and you would have a right to have the

2  jury determine whether or not the prior offenses were

3  committed and whether or not you were the person

4  committing the offenses?  Do you understand that

5  right?

6       THE DEFENDANT:  Yes.

7       THE COURT:  Do you give up and waive your right

8  to a jury trial on the priors?

9       THE DEFENDANT:  Yes.

10      THE COURT:  All right.  Record will so reflect.

11           Okay.  I am going to step down.  We'll

12  bring the jury in, we'll start with closing argument.

13           What's your time estimate?

14      MR. GROCH:  15, 20 minutes.

15      THE COURT:  Mr. Mangarin, what's your time

16  estimate?  I heard 20 minutes from the prosecution.

17      MR. MANGARIN:  About 45 minutes, your Honor.

18      THE COURT:  All right.  I'll step down.  Bring

19  the jury in.

20           (The following proceedings were had in open

21  court in the presence of the jury:)

22      THE CLERK:  People of the State of California

23  versus Leovardo Salceda.

24      THE COURT:  Record should reflect that all

25  members of the jury are present, along with counsel and

26  the defendant.

27           Good morning, ladies and gentlemen.  This

28  morning we're going to hear the closing arguments of

496

1    counsel.  There is also another trial that's taking
2    place in Los Angeles, and I know a number of you are
3    interested in that case.  My clerk will monitor the
4    results, and at a break or whenever, we will advise you
5    of the outcome in that case.
6           Also, what I anticipate is that we'll hear
7    the arguments this morning, and then we'll take a
8    recess and you can listen to the commentary, whatever,
9    involving that case, and when you come back this
10   afternoon, I will instruct you on the law and give you
11   the case here for your deliberations.
12          Now, keep in mind my earlier comments about
13   the statements of the attorneys.  The statements of the
14   attorneys are not evidence and should not be considered
15   by you as evidence.  Each side will present his closing
16   arguments in the case.  I'm sure that neither side will
17   intentionally try to mislead you.  In the event,
18   however, your recollection of the evidence differs from
19   their recollection, you should rely upon your own
20   recollection.
21          Mr. Groch will go first.  He will be
22   followed by Mr. Mangarin.  Mr. Groch has an opportunity
23   to address you twice.  He has an opportunity to talk to
24   you twice because he has the burden of proof in this
25   case.
26          All right, Mr. Groch, are you ready to
27   proceed?
28      MR. GROCH:  Yes, your Honor, thank you.

997

1    with a deadly weapon.

2            It's now in your hands and I appreciate

3    your time, patience, and your consideration, and I ask

4    you to do the right thing.  Doing the right thing is

5    following the law.  Apply the facts to the law, coming

6    back with the verdicts of guilty.

7            Thank you.

8        THE COURT:  All right, ladies and gentlemen, what

9    remains is for me to instruct you on the law and for

10   you to commence your deliberations.

11           You will have the jury instructions with

12   you in written form in the jury room.  There are some

13   revisions that still need to be made, and there are

14   some instructions that need to be completed in their

15   final typing.  The attorneys need to take care of that

16   and get those back to me before I instruct you on the

17   law, so we're going to take our recess and we'll be in

18   recess until 1:30.

19           Now, when you leave this courtroom you will

20   find out, I am going to tell you in a moment, the

21   verdict in the case in Los Angeles.  All right.

22   Irrespective of your feelings on that verdict, whether

23   you think it's good or bad or whatnot, when you come

24   back this afternoon, I want you to put that aside.  I

25   know that I could, but I am not going to sequester you,

26   obviously, over the noon hour, but that's a separate

27   case, so when you come back, I want you to put that

28   case aside, I want you to concentrate on this case,

1    concentrate on the instructions that I'll be giving you
2    and concentrate on the evidence that's presented in
3    this case.  So I know you are going to find out about
4    the case, I know you are going to think about it, but
5    put that case aside when you come back.
6             We'll take our noon recess at this time.
7    We'll be in recess until 1:30.  Keep in mind my
8    admonition it's your duty not to converse among
9    yourselves or anyone else on any topic connected with
10   the trial or form or express any opinion on the case
11   until it's submitted to you.
12            The verdict in the Simpson matter was not
13   guilty.
14            We'll recess now until 1:30.
15            (The following proceedings were had in open
16   court, outside the presence of the jury:)
17        THE COURT:  Record should reflect we're outside
18   the presence of the jury.
19            Here are the items I need to come back this
20   afternoon, and I want to make sure that I know who is
21   taking responsibility for preparing a particular item.
22            Mr. Mangarin, you indicated that you do
23   want a self-defense instruction, I think that's 5.30,
24   so you will need to prepare that with the appropriate
25   copies for Mr. Groch.  Be ready to present that.
26            17.10, which is an instruction dealing with
27   lesser related or included offenses, needs to be
28   revised.  Do you want to do that, Mr. Groch?

State of California                                    California Department of Corrections and Rehabilitation

# Memorandum

Date:      February 15, 2007

To     :   FACILITY "B"
           Inmate Population

Subject:   **FACILITY "B" SENSITIVE NEEDS YARD (SNY) CONVERSIION**

Facility "B" is currently undergoing conversion from Level II General Population (GP) to a Level II Sensitive Needs Yard (SNY). All facility "B" GP inmates will be reviewed by UCC starting the week of February 19, 2007. This process will continue until you are re-housed on another facility or transferred.

When you are approved to move or transfer your property shall not exceed the maximum of six (6) cubic feet. If transferring to another institution your property will be processed through R&R pursuant to established procedures.

GP critical workers will not transfer until the SNY conversion is at midpoint. At that time GP inmate workers will be unassigned and SNY inmates assigned.

## TEMPORARY PROGRAM MODIFICATIONS:

o  **FEEDING**
   SNY and GP inmates will be fed the morning and evening meals according to GP/SNY conversion schedule. SNY/GP inmates will be issued a sack lunch

| | |
|---|---|
| 0400 hours | GP Dining Workers Release |
| 0530 hours | GP Early Workers Feeding |
| 0550 hours | GP Scullery Workers back to housing units |
| 0600 hours | SNY feeding commence "A" side dining |
| 0630 hours | SNY feeding completed |
| 0730 hours | GP feeding commence/ GP Scullery Workers return to Culinary |
| 0800 hours | GP feeding completed |
| 1015 hours | Deliver Sack Lunches to Housing Units |
| 1200 hours | GP Dining Workers Report to Work |
| 1700 hours | SNY feeding commence |
| 1730 hours | SNY feeding completed |
| 1800 hours | GP feeding commence/ GP Scullery Workers return to Culinary |
| 1830 hours | GP feeding complete |

Sensitive Needs Yard Conversion

3

o **Exercise Yard/Dayroom**
There will be no yard for SNY inmates until Wednesday, February 28, 2007, (see attached SNY Temporary Yard Schedule):

  0600-1630/1730-2130     GP/SNY dayrooms in assigned units.
  1200-1615 hours GP exercise yard
  1900-2115 hours GP exercise yard

o **Medical Schedule:**
  0600-0630/1700-1730 hours AM/PM GP diabetes and medications
  0700-0730/1800-1830 hours AM/PM SNY diabetes and medications
  0900-1000 hours SNY medical/dental calls and passes
  1000-1200 hours GP medical/dental calls and passes

o **Mental Health**
Mental Health Services will be provided by mental Health Clinicians in the Facility "B" medical clinic on designated days and at designated times.

o **Visiting/Family Visiting**
Saturday
  0800-1130 hours GP visiting
  1200-1500 hours GP visiting

Sunday
  0800-1130 hours GP visiting
  1200-1500 hours GP visiting

There will be no visiting for SNY inmates until seen by UCC. At transition mid point SNY and GP program times (Feeding, Yard, visiting, etc.) will change.

o **Chapel**
SNY and GP inmates will be allowed Chapel during their scheduled yard times only.

o **Law Library**
Sensitive Needs yard inmates will ot be scheduled to use the Law Library until the midway point of conversion has taken place. GP inmates will not be scheduled for the Law Library once midway conversion point is reached. Inmate who does not have access to the library, with legal deadlines, may submit an inmate request form to the Facility Librarian. Arrangements shall be made for access to materials on a case-by-case basis.

o **Canteen and Quarterly Packages**
Canteen orders will be allowed for SNY inmate at conversion mid point and GP inmates will not longer be allowed canteen. Quarterly Packages for SNY inmates will not be allowed until conversion is completed. Quarterly packages

Facility "B" Sensitive Needs Yard Conversion
Page 3 of 3

for Facility "B" GP inmates will be terminated upon distribution of this procedure.

o **Special Purchases**
Sensitive Needs Yard inmate will not be allowed to make special purchases until conversion is complete. Special purchases for Facility "B" GP inmates are terminated upon distribution of this procedure.

K. HUGHES
Facility B Captain

cc: J.F. Salazar, Warden (A)
    M. Muntz, Chief Deputy Warden
    D. Ollison, Associate Warden, Complex I
    J. Cortez, Associate Warden, Complex II
    J. Abbs, Associate Warden, Business Services

State of California                                         California Department of Corrections and Rehabilitation

# _emorandum

Date    :    February 21, 2007

To      :    All Staff

Subject:    **FACILITY "B" SENSITIVE NEEDS YARD-TEMPORARY YARD SCHEDULE**

During the transition of Facility "B" to a Sensitive Needs Yard, the following temporary yard schedule will be implemented.

Wednesday, February 28, 2007
0800-1050 hours          GP exercise yard
1200-1600 hours          SNY exercise yard
1900-2115 hours          GP exercise yard

Thursday, March 1, 2007
0800-1050 hours          SNY exercise yard
1200-1600 hours          GP exercise yard
1900-2115 hours          SNY exercise yard

Friday, March 2, 2007
0800-1050 hours          GP exercise yard
1200-1600 hours          SNY exercise yard
1900-2115 hours          GP exercise yard

Saturday, March 3, 2007
0800-1050 hours          SNY exercise yard
1200-1600 hours          GP exercise yard
1900-2115 hours          SNY exercise yard

Sunday, March 4, 2007
0800-1050 hours          GP exercise yard
1200-1600 hours          SNY exercise yard
1900-2115 hours          GP exercise yard

Monday, March 5, 2007
0800-1050 hours          SNY exercise yard
1200-1600 hours          GP exercise yard
1900-2115 hours          SNY exercise yard

Sensitive Needs Yard-Facility "B"
February 14, 2007
Page 7


| Monday, April 16, 2007 | |
| 0800-1050 hours | SNY exercise yard |
| 1200-1600 hours | GP exercise yard |
| 1900-2115 hours | SNY exercise yard |

| Tuesday, April 17, 2007 | |
| 0800-1050 hours | GP exercise yard |
| 1200-1600 hours | SNY exercise yard |
| 1900-2115 hours | GP exercise yard |

| Wednesday, April 18, 2007 | |
| 0800-1050 hours | SNY exercise yard |
| 1200-1600 hours | GP exercise yard |
| 1900-2115 hours | SNY exercise yard |

| Thursday, April 19, 2007 | |
| 0800-1050 hours | GP exercise yard |
| 1200-1600 hours | SNY exercise yard |
| 1900-2115 hours | GP exercise yard |

| Friday, April 20, 2007 | |
| 0800-1050 hours | SNY exercise yard |
| 1200-1600 hours | GP exercise yard |
| 1900-2115 hours | SNY exercise yard |


Effective April 17, 2007, all general population inmates will be removed from Facility "B", therefore Facility "B" will resume a normal yard program.

Questions concerning the Facility "B" yard program during transition to an SNY, should be referred to the Facility "B" Captain at extension 6220.


J. F. SALAZAR
Warden (A)
Chuckawalla Valley State Prison

0053        ~~0193~~

SALCEDA, LEOVARDO                    11                          11/17/95
SCD-112436

## Gang Affiliation:

The defendant states he joined the "Varrio Encanto Locos" when he was
in the fourth grade; however, he states he severed his ties when he
was released from state prison.

## Collateral Information:

When interviewed in preparation for the presentence report in Case
CR 140382, dated 8-11-93, on page four, the defendant's statement
included some of the following:

"I had been drinking all day, and I remember I was trying to get
home."

"I have a problem with alcohol.  I am asking to work a program.
I have never been to one, or tried to work one.  I want to change for
myself and for my family.  I am attending A.A. Meetings every day,
Monday through Friday, and learning something new and positive every
day."

"I want to help myself... we have two beautiful daughters, and I
love my wife and daughters with all my heart.  I do not want to lose
them because of drinking in jail, so please, I am asking for a
chance."

Further, when interviewed orally by the Probation Officer regarding
the incident which involved the defendant swinging a large brick at
the victim, and then threatening the victim with a broken beer
bottle, the defendant stated he believed he was in a blackout when it
occurred.  He reported that he had been drinking all day and became
very intoxicated.  He stated he was trying to get home and believed
he went to the victim's house to ask for a ride.

## SENTENCING DATA:

The Judge made a true finding on the first, second, and third strike
priors, pursuant to PC 667(b)-(i).  There is only one sentence choice
available to the Court, that being an indeterminent term of 25-years-
to life.  Thus, there is no need to cite the mitigants or aggravants.